UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARVER MIDDLE SCHOOL GAY-
STRAIGHT ALLIANCE, an
unincorporated association; and
H.F., a minor by and through parent
Janine Faughnan,

       Plaintiffs,

v.                             No. 5:13-cv-00623-WTH-PRL

SCHOOL BOARD OF LAKE
COUNTY, FLORIDA,

       Defendant.

_____

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65(a), Plaintiffs move the Court for a preliminary injunction enjoining Defendant from denying Plaintiffs equal access to the forum for student clubs and official recognition as a student club with its attendant benefits.

## I.    INTRODUCTION

Plaintiff H.F. is a seventh grader at Carver Middle School ("Carver") in Leesburg, Florida. To create a safer and more welcoming environment for all students, including lesbian, gay, bisexual, and transgender ("LGBT") students and allied straight students, H.F. wants to continue the Gay-Straight Alliance ("Carver GSA") that began meeting as an official student club at the school following a lawsuit in May 2013 and that is also a plaintiff in this lawsuit. Defendant has denied this request. This denial violates the federal

Equal Access Act, which protects students' ability to form and run school clubs, as well as the First and Fourteenth Amendments to the United States Constitution.

## II.    STATEMENT OF FACTS

Defendant permits middle school students in the district to form and operate both curricular and non-curricular student clubs at school. *See* School Board Policy No. 4.502 ("Middle School Student Clubs and Organizations"), attached and incorporated as Exhibit 4-1 (DE[1] 4-1)[2]; H.F. Decl. ¶ 4, attached and incorporated as Exhibit 4-2 (DE 4-2).[3] Policy 4.502 defines what clubs the School Board permits in middle schools:

> (2) Middle School clubs and organizations are an extension of the school curriculum. Middle School clubs must be sponsored by the school and are limited to organizations that strengthen and promote critical thinking, business skills, athletic skills, and performing/visual arts. Schools may also establish organizations relating to academic honor societies and student government and clubs that are directly related to the curriculum.

School Board Policy 4.502 (DE 4-1). Through Policy 4.502, the School Board has created and maintains a limited public forum at the middle school for student clubs. *See id.* Policy 4.502 limits the forum to three types of student groups: (1) non-curricular clubs "that strengthen and promote critical thinking, business skills, athletic skills, [or] performing/visual arts"; (2) non-curricular clubs that "relat[e] to academic honor societies and student government"; and (3) "clubs that are directly related to the curriculum" (i.e.,

---

[1] "DE" refers to the docket entry of the document filed with the Court.
[2] This Exhibit is admissible as a public record. *See* Tilley Decl. ¶ 3, attached and incorporated as Exhibit 4-16 (DE 4-16).
[3] An exhibits list is included at DE 4-17.

curricular clubs).[4] *See id.* In addition to the three types of clubs specified in the policy, the Superintendent has approved student clubs that do not fit within any of these categories, as discussed below.

In and through participating in this forum, students and clubs derive many benefits and opportunities: The clubs (a) are officially recognized as school clubs by school officials, (b) may meet on school property, (c) have their finances accounted through and by the school, (d) may appear in the school's yearbook, (e) may use school resources and equipment for meetings and activities, (f) may use school resources to advertise the club, (g) may hold social events, and (h) have a School Board employee or sponsor (possibly compensated by the School Board) appointed by the principal to assist the club. Policy No. 4.502 (DE 4-1); H.F. Decl. (DE 4-2) ¶ 7.

There are numerous curricular and non-curricular clubs at middle schools in the district. Carver itself has at least two non-curricular student groups: (1) the Junior National Honor Society, a service club; and (2) a cheerleading squad. As stated in its club application, the Junior National Honor Society's purpose is to "create enthusiasm for scholarship, to stimulate a desire to render service, to promote leadership, to develop character, and to encourage good citizenship in the students of secondary schools." *See* Club Application, Jr. National Honor Society of Carver Middle School, attached and

_____

[4]    To the extent Defendant offers a different interpretation of this policy, as discussed below, its conduct in approving non-curricular clubs is dispositive.

incorporated as Exhibit 4-3 (DE 4-3)[5] at 2 ("Page 1"); *cf. also id.* at 4 ("Page 3") ("Duly chartered local chapters shall conform to this Constitution"). Its activities principally consist of "one or more service projects." *Id*. at 8 ("Page 7"); *see also id.* at 1 (listing anticipated activities for the year as "Red Ribbon Week" (a drug prevention campaign, H.F. Decl. (DE 4-2) ¶ 5), "Can Good Drive," "Academic Competitions," "Community Service," and "School Service"). The cheerleading club practiced and cheered for football and volleyball games, and it marched in the Leesburg Christmas parade. H.F. Decl. (DE 4-2) ¶ 5.

