UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARVER MIDDLE SCHOOL
GAY-STRAIGHT ALLIANCE, an
unincorporated association; and H.F.,
a minor by and through parent Janine
Faughnan,

    Plaintiffs,

v.                              CASE NO. 5:13-cv-623-oc-10 PRL

SCHOOL BOARD OF LAKE
COUNTY, FLORIDA,

    Defendant.

_____

## DEFENDANT, THE SCHOOL BOARD OF LAKE COUNTY FLORIDA'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION WITH MEMORANDUM OF LAW IN SUPPORT

Defendant, the School Board of Lake County, Florida (hereafter "School Board") pursuant to Fed.R.Civ.P.65 and Local Rule 3.01, files this Response in Opposition to Plaintiffs' Motion for Preliminary Injunction with Memorandum of Law In Support, and as grounds for such states:

1. The Plaintiffs have not and cannot meet the requirements to establish entitlement to the issuance of a temporary injunction, because Plaintiffs have no likelihood of success on the merits. The Plaintiffs do not have standing to assert the claims alleged; the Equal Access Act is not applicable to any students, student clubs, or associations at Carver Middle School or any other middle school, and does not govern the relationship between the parties as a matter of law.

2. The First Amendment was at all times complied with by the School Board and the Superintendent, and the Plaintiffs' First Amendment claim is not viable as a matter of law. The restrictions set forth by the School Board were reasonable restrictions upon student expression

within a middle school given the nature of the forum, the nature of the expression and the age and maturity level of middle school students. Since Plaintiffs cannot recover under the Equal Access Act or prove a Constitutional violation, Plaintiffs cannot recover under 42 U.S.C. §1983.

3. The Plaintiffs cannot show irreparable harm; in fact, greater harm to the School Board will result from issuance of an injunction. Further, issuance of an injunction is not in the public's interest.

4. If an injunction is issued, Plaintiffs should not be relieved of Rule 65's requirement to post security. The School Board is exposed to potential expense and monetary damages by virtue of the issuance of the injunction.

## STATEMENT OF FACTS

In her Statement of Facts in the interpretation of School Board policy 4.502, Plaintiff fails to distinguish the difference between a limited open forum under the Equal Access Act and a limited public forum under the First Amendment, and more importantly the distinction between curricular/non-curricular clubs as those are defined under the Equal Access Act as opposed to the First Amendment. As will be obvious later in this Memorandum, the School Board's position is that the Equal Access Act does not apply so that Plaintiff's references to Equal Access related terms are misplaced. What the Board policy does make clear is that clubs and organizations in middle school are an extension of the school curriculum and they all must be sponsored by the school.

Plaintiff discusses two particular groups that Plaintiff classifies as non-curricular under the Equal Access Act. However, under School Board policy 4.502, the Junior National Honor Society is an Honor Society and qualifies as such (Exhibit 2, Cole Affidavit, paragraph 4). The

Cheerleading Squad is considered an athletic team (Exhibit 2, Cole Affidavit, paragraph 5), and also falls within the athletic skills category of Policy 4.502.

Plaintiff then discusses the approval of a number of other clubs that is felt mandates approval of the GSA Club at Carver Middle School. The Plaintiff complains that the Superintendent approved other clubs which were non-curricular, which did not fit within the Policy 4.502 categories. We assume that the "non-curricular" references are to the interpretation under the Equal Access Act. The following clubs were approved which fit within Board Policy 4.502. Avid is a course in middle school and the clubs are an approved part of the course (Exhibit 2, Cole Affidavit, paragraph 6). The Robotics Club was approved as a club that is directly related to the curriculum. Its establishment, as part of STEM, supports that curriculum-based initiative and the club also strengthens and promotes critical thinking. (Exhibit 2, Cole Affidavit, paragraph 7). The Chess Club at Mount Dora Middle School was specifically approved as a club that strengthens and promotes critical thinking. The skills taught by the club are those skills that comprise critical thinking. The News Production Team and School News Crew at the middle schools are not being operated as clubs; they are being operated as school activities. The majority of the activities of the students occur during school hours, and are an extension of the school administration announcements and presentation of the news to the school as a whole. (Exhibit 2, Cole Affidavit, paragraph 8).

