UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARVER MIDDLE SCHOOL GAY-
STRAIGHT ALLIANCE, an unin-
corporated association; and
H.  F., a minor by and through
parent Janine Faughnan,

                         Plaintiffs,

-vs-                            Case No.    5:13-cv-623-Oc-10PRL

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

                         Defendant.

_____/

## ORDER

      The Carver Middle School Gay-Straight Alliance wants to be recognized by the Lake County School Board at Carver Middle School in order to receive certain benefits that would accompany that recognition.  The School Board has declined to grant the Alliance such status.

      This action was filed by the Alliance against the School Board on December 19, 2013 (Doc. 1).[1]  Later, on January 15, 2014, the Alliance filed a motion for a preliminary injunction (Doc. 4) prohibiting the School Board "from denying [the Alliance] access to the forum for non-curricular student clubs, from denying [the

---

[1]     Joining the Alliance as a plaintiff is H.F., a minor who sues through her parent, Janine Faughnan.  H.F. has waived her privacy (Doc. 1, p. 1, n. 1) but as a matter of convenience, reference to the Alliance should be understood to include the minor Plaintiff individually except where the text clearly reflects that the Plaintiffs are being identified separately.

Alliance] official recognition as a student club, and from denying [the Alliance] the ability to operate [the Alliance] at Carver with all attendant benefits afforded to student clubs." (Doc. 4, p. 25).

The Court scheduled a hearing on the Alliance motion to be held on February 10, 2014 (Doc. 5). The School Board was then properly served (Doc. 8) and promptly filed a motion to dismiss (Doc. 10) followed by a response (Doc. 11) opposing the Alliance motion for preliminary injunctive relief.[2]

Oral argument was entertained at the hearing conducted on February 10, 2014, and all pending motions are ready for decision. The Court will Deny the School Board's motion to dismiss (Doc. 10), but will also Deny the Alliance's motion for a preliminary injunction (Doc. 4). Explanations follow.

## I.      The Legal Basis Of The Action.

The complaint (Doc. 1) states two claims. Count One seeks relief under the Equal Access Act, 20 U.S.C. §§ 4071 - 4074.[3] Count Two invokes 42 U.S.C. § 1983 and seeks relief under the First Amendment to the Constitution of the United States – specifically the First Amendment right to free speech and association as applicable to the states through the Fourteenth Amendment.

---

[2]     The Alliance motion (Doc. 4) and the School Board's response (Doc. 11) are both supported by accompanying affidavits and exhibits as well as memoranda of law.

[3]     The Equal Access Act, adopted by Congress in 1984, provides that when a "public secondary school," which receives Federal funds, creates a "limited open forum" by permitting "noncurriculum related student groups to meet on school premises during noninstructional time," it may not "deny equal access" to other student groups "on the basis of the religious, political, philosophical, or other content of the speech" of such groups. 20 U.S.C. § 4071(a), (b).

## II.    The School Board's Motion To Dismiss.

The motion to dismiss (Doc. 10) asserts five independent grounds for dismissal: (1) that neither of the Plaintiffs have standing to assert the claims alleged; (2) that the complaint fails to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), and does not comply with the basic pleading requirements of Fed. R. Civ. P. 8 and 10; (3) that the Equal Access Act is not applicable to the case; (4) that the First Amendment has been complied with at all times by the School Board; and (5) that the complaint fails to state a claim for relief under 42 U.S.C. § 1983.

In passing on a motion to dismiss under Rule 12(b)(6), the Court is mindful that "[d]ismissal of a claim on the basis of barebones pleadings is a precarious disposition with a high mortality rate." Int'l Erectors, Inc. v. Wilhoit Steel Erectors Rental Serv., 400 F.2d 465, 471 (5th Cir. 1968).  For the purposes of a motion to dismiss the Court must view the allegations of the complaint in the light most favorable to plaintiff, consider the allegations of the complaint as true, and accept all reasonable inferences that might be drawn from such allegations.  Speaker v. U. S. Dep't. of Health & Human Servs., 623 F.3d 1371, 1379 (11th Cir. 2010); Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1532, 1534 (11th Cir. 1994).  Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations of the complaint.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007).

In order to avoid dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face" and that rises "above the speculative level." Speaker, 623 F.3d at 1380 (citing Twombly, 550 U.S. at 570, 127 S. Ct. at 1964-65,

1974).  A claim is facially plausible "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)).  The plausibility standard requires that a plaintiff allege sufficient facts to nudge his "claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974.  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555, 127 S. Ct. at 1964-65).