The Superintendent has also approved non-curricular clubs at all other middle schools in the district, including some that do not fit within any of the categories identified in Policy 4.502. For example, she has approved the East Ridge Middle School "AVID club," whose stated purpose is as follows: "We will be bonding with each other and working towards making our school, community, and world a better place." *See* Club Application, East Ridge Middle School AVID Club, attached as Exhibit 4-4 (DE 4-4). The club's activities are service-related. *Id*. The Superintendent also approved the AVID club for Umatilla Middle, whose application dispensed with the club charter, anticipated activities, and club meeting information altogether. *See* Club Application, Umatilla Middle School AVID Club, attached and incorporated as Exhibit 4-5 (DE 4-5).[6]

---

[5] This Exhibit is admissible as a public record. *See* Tilley Decl. (DE 4-16) ¶ 4.
[6] Other clubs that were approved yet are "not an extension of the school curriculum" are robotics clubs, news production clubs, and a chess club. *See* Club Application, East Ridge Middle School Robotics Club, attached and incorporated as

The subject matter of Junior National Honor Society and cheerleading is not taught at Carver, nor do the subject matter of these groups concern the body of courses as a whole. H.F. Decl. (DE 4-2) ¶ 6. Participation in these clubs is not required by any course, and students do not receive academic credit for participation in any of these clubs. *Id.* Finally, each of these clubs meets on school premises during non-instructional time. *Id.*; *see also* Policy No. 4.502 (DE 4-1) (requiring student clubs, absent a waiver, to meet on School Board property).

H.F. is a seventh grader at Carver. H.F. Decl. (DE 4-2) ¶ 2. She and other students making up the Carver GSA want to have the club officially recognized this school year and want to participate in the GSA and avail themselves of the benefits of being an official student club. *Id.* ¶ 8. The stated purposes and goals of the Carver GSA are:

(1)  to create a safe, supportive environment at school for students to discuss experiences, challenges, and successes of LGBT students and their allies

(2)  to create and execute strategies to confront and work to end bullying, discrimination, and harassment against all students, including LGBT students

(3)  to promote critical thinking by discussing how to address bullying and other issues confronting students at Carver Middle School

---

Exhibit 4-6 (DE 4-6); Club Application, Oak Park Middle School Robotics Club, attached and incorporated as Exhibit 4-7 (DE 4-7); Club Application, Gray Middle School News Production Team, attached and incorporated as Exhibit 4-8 (DE 4-8); Club Application, Mount Dora Middle School News Crew, attached and incorporated as Exhibit 4-9 (DE 4-9) ; Club Application, Mount Dora Middle School Chess Club, attached and incorporated as Exhibit 4-10 (DE 4-10). These Exhibits are admissible as public records. *See* Tilley Decl. (DE 4-16) ¶ 4.

Club Application, Carver Middle School Gay-Straight Alliance, attached and incorporated as Exhibit 4-11 (DE 4-11) at 2.[7]

H.F. and other students identified a faculty supervisor, and H.F. helped prepare the application that was attached as Exhibit 3 to the complaint. H.F. Decl. (DE 4-2) ¶ 11. On October 29, 2013, the Carver GSA club application was submitted to Principal Mollie Cunningham by the Carver GSA's faculty supervisor at Plaintiffs' request. *Id.* ¶ 12. The club application included a cover letter from H.F. (DE 4-3 at 3). By submitting a properly completed club application (DE 4-3), H.F. complied with all the requirements to apply for a student club to form and operate at Carver. *See* Policy 4.502(4) (DE 4-1).

On December 5, 2013, Superintendent Susan Moxley—through her designee and through counsel—declined to permit the GSA to operate as a school club. *See* 12/05/13 e-mail from Steve Johnson to Daniel Tilley, attached and incorporated as Exhibit 4-12. (DE 4-12).[8] The denial, handwritten on the top of the club application by Aurelia Cole—the Superintendent's designee—states, "Club is Not an extension of the school curriculum, Per Policy. Not approved." (DE 4-11 at 1). Although the Superintendent purported to deny the Carver GSA's application because the club was not an extension of the school curriculum, *see id.*, the following suggests that the denial was actually based on the Carver GSA's purpose, the content of the speech and viewpoints that will be expressed at its meetings, and the nature of the association that will take place at the meetings: First,

---

[7] This Exhibit is admissible as a public record. *See* Tilley Decl. (DE 4-16) ¶ 4.
[8] This Exhibit is admissible as a public record. *See* Tilley Decl. (DE 4-16) ¶ 5.

as noted above, through Policy 4.502 the School Board permits both curricular and non-curricular clubs to operate at middle schools in the district. (It permits clubs "that are directly related to the curriculum" (i.e., curricular clubs) and other clubs (i.e., non-curricular clubs) that (1) "strengthen and promote critical thinking, business skills, athletic skills, [or] performing/visual arts" or (2) "relat[e] to academic honor societies and student government." (DE 4-1).) Second, the Superintendent approved numerous other middle school clubs that were non-curricular, some of which do not fit within any of Policy 4.502 categories. *See* Exhibits 4-3 to 4-10. Ultimately, neither Policy 4.502 nor the Superintendent's own decisions reflect a mandatory requirement that a club must be "an extension of the school curriculum."