H.F. asserts that she completed a club application. That is not accurate. After declining to approve the GSA application to operate as a school club, the Chief of Administration, Mrs. Cole, directed the Principal at Carver Middle School to contact Ms. Jablonski. Ms. Jablonski was the teacher who submitted the application for the GSA at Carver Middle School and is noticeably absent as a party. The Principal was directed to notify Ms. Jablonski that the

3

application she submitted did not meet the requirements of Board Policy 4.502 and to offer her an opportunity to review and re-submit the application. No revised application was submitted. (Exhibit 2, Cole Affidavit, paragraph 3).

The Plaintiffs contention that Board Policy 4.502 and the Superintendent's decisions do not reflect the requirement that a club must be an extension of the school curriculum is misplaced. The policy specifically states: "Middle schools clubs are an extension of the school curriculum." As evidenced by the facts provided above, the Superintendent's decisions for each club are based upon the specific requirements in Board policy.

The middle schools in Lake County serve children in grades 6, 7 and 8, who are primarily ages 11 to 14 (Exhibit 3, Tobias Affidavit, paragraph 4).

In a statement of the bylaws of the GSA in the *Gonzalez* case, it was stated that "the purpose the GSA is:

a. To promote tolerance and equality among students of all sexual orientations and gender identities through educational efforts and awareness building;
b. To inform members in the student body of issues and events affecting [sic] the lives of lesbian, gay, bisexual, transgender and straight ally youth.;
c. To create a safe or more respectful learning environment for all students;
d. To work in coalition with administration and other on-campus clubs to expose and dismantle oppressions and prejudices in all of their expressions;
e. To create a self-welcoming space for LGBT and straight ally students to socialize and talk together about issues they hold in common.

*Gonzalez v. School Board of Okeechobee County*, (Case No: 06-14320-KMM, document 122, page 6). It is of significance that the words "critical thinking" are nowhere to be found in the purpose or bylaws as presented in that particular case. It might lead one to believe that those words were added only to attempt to comply with Board Policy 4.502.

In a footnote, Plaintiff attempts to introduce a newspaper article as proof of the truth of the facts contained in that article. The School Board objects. There is no evidentiary basis for

4

the introduction of the article in this manner not even taking into consideration the inherently low level of accuracy and objectivity of the print media.

## MEMORANDUM OF LAW

### I. STANDARD FOR PRELIMINARY INJUNCTION

Plaintiff must establish four factors in order to prove entitlement to entry of a preliminary injunction: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest.

### II. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

#### A. PLAINTIFFS DO NOT HAVE STANDING

In order to have associational standing for an unincorporated association to assert the claims of its members, the association must show that the members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim nor the relief requested requires participation of the individual members. *Ouachita Watch League v. Jacobs*, 463 F. 3d 1163, 1170 (11th Cir. 2006). In order for Plaintiff, a member, to have standing to assert the Constitutional claims contained in Plaintiffs' Complaint, Plaintiff, H.F. must show that: (1) She has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision by the court. *Sierra Club v. Johnson*, 436 F.3d 1269, 1275 (11th Cir. 2006).

In the instant case, the Plaintiff H.F. does not have standing, because she has not suffered a concrete and particularized injury, for the reasons discussed elsewhere in this Response. The

Plaintiff has not been disciplined or reprimanded for any of her expression, and no First Amendment violation has occurred by virtue of the School Board's facially-neutral Policy regarding clubs that are school-sponsored. The Plaintiff has not been prohibited from or disciplined for engaging in any pure expression, but rather, well within their rights, the School Board has determined the activities that are going to be school-sponsored. The GSA is not prohibited from meeting of their own volition, in compliance with the School Board's facilities' use policy, upon school facilities. The GSA simply does not meet the criteria to form a school-sponsored club under School Board Policy 4.502. As such, the interests at stake in this case are not germane to the GSA's stated purpose. Accordingly, since Plaintiff H.F. has no standing, the Plaintiff GSA cannot have standing either.