As the School Board's motion accurately states (Doc. 10, pp. 2-3) in order for an unincorporated association to have prudential standing to sue for itself and its members, the association must show:  (1) that the individual members would have standing to sue in their own right; (2) that the interests at stake are germane to the purpose of the association; and (3) that neither the claims nor the relief requested requires participation of the individual members. Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S. Ct. 693, 704 (2000)).  In addition, a plaintiff must have constitutional standing under the case or controversy jurisdictional grant of Article III of the Constitution.  This requires a showing that the plaintiff has suffered an injury in fact that is concrete and particularized as well as

4

actual or imminent; and it must also be shown that there is a causal connection between the injury and the conduct complained of, with a likelihood that the injury will be redressed by a favorable decision of the court.  Sierra Club v. Johnson, 436 F.3d 1269, 1276 (11th Cir. 2006) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S. Ct. 2130, 2136 (1992)).

The minor plaintiff alleges in the complaint (Doc. 1), and avers in her affidavit (Doc. 4-2) filed in support of the Alliance motion for a preliminary injunction, that she is a 12 year old student in the seventh grade at the Lake County Carver Middle School which is comprised of grades six through eight; that she is Vice President of Carver Middle School Gay-Straight Alliance; that she and other students "making up" the Alliance want to have the Alliance recognized by the school administrators as an official student club with the same privileges that are extended to other non-curricular related clubs like the Honor Society and the Cheerleaders (among others); that she participated in the preparation of a written application (Doc. 4-11) to School Board authorities to have the Alliance recognized as an approved club; and that such application was denied.  The complaint further alleges in two counts that the denial of the Alliance application under those circumstances constituted a violation of both statutory and constitutional rights, namely the Equal Access Act, 20 U.S.C. § 4071, et seq. (Count One) and the right of free speech and association assured by the First and Fourteenth Amendments to the Constitution (Count Two).

The School Board argues that these allegations are insufficient to demonstrate that either of the Plaintiffs have suffered a concrete injury.  It is asserted that the

minor Plaintiff has not been disciplined or reprimanded for any speech or expression; and, similarly, that the Alliance has not been prohibited from meeting at its pleasure on the premises of the school upon compliance with the School Board's facilities use policy (Doc. 10, p.3).  The School Board's argument fails, however, not only because it involves assertions of fact going beyond or outside of the complaint thereby becoming a "speaking motion,"[4] but also because the Plaintiffs have alleged that approved groups may meet on school property without compliance with the School Board's facilities use policy; may have their finances accounted for through and by the school; may appear in the school's yearbook; may use school resources and equipment for meetings; and may have a School Board employee or sponsor appointed by the Principal to assist the Club (Doc. 1, p.7, ¶17).  Denial of these benefits in the context of an alleged statutory violation of the Equal Access Act as well as an alleged violation of the Constitution itself, constitutes a concrete, particularized, and actual injury to those rights.  These allegations are sufficient to establish the standing of the minor plaintiff to bring this action.

The standing of the Alliance is also justified by the complaint.  As just determined, the minor plaintiff, as a member of the Alliance, has standing to sue in her own right through her parent, see Fed. R. Civ. P. 17(c); the interests at stake are

---

[4]   In passing on a Rule 12(b)(6) motion to dismiss the complaint, a court cannot consider the facts supplied by a "speaking motion" – facts not found within the four corners of the complaint itself.  To do so converts the Rule 12(b)(6) motion into one for summary judgment under Rule 56.  See Fed. R. Civ. P. 12(d); Starship Enter. of Atlanta, Inc. v. Coweta County, 708 F.3d 1243, 1252 n. 13 (11th Cir. 2013); Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1296-97 (11th Cir. 2011).

germane to the purposes of the Alliance;[5] and neither the claims asserted or the relief requested necessitates participation by the individual members.

Both Plaintiffs have standing to bring this action and the motion to dismiss on that ground will be denied.

The School Board advances three other arguments in seeking a dismissal. The first is that the complaint is too short on facts and too long on legal theories to comply with Fed. R. Civ. P. 8 and 10, and the Supreme Court's decision in Twombly, supra. This argument is simply unpersuasive. The complaint is well crafted and pleads alleged historical facts upon which the legal theories of entitlement to relief are set out in separate Counts One and Two. The School Board's remaining arguments – that the Equal Access Act is not applicable to the case; that the School Board has complied with the First Amendment; and that 42 U.S.C. § 1983 does not apply for those reasons – all rely at least in part upon factual assertions (or mixed assertions of fact and law) that may not properly be considered in passing upon a motion to

---

[5]     The charter of the Alliance states its purposes this way (Doc. 4-11, p. 2):

> Club Purposes and Goals:
>
> (1)     to create a safe, supportive environment at school for students to discuss experiences, challenges, and successes of LGBT students and their allies
>
> (2)     to create and execute strategies to confront and work to end bullying, discrimination, and harassment against all students, including LGBT students
>
> (3)     to promote critical thinking by discussing how to address bullying and other issues confronting students at Carver Middle School

dismiss unless the motion is converted to one for summary judgment.  See footnote 4, supra.