Because the Defendant refused to grant access to the Carver GSA to operate as a school club, Plaintiffs have not been able to meet at the school, advertise club meetings, or avail themselves of all of the attendant benefits of being a school club. H.F. Decl. (DE 4-2), ¶ 13.

Carver Middle School is a public secondary school (see discussion *infra* at footnote four), and both it and Lake County Schools receive federal funds, *see* District School Board of Lake County, District Summary Budget, Fiscal Year 2013-2014, attached and incorporated as Exhibit 4-13 (DE 4-13).[9] Only grades six through eight attend Carver. H.F. Decl. (DE 4-2) ¶ 3.

---

[9] This Exhibit is admissible as a public record. *See* Tilley Decl. (DE 4-16) ¶ 6.

Superintendent Moxley is the final decision maker with respect to approval of student clubs at Carver. *See* School Board Policy 4.502(3) (DE 4-1) ("All student clubs and organizations must be approved by the Superintendent before they can operate at a school.").

## III.    PRELIMINARY INJUNCTION STANDARD

A district court should grant preliminary injunctive relief when the movant establishes four factors: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Siebert* v. *Allen*, 506 F.3d 1047, 1049 (11th Cir. 2007); *see also Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary-injunction hearing.").

## IV.    ARGUMENT

### A.    There is a Substantial Likelihood that Plaintiffs Will Succeed on the Merits of Their Claims

Plaintiffs will ultimately prevail on the merits of their claims. Defendant violates the Equal Access Act and the First Amendment to the U.S. Constitution by refusing to permit the Carver GSA to operate at Carver as a student club.

1.    Because Defendant has Unlawfully Denied Plaintiffs Access in Violation of
      the Equal Access Act, Plaintiffs will Succeed on their Equal Access Act
      Claim (Count 1)

The mandates of the Equal Access Act are straightforward. 20 U.S.C. § 4071 *et seq*. If a (a) public secondary school (b) receives federal financial assistance and (c) has a "limited open forum" granting "an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time," then it must not "deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a)-(b).

The Equal Access Act's obligations have been triggered at Carver. It is a public secondary school[10] that is part of Lake County Schools, which receives federal funding.

_____

[10] The Equal Access Act states that "'secondary school' means a public school which provides secondary education as determined by State law." 20 U.S.C. § 4072(1). A section of the Florida Secondary School Redesign Act previously stated that "Secondary schools are schools that primarily serve students in grades 6 through 12." § 1003.413(1), Fla. Stat. (repealed 2013), *see MP v. Fla. Dep't of Corrections*, No. 4:06cv52-SPM/WCS, 2008 WL 4525134, at *1 (N.D. Fla. Sept. 30, 2008) ("In Florida, 'secondary school' constitutes education from grades 6 through 12." (citing § 1003.413. Fla. Stat)). However, that Act was repealed effective July 1, 2013, Ch. 2013-27, § 12, Laws of Fla. As such, there is no longer any explicit statement in Florida statutory law that any particular grades are "secondary school" grades.

It would be impossible, of course, for a state to opt its schools out of the requirements of federal law simply by not defining a term, and this Court should find that Carver Middle School is a secondary school and thus covered by the Equal Access Act. Although some Florida statutes appear to exclude middle schools from the definition, *see*, *e.g.*, § 386.212, Fla. Stat. (prohibiting smoking within 1,000 feet of an "elementary, middle, or secondary school" during certain hours), others—most notably within the K-

*See*, District School Board of Lake County, District Summary Budget, Fiscal Year 2013-2014 (DE 4-13). Furthermore, district officials have created a "limited open forum." This can be done not only by "permit[ting] one or more 'noncurriculum related student groups' to meet on campus before or after classes," *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 236 (1990), but also by merely creating a process by which students can apply to create such clubs, *see* 20 U.S.C. § 4071(b) ("A public secondary school has a limited open forum whenever such school grants an offering to *or opportunity for* one or more noncurriculum related student groups to meet on school premises during noninstructional time.") (emphasis added). Here, not only has Defendant's passage of School Board Policy 4.502 created a "limited open forum" by creating an "opportunity for" non-curricular student clubs to form, but non-curricular groups—both the Junior National Honor Society and the cheerleading squad—have in

---

20 Education Code itself—demonstrate that Carver is covered: the Florida Partnership for Minority and Underrepresented Student Achievement Act, for example, states that "[i]t is the intent of the Legislature to provide assistance to all public secondary schools, with a primary focus on low-performing middle and high schools." § 1007.35(2)(b), Fla. Stat. Moreover, the legislative history of the Equal Access Act supports this more inclusive interpretation covering middle schools. *See Peck v. Upshur Cnty. Bd. of Educ.*, 155 F.3d 274, 299 (4th Cir. 1998) (Motz, J., concurring in part and dissenting in part) ("The original legislative proposal applied to both 'public elementary and secondary school[s],' but the law enacted by Congress applies only to secondary schools.") (alteration in original; citations omitted). Finally, because the Equal Access Act is a remedial statute, the definition of "secondary school" should be construed broadly absent an explicit statement from the state legislature that middle schools are not covered. *See, e.g., Garcia-Celestino v. Ruiz Harvesting, Inc.*, No. 2:10-cv-542-FtM-38DNF, 2013 WL 3816730, at *6 (M.D. Fla. July 22, 2013) ("Finally, the FLSA is a remedial statute and must, therefore, be broadly construed.").