### B. THE EQUAL ACCESS ACT IS INAPPLICABLE

The argument by Plaintiffs that the School Board is required to allow access for all non-curricular clubs at a public school if one non-curricular club is permitted on campus (a limited open forum) is only valid where the Equal Access Act applies. The Equal Access Act applies only to secondary schools "as determined by state law." Therefore, it applies only to schools that are defined as "secondary schools" by Florida law.

Plaintiff seeks to dismiss, in a footnote, the fact that middle schools are not secondary schools under Florida law and therefore not subject to the Equal Access Act. Plaintiffs argue that the School Board must permit the plaintiff to form a GSA club at the Carver Middle School because the federal Equal Access Act mandates that result. However, in order to fall under the purview of the federal Equal Access Act the school in question must be a secondary school under Florida law.

> "It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny

equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. §4071(a).

The definition of "secondary school" as used in the Equal Access Act is found in 20 U.S.C.A. §4072: "The term 'secondary school' means a public school which provides secondary education <u>as determined by state law</u>." (Emphasis supplied).

Prior to July 1, 2013 Section 1003.413, Florida Statutes was the only location in the Statutes that specifically referenced a definition for "secondary schools" That section of the Florida Statutes, which was titled "Florida Secondary School Redesign Act," provided "secondary schools are schools that primarily serve students in grades six through twelve...". *Fla. Stat. §1003.413(1).*

On July 1, 2013, Florida's Senate Bill 1076 was enacted. Section 12 of that Bill repealed Section 1003.413, Florida Statutes. With the deletion of that definition in Section 1003.413, there remain fifty to sixty references in the Florida Statutes to "secondary school." Unfortunately, in most instances those definitions are inconsistent. In some places the statute lists (in discussing a particular point) schools as elementary and secondary schools. In other places, it identifies schools as elementary, middle schools and secondary schools.

However, when looking specifically at the definition section of Chapter 1003 of Florida's School Code, there is a definitive statement that 'School' means an organization of students for instructional purposes on an elementary, middle or junior high school, secondary or high school, or other public school level authorized under Rules of the State Board of Education, *Fla. Stat. §1003.01.*

It must be assumed that the Legislature knew what it was referring to when it established a list of definitions. *American Bankers Ins. Group v. U.S.*, 408 F.3d 1328, 1332-35 (11th Cir.

7

2005); *Koile v. State, 934 So.2d 1226 (Fla. 2006).* A middle school cannot be a secondary school if the two are identified side by side. Although the use of different terms to identify schools has fluctuated over the years, it seems apparent, at least to the legislature, that a middle school is not a secondary school.

Additionally, in looking at the totality of all of the references in the statutes, a reasonable interpretation is that secondary schools are intended to be high schools. This is particularly the case in several statutes, including those governing provisions of dual enrollment, where it provides that only students in secondary schools are allowed to participate in dual enrollment. *Fla. Stat. §1007.271.* That has been interpreted by the Department of Education and by the school districts in the state as permitting participation only by those students attending high school.

The case law interpreting the Equal Access Act also supports a determination that only high school age students are subject to its requirements and the cases explain the reasoning behind that philosophy. As is outlined in Section C of this memorandum, the case law relies on the difference in maturity between high school and younger students. The cases supporting Plaintiffs' argument for equal access, if the Equal Access Act applied, refer specifically to high school students and the level of maturity and understanding of high school students, and not to Middle School students. (Exhibit 2, Tobias Affidavit, paragraph 3).

"…Congress specifically rejected the argument that high school students are likely to confuse an equal access policy with state sponsorship of religion." *Board of Education of Westside Community Schools v. Mergens*, 496 U.S. 224, 250 (1990). "In 1984, Congress passed the EAA to both guarantee and protect the rights of public high school students." *Boyd County*

*High School Gay Straight Alliance v. Board of Education of Boyd County,* 258 F. Supp. 2d 667, 680 (E.D. Ky. 2003).