The School Board's motion to dismiss (Doc. 10) will therefore be Denied in all respects.

### III.    The Plaintiffs Motion For Preliminary Injunction

The law of the Circuit is well settled, and is embodied in the local rules of this Court, Rules 4.05(b)(4) and 4.06(b)(1), M.D. Fla. Rules, that an applicant for preliminary injunctive relief must demonstrate:  (1) a substantial likelihood of ultimate success on the merits of the claim; (2) the irreparable nature of the threatened injury; (3) the potential harm that might be caused to the opposing party or others if preliminary injunctive relief is granted; and (4) the public interest in the granting of the requested relief.

The Alliance asserts two independent legal theories or claims of entitlement to relief – the Equal Access Act (Count One) and the First Amendment (Count Two). With respect to the question of the likelihood of ultimate success on the merits, each of these theories presents a free standing claim that must be evaluated separately and individually.

### A.    The Equal Access Act Claim

The Plaintiffs' attempt to invoke the Equal Access Act is plagued by several large problems.  First, the statute expressly applies only to "secondary school[s]," 20 U.S.C. § 4071(a), and a secondary school "means a public school which provides secondary education as defined by State law."  20 U.S.C. § 4072(1) (emphasis

supplied).  The problem here is that there is no state law in Florida defining any of those terms as used in the Act.  Second, and closely related to that first problem, the Plaintiffs are unable to point to any published decision by any court applying the Act to any school below the high school level.  This would be a case of first impression.[6] Third, even if one looks beyond state law in search of a generally accepted definition of "secondary school," that search does not yield much ammunition for the Plaintiffs. While some usages in Florida law and other literature would suggest a synonymous relationship between "middle" school and "secondary" school, an equal or greater number of references suggest that "secondary" school means "high school."[7]  Fourth, the usual office of preliminary injunctive relief is to preserve the status quo against a threatened change that would injure protected rights such that the existing landscape

_____

[6]     Heinkel ex rel. Heinkel v. School Bd. of Lee County, 194 F. App'x. 604 (11th Cir. 2006) is a case involving a middle school student who wished to distribute anti-abortion materials to her classmates and was prevented from doing so by the principal of the school. However, the case was litigated solely as a constitutional claim.  The Equal Access Act was not involved and was not mentioned in the opinion.  Additionally, the decision would be of little aid to the Alliance in any event because a summary judgment for the school board was affirmed on the basis that the school principal reasonably forecast substantial interruption of or material interference with school activities, applying Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 89 S. Ct. 733 (1969).

[7]     The School Board concedes – indeed, it urges – that high schools are secondary schools within the meaning of the Act and Florida law, and it has granted recognition of a Gay-Straight Alliance Club at one of its high schools (the only application made at the high school level thus far).  In Gay-Straight Alliance of Yulee High School v. School Bd. of Nassau Cnty., 602 F. Supp.2d 1233 (M.D. Fla. 2009) and Gonzalez v. School Bd. of Okeechobee Cnty., 571 F. Supp. 2d 1257 (S.D. Fla 2008), Judge Adams in this District and Judge Moore in the Southern District of Florida both held that the Equal Access Act applied to the high schools involved in those cases.

should be preserved pending a final adjudication.[8]  Here the reverse is true.  The relief

sought by the Plaintiffs would alter the status quo.

The Equal Access Act was passed by Congress in 1984 as an obvious reaction

to several Court of Appeals and Supreme Court decisions during the previous three

years.  See Board of Educ. of the Westside Cmty. Schools v. Mergens, 496 U. S. 226,

239, 110 S. Ct. 2356, 2366 (1990).  Two courts of appeals had held that student

religious groups could not, consistent with the Establishment Clause, meet on public

school premises during noninstructional time.  Id.  See Lubbock Civil Liberties Union

v. Lubbock Indep. Sch. Dist., 669 F.2d 1038, 1042-1048 (5th Cir. 1982), and Brandon

v. Guilderland Bd. of Educ., 635 F.2d 971 (2d Cir. 1980).  At about the same time,

however, the Supreme Court decided Widmar v. Vincent, 454 U.S. 263, 102 S. Ct.

269 (1981) holding that, at the university level, when a school creates a "limited public

forum"[9] by making its facilities available to registered student groups, it may not deny

---

[8]    See, e.g. Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1233 (11th Cir.
2005); Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1101 n. 13 (11th Cir. 2004);
Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville,
Fl., 896 F.2d 1283, 1284 (11th Cir. 1990).