fact also availed themselves of the benefits of that forum. A review of case law makes clear the non-curricular nature of these student groups at Carver.[11]

In *Mergens*, the U.S. Supreme Court examined what constitutes a "noncurriculum related student" club triggering the obligations of the Equal Access Act. The Court began by reviewing the definition of a club "meeting" in § 4072(3), which includes activities "not *directly related* to the school curriculum." 496 U.S. at 237-38 (emphasis in court opinion, not statute). To give full effect to the Act's non-discriminatory purpose, the Court read "noncurriculum related"—i.e., non-curricular—broadly, such that political clubs, for example—which may be somewhat related to government or history class— would still be non-curricular and thus could avail themselves of the law's benefits. In other words, while a club may have "a tangential or attenuated relationship to courses offered by the school," *id.* at 238, a club is nevertheless non-curricular unless its subject matter *directly* relates to "the body of courses offered by the school," *id.* at 239. Using a four part test, the Court ruled that a club is non-curricular unless (1) the club's subject matter (a) "is actually taught, or will soon be taught, in a regularly offered course," or (b) "concerns the body of courses as a whole"; or (2) participation in the club (a) is a class

---

[11] Non-curricular clubs also exist at all other middle schools in the district, and the approval of several of the clubs makes clear the dubious nature of the denial of the Carver GSA's application. For instance, one middle school's "AVID" club—a community service club—stated the following for its purpose: "We will be bonding with each other and working towards making our school, community, and world a better place" (DE 4-4). Another middle school's AVID club dispensed with the club charter, anticipated activities, and club meeting information altogether (DE 4-5). Yet both clubs were approved. Other approved non-curricular clubs include robotics clubs, news production clubs, and a chess club (DE 4-6 to 4-10).

requirement or (b) itself results in academic credit. *Id*. at 239-40.

The Supreme Court in *Mergens* found numerous clubs to be non-curricular, rejecting the school's contention that these clubs were "curriculum related" because they somehow "related to abstract educational goals." *Id*. at 245-46. Instead, the Court demanded an exacting relationship between the club and a class—like French club and French class—before it found them to be *directly* related and thus curricular. *See id*. at 240; *see also Straights and Gays for Equality v. Osseo Area Schools-District No. 279*, 540 F.3d 911, 914 (8th Cir. 2008) [hereinafter *Osseo GSA*] ("The circle of groups considered 'curriculum related' has a relatively small circumference and does not include 'anything remotely related to abstract educational goals'" (quoting *Mergens*, 496 U.S. at 244))).

Applying the definition in *Mergens*, at least two non-curricular student groups exist at Carver and meet during non-instructional time: (1) the Junior National Honor Society (primarily a service organization[12]); and (2) a cheerleading squad. Defendant bears the burden of proof that it does not have a "limited open forum." *See Mergens*, 496 U.S. at 236, 240 ("[U]nless a school could show that groups such as a chess club, a stamp collecting club, or a community service club fell within our description of groups that directly relate to the curriculum, such groups would be 'noncurriculum related student

---

[12]   The group's planned activities include "Red Ribbon Week" (a drug prevention campaign, H.F. Decl. (DE 4-2) ¶ 5), "Can Good Drive," "Academic Competitions," "Community Service," and "School Service." *See* Club Application, Jr. National Honor Society of Carver Middle School (DE 4-3), at 1.

groups' for purposes of the Act."); *Pope v. E. Brunswick Bd. of Educ.*, 12 F.3d 1244,

1252 (3d Cir. 1993) ("The burden of showing that a group is directly related to the

curriculum rests on the school district." (citing *Mergens*, 496 U.S. at 240)). Defendant

cannot meet that burden. The subject matter of the Junior National Honor Society and

cheerleading are not taught at Carver, nor do they concern the body of courses as a

whole. H.F. Decl. (DE 4-2) ¶ 6. Further, participation in these clubs is not required by a

class, and students do not receive academic credit for participating in them. *Id.* Finally,

the clubs all meet at school during non-instructional time. *Id.* Supporting this analysis are

*Osseo GSA*, 471 F.3d at 912-13 ("The 'subject matter' of cheerleading is dance,

gymnastics, jumps, and stunts, which are performed for the purpose of creating team

spirit at athletic contests. While the . . . Registration Handbook does list 'Body Control'

as a 'theme' for its physical education classes—which includes dance, gymnastics, and

tumbling—none of the offered courses listed in the Handbook . . . actually teach all of the

subject matter performed in cheerleading."; "Second, cheerleading . . . do[es] not concern

the body of courses as a whole.") and *Boyd Cnty. High Sch. Gay Straight Alliance v. Bd.*