On June 14, 2011 Arne Duncan, appointed as the U.S. Secretary of Education in 2009, wrote and posted "Key Policy Letters from the Education Secretary and Deputy Secretary." It was generally a statement that GSA groups have been prevented from forming clubs. He noted the passage of the Equal Access Act in 1984 and advised that DOE's General Counsel was putting out guidelines to prevent discrimination. He goes on to state that:

> "Although specific implementation of the Equal Access Act depends upon contextual circumstances, these guidelines reflect basic obligations imposed on public school officials by the Act and the First Amendment to the U.S. Constitution. The general rule, approved by the Supreme Court, is that a public high school that allows at least one noncurricular student group to meet on school grounds during noninstructional time (e.g. , lunch, recess, or before or after school) may not deny similar access to other noncurricular student groups, regardless of the religious, political, philosophical, or other subject matters that the groups address." (Emphasis supplied)

It seems then that the Secretary of Education is interpreting the reach of the Equal Access Act in the same manner as the School Board, which has interpreted that it is not applicable in Florida for Middle School children. The cases cited by the Plaintiffs are inapplicable here, as all involve the formation of the GSA in **high schools**, and construction of the Equal Access Act in high schools. *Plaintiffs' Motion, Pp.14-15,* citing *Yulee High Sch. v. Sch. Bd. of Nassau Cnty.,* 602 F.Supp2d 1233 (M.D. Fla. 2009).

### C. <u>PLAINTIFF CANNOT ASSERT A CLAIM FOR A FIRST AMENDMENT VIOLATION AS A MATTER OF LAW</u>

The Constitutional rights of students in public schools are not automatically coextensive with the rights of adults (or even children) "in other settings." Put differently, "when minors speak in public schools, the Supreme Court has held that what is good for the goose is not invariably good for the gander." *Morgan v. Swanson,* 659 F.3d 359,374-75 (5th Cir. 2011), citing

*Morse v. Frederick*, 551 U.S. 393, 401 (2007). A court should evaluate student speech claims "in light of the special characteristics of the school environment," beginning by categorizing the student speech at issue. *Morgan*, 659 F.3d 359, 374-75. Where, as here, the speech restrictions are alleged to be viewpoint-specific, the Court should decide whether to apply the general rule of *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736 (1969) or the *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 268, 108 S. Ct. 562, 568 (1998) rule that applies to curricular or "school-sponsored speech or expression."

After *Tinker,* the Supreme Court refined the framework for analyzing First Amendment claims in the public school context. There are four clear categories of expression: vulgar expression, pure student expression, government expression, and school-sponsored expression. The student expression at issue in this case clearly falls into the category of "school sponsored." Educators enjoy far greater latitude to regulate "school-sponsored" expression and are compliant with the First Amendment as long as their actions are "reasonably related to legitimate pedagogical concerns." *Hazelwood,* 484 U.S. at 273. Although it is clear that the GSA as a club is not an extension of the curriculum for purposes of School Board policy 4.502, it is equally clear that the GSA is asking for the club to be "school-sponsored." *See Complaint, Par. 17.* School Board Policy 4.502 permits the formation of only "school-sponsored" clubs at the middle school level, and only those clubs that are an extension of the curriculum or are otherwise "curricular" student groups. As such, the School Board clearly has the authority to regulate the content of the expression related to any student clubs that seek to be formed and "school sponsored."

The critical inquiry in deciding whether speech is "school-sponsored" is whether it could be reasonably understood to bear the school's sanction or approval. Relevant

considerations include (1) Where and when the speech occurred; (2) to whom the speech was directed and whether recipients were a "captive audience"; (3) whether the speech occurred during an event or activity organized by the school, conducted pursuant to official guidelines, or supervised by school officials; and (4) whether the activities where the speech occurred were designed to impart some knowledge or skills to the students. *Morgan*, 659 F.3d at 375-77. To be considered "curricular," for purposes of a First Amendment analysis, expressive activities need not occur in a traditional classroom setting; instead, expressive activities are curricular so long as they are merely (1) supervised by faculty members, and (2) designed to impart particular knowledge or skills to student participants and audiences. *Bannon v. School Dist. of Palm Beach Co.*, 387 F. 3d 1208 (11th Cir. 2004). Not only does School Board Policy 4.502 provide that "middle school clubs are an extension of the curriculum," and "must be sponsored by the school," the Plaintiffs have asked for precisely that. The GSA requests to have the club meet at the school, use school resources and staff, have their finances accounted for by the school, and hold social activities on campus; the speech is directed to a captive audience of middle school students; the speech would occur during activities conducted pursuant to official club guidelines and supervised by school officials; be featured in school yearbooks and publications; utilize school communication mediums; and the speech, according to the GSA, may be designed to impart some knowledge or skills to its student members. *Plaintiffs' Complaint, Par. 17 and 21-22.*