[9]    The term "limited public forum" in the Supreme Court's jurisprudence under the First
Amendment refers to the use of public facilities for expressive activity during a limited time
or for a limited purpose as distinguished from "streets and parks which have immemorially
been held in trust for the use of the public, and, time out of mind, have been used for
purposes of assembly . . . ."  Perry Educ. Ass'n. v. Perry Local Educators' Ass'n., 460 U.S.
37, 45, 103 S. Ct. 948, 955 (1983) (internal quotations omitted).  See also, Widmar, 454 U.S.
at 268 n. 5, 102 S. Ct. at 274 n. 5 (concerning university limited public forums).

the same privilege to religious groups; and, further, the recognition of such religious groups under the Free Exercise Clause would not violate the Establishment Clause.[10]

Finding encouragement in <u>Widmar</u>, Congress enacted the Equal Access Act in an obvious effort to create a <u>statutory</u> right in secondary schools akin to the constitutional principles established by <u>Widmar</u> at the university level; and it did this by formulating and specifically defining what it called a "limited open forum"[11] as distinguished from the concept of a "limited public forum," a term of art used by the Supreme Court in its free speech cases. <u>See</u> <u>Mergens</u>,496 U. S. at 242, 110 S. Ct. at 2367-68.

Congress also took care to limit the scope of the act to "public secondary school[s]" which it defined in 20 U.S.C. § 4072(1) as follows:

> The term "secondary school" means a public school which provides secondary education as determined by state law.

---

[10]     The Court noted that opening university facilities for secular, educational reasons to a student religious group would not be perceived as conferring an imprimatur of state approval of any particular religious group and would not violate the Establishment Clause because:

> University students are, of course, young adults.  They are less impressionable than younger students and should be able to appreciate that the University's policy is one of neutrality toward religion.

454 U.S. at 274 n. 14, 102 S. Ct. at 276 n. 14.

[11]     The term "limited open forum" is defined by the Act, 20 U.S.C. § 4071(b), this way:

> A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time.

Prior to July 1, 2013, the Florida Secondary School Redesign Act contained a provision stating that "[s]econdary schools are schools that primarily serve students in grades 6 through 12." Fla. Stat. § 1003.413(1) (repealed effective July 1, 2013, Ch. 2013-27, § 12, Laws of Fla.).[12] The parties agree that there is no remaining statutory provision in Florida specifically defining "secondary school" or "secondary education;" and the School Board represents in its brief (Doc. 11, p. 7), without contradiction, that there are fifty to sixty references in the remaining Florida statutes mentioning secondary schools in a variety of contexts supplying inconsistent inferences concerning the precise meaning of the term. The Plaintiffs confirm this point by calling attention for example to Fla. Stat. § 386.212 prohibiting smoking during certain hours within 1,000 feet of an "elementary, middle, or secondary school." (Doc. 4, pp. 9-10, n. 10). On the other hand the Florida Partnership for Minority and Underrepresented Student Achievement Act states in Fla. Stat. § 1007.35(2)(b) that it is the "intent of the Legislature to provide assistance to all public secondary schools, with a primary focus on low-performing middle and high schools."

There is, nonetheless, one definitional statute that – by its very nature as a definitional provision – caries more weight in the debate on this issue, and that statute, Fla. Stat. § 1003.01, favors the position of the School Board:

---

[12] There is no suggestion that the repeal of former Section 1003.413(1) had anything to do with the Equal Access Act, nor is there any argument by the Plaintiffs that the State lacks the power and authority to change its definition of "secondary schools" from time to time as it sees fit. (Plaintiffs do contend that the state cannot exempt itself from the Equal Access Act, and that argument will be discussed infra.)

> 1003.01 Definitions.– As used in this chapter [entitled Public K-12 Education] the term
>
> (1)    "District school board" means the members who are elected by the voters of a school district created and existing pursuant to s.4, Art. IX of the State Constitution to operate and control public K-12 education within the school district.
>
> (2)    "School" means an organization of students for instructional purposes on an elementary, middle or junior high school, secondary or high school, or other public school level authorized under rules of the State Board of Education.

The structure of subsection (2) clearly creates three tiers of schools. Elementary schools constitute one tier.   Middle or junior high schools synonymously constitute a second tier.  And "secondary" or high schools synonymously constitute a third tier.  Furthermore, this structure, and the use of these terms to describe that structure, is consistent with the general (but by no means universal) definition given to secondary schools as meaning high schools.   Secondary education is most often described as that level of schooling coming after those grades in which a general education is provided – reading, writing and arithmetic – with a "secondary" education being preparatory to the college or university level thereafter.[13]

---

[13]    For example, Webster's Third New International Dictionary (2002 ed.) defines "secondary school" this way:

> [A] school more advanced than an elementary school and offering general, technical, vocational or college-preparatory courses

Random House Unabridged Dictionary (2d ed. 1997) defines "secondary school" as:

> [A] high school or a school of corresponding grade, ranking

(continued...)