*of Educ. of Boyd Cnty.*, 258 F.Supp.2d 667, 687 (E.D. Ky. 2003) (finding a community

service club to be non-curricular).[13]

---

[13] Although one district court found another club with the words "honor society" in its name—in that case, the National Honor Society—to be curricular for the purposes of the Equal Access Act, *see E. High Gay/Straight Alliance v. Bd. of Educ. Of Salt Lake City Sch. Dist.*, 30 F. Supp. 2d 1356, 1362-64 (D. Utah 1998), that club was very different from the Junior National Honor Society at Carver, which is focused almost entirely on service to the community and school through activities such as Red Ribbon Week (a drug prevention campaign, H.F. Decl. (DE 4-2) ¶ 5)) and a canned food drive

Because the Equal Access Act's obligations are triggered, Defendant must not "deny equal access or a fair opportunity to, or discriminate against" other clubs that students want to have at school. 20 U.S.C. § 4071(a). Despite this, Defendant has denied the Carver GSA and its members, including H.F., a fair opportunity to access the forum of student clubs and the ability to operate at the school as a student club.

"The expansive nature of the EAA's description of student groups encompassed by the statute clarifies that there are few limits to the types of student groups permitted to meet once the EAA is triggered." *Gonzalez v. Sch. Bd. of Okeechobee Cnty.*, 571 F.Supp.2d 1257, 1262 (S.D. Fla. 2008) (citing *Mergens*, 496 U.S. at 239). Indeed, the Act only permits a school to deny access to a student club in limited circumstances, specifically, "to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary." 20 U.S.C. § 4071(f).

---

(DE 4-3 at 1). Further, to the extent the court's opinions in that case can be read to suggest that creating a requirement that students make certain grades in order to be members of a student organization make that club curricular, then the court simply misreads *Mergens*, because under such a reading, the term "curricular" would have no meaning because any club could qualify by simply requiring certain grades for admission. *See White Cnty. High Sch. Peers in Diverse Educ. V. Whit Cnty. Sch. Dist.*, Civil Action No. 2:06-CV-29-WCO, 2006 WL 1991990 at *6 n.3 (N.D. Ga. July 14, 2006) ("A noncurriculum-related student group would not become curriculum related simply because its members were required to maintain a particular academic standard in order to participate. Beta Club is directly related to the curriculum because academic achievement is the *sole* criterion by which membership is determined.") (emphasis added). *Compare Boyd Cnty.*, 258 F.Supp.2d at 687 (Beta Club at Boyd County High School, a "community service honor group," held non-curricular because it was a community service club).

None of these exceptions applies here. This Court has already held that a school's refusal to allow a GSA to form violates the Equal Access Act. *Gay-Straight Alliance of Yulee High Sch. v. Sch. Bd of Nassau Cnty.*, 602 F.Supp.2d 1233 (M.D. Fla. 2009) [hereinafter *Yulee GSA*].[14] And courts across the country have done likewise. *See Osseo GSA*, 540 F.3d 911 (8th Cir. 2008); *Gonzalez*, 571 F.Supp.2d 1257 (S.D. Fla. 2008); *White Cnty.*, Civil Action No. 2:06-CV-29-WCO, 2006 WL 1991990 (N.D. Ga. July 14, 2006); *Boyd*, 258 F. Supp. 2d 667 (E.D. Ky. 2003); *Franklin Cent. Gay/Straight Alliance v. Franklin Township Cmty. Sch. Corp.*, No. IP01-1518, 2002 WL 32097530 (S.D. Ind. Aug. 30, 2002); *Colin v. Orange Unified Sch. Dist.*, 83 F.Supp.2d 1135, 1148 (C.D. Cal. 2000). These courts have rejected the notion that GSAs like the Carver GSA will negatively affect the well-being of high school students. *See, e.g., Yulee GSA*, 602 F.Supp.2d at 1236 (rejecting argument that using the name "Gay–Straight Alliance" for a student club would harm the well-being of students); *Gonzalez*, 571 F.Supp.2d at 1266-67 (rejecting assertion that GSA focused on preventing bullying and harassment and educating about issues affecting lesbian, gay, bisexual, and transgender students would cause "premature sexualization" of children or otherwise harm their well-being).[15]

---

[14] The purposes of the GSA at Yulee High School were very similar to those of the Carver GSA, focusing on preventing bullying and harassment and education about issues affecting lesbian, gay, bisexual, and transgender students. *Yulee GSA*, 602 F.Supp.2d at 1235.