Plaintiffs' argument that the expression at issue is "pure student expression,' and should be governed by the standards in *Tinker* is without merit. This is not a case where the School Board has restricted any student from personal speech while at school or "pure student expression." There is no allegation that any student was disciplined, punished, or restricted from

11

discussing the topics promoted by the GSA during lunch, class period breaks, in the halls, or in other situations where students may potentially be afforded more First Amendment protection under *Tinker*. Under *Tinker* School officials can restrict such "pure student expression," if they can "reasonably forecast" that the expression at issue would substantially and materially interfere with the appropriate discipline, cause significant disruption in school, or interfere with the rights of other students. *Morgan,* 659 F.3d at 375-6; *Bannon v. School District of Palm Beach Co.*, 387 F.3d 1208, 1212 (11th Cir. 2004). Even under a *Tinker* analysis, the School Board's restrictions in this case are more than reasonable. *Tinker*, 393 U.S. at 508, 89 S.Ct. at 737; see also *Heinkel ex rel Henkel v. School Bd. of Lee Co. Fla.,* 194 Fed. Appx. 604 (2006), quoting *Walker-Serrnao ex rel. Walker v. Leonard,* 325 F.3d 412, 416 (3d Cir. 2003)(Any analysis of the students' rights to expression…and of schools' need to control behavior and foster an environment conducive to learning on the other, must necessarily take into account the age and the maturity of the student."). In *Heinkel,* the court held that a middle school student's constitutional "as-applied" challenge to the school district's policy which ultimately prohibited her from distributing materials about abortion and abortion alternatives to her classmates, ages 11-14, failed to establish a First Amendment violation. *Id.* at 609-10. The Court found persuasive the school district's rationale that abortion is not discussed in the curriculum or the school setting, because it is a "very emotional issue" that may cause some "anger" and "becomes disruptive to the educational setting." *Id., citing Shanley v. Northeast Ind. School Dist.,* 462 F.2d 960, 973-974 (5th Cir. 1972) ("If the content of a student's expression could give rise to a disturbance from those who hold opposing views, then it is certainly within the power of the school administration to regulate the time, place and manner… with even greater latitude of discretion."). Sexuality, including homesexuality and bullying based upon sexual identity, is clearly a "controversial"

topic likely to cause significant disruption in the educational community, particularly in the middle school setting. This is so much as admitted by the Plaintiff in the Complaint by virtue of the stated purpose of the GSA. However, since the student expression in this case is clearly "school sponsored," this Court should utilize the First Amendment analysis set forth in *Hazelwood* to determine that the expression at issue is entitled to less protection under the First Amendment.

In addition to the greater latitude afforded to schools in regulating school-sponsored expression, many Courts have held that the same First Amendment Rights that apply to high school students do not apply to elementary school students. Similarly, a school must be able to take into account the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics. *Morgan,* 659 F. 3d at 378-380, citing *Hazelwood,* 484 U.S. at 272. Further, like elementary students, middle school students are typically in the age range of 11-14, some not even newly teenagers, and the young students are just beginning to acquire the means of expression. *Id.* Courts have held that school's efforts to prevent "advocacy" in classroom activities, religious, political or even commercial (and in this case, sexual), is a legitimate educational purpose, particularly given younger students' impressionability. *Id.* Children younger than high school age may not be able to fully recognize and appreciate the difference between government and private speech…. And a school's neutrality could more easily be misperceived as endorsement, rather than neutrality. *Id. at* 381, citing *Walz v. Egg Harbor Township Bd. of Ed.,* 342 F. 3d 271,277(3rd Cir. 2003). There can be little doubt that speech appropriate for eighteen year- old high school students is not necessarily acceptable for younger students. Courts have held that human sexuality provides the most obvious example of age-sensitive matter. *Walker v. Serrano,* 325 F. 3d 412, 416-17 (3rd Cir.