The Plaintiffs argue that "[i]t would be impossible, of course, for a state to opt its schools out of the requirements of federal law simply by not defining a term, and this Court should find that Carver Middle School is a secondary school and thus covered by the Equal Access Act." (Doc 4, pp. 9-10, n. 10). No authority is cited in support of this proposition, and while the stated premise has some initial appeal, it does not withstand closer scrutiny. Although Congress may not have contemplated that there could be instances in which a given state would be placed entirely outside of the operation of the Act because of the lack of state law defining secondary education, it must be conceded that Congress at the least conferred upon the several states the power to "opt out" with respect to a given school grade or grades. A state could, for example, define secondary schools as consisting of grades 10 through 12, while another state might define its secondary schools as consisting of grades 9 through 12. Or, of course, as Plaintiffs would have it here, Florida could treat grades 6 through 12 as secondary schools. There could well be any number of variations among the states in the way the Equal Access Act applies, or does not apply. In fact, it is conceivable that the Act could have a different application even within a given state from district to district if state law should provide, for example, that "middle

_____

[13](...continued)
　　　　　　between a primary school and a college or university.

　　　And Princeton University's WordNet online dictionary defines "secondary school" as:

　　　　　　[A] school for students intermediate between elementary school
　　　　　　and college, usually grades 9 to 12

　　　Princeton University "About WordNet." WordNet. Princeton University. 2010.
<http://wordnet.princeton.edu>.

schools shall be regarded as secondary schools," but each district had the autonomy to configure its Middle Schools as consisting of either grades 6 through 8 or grades 7 through 9.  In such a case there could be contiguous school districts in which all of the sixth graders in one district would be covered by the Act while those in the other district would not.[14]

The Plaintiffs are thus left in the unenviable position of inviting the Court to fill a legislative void and supply a judicial definition for the term "secondary school" in Florida.  No authority is cited for that course of action either,[15] and the Court will decline to do so.  Where that leaves the case is yet to be determined; but one thing is clear.  The Plaintiffs have not demonstrated a substantial likelihood of prevailing on the merits of their claim under the Equal Access Act.  Indeed, the probable outcome with respect to that claim appears to be to the contrary.  A preliminary injunction under the Equal Access Act must be denied for that reason.[16]

---

[14]    At oral argument counsel were uncertain as to whether the Middle Schools in Florida might indeed vary in grade structure from one district to another.

[15]    Moreover, if the Court thought it had the authority to proceed in that manner, then, relying upon Fla. Stat. § 1003.01, quoted supra, and the generally accepted definitions of "secondary school," see note 12, supra, the Court would define the term "secondary school" to mean high schools, grades 9 - 12.

[16]    With respect to the Equal Access Act, the Court does not reach the remaining requirements that must be established in order to justify preliminary injunctive relief, namely, a showing of irreparable harm to the Plaintiffs, lack of substantial harm to the Defendant, and the public interest.  The Court expresses no opinion with respect to those matters.  It is appropriate to note, however, that while a constitutional injury is irreparable per se, see Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689 (1976) and KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1271-72 (11th Cir. 2006), this is a statutory claim and if the Court should reach the point of evaluating the harm caused to the Plaintiffs by withholding preliminary relief, against the harm to the School Board by granting preliminary relief, the
(continued...)

B.   The Constitutional Claim

The School Board's written policy governing Middle School sponsored clubs is

its Policy 4.502 (Doc. 4-1), which states, in pertinent part:

### Middle School Student Clubs and Organizations

(1)   This policy applies to all school clubs and organizations at all District Middle Schools.

(2)   Middle School Clubs and organizations are an extension of the school curriculum.  Middle School clubs must be sponsored by the school and are limited to organizations that strengthen and promote critical thinking, business skills, athletic skills and performing/visual arts.  Schools may also establish organizations relating to academic honor societies and student government and clubs that are directly related to the curriculum.

(3)   All student cubs and organizations must be approved by the Superintendent before they can operate at a school.

(4)   All prospective clubs must submit a District approved application. The application shall include a club charter which shall set forth the purposes, qualifications for members, and the rules of conduct

_____

[16](...continued)

alteration of the status quo might become a significant consideration.  Specifically, in this instance, the Court can envision that granting relief to the Plaintiffs at this juncture, only to yank it away if Plaintiffs do not prevail later on, might cause more mischief in the lives of 12 year old sixth graders (and the School Board's effort to educate them in a stable environment) than would be caused by withholding relief now and maintaining the status quo until the case is decided.  See Northeastern Florida Chapter of Ass'n of Gen. Contractors of America v. City of Jacksonville, Florida, 896 F.2d 1283, 1284 (11th Cir. 1990) ("The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated"); Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001) (same).  But see Canal Authority of State of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974) ("If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury. . . ."); Gropp v. United Airlines, Inc., 817 F. Supp. 1558, 1562 (M.D. Fla. 1993) (in deciding whether to grant preliminary injunctive relief "preservation of the status quo is not the only concern of the court.").

and shall be maintained on file for reference by all students and school employees.