[15] Although School Board member Bill Mathias suggested in an e-mail with a blogger that the Carver GSA would not be "age appropriate," he offers no indication that the GSA plans to engage in inappropriate activities. This e-mail is attached and

Indeed, as the Southern District of Florida recognized, the GSA's purposes would actually protect the well-being of students, particularly non-heterosexual and transgender students, whose well-being must also be "taken into account." *Gonzalez*, 571 F.Supp.2d at 1267. Moreover, the legislative history of the Equal Access Act confirms that Congress recognized that the Act would protect the right of a GSA to meet. *See* Regina M. Grattan, *It's Not Just for Religion Anymore: Expanding the Protections of the Equal Access Act to Gay, Lesbian, and Bisexual High School Students*, 67 GEO. WASH. L. REV. 577, 586 n. 100 (Mar. 1999) (discussing the legislative debate over the Equal Access Act and how it was acknowledged that the law would prevent schools from denying "gay rights" groups access).

Because Defendant has denied and continues to deny the Carver GSA access to the forum in violation of the Equal Access Act, Plaintiffs will likely succeed on the merits of this claim.

2.      Because Defendant has Denied Plaintiffs Access in Violation of the First Amendment, Plaintiffs will Succeed on their Constitutional Claim (Count 2)

Defendant makes its middle schools available for the activities of student groups through School Board Policy No. 4.502 ("Middle School Student Clubs and Organizations") (DE 4-1). As such, Defendant "has created a forum generally open for use by student groups." *Widmar v. Vincent*, 454 U.S. 263, 267 (1981); *see also Prince v.*

_____

incorporated as Exhibit 4-14 (DE 4-14). This Exhibit is admissible as a public record. *See* Tilley Decl. (DE 4-16) ¶ 7.

*Jacoby*, 303 F.3d 1074, 1091 (9th Cir. 2002) (finding the school had "created a limited public forum [like in *Widmar*] in which student groups are free to meet" as well as use school resources). And by creating this limited public forum, Defendant has assumed the responsibility to regulate it consistent with the First Amendment of the U.S. Constitution. *Widmar,* 454 U.S. at 267. Indeed, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969). Accordingly, Defendant may only deny a student club access to this forum on the basis of the club's content if it can demonstrate a narrowly drawn, compelling interest. *Widmar*, 454 U.S. at 270; *Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288, 293 n. 5 (1984) ("[I]t is common to place the burden upon the Government to justify impingements on First Amendment interests . . . ."). Defendant cannot make this showing with respect to the Carver GSA.

The Supreme Court has explained that the free speech and association rights of high school students "are not automatically coextensive with the rights of adults in other settings, and . . . the rights of students must be applied in light of the special characteristics of the school environment." *Morse v. Frederick*, 551 U.S. 393, 396-97 (2007) (internal quotation marks omitted) (quoting *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 682 (1986) and *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266 (1988)[16]). Accordingly, Defendant can make certain content-based distinctions in its

---

[16] Although many court opinions refer to *Kuhlmeier* as "*Hazelwood*," Plaintiffs refer to the opinion as *Kuhlmeier*, following the Supreme Court's usage in *Morse*.

decisions to allow or deny a student club that are generally unavailable to other

government actors. Nevertheless, denying a student club because of its content must

comply with the U.S. Supreme Court's four student speech cases: *Tinker*, *Fraser*,

*Kuhlmeier*, and *Morse*. *See Gonzalez*, 571 F.Supp.2d at 1268-69.[17]

In these four cases, the Supreme Court has set forth four First Amendment tests

for student speech, depending on the nature of the expression: pure student expression,

vulgar expression, school-sponsored expression, and illegal drug use promotion. *Morse,*

551 U.S. at 403-406 (reviewing the three types of expression discussed in *Tinker*, *Fraser*,

and *Kuhlmeier* and adding speech "promoting illegal drug use" to the established list);

---

[17] Further, despite the allowance of some content-based distinctions, the Eleventh Circuit has made clear that viewpoint discrimination is still impermissible. *See Searcey v. Harris*, 888 F.2d 1314, 1319 n.7 ("[*Kuhlmeier*] acknowledges a school's ability to discriminate based on *content* not *viewpoint*.") (emphasis in original).

Yet there is some indication that Defendant is discriminating on the basis of viewpoint. For example, very shortly after Plaintiffs' counsel began assisting in student efforts to form a GSA at Carver, School Board Chairwoman Kyleen Fischer—according to the Orlando Sentinel—"spoke in favor of a rule that would ban extra-curricular clubs in secondary schools . . . . Fischer said the district should focus on education and that 'social engineering' is not the job of the School Board." According to that same article— attached and incorporated as Exhibit 4-15 (DE 4-15)—another School Board member, Tod Howard, "favored banning extra-curricular clubs only in middle schools. . . . Howard said he was worried about the clubs that would be lost under stricter rules. 'I am very concerned that one club would push out the remainder of the clubs that are doing good things,' he said." The obvious implication, of course, is that the "one club" Howard refers to—the GSA—is not one of the clubs "that are doing good things." These indications, coupled with the fact that while the Superintendent purported to deny the Carver GSA because it was "not an extension of the school curriculum," she approved other non-curricular clubs—including some that did not fall into any of the categories of Policy 4.502—suggest, as stated above, that the denial was actually based on the Carver GSA's purpose, the content of the speech and viewpoints that will be expressed at its meetings, and the nature of the association that will take place at the meetings.