13

2003). Young students demand a far greater level of guidance, which is fundamental to a public school's mission. *Id.* By contrast, in a high-school setting, "students are mature enough and are likely to understand that a school does not endorse speech that it merely permits on a nondiscriminatory basis." *Id.* The legitimacy, intent, and reasonableness of the School Board's policy and decision regarding restriction of the clubs allowed in middle schools is solidified by the fact that the GSA **is allowed** in Lake County High Schools. The GSA is permitted to apply as a student group in Lake County high schools through the limited open forum established by the School Board under the Equal Access Act for high schools. The only application received from a Gay Straight Alliance group was approved. It is also noteworthy that the prior GSA student-member's action cited by the Plaintiffs and attached to the Complaint, is now in the high school setting where the GSA <u>is</u> allowed; yet this student has failed to organize or participate in a GSA club. Analysis of the restrictions upon <u>high school</u> student expression under the First Amendment is not applicable to the instant analysis, as those cases involved <u>high school</u> students, not middle school students. This case is more analogous to the First Amendment cases involving elementary school students, where schools may regulate student expression more freely. Plaintiffs have not cited one middle school case allowing such a club or supporting the theory that the same analysis that applies to students in high schools. High school students range in age from 14-18, and many are charged with many "adult" responsibilities such as driving a car, maintaining a job, or being on the verge of adulthood. The maturity level and ability of high school students to differentiate between what the school **allows** to avoid discrimination versus what the school **endorses** is much different than middle school students. In fact, other categories of First Amendment analysis, Courts have repeatedly recognized the lower level of First Amendment protection afforded to middle school students, and use of a middle school as a

forum is governed by the school board's intent. *Heinkel,* 194 Fed.Appx. at 609-610; *M.A.L . v. Kinsland,* 543 F.3d 841, 846-847(6th Cir. 2009); *Campbell v. St. Tammany Parish School Bd.,* 231 F.3d 937, 940-41(5th Cir. 2000)(Since a middle school is not a traditional public forum, the type of forum created by policy is a function of the intent of the school board). There are no heterosexual clubs or clubs regarding sexuality or sexual expression, of any kind approved at the middle school level either, which tends to negate Plaintiffs' argument that the School Board is discriminating solely based upon viewpoint. The clubs allowed are clearly an extension of the school curriculum or bear a direct correlation to the curriculum or athletics.[1] The law is clear that schools may regulate the <u>content</u> of speech without violating the First Amendment. *Bannon,* 387 F.3d at 1215-16. It is not reasonable of Plaintiff to argue that all content should be permissible and school-sponsored in a middle school setting, where students ages 11-13 or 14 at best are attending, simply based on an unsupportable conclusion that the topic promotes "critical thinking." *Id.* It is a well-recognized principle that agencies, like the School Board, are afforded great deference in interpreting their own policies and regulations they are responsible for enforcing. *Auer v. Robbins,* 519 U.S. 452, 117 S. Ct. 905(1997); *Cagle v. St. Johns County School Dist.,* 939 So.2d 1085, 1088-89 (5th DCA 2006)(Administrative agencies are afforded wide discretion in the interpretation of statutes and application of policies they are give the powers and duties to administer; if the agency's interpretation is within the range of possible and reasonable interpretations, it should be affirmed). Pursuant to the School Board's reasonable interpretation of its own policy, and quite frankly, any <u>reasonable</u> interpretation, the GSA is not permissible student group in the middle-school setting. Again, the Plaintiffs has failed to cite any case that would suggest that the School Board does not have the right to restrict a school-

---

[1] The Plaintiff cites to AVID, a club permitted to form under the School Board Policy, as support of its argument that the School Board has committed viewpoint discrimination; however, AVID is part of the school's curriculum, so this argument is without merit.

sponsored club in a middle school setting in the manner that it has been done in this case. In fact, Plaintiffs concede that schools may restrict the content of school-sponsored speech without violating the First Amendment, and the primary cases they rely upon to the contrary again deal with high school or college students; not middle school students. *Plaintiff's Motion, Pp.17-18.*

### D. PLAINTIFFS' §1983 CLAIMS MUST FAIL

Plaintiffs must show that the alleged Constitutional violation was caused by some official policy. *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 694-95(1977); *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir. 1991). In order for a local government entity to be liable for a §1983 claim, an official policy or custom must be the moving force behind the alleged Constitutional violation. The Equal Access Act is inapplicable, so §1983 provides no mechanism of enforcement of any rights set forth in that statute. Further, there is no evidence that any Constitutional violation occurred, let alone that a School Board Policy was the cause of a constitutional violation or other violation of any claims that can be permissible through the mechanism of §1983. Accordingly, Plaintiffs cannot show a substantial likelihood of prevailing on the merits, and the Motion for Preliminary Injunction should be denied. *Barrett v. Claycomb,* 705 F.3d (8th Cir. 2013).