The Alliance submitted its application on the prescribed form and attached a copy of its charter.  See note 5, supra.  There is no claim by the School Board that there was any procedural deficiency in the manner in which the Alliance sought to be a sponsored club.  Rather, the application was rejected on substantive grounds by a handwritten notation:

> Club is not an extension of the school curriculum.  Per policy, Not Approved.

(Doc. 4-11, p. 1).

Clearly, therefore, the rejection of the Alliance application was necessarily a prior restraint predicated upon the content of the speech or associational rights intended to be exercised by the Alliance as expressed in its charter, namely, " . . . to discuss experiences, challenges, and successes of LGBT students and their allies." And the same would be true whether the rejection occurred solely because of a perceived departure from the school's curriculum[17] or because a majority of the School Board was of the opinion that such speech – or such association for the purposes of expressing such speech – was not age appropriate.[18]

---

[17]   During oral argument the Court inquired of counsel whether sex education classes were a part of the curriculum at Carver Middle School and, if so, whether such classes had advanced to the level of instruction on the sexual orientation of lesbian, gay, bisexual and transgender persons.  Counsel were unaware and unable to answer at that time.

[18]   Because of the School Board's motion to dismiss, no answer has been required (Rule 12(a)(4), Federal Rules of Civil Procedure) and none has been filed.  However, attached to the Alliance motion for a preliminary injunction are two documents (Docs. 4-14 and 4-15)
(continued...)

Nevertheless, a governmental restraint on First Amendment rights is not necessarily a violation of those rights in every setting including, in particular, the management of nonpublic fora in public schools.

In Tinker v. Des Moines Independent Community School District, 393 U. S. 503, 89 S. Ct. 733 (1969) the Supreme Court gave voice to the oft quoted pronouncement that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U. S. at 506, 89 S. Ct. at 736. The Court went on to say, however, that "[o]n the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." 393 U. S. at 507, 89 S. Ct. at 737.[19]

---

[18](...continued)
from which it may be inferred that the School Board is unanimous in the view that the Alliance is an appropriate school sponsored club at the high school level, but the Board is also unanimous that the immaturity of middle school children renders the Alliance "speech" not age appropriate for sponsorship at the middle school level. Further, that argument is specifically advanced by the School Board's memorandum in opposition to the Alliance motion for a preliminary injunction (Doc. 11, pp 13-16).

[19]     Tinker involved enforcement by school officials of a regulation prohibiting students from wearing black arm bands on school premises in protest of the Viet Nam war. This has come to be known as the pure speech case in which the Court held that the prohibitive regulation was unconstitutional in the absence of evidence of "interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone." 393 U.S. at 508, 89 S. Ct. at 737.

As our court of appeals has noted (Heinkel v. School Board of Lee County Florida, 194 F. A'ppx. 604, 609 n. 7 (11th Cir. 2006)):[20]

> Since Tinker, the Supreme Court has refined the framework for analyzing First Amendment claims in the public school context.  As we have explained, "[w]ithin scholastic nonpublic fora, there are four clear categories of expression:  vulgar expression, pure student expression, government expression, and school-sponsored expression."  Bannon v. Sch. Dist. of Palm Beach County, 387 F.3d 1208, 1213 (11th Cir. 2004).

In Bannon v. Sch. Dist. of Palm Beach Cnty., 387 F. 3d 1208, 1213-1214 (11th Cir. 2004), as noted in Heinkel, supra, the court of appeals synthesized the Supreme Court's student speech cases this way:

> Within scholastic nonpublic fora, there are four clear categories of expression:  vulgar expression, pure student expression, government expression and school-sponsored expression.
>
> Vulgar expression is student expression that is lewd, offensive, or indecent and schools may freely curtail it.  Bethel Sch. Dist. No. 403 v. Fraser, 478 U. S. 675, 685, 106 S. Ct. 3159, 92 L.Ed.2d 549 (1986).  Pure student expression is student expression that merely happens to occur on the school premises, and schools must tolerate such expression unless they can reasonably forecast that the expression will lead to "substantial disruption of or material interference with school activities."  Tinker, 393 U.S. at 514, 89 S. Ct. 733.  Government expression is expression delivered directly through the government or indirectly through private intermediaries, and the

---

[20]   Heinkel involved a prohibition against a middle school student's distribution of pro-life literature to her classmates on school premises.  The court applied the pure speech precedent of Tinker, but upheld the prohibition because the record supported the findings of the district court that the school authorities reasonably forecasted substantial disruption of, or material interference with, school activities if the distribution of the pro-life literature was permitted.  194 F. App'x. at 609-10.

government is free to make subject-matter-based choices. See Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 833, 115 S. Ct. 2510, 132 L.Ed.2d 700 (1995).  Finally, between the spectrum of pure student expression and government expression is the intermediate category of school-sponsored expression:  when "students, parents, and members of the public might reasonably perceive [students' expressive activities] to bear the imprimatur of the school," schools may censor student expression so long as their actions are reasonably related to legitimate pedagogical concerns.  [Hazelwood School District v. Kuhlmeier, 484 U. S. 260, 271-273, 108 S. Ct. 562, 570 (1988)].