*see also Saxe v. State Coll. Area Sch. Dist.,* 240 F.3d 200, 214 (3d Cir. 2001) (Alito, J.)

("To summarize: [u]nder *Fraser*, a school may categorically prohibit lewd, vulgar or

profane language. Under [*Kuhlmeier*], a school may regulate school-sponsored

speech . . . . Speech falling outside these categories is subject to *Tinker*'s general rule: it

may be regulated only if it would substantially disrupt school operations or interfere with

the right of others.")). Here, the Carver GSA's desire to meet as a group at school to

discuss matters pertinent to the harassment faced by LGBT students and to educate

students in an effort to reduce bullying of LGBT students sounds in the pure student

speech addressed in *Tinker. See Gillman v. Sch. Bd. for Holmes Cnty., Fla.,* 567

F.Supp.2d 1359, 1370 (N.D. Fla. 2008). The speech relevant to the Carver GSA's

constitution plainly is not (a) lewd or obscene (*Fraser*), (b) school-sponsored

(*Kuhlmeier*), *see Widmar*, 454 U.S. at 274, or (c) related to illegal drug use (*Morse*). *See*

*Gonzalez*, 571 F.Supp.2d at 1269 (concluding that the GSA speech best fits under *Tinker*

and rejecting the other applicable tests). Accordingly, the test applicable here, as first

articulated in *Tinker*, asks whether the Carver GSA's intent to gain recognition as a non-

curricular student group "materially and substantially interfere[s] with the requirements

of appropriate discipline in the operation of the school." *Tinker,* 393 U.S. at 509.

To justify a ban on student speech under the *Tinker* standard, "[t]here must be

*demonstrable factors* that would give rise to any reasonable forecast by the school

administration of 'substantial and material' disruption of school activities before

expression may be constitutionally restrained." *Holloman v. Harland,* 370 F.3d 1252,

1273 (11th Cir. 2004) (emphasis added) (quoting *Shanley v. Ne. Indep. Sch. Dist.,* 462

F.2d 960, 974 (5th Cir. 1972)). In denying the Carver GSA, Defendant can point to no

"demonstrable factors" from which it could reasonably predict a substantial and material

disruption to school activities. Indeed, GSAs like the Carver GSA have long existed

without incident at numerous middle and high schools throughout Florida and the rest of

the country, *Yulee GSA*, 602 F.Supp.2d at 1235 n. 2 ("There are thousands of secondary

school [GSAs] nationwide."). The Superintendent's designee did not deny the club's

application based on a stated concern about disruption; it stated only that Plaintiffs'

application does not satisfy the criteria laid out in the middle school club policy. While

the purposes and goals easily fall under the "critical thinking" criterion, even if they did

not, the content-based criteria themselves fail the *Tinker* test because they purport to

replace the inquiry whether the club's activities will cause a substantial and material

disruption.

Under the applicable *Tinker* standard, Defendant's refusal to recognize the Carver

GSA and afford it equal access to Carver's facilities and resources granted to other non-

curricular student groups violates the First Amendment and should be enjoined.

**B.      Plaintiffs Will Suffer Irreparable Injury Unless this Court Issues an
         Injunction**

When school resumed on January 6, 2014, Carver student groups had the same

opportunity as before to avail themselves of the school's forum for forming and

maintaining such groups. But absent judicial intervention, the Carver GSA will continue

to be barred from this forum for student clubs. The Carver GSA, H.F., and other members will not be able to meet on school property or avail themselves of the other benefits available to student clubs. Defendant's refusal to allow the Carver GSA infringes on Plaintiffs' free speech rights secured by the First Amendment and the Equal Access Act. This infringement constitutes irreparable injury *per se* because, as the Supreme Court has noted, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347,373 (1976) (plurality opinion), *cited in KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir. 2006). As this Court held in another GSA case, "there is a substantial threat of irreparable injury if the injunction is not granted; loss of First Amendment freedom constitutes irreparable injury." *Yulee GSA.*, 602 F.Supp.2d at 1238.  Recognizing that the Equal Access Act protects "expressive liberties," other courts have similarly found deprivation of this federal right to be an irreparable injury. *See id.*  at 1235, 1238 (finding irreparable injury in an Equal Access Act violation without a separate First Amendment analysis because the Act "effectively codified the First Amendment rights of non-curricular student groups")*; see also Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 872 (2d Cir. 1996) (denial of access to Bible group constituted "irreparable injury") (quotation marks omitted); *White*, 2006 WL 1991990, at *13 (denial of GSA constituted "irreparable injury"). Preliminary injunctive relief is essential to safeguard Plaintiffs' federal statutory and constitutional rights during the pendency of these proceedings.[18]