### III. PLAINTIFFS CANNOT SHOW THEY HAVE SUFFERRED OR WILL SUFFER IRREPARABLE INJURY; THE HARM TO THE SCHOOL BOARD OUTWEIGHS THE INJURY TO THE PLAINTIFFS IF RELIEF IS NOT GRANTED.

Plaintiffs cannot show they have suffered nor will suffer irreparable injury due to the lack of recognition of the GSA as a school-sponsored club. Plaintiffs have not and cannot show a violation of the Equal Access Act or the First Amendment. The Plaintiff, H.F. has not been disciplined or reprimanded for speaking about the topics the GSA promotes. Upon proper application, the GSA would be recognized in Lake County High Schools. The School Board has

a greater interest in restricting the student expression in the middle school setting. However, even a GSA formed from middle school students would be permitted to utilize school facilities to conduct its activities pursuant to the School Board's facilities use policy. On the other hand, there would be harm to the School Board if an injunction were to be granted. Basically, the School Board would be in a position of being forced to utilize school facilities and resources for a type of club that was not intended to be "school sponsored" and would now have to allow other types of student clubs that clearly do not meet the criteria for becoming "school-sponsored" clubs under School Board Policy 4.205. The School Board was clearly within its rights and the confines of the First Amendment to establish such a policy and determine what content would be considered "school sponsored." The School Board's tolerant neutrality toward student expression in the middle school setting would be completely eroded, as would its ability to maintain order and foster an educational environment appropriate for young students.

## IV. **ENTRY OF AN INJUNCTION WOULD BE AGAINST THE PUBLIC INTEREST**

Since there is no evidence of a violation of the Equal Access Act or the First Amendment, the only "public interest" at stake is the School Board's interest in maintaining its neutrality in school-sponsored activities, maintaining order and reasonably restricting student expression based upon legitimate pedagogical concerns, low maturity level of its young and impressionable middle school students, and other legitimate educational concerns. As cited in the numerous First Amendment cases above, providing guidance and reasonably restricting student expression in public schools, particularly the younger students, is one of the primary responsibilities of the public school system.

## V. PLAINTIFFS SHOULD HAVE TO POST SECURITY PURSUANT TO RULE 65

Rule 65(c), Fed. R. Civ. P. clearly requires the Plaintiffs to post security for the injunction. Granting the injunction will clearly expose the School Board to economic harm; at a minimum, will subject the School Board to attorney's fees, costs, and the potential for Appellate costs. In addition, the Plaintiff is asking for the group to be "school-sponsored," which would entail faculty and facility costs as well.

## VI. CONCLUSION

WHEREFORE, the School Board of Lake County, Florida, respectfully requests this Court to deny the Plaintiffs' Motion for Preliminary Injunction, and any such other relief the Court deems appropriate.

Respectfully submitted this 3rd day of February, 2014.

BY: _____
STEPHEN W. JOHNSON, ESQ.
Florida Bar No. 269867
STEPHANIE J. MCCULLOCH, ESQ.
Florida Bar No. 0638161
McLin Burnsed
Post Office Box 491357
Leesburg, Florida 34749-1357
(352) 787-1241 Telephone
(352) 326-2608 Facsimile
Email: SteveJ@mclinburnsed.com
StephM@mclinburnsed.com
Trial Counsel for Defendant, The School
Board of Lake County, Florida

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of February, 2014 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to the following: Daniel B. Tilley at dtilley@aclufl.org, ACLU Foundation of Florida, Inc., Suite 340, 4500 Biscayne Blvd, Miami, FL 33137.

By: _____
Stephen W. Johnson

18