The facts in Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 108 S. Ct. 562 (1988) were these.  As an adjunct to one of its classes on journalism, a high school in the district sponsored and supervised a student run newspaper – the Spectrum. In one of the issues of Spectrum, routinely presented to the school principal before publication, there were two articles written by student reporters.  One of the articles described student experiences with pregnancy.  The other discussed the impact of parental divorce on students at the school.  Believing these articles to be inappropriate for publication in the school sponsored newspaper due to a number of reasons, the principal directed that the articles be removed.[21]  484 U.S. at 262-64, 108 S. Ct. at

---

[21]     The principal was concerned about identifying characteristics in the article that would permit personal identification of the pregnant students resulting in invasion of their privacy; and, with respect to the divorcing parents, the principal was concerned that they had not been given an opportunity to respond consistent with good journalistic practice. With greater relevance to this case, the principal also acted, and the district court held such action to be justified – "to avoid the impression that [the school] endorses the sexual norms of the subjects and to shield younger students from exposure to unsuitable material." 484 U.S. at 264-265, 108 S. Ct. at 566 (quotations omitted).  This is not to suggest that the Alliance endorses or does not endorse any sexual "norms," or that it would produce or disseminate "unsuitable" material. The emphasis here should be upon the concept of shielding younger

(continued...)

565-66.  The student reporters sued, claiming a violation of their First Amendment rights.  The district court held that the school authorities were authorized, consistent with the First Amendment, to impose restraints on student speech in activities that are a part of the school's educational function as long as such restraints have a substantial and reasonable basis.  The Eighth Circuit reversed, finding that Tinker supplied the governing standard with respect to student speech, and that the principal's removal of the articles was not justified by any showing that he could have reasonably forecasted material disruption or disorder in the school resulting from their publication.  Id. at 264-66, 108 S. Ct. at 566-67.  The Supreme Court reversed the Eighth Circuit and held that the Tinker standard involving "pure speech" in the public areas of a school did not apply.  Rather, Spectrum was not a public forum and was sponsored by the school.  As such, publications in Spectrum were subject to reasonable controls.  Id. at 268-70; 108 S. Ct. at 568-69.

Not surprisingly, Alliance urges in this case that Tinker supplies the rule of decision; that strict scrutiny is required; and that, in the absence of any basis for reasonably forecasting disruption of, or interference with, the educational mission of Carver Middle School by the recognition of Alliance as an approved club, the rejection of the club because of the content of its speech is a violation of the First Amendment.

The School Board, by contrast, argues that Hazelwood School District should govern this case.  It points out that there has been no limitation of any kind upon pure

---

[21](...continued)
students from material that may be unsuitable for them because of their immaturity.

speech activity by Alliance or any of its members, and no discipline or penalty of any kind has been imposed upon the Alliance or any of its members because of speech or speech related activities.  Rather, the only deprivation has been the withholding of sponsorship by the school; and, significantly, apart from a prayer for nominal damages, the only relief sought by the complaint is recognition of the Alliance by Carver Middle School as a school sponsored club.

It appears, at this early stage of the case at least, that the School Board has the better of this argument.  Hazelwood School District rather than Tinker supplies the governing standard.

Returning to Bannon, supra, the court of appeals observed that Hazelwood School District applies to cases involving school sponsored expression which students, parents and members of the public might reasonably perceive as bearing the imprimatur of the school and where the protected speech or expression occurs in the context of "curricular activities."  387 F.3d at 1214-15.  This creates a basis for some confusion in this case because the stated reason for the School Board's rejection of the Alliance application was: "Club is not an extension of the school curriculum."  One might well ask, under those circumstances, how Hazelwood School District could apply when the School Board itself declared that the Alliance (and its "speech") is not an extension of the school's curriculum?  The answer is that the terms curriculum or curricular have two distinct meanings in the context of this case.  Here, the School Board used the term curriculum to mean its existing courses of study, and that the goals and stated purposes of the Alliance were not related to or an extension

of any of those existing courses or classes.  However, as observed in <u>Bannon</u>, the term "curricular activity" as used in <u>Hazelwood School District</u> is a much broader term that encompasses any didactic activity sponsored or supervised by the school whether it is an "extension" of an existing course of study or not.  The <u>Bannon</u> court explained:

> . . . Appellant underestimates how broadly the <u>Hazelwood</u> Court defined curricular activities.  To be considered curricular, expressive activities need not occur in a "traditional classroom setting."  <u>Hazelwood</u>, 484 U. S. at 271, 108 S. Ct. 562.  Instead, expressive activities are curricular so long as they are merely (1) "supervised by faculty members," and (2) "designed to impart particular knowledge or skills to student participants and audiences." <u>Id</u>.  In contrast to Appellant's position, <u>Hazelwood</u> never defined curricular activity in terms of whether student participation was required, earned grades or credit, occurred during regular school hours, or did not require a fee.

387 F.3d at 1214.

In this instance, if the Alliance was recognized as an approved club, its meetings would be supervised by a representative of the school,[22] and its stated <u>teaching</u> objective is "to discuss experiences, challenges, and successes of LGBT students and their allies . . . [and] . . . to create and execute strategies to confront and work to end bullying, discrimination, and harassment against all students, including LGBT students."  (Doc. 4-11, p. 2).

---

[22]    <u>See</u> footnote on the Alliance application (Doc. 4-11, p. 1) reading: "Principal will determine the staff member assigned to supervise and/or sponsor the club/organization."

Having concluded that <u>Hazelwood School District</u> governs this case, the lone remaining question is whether the curtailment of the Alliance speech by the School Board's failure to recognize it as a sponsored club was reasonably related to legitimate pedagogical concerns.  Before embarking upon that inquiry, it is necessary to put aside a matter that is <u>not</u> germane to the question of reasonableness of the School Board's conduct.  The fact that the School Board has granted recognition or sponsorship to other clubs that are arguably not an extension of the school curriculum" is simply not relevant to the legitimacy or illegitimacy of the rejection of the Alliance as a school sponsored club.  This is a First Amendment case, not an Equal Protection case, and the claim of the Alliance must stand or fall on its own merit under the Supreme Court's school speech cases meaning, more particularly, <u>Hazelwood School District</u>.

Turning, then, to the reasonableness of the School Board's action, it must surely be beyond question at this moment in the nation's history that the subject of sexual orientation and the legal status of those in the LGBT Community is at the forefront of public debate, particularly with regard to same sex marriages.  Moreover, it is a very controversial issue.  Indeed, and sadly, it is common knowledge that the debate has often turned violent.  It seems entirely reasonable, therefore, that those in charge of a public middle school with students twelve to fourteen years of age would want to distance the school and its pupils from a debate best left to more

mature educational levels.[23]  Indeed, even if a reasonable person could disagree with that assessment, the same reasonable person would be forced to agree that the contrary view, while perhaps mistaken, is nevertheless within the range of reasonableness.  In any event, in addition to <u>Hazelwood School District</u> itself, there is ample authority for the proposition that the youth and immaturity of students below the high school level is an appropriate if not a vital consideration in determining whether a restraint on speech is permissible.  <u>See</u> <u>Walker-Serrano v. Leonard</u>, 325 F.3d 412, 416 (3d Cir. 2003) (Scirica, J.) ("[A]ny analysis of the students' rights to expression on the one hand, and of schools' need to control behavior and foster an environment conducive to learning on the other, must necessarily take into account the age and maturity of the student.") (citations omitted).  "Human sexuality provides the most obvious example of age-sensitive matter."  <u>Id.</u> at 417.

The Court concludes, therefore, as it did with regard to the Alliance claim under the Equal Access Act, that the Alliance has not sustained its burden of persuasion that it has a substantial likelihood of success on the merits of its claim under the First Amendment.  That appears to be a doubtful proposition at best.  It follows that the Motion For Preliminary Injunction (Doc. 4) will be Denied as to both claims in all respects.

---

[23]    In <u>Bethel Sch. Dist. No. 43 v. Fraser</u>, 478 U.S. 675, 683, 106 S. Ct. 3159, 3164 (1986), the lewd speech case, the Supreme Court characterized the audience of the speech as less mature, ". . . many of whom were only 14 years old and on the threshold of awareness of human sexuality."

## **Conclusion**

Accordingly, upon due consideration, it is hereby ORDERED as follows:

1.      The Defendant's Motion To Dismiss The Complaint (Doc. 10) is in all respects DENIED.

2.      The Plaintiffs' Motion For Preliminary Injunction (Doc. 4) is in all respects DENIED.

3.      The Defendant shall file an answer to the complaint within fourteen (14) days.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida, this 6th day of March, 2014.

_____

**UNITED STATES DISTRICT JUDGE**

Copies to:    Counsel of Record
              Maurya McSheehy, Courtroom Deputy