_____

[18] "[I]n First Amendment cases, the likelihood of success on the merits will often

**C.**     **The Threatened Injury to Plaintiffs Outweighs Whatever Harm the Preliminary Injunction Could Cause Defendant**

While Plaintiffs will suffer irreparable harm if Defendant continues to bar them from the school's forum for student groups because of the content and viewpoint of their speech, Defendant will suffer no harm. The requested preliminary injunctive relief would do no more than compel Defendant to permit the Carver GSA to meet at the school, thus providing the club the same opportunity to form and maintain a club as other current and potential groups at the school. Lake County Schools would re-join the many other school districts across Florida and the rest of the country that have GSAs at their schools. *See Yulee GSA*, 602 F.Supp.2d at 1235 n. 2 ("There are thousands of secondary school [GSAs] nationwide."); *Gonzalez,* 571 F.Supp.2d at 1264 (recounting the undisputed facts about the number of GSAs in the U.S. and Florida in 2008).

**D.**     **Entry of the Relief Sought by Plaintiffs Will Serve the Public Interest**

"No long string of citations is necessary to find that the public interest weighs in favor of having access to a free flow of constitutionally protected speech." *ACLU of Ga. v. Miller*, 977 F.Supp. 1228, 1235 (N.D. Ga. 1997) (quotation omitted); *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) ("The vitality of civil and political institutions in our society depends on free discussion"). The public has no interest in allowing an unconstitutional or illegal practice to continue. *KH Outdoor, LLC*, 458 F.3d at 1272 ("The public has no interest in enforcing an unconstitutional ordinance.") (citing *Joelner*

_____

be the determinative factor." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, (7th Cir. 2012) (internal quotation marks omitted).

*v. Vill. of Washington Park,* 378 F.3d 613, 620 (7th Cir. 2004) (noting that "there can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect First Amendment liberties") (internal quotation marks omitted)).  Thus, entry of the relief sought by Plaintiffs will serve the public interest. The equities weigh in favor of enjoining Defendant from denying access to the Carver GSA until Plaintiffs prevail at trial.

**E.    No Security Should Be Required**

Although the Federal Rules of Civil Procedure states that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant," Fed. R. Civ. P. 65(c), "the court may dispense with security altogether if grant of the injunction carries no risk of monetary loss to the defendant," Charles A. Wright, Arthur R. Miller & Mary K. Kane, 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed. 2009). The Eleventh Circuit has accepted this position. *Carillon Importers v. Frank Pesce Int'l Grp.*, 112 F.3d 1125, 1127 (11th Cir. 1997) (citing *Corrigan Dispatch Co. v. Casa Guzman,* 569 F.2d 300, 303 (5th Cir. 1978) (affirming no security bond)). Because Defendant would suffer no economic harm from the entry of the preliminary injunction sought by Plaintiffs, no security should be required. *See Yulee GSA*, 602 F.Supp.2d at 1238 (waiving the security requirement for an injunction because "[i]t strains logic to assert that granting recognition to an anti-harassment group will expose Defendant to liability for 'additional harm and injury to the students . . . .'").

## V.     CONCLUSION

Plaintiffs are entitled to a preliminary injunction enjoining Defendant from denying Plaintiffs access to the forum for non-curricular student clubs and the ability to operate the Carver GSA at their school. Plaintiffs are entitled to equal access to all of the benefits afforded to any other non-curricular club. *See Mergens,* 496 U.S. at 237, 247 (requiring equal access to official recognition as a school club, including access to school newspaper, bulletin boards, public address system and club fair).

**WHEREFORE**, Plaintiffs request that the Court enjoin Defendant from denying Plaintiffs access to the forum for non-curricular student clubs, from denying the GSA official recognition as a student club, and from denying Plaintiffs the ability to operate the GSA at Carver with all attendant benefits afforded to student clubs. Further, Plaintiffs request that they be excused from posting a security bond.

Dated: January 15, 2014

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed today the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all persons registered for this case, including any opposing counsel that have appeared.

Furthermore, I HEREBY CERTIFY that today I have served a copy of the foregoing on the following person(s) by U.S. Mail and e-mail:

Stephen W. Johnson
McLin Burnsed
1000 West Main Street, P.O. Box 491357
Leesburg, FL 34749

**Respectfully Submitted,**

**/s/ Daniel B. Tilley**
**Daniel B. Tilley**
Trial Counsel
Florida Bar No. 102882
ACLU Foundation of Florida
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
(786) 363-2700
dtilley@aclufl.org

**Benjamin James Stevenson**
Fla. Bar. No. 598909
ACLU Foundation of Florida
P.O. Box 12723
Pensacola, FL  32591-2723
T. 786.363.2738
F. 786.363.1985
bstevenson@aclufl.org

**Leslie Cooper**
*Pro hac vice* application pending
ACLU Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2627
LCooper@aclu.org

*Counsel for Plaintiff*