UNITED STATES DISTRICT COURT
MIDDLE DISTRICT O FLORIDA
OCALA DIVISION
CASE NO.:  5:13-cv-00623-WTH-PRL


CARVER MIDDLE SCHOOL GAY-STRAIGHT
ALLIANCE et al,
          Plaintiffs,
vs.
SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

          Defendant.



DEPOSITION OF:        AURELIA COLE
                      Taken on behalf of Plaintiff
DATE:                 WEDNESSDDAY, JUNE 25, 2014
TIME:                 8:12 A.M. - 9:49 A.M.
LOCATION:             100 WEST MAIN STREET
                      LEESBURG, FLORIDA


REPORTER:             Courtney L. Wear, RMR, CRR, FPR
                      Court Reporter
                      Reported by Stenographic Means



CAB REPORTING, INC.
Post Office Box 1684
Ocala, Florida  34478
(352) 401-0080

A P P E A R A N C E S

DANIEL B. TILLEY, Esquire
ACLU FOUNDATION OF FLORIDA
4500 Biscayne Boulevard, Suite 340
Miami, Florida 33137
        E-mail:  dtilley@aclufl.org
        On behalf of the Plaintiffs

BENJAMIN JAMES STEVENSON, Esquire
ACLU FOUNDATION OF FLORIDA
P.O. Box 12723
Pensacola, Florida 32591
        E-mail:  bstevenson@aclufl.org
        On behalf of the Plaintiffs


STEPHANIE McCULLOCH, Esquire
McLIN BURNSED
100 West Main Street
Leesburg, Florida  34749
        E-mail: stephm@mclinburnsed.com
        On behalf of Defendants

ALSO PRESENT:
        Austyn Sanders, Esquire


        *    *    *    *    *    *

I N D E X

TESTIMONY OF AURELIA COLE                          PAGE


Direct Examination by Mr. Tilley.................4
Cross-Examination by Ms. McCulloch..............69


Certificate of Oath ............................71
Reporter's Certificate .........................72
Read and Sign Letter to Witness.................73
Errata Sheet ...................................74


\*     \*     \*     \*     \*     \*


E X H I B I T S


PLAINTIFF'S EXHIBIT                                PAGE


I ............................................37
J ............................................54

```
 1                  P R O C E E D I N G S
 2          THE REPORTER:  Raise your right hand.
 3          Do you swear the testimony you're about to
 4      give will be the truth, the whole truth, and
 5      nothing but the truth?
 6          THE WITNESS:  I do.
 7  Whereupon,
 8                  AURELIA COLE,
 9   a witness herein having been first duly sworn, was
10          examined and testified as follows:
11                  DIRECT EXAMINATION
12  BY MR. TILLEY:
13      Q.  Good morning.
14      A.  Good morning.
15      Q.  My name is Daniel Tilley, and I represent the
16  Carver Middle School Gay-Straight Alliance and the
17  student HF in the lawsuit against the Lake County
18  School Board.  In the room today we have
19  Benjamin Stevenson, my co-counsel, Austyn Sanders, a
20  volunteer attorney with the ACLU of Florida, the
21  court reporter, the witness, and Ms. McCulloch,
22  opposing counsel.
23          Are you represented by legal counsel here
24  today?
25      A.  None other than that of the School Board.
```

1    None personal.

2        Q.    No personal representation?

3        A.    No, no.

4        Q.    And there's no written retainer agreement?

5        A.    No.

6        Q.    Are you taking any medications today that

7    would prevent you from being able to testify completely

8    and truthfully and honestly and --

9        A.    No.

10        Q.    And your memory's not impaired by any

11    medication or any other --

12        A.    No.  I hope I say the same thing after you

13    ask a couple of questions.

14        Q.    Have you been deposed before?

15        A.    Yes.

16        Q.    Was that in an education matter?

17        A.    Yes.

18        Q.    About how long ago was that?

19        A.    I don't know.  Maybe four, five years ago.

20        Q.    Can you tell me just briefly what the matter

21    was about?

22        A.    I really don't remember.

23        Q.    Was it in a lawsuit against the School Board?

24        A.    May have been.  I just -- I remember coming

25    over here.  And I don't remember what it was now.  In

 1   my job I deal with a little bit of everything.  So I do
 2   not remember back then.
 3       Q.   Okay.
 4       A.   I'm sorry.
 5       Q.   That's okay.
 6           So you see that there's a court reporter here
 7   who's transcribing what we're saying.  Even though
 8   we're not in a court with a judge, you're still under
 9   oath and required to testify truthfully.
10       A.   Exactly.
11       Q.   You understand that if you answer a question,
12   I will assume that you understood what I asked?
13       A.   Okay.
14       Q.   And so if you don't understand, then you'll
15   let me know, right?
16       A.   I will.
17       Q.   Can you tell me how you prepared for the
18   deposition today?
19       A.   Yes.  I reviewed some of my notes, policies.
20   And I came over and, you know, met with the attorneys
21   here.
22       Q.   When did you meet with the attorneys here?
23       A.   It was last week.  I think it was last
24   Thursday.  Can I check my calendar?
25       Q.   It's not necessary.

1  A.  Okay.

2  Q.  But thank you.

3  How long did you speak with the attorneys?

4  A.  I guess about an hour.

5  Q.  Did you look at any documents other than your

6  notes?

7  A.  No.

8  Q.  What were your notes?

9  A.  Well, I didn't bring notes with me that day.

10  I have just checked, you know, some of the -- just

11  checked out some of the clubs that I approved.

12  Q.  So you just looked at the previous club

13  applications?

14  A.  Uh-huh.

15  Q.  And you didn't look at anything else?

16  A.  No.

17  Q.  What's your position with Lake County

18  schools?

19  A.  Chief of administration.

20  Q.  Do you have any other positions?

21  A.  No.

22  Q.  What are your duties as chief of

23  administration?

24  A.  Actually all schools are under my authority.

25  And I'm second in charge of the District, so I'm

1    superintendent in absence, I'm number one.

2        Q.    **How do your duties differ from the**

3    **superintendent's?**

4        A.    I try to stop problems before they get to

5    her.  I deal directly with the schools, parents,

6    administrators, teachers, you know, any problems that

7    may occur, I deal directly with them.  Of course if I

8    can't resolve them then they get to the superintendent.

9        Q.    **If a principal has an issue, do they come to**

10   **you, do they go to the superintendent or do they go to**

11   **someone else?**

12       A.    Normally they come to me.

13       Q.    **Do parents ever come directly to you, or do**

14   **you hear that --**

15       A.    They call me, yes.  I'm the first one they

16   call.

17       Q.    **Okay.**

18       A.    Now you know why my memory is so bad.

19       Q.    **I want to hand you what is marked Plaintiff's**

20   **Exhibit F.  And can you please look over that, and when**

21   **you're ready can you let me know what that is.**

22       A.    Okay.  This is the application that was filed

23   by the Gay-Straight Alliance from Carver Middle School.

24       Q.    **The form that the application is on, is that**

25   **the only form that middle school clubs use to submit an**

1    application?

2        A.    Yes.

3        Q.    So there aren't any other forms that

4    schools -- that clubs could fill out and give to you or

5    the principal?

6        A.    No.

7        Q.    Near the bottom of that form, you see there's

8    a place to sign that's labeled, quote,

9    superintendent/designee approval, closed quote?

10       A.    Yes.

11       Q.    And you are the superintendent's designee --

12       A.    Yes.

13       Q.    -- for club application, correct?

14       A.    Yes.

15       Q.    At what point did you learn that you would be

16   the designee under the policy?

17       A.    Once we actually -- the policies changed.  We

18   had one policy.  And once the policy's changed by, you

19   know, direction of the school board, then that was

20   under my purview.

21       Q.    When you say you had one policy, do you mean

22   before policy 4502, or --

23       A.    Before the three policies came into effect.

24       Q.    When you say "the three policies --"

25       A.    Elementary, middle and high school.

1      Q.    What was the one policy before?

2      A.    Well, it just -- it didn't separate levels.

3    It was just one policy that pertained to clubs.  And

4    can't recite it to you, but it was just a general

5    policy that pertained to clubs.

6      Q.    Can you give me the essence of what the

7    policy was?

8            MS. McCULLOCH:  Object to the form.  You can

9       answer, if you know.

10           THE WITNESS:  And actually you -- it was just

11      a general policy.  And the only thing -- you know,

12      just talking about how clubs can be established,

13      what had to occur.

14   BY MR. TILLEY:

15     Q.    But you don't remember --

16     A.    And a few guidelines.  I don't remember.

17     Q.    You don't remember the guidelines of the

18   policy?

19     A.    I don't.  I can't remember, I'm sorry.

20     Q.    Do you remember if the clubs were subject to

21   the principal's discretion or it was subject to your

22   discretion, or how clubs got approved?

23     A.    At that time they did not come to me, so it

24   must have been the principal's discretion.

25     Q.    Okay.  Who told you that you would be the

1    designee under the new policy?  When I say "the new

2    policy," I'm talking about the three policies with

3    respect to middle schools.  The policy is 4.502.

4        A.    I am trying to remember if I was actually

5    told.  It's like when you're in this position, if

6    something occurs, I'm over policies.  Policies is under

7    my authority.  So I do all policies of Lake County

8    schools, therefore I am over policies.  If a policy

9    changes, I'll address it.

10       Q.    But before the new policy came into being,

11   you weren't the designee, correct?

12       A.    I was still over all policies, but that

13   one -- there was nothing that had to be signed by my

14   office.

15       Q.    Do you know who told you that you are now

16   going to be reviewing and signing applications, given

17   that you weren't doing that before?

18       A.    You know what, I am going to be honest with

19   you, I don't know if somebody told me.  I know if it's

20   dealing with policies, I do it, so... I'm sorry.

21       Q.    Do you expect that you will remain in the

22   role as designee for the next school year?

23       A.    No, because I expect I am going to be

24   retired.

25       Q.    So you're almost done?

1        A.    Actually, tomorrow was supposed to be my last
2    day, but I'm --
3        Q.    **Well, I'm sorry to bring you in here on your**
4    **almost last day.**
5        A.    It's okay.  I will be here a few more weeks
6    because we are still looking for a replacement.
7        Q.    **Do you know who that replacement will be?**
8        A.    I don't.
9        Q.    **Do you expect that there will be a designee**
10    **for next year?**
11        A.    Yes, unless the school board decides to
12    change the policy.
13        Q.    **Do you know why you were selected as the**
14    **designee?**
15        A.    Well, I think it's because I'm second in
16    charge of the district.  And policies are under my
17    purview, so... It's just automatically if the
18    superintendent doesn't sign it, normally I do.
19        Q.    **And there's not any other reason that you're**
20    **aware of that you were selected?**
21        A.    No.
22        Q.    **No?**
23        A.    No, not that I know of.
24        Q.    **Just so she can hear.**
25        A.    I'm sorry.

1    Q.    That's okay.

2          Prior to being selected, did you ever have

3  any discussions with the superintendent or any school

4  officials or board members about the fact that there

5  was a group of students seeking to form a Gay-Straight

6  Alliance at Carver Middle School?

7    A.    Yes.

8    Q.    Who did you talk to?

9    A.    Superintendent.

10   Q.    Did you talk to anybody else?

11   A.    The principal and superintendent.

12   Q.    Did you talk to anybody else?

13   A.    I don't think so at that time.

14   Q.    You didn't talk to any of the Board members?

15   A.    No.

16   Q.    When did you talk to the superintendent?

17   A.    Oh, gee... I don't remember specifically.

18  But when the principal called and said that she had

19  gotten a request for the Gay-Straight Alliance, and I

20  went to -- I told the superintendent.

21   Q.    When the principal called, did she say

22  anything to you other than the fact that she had this

23  application?

24   A.    No.

25   Q.    And what did you tell the superintendent?

1      A.    I told her that there were students at

2   Carver Middle School who wanted to start a Gay-Straight

3   Alliance club.

4      Q.    **Did you tell her anything else?**

5      A.    Nope.

6      Q.    **At the time that you were deciding -- well,**

7   **excuse me.  At the time that you received this phone**

8   **call and you had this conversation with the**

9   **superintendent --**

10     A.    Yes.

11     Q.    **-- did you have any views about whether a**

12  **Gay-Straight Alliance should be permitted to form?**

13     A.    Personal views?  I don't think on the job it

14  doesn't matter whether I personally agree or disagree.

15  I just wait for the policy.

16     Q.    **Do you have personal views?**

17     A.    I have personal views.

18     Q.    **What are your personal views?**

19         MS. McCULLOCH:  I'll object to the form.  But

20      you can answer, if you have a personal view.

21         THE WITNESS:  Say what now?

22         MR. TILLEY:  What's the objection?

23         MS. McCULLOCH:  I don't think it's relevant.

24  BY MR. TILLEY:

25     Q.    **Can you tell me what your personal views are?**

1       A.     Should you -- do I need to say this?

2            MS. McCULLOCH:  What are you asking her,

3       personal view about what?

4            MR. TILLEY:  She said she has a personal

5       about whether a Gay-Straight Alliance should be

6       able to form.  So I'm asking her what her personal

7       views are.

8            MS. McCULLOCH:  Are you talking about the

9       first application, or the school year?

10           MR. TILLEY:  I stated what I was discussing.

11      It was at the time she had the conversation.

12           THE WITNESS:  Okay.

13   BY MR. TILLEY:

14      Q.     **Can you please tell me your personal views?**

15      A.     I will tell you this, I feel all men are

16   created equal.

17      Q.     **Can you tell me your personal view about**

18   **whether a Gay-Straight Alliance should be permitted to**

19   **form at Carver Middle School?**

20      A.     You know what, I don't think -- I don't think

21   my personal view -- because I don't know if I -- that's

22   not important.  I work under the leadership of a

23   superintendent and a school board.  And what I

24   personally think really doesn't interfere with my job.

25      Q.     **I understand that perspective, but I'm asking**

```
 1    what your personal views are on Gay-Straight Alliance,
 2    and whether it should be permitted to form at
 3    Carver Middle School?
 4              MS. McCULLOCH:  You can answer based on if
 5         you have a personal view one way or the other, yes.
 6         No, should it be able to be formed in the
 7         Carver Middle School, then you can answer it.
 8              THE WITNESS:  Yes.
 9    BY MR. TILLEY:
10         Q.  Why do you think it should be permitted to
11    form at Carver Middle School?
12         A.  Because all men are created equal.  And I
13    just -- well, that's what I feel.  And I feel everybody
14    has rights.
15         Q.  Do you have religious views about same sex
16    relationships?
17              MS. McCULLOCH:  Object to the form, again.  I
18         don't think her personal religious views should be
19         part of this lawsuit.
20    BY MR. TILLEY:
21         Q.  Can you tell me what your religious views
22    about same sex relationships are, if you have any?
23         A.  So once you object, do I answer or don't?
24              MS. McCULLOCH:  Yes, you can still answer.
25         The objection's just down on the record.
```

```
 1              THE WITNESS:  Well, let me put it this way:
 2       I have a young man who's like a son to me, and he's
 3       married to another man.  And he's like a son-in-law
 4       to me.  Those are my views.  And I love them, okay?
 5  BY MR. TILLEY:
 6       Q.   Do you think that the school should be
 7  supportive of gay students?
 8              MS. McCULLOCH:  Object to the form.
 9              THE WITNESS:  I think that is a parent's
10       responsibility.  Whatever parent says is okay, then
11       it's fine with me.
12  BY MR. TILLEY:
13       Q.   And you agree that students who are gay
14  should be supported in school?
15       A.   I think all students --
16              MS. McCULLOCH:  Object to the form, but you
17       can answer.
18              THE WITNESS:  I think all students should be
19       supported in a school.
20  BY MR. TILLEY:
21       Q.   Do you see any difference between same sex
22  and different sex relationships?
23              MS. McCULLOCH:  Object to the form.
24              THE WITNESS:  Do I see any difference...
25       Well, let me put it this way:  I have four grand
```

```
1        boys, and I am going to love them, I don't care

2        where they are or what they do, okay?

3   BY MR. TILLEY:

4        Q.   Would you support one of your grandchildren

5   if they wanted to join a Gay-Straight Alliance?

6             MS. McCULLOCH:  Object to the form.

7             THE WITNESS:  Well, yes, I would support

8        them, wherever -- whatever they feel they want to

9        do, and it's not damaging to them or hurting them

10       in any way, then I am going to support them.

11  BY MR. TILLEY:

12       Q.   Going back to your duties as designee.  What

13  do those duties entail, or did they entail?

14       A.   Well, I actually received every application

15  from all school levels.  I read every application.  We

16  also -- they had to attach a charter, and I read every

17  one of them.  And I would either tell the club why I

18  could not approve it, or I would approve the club.

19       Q.   Were there any other duties that you had in

20  fulfilling your role as designee?

21       A.   I would answer -- you know, if a principal

22  called with questions about why I did or didn't, I

23  would answer those questions.

24       Q.   Anything else?

25       A.   Pertaining to clubs?
```

1    Q.    Pertaining to your duties as designee.

2    A.    There was sometimes I would actually -- I

3    would communicate with the superintendent, if I wasn't

4    sure.  This is the first year we had done this.  I

5    almost retired last year, and I didn't.  So --

6    Q.    Now you wish you did.

7    A.    So anyway... You know, so there was some -- I

8    would have to consult with her, you know, and we would

9    talk about them, you know, just to be sure.  I was

10   trying to do it right.

11   Q.    Other than those things, were there any other

12   duties that you had in fulfilling your role as

13   designee?

14   A.    I actually -- you know, I kept copies of

15   everything that we did.  I had to be sure that the

16   copies were returned back to the schools.  And I think

17   that was about it.

18   Q.    Had you had to fulfill those duties in the

19   past?

20   A.    No, because we didn't have this -- policy

21   change.  So, no, in the past I didn't.  That was an

22   added responsibility.

23   Q.    So this is the first time that you're

24   performing these specific duties?

25   A.    Yes.  Yes, this year was the first.

1      Q.    And the only reason you're performing them is
2  because of the new policy?
3      A.    Yes.
4      Q.    And it's your understanding that this new
5  policy came about following many months of school board
6  meetings and community discussion about how to address
7  the Carver Middle School Gay-Straight Alliance's
8  application?
9           MS. McCULLOCH:  Object to the form.  You can
10      answer if you know.
11          THE WITNESS:  Okay.  Maybe.  Maybe yes.
12  BY MR. TILLEY:
13      Q.    You're not sure, but you think maybe yes?
14          MS. McCULLOCH:  Object to the form.
15          THE WITNESS:  Yes.  I think maybe so.
16  BY MR. TILLEY:
17      Q.    What makes you think that?
18      A.    Well, I didn't have to approve any
19  applications prior to the new policy, you know.  And
20  the new policy came in effect after, you know,
21  several -- and I'm not sure Carver Middle was the only
22  one.  We had some FCA clubs, you know.  So -- and I
23  think the Board just decided to look into what they
24  wanted to do.
25      Q.    Why do you think they decided to look into

1    that?

2        A.    Well, it's kind of like -- I think it's

3    because it's something new, kind of like when I was in

4    school we didn't have tardy policies.  People started

5    being tardy and then you had to have tardy policies.

6    So it's like when something new comes and, you know,

7    you look at your policy to see if we're addressing it

8    in a way that you want to address it.

9        Q.    So is it accurate to say that because the

10    Gay-Straight Alliance is this new type of club, they

11    are trying to figure out a policy to figure out how to

12    deal with it?

13        A.    I think not just Gay-Straight, I think they

14    addressed several areas.

15        Q.    What other areas did they address, do you

16    think?

17        A.    Well, in high school where the club was a

18    co-curricular club, or a curricular club, or

19    non-curricular club, you know, because we had others

20    like FCA.  So I think they were just -- they decided,

21    okay, it's time for us just to decide how we want to

22    address this.

23        Q.    Are you aware of any specific applications

24    for clubs that were seeking to form that caused the

25    school board to --

1      A.    FCA.

2      Q.    When was there an FCA application that you

3  are aware of?

4      A.    At the beginning of the year, too.  It was --

5  it came in sometime this school year.  And it was

6  early.

7      Q.    You're talking about the 2013/'14 school

8  year?

9      A.    Yes.

10     Q.    But in the 2012/'13 school year, are you

11 aware of any applications other than the Gay-Straight

12 Alliance application?

13     A.    They didn't have to submit applications at

14 that time.  It was handled locally.

15     Q.    Are you aware of any clubs that were seeking

16 to form during the 2012/'13 school year, other than the

17 Gay-Straight Alliance, that would have caused the

18 school board to look at its policies?

19         MS. McCULLOCH:  Object to the form.  You can

20      answer, if you know.

21         THE WITNESS:  FCA.

22 BY MR. TILLEY:

23     Q.    There was an FCA application in 2013?

24         MS. McCULLOCH:  Object to the form.

25         THE WITNESS:  There were no applications.

1          But I think there was a request for one at a
2     school.
3   BY MR. TILLEY:
4          Q.   **Do you know what school?**
5          A.   Mount Dora High School.
6          Q.   **There was a request for an FCA at Mount Dora**
7   **High School in 2013?**
8          A.   I think so.
9          Q.   **Are there FCAs at the high school now?**
10         A.   Yes.
11         Q.   **So that really hasn't changed, the fact that**
12  **there are FCAs in high schools, right?**
13         A.   The new policy addressed it.  There are three
14  different policies, and you probably know that.  So
15  high schools have a different one.  So the high school
16  policy addressed it.
17         Q.   **But FCAs exist under the new policy, just as**
18  **they existed under old policy, correct?**
19              MS. McCULLOCH:  Object to the form.
20              THE WITNESS:  Not quite.  No.  Uh-uh.
21  BY MR. TILLEY:
22         Q.   **In what way do they not exist?**
23         A.   They can't have a school sponsor.
24         Q.   **But they are allowed to meet on school**
25  **property?**

1        A.    They can meet on school property.

2        Q.    **And they're official school clubs, correct?**

3        A.    No.

4        Q.    **What makes them not official now?**

5        A.    Well, let's see... They are non-curricular

6    clubs.  They can meet on school property.  They can

7    have -- a teacher or principal can assign someone to

8    supervise the club, but they cannot have any input

9    whatsoever into the club.

10       Q.    **Are you saying that non-curricular clubs that**

11   **you approved are not official student clubs?**

12            MS. McCULLOCH:  Object to the form.  And

13        based on the relevance stand, so you know, related

14        to high schools versus middle schools.  And she's

15        already said there's three different policies that

16        govern that.

17   BY MR. TILLEY:

18       Q.    **Can you tell me that -- so you're saying that**

19   **the non-curricular student clubs that you approve at**

20   **the high school are not official student clubs?**

21       A.    They are not clubs that are actually

22   supported by the school.  For example, a Kiwanis Club

23   may have a Key Club on campus, you see?  But the school

24   doesn't support it.

25       Q.    **What do you mean that the school doesn't**

1    support it?

2        A.    There's no sponsor, school sponsor for it.

3        Q.    Do those clubs appear in the yearbook?

4        A.    I think they do now, yes.  At one point they

5    didn't.

6        Q.    Do they have funds that are accounted for

7    through the school?

8        A.    I don't know.

9        Q.    But there is an FCA in the high schools in

10   Lake County --

11       A.    Yes.

12       Q.    -- under the new policy, correct?

13       A.    Yes.

14       Q.    So you identified the Mount Dora High School

15   FCA from the 2013/2014 school year as being a club that

16   invited discussion of a policy, correct?

17            MS. McCULLOCH:  Object to the form.

18            THE WITNESS:  No, I -- see, I am not sure.  I

19       can't answer that.

20   BY MR. TlLLEY:

21       Q.    So you're not sure anymore that the FCA was

22   what --

23       A.    What I think is when the Board decided to --

24   I think they were aware of the request.  I don't

25   know --

1        Q.    When you say "request" -- sorry.    What
2    request are you --
3        A.    The request that they wanted an FCA --
4    school-sponsored FCA club.
5        Q.    How do you know they were aware of the
6    request?
7        A.    Well, I'm thinking they were because once
8    they started addressing policies then, you know, it was
9    kind of included.    They started looking at clubs.
10   There were other clubs, too, that were not
11   non-curricular clubs that they wanted to have --
12   schools were requesting.    So I think they were looking
13   at all of them.
14       Q.    Can you tell me what other clubs they were
15   looking at?
16       A.    Non-curricular clubs, let me see... This was
17   only on the high school level.    And some of them had,
18   oh, gosh... Trying to think of some non-curricular
19   clubs that I approved back in September.
20       Q.    I'm talking about the 2012/2013 school year.
21       A.    Oh.    See, I can't -- clubs then, they didn't
22   have to come to me, you know?    So if I didn't get a
23   call, or something, I didn't deal with clubs, they just
24   followed the policy and it was -- all decisions were
25   made on a local level.

1    Q.    How are you aware of the FCA request in

2  2012/'13?

3    A.    Well, it made the news.  And I think it was

4  '12 -- it was either that, or the year before.  And it

5  was a big deal because it made the news.  I wasn't

6  involved in that.

7    Q.    So it could have been either --

8    A.    But the school board, of course, would have

9  been aware of all of that.

10   Q.    So it could have been the 2011 or 2012 school

11 year or --

12   A.    It could have been, yes.  I can't remember.

13   Q.    There are no other clubs that you are aware

14 of, other than the Gay-Straight Alliance and the FCA in

15 the 2012/2013 school year, that could have sparked this

16 discussion?

17       MS. McCULLOCH:  Object to the form; asked and

18    answered.

19       THE WITNESS:  Not that I am aware of.

20 BY MR. TILLEY:

21   Q.    So is it fair to say that if the FCA was

22 actually proposed in the 2011/2012 school year and only

23 the Gay-Straight Alliance was proposed in the 2012/2013

24 school year, that the Gay-Straight Alliance was the

25 reason that the school board began looking at the

1   policies in the spring --

2       A.   I really can't answer for the school board.

3   I am not sure about that one.

4       Q.   You're not sure?

5       A.   No.

6       Q.   You said earlier, I believe, that sometimes

7   you have conversations with the superintendent about

8   clubs, correct?

9       A.   Uh-huh.

10      Q.   In fulfilling your duties as the designee; is

11  that correct?

12      A.   Yes.

13      Q.   How often did you have those conversations?

14      A.   I don't remember.  I don't remember how

15  often.

16      Q.   Would you say that during the 2013/'14 school

17  year you had many conversations, or just a few, or --

18      A.   A few.

19      Q.   Maybe three to five, or is that a guess,

20  or --

21      A.   Oh, God, you're asking me to answer something

22  that -- see, we talk so much, I mean we talk

23  constantly, but it's about everything in the district

24  and not just clubs.  So I can't get that specific for

25  you.

1      Q.    Fair enough.

2            When you did speak, what did you talk about?

3      A.    We did speak about -- clubs?

4      Q.    Yes.  Excuse me.

5      A.    Well, when I was getting applications, if

6   there was one I wasn't sure if I could approve, you

7   know, then I would speak to her.  Or if there was one

8   that, you know, that I just needed a little

9   clarification on, we might talk.  We didn't -- most of

10  them I just did, you know?  I read, I read the

11  policies.  I sat up every night and I read three

12  policies, and I did each application, and I, you

13  know...

14     Q.    When you did have the conversations with her,

15  were conversations about, I am trying to figure out

16  whether this fits into the policy, or was it about -- I

17  guess what I'm asking is:  When you said you were

18  talking to her to get clarification, what do you mean

19  by getting clarification?

20     A.    It might have been on the charter that was

21  submitted, you know?  The information.  Like, for

22  example, I had approved an FFA club, and she said --

23  you know, I was going to approve it.  And she said, I

24  think we need more information, or something, you know.

25  So I would go back and request it.

1       Q.     What's the FA club?

2       A.     FFA.  Future Farmers of America.

3       Q.     Sorry.

4              Did the superintendent ever give you any

5       guidelines about what to approve or not approve, or how

6       to interpret the new school board policies?

7       A.     We sat down -- in fact, you probably have the

8       guidelines that she sent out, even to I think -- there

9       were guidelines sent to principals.  You know, she

10      talked to principals and everybody, all of us were

11      involved in that conversation, so we would kind of be

12      on the same page and they would know what to expect,

13      what they were supposed to do in relation to club

14      applications, because there was a new process.  So,

15      yeah, we all talked.

16      Q.     Other than those guidelines that she sent to

17      principals, are you aware of any other -- did she send

18      other guidelines to anybody?

19      A.     Not that I am aware of.

20      Q.     Did she give you any additional verbal

21      guidelines?

22      A.     No.

23      Q.     So other than the guidelines that were sent

24      in written form to principals --

25      A.     I am not aware of any others.

1    Q.    From any other instructions from the

2    superintendent on how to process applications, or how

3    to determine whether an application fit within the

4    policies?

5    A.    No, I don't think so.

6    Q.    Be sure to speak up.

7    A.    Oh, no, I don't think so.

8    Q.    It's easy to forget.

9    A.    Yeah.

10   Q.    Did you talk to anyone other than the

11   superintendent when you were trying to figure out

12   whether or not to approve a club application?

13   A.    There were occasions when we would check with

14   Mr. Johnson, our attorney.

15   Q.    How often would you say that you spoke with

16   Mr. Johnson about --

17   A.    During entire year, maybe once or twice.

18   That's it.

19   Q.    Did you talk to him before talking to the

20   superintendent or in addition to talking to the

21   superintendent?

22   A.    No, no.  I -- I'm always going to go to the

23   superintendent first.  Protocol.

24   Q.    Then she said, this is a matter we need to

25   bring to --

1    A.    Yeah, she might say something like that.
2  Uh-huh.
3    **Q.    Can you tell me what the applications were**
4  **where she said, let's talk to Mr. Johnson about this?**
5          MS. McCULLOCH:  Object to the form.  I think
6      that's kind of diving a little too much into our
7      discussions.
8          THE WITNESS:  We had a Best Buddies Club at
9      one school.  And we were trying to see how that
10     fit.  And so eventually we realized in talking to
11     Mr. Johnson it was more a class and not a club,
12     because it dealt with our special ed students and
13     regular students working together.
14  BY MR. TILLEY:
15    **Q.    Were there any other clubs where the**
16  **superintendent said, let's talk to Mr. Johnson about**
17  **this?**
18    A.    Oh, gee... I can't answer that.  I don't
19  know.  I just -- I remember that one in particular.  I
20  think we might have talked about the Chess Club.
21         MS. McCULLOCH:  You don't have to go into
22     detail about any of your discussions or what
23     Mr. Johnson's opinion was.
24         THE WITNESS:  Okay.
25         MR. TILLEY:  That's right.  I'm just asking

1          you --
2              THE WITNESS:  Okay.  That's all.
3      BY MR. TILLEY:
4          Q.    So other than the Chess Club and Best Buddies
5      Club, were there any other clubs where the
6      superintendent said, let's talk to Mr. Johnson about
7      this?
8          A.    I can't remember.  I really can't.
9          Q.    Was the Gay-Straight Alliance one of those
10     clubs?
11             MS. McCULLOCH:  Object to the form.
12             THE WITNESS:  See, I don't think so, because
13         the policy had already been approved.  So I don't
14         think -- I don't think we talked about that one.
15     BY MR. TILLEY:
16         Q.    What do you mean when you say you don't think
17     you talked about that one because the policy had
18     already been approved?
19         A.    Because when the middle school policy said,
20     you know, it's an extension of the curriculum and
21     stuff, and so I don't think -- I don't know.  I can't
22     remember us discussing that one afterwards.
23         Q.    Did you feel that because of the new policy
24     the Gay-Straight Alliance would not be approved?
25         A.    I did.

1    Q.    Why did you feel that way?

2    A.    Because it wasn't an extension of the

3    curriculum, you know?  That's what I thought.

4    Q.    What made you think that?

5    A.    That it wasn't an extension of the -- because

6    we don't offer classes pertaining to gay-straight or

7    sexual orientation or anything like that.  So that's

8    why I thought that it wasn't.

9    Q.    Did you talk to anyone other than the

10   superintendent and Mr. Johnson about your decision

11   whether to approve or disapprove a club application?

12   A.    I don't think so.  I mean, my husband was

13   sitting next to me.  I might have said, you know, I

14   don't know if I should approve this one or not, in

15   talking to myself sort of.  But I don't think I talked

16   to anybody else.

17   Q.    Was there anyone other than the

18   superintendent who gave guidelines to you about --

19   A.    No.

20   Q.    -- how to approve or disapprove?

21   A.    No.

22   Q.    Looking back at Plaintiff's Exhibit F, which

23   is in front of you, the Gay-Straight Alliance

24   application --

25   A.    Yes.

1      Q.    If the superintendent's signature or your
2   signature appears on that signature line designated
3   superintendent/designee approval, does that mean the
4   club is approved?
5      A.    Yes.    99.5 percent of the time, yes.    I
6   approved so many clubs, and there were times when I may
7   have signed it and then looked at something and said,
8   you know what, I need more information, or something,
9   and I would -- you might see some where I scratched
10  through my name, and then requested additional
11  information or something, you know.  So most of the
12  times, yes.  I didn't sign it until I approved it.  You
13  see, the thing with clubs, they come in all year, so
14  it's not like when I approved my first 300, I was
15  through.  They kept coming all year, you know?  I will
16  recommend next year that we have a point where they
17  stop, you know?  If you haven't applied by now, you
18  won't until next year.  But I tried to be as consistent
19  as I could.
20     Q.    So the times when you signed it but it turned
21  out that you needed more information, did you always
22  scratch out your name or did you sometimes scratch out
23  your name?
24     A.    I can't say.  I can't answer that.  I think I
25  did, but I can't answer.

1      Q.    But to your knowledge, those clubs where you

2  needed more -- where you had already signed your name

3  but needed more information, did those clubs end up

4  becoming approved?

5           MS. McCULLOCH:  Object to the form.

6           THE WITNESS:  I can't remember.  I can't

7      remember.

8  BY MR. TILLEY:

9      Q.    Do you think there's a possibility where you

10  signed your name to a club application and it was not

11  approved?

12          MS. McCULLOCH:  Object to the form.

13          THE WITNESS:  I would hope not.  I don't

14     think so.

15  BY MR. TILLEY:

16     Q.    You would be surprised if that happened?

17     A.    Yeah, I would be.

18     Q.    And if your signature or the superintendent's

19  signature is not on the form, that means it's not

20  approved, correct?

21     A.    Yes.  And I usually tried to write a note, or

22  something.  Now, there were cases where I might have

23  approved it, but I might have made a note on the chart,

24  or saying something, that this cannot be included, or

25  something like that.

1        Q.     Were there any clubs that were approved where
2    you didn't or the superintendent didn't sign them?
3        A.     There shouldn't have been.  Not that I am
4    aware of.
5        Q.    I notice that on certain high school
6    applications --
7              MR. TILLEY:  And for this purpose I am going
8         to hand you Plaintiff's Exhibit I --
9              (Plaintiff's Exhibit I marked for
10        identification.)
11   BY MR. TILLEY:
12       Q.     I notice that someone has crossed out the
13   characterization of the club as curricular, for
14   example, and written something else, sometimes
15   co-curricular, sometimes non curricular.
16       A.     Okay.
17       Q.     First I will let you look over that.
18       A.     Okay.  Sometimes they would send -- and I
19   wrote that.  Sometimes --
20       Q.     Sorry.  Can you tell me what that document
21   is?
22       A.     Okay.
23       Q.     Sorry.
24       A.     All right.  This is the curricular club
25   application.  But this is a co-curricular club.  Now,

1  because the applications are similar -- like I couldn't

2  do this on a non-curricular club application.  But

3  because these applications are -- I think they're the

4  same application, I would put co up there, just to keep

5  from having to send it back, send it back, no.  So I

6  would do that.  I could not do that if it were a

7  curricular club.  But if they sent -- on this

8  application, if it was a non-curricular club, I

9  couldn't do that.  For co-curricular, I could, because

10  the applications were the same.

11      Q.   So you could change curricular to

12  co-curricular --

13      A.   Yes.

14      Q.   -- but you could not change non curricular to

15  co-curricular?

16      A.   No, I couldn't.

17      Q.   Could you change curricular to non

18  curricular?

19      A.   No.

20          MS. McCULLOCH:  Object to the form and the

21      relevance, because this is a high school, again.

22      It's a different policy.

23          THE WITNESS:  See, because the non-curricular

24      application was different.  With your co-curricular

25      and curricular clubs -- I'm sorry.  With your

1     non-curricular club, you had to have a student
2     actually applying for it.  With your co-curricular
3     or your curricular, it could be a teacher or an
4     administrator.
5     BY MR. TILLEY:
6          Q.    **When those markings are made on the document**
7     **like the cross-out, is that from you or from somebody**
8     **else?**
9          A.    That's from me.
10         Q.    **And those only happened on the high school**
11    **applications, right, the cross-outs?**
12         A.    That's the only level that had three
13    different applications.
14         Q.    **To your knowledge it was always you who was**
15    **crossing stuff out -- for example, an applicant would**
16    **never cross something out and write something in,**
17    **correct?**
18         A.    I don't think so.  I think I always did it.
19         Q.    **Okay.  And the reason you crossed them out**
20    **was because you wanted to make the application conform**
21    **to where it would -- or what level of policy it would**
22    **fit under, co-curricular, curricular, non curricular?**
23         A.    Yes.  And I have been a principal once and I
24    know how difficult it is with extra duties.  I was
25    actually saving time.  If I had not done this then I

1    have to send it back, they have to redo it, they have

2    to send it back.  And I was really just trying to save

3    the principal some time.  That was my intention.

4        Q.    Plaintiff's Exhibit I, that I just handed

5    you, that's the first robotics team --

6        A.    Yes.

7        Q.    -- for which high school?

8        A.    Lake Minneola High.

9        Q.    Going back to Plaintiff's Exhibit F --

10       A.    Yes.

11       Q.    -- which is the Gay-Straight Alliance

12   application at Carver Middle School.

13       A.    Right.

14       Q.    At the top of the application there are some

15   handwritten remarks, correct?

16       A.    Yes.

17       Q.    And are those your remarks?

18       A.    Yes.  I initialed it (indicating).

19       Q.    And you wrote, "Club is not an extension of a

20   school curricular.  Per policy, not approved"?

21       A.    Yes.

22       Q.    You said that that was your

23   signature/initials?

24       A.    Yes.

25       Q.    When you came to the conclusion that the

1   Gay-Straight Alliance was not an extension of the
2   school curriculum --
3        A.   Yes.
4        Q.   -- and that therefore it was not approved --
5        A.   Right.
6        Q.   -- did you come to that decision on your own,
7   or did you speak with someone about it?
8        A.   Yes.  I came to that conclusion on my own.
9        Q.   Did you talk with anyone else before making
10  your decision?
11       A.   No, I just had the policy there.
12       Q.   And you returned the application after making
13  those remarks --
14       A.   Right.
15       Q.   -- with the instructions that the applicant
16  could reapply, correct?
17       A.   Later.  At a later date, yes.
18       Q.   When you say "later date," what do you mean?
19       A.   I think it was little later when -- okay.
20  When I found out that if the club -- if it strengthened
21  and promoted critical thinking, the business skills,
22  the athletic skills and performing visual arts, then it
23  could be, even if it's not related to the curriculum.
24  And I just didn't know that at first.  Then it could be
25  approved.  So then I sent an e-mail and said, look,

1    just, you know, show us how it's going to be related to

2    that, those things, and then that way I could approve

3    it.

4        Q.    **When you sent it back, who did you send it**

5    **to?**

6        A.    I sent it to the principal and asked her if

7    she would deliver it to the teacher.  I deal directly

8    with principals.

9        Q.    **Did you inform the principal to tell the --**

10       A.    Yes.  And I received an e-mail when she said

11   I had given it to her.

12           MS. McCULLOCH:  Ms. Cole, just to let you

13       know, I know that you're anticipating what he's

14       asking you, but if you can just let him finish his

15       question before you start your answer, it will be a

16       lot easier.

17           THE WITNESS:  All right.  I think I'm ready

18       to go, so...

19           MR. TILLEY:  Won't be too much longer.

20           THE WITNESS:  Okay.

21   BY MR. TILLEY:

22       Q.    **Did you inform the applicant, the teacher**

23   **that she could appeal the decision?**

24       A.    I didn't deal directly with the teacher, I

25   deal with principals.  And so I sent -- I just sent an

1  e-mail to the principal.

2      Q.    And that's the only communication that you

3  had with the principal about the non approval, was you

4  said an e-mail?  I'm sorry?

5      A.    Let me take that back.  I may have called.  I

6  remember she sent me an e-mail back saying that she had

7  done that.

8      Q.    When you talked to the principal, did you

9  tell the principal to tell the teacher that she could

10  appeal the decision?

11      A.    Yes.

12      Q.    What did you say?

13      A.    What I said -- if I remember correctly, what

14  I said was, tell her to redo the application and

15  address how they are going to actually -- how the

16  critical thinking -- she had to get more into the real

17  definition of the critical thinking, and how it was

18  going to be applied to that club.  And then I could

19  approve it.

20      Q.    And you didn't say anything else?  Or did you

21  say additional things?

22      A.    That was it, for the principal.  And I think

23  I sent an e-mail, but I am not sure.

24      Q.    How could the application be improved, the

25  Carver Middle School Gay-Straight Alliance application?

1          MS. McCULLOCH:  Object to the form.  You can

2      answer.

3          THE WITNESS:  Okay.  If they get into exactly

4      how they are going to use the critical thinking.  I

5      think a good example was the Chess Club, I approved

6      one of those after I was told how.  But the way he

7      listed the critical thinking and an extension of

8      it, of the critical thinking on that.  How, you

9      know, it was relative to the math, or something

10     like that, so...

11 BY MR. TILLEY:

12     Q.   **What do you mean when you say "relative to**

13 **the math"?**

14     A.   You know, with chess and math, the relativity

15 there.

16     Q.   **Okay.  So, in your view, chess is approved**

17 **because it relates to math?**

18     A.   That's what I was told.

19          MS. McCULLOCH:  Object to the form.

20 BY MR. TILLEY:

21     Q.   **Who told you that?  Excuse me.  I'll withdraw**

22 **the question.**

23     A.   Thank you.

24     Q.   **So chess relates to the curriculum because**

25 **it's related to math?**

1             MS. McCULLOCH:  Object to the form.

2             THE WITNESS:  That's what I was told.

3    BY MR. TILLEY:

4        Q.    And the Gay-Straight Alliance was disapproved

5    because it doesn't involve critical thinking; is that

6    correct?

7             MS. McCULLOCH:  Object to the form.

8             THE WITNESS:  I didn't approve it because I

9         thought it had to be relative to an extension of

10        the curriculum.

11   BY MR. TILLEY:

12       Q.    How does the idea of critical thinking play

13   into that?

14       A.    Well, when the policy says, "Middle school

15   clubs must be sponsored, they will have to be

16   organizations that strengthen and promote critical

17   thinking, or business skills, athletics skills or

18   performing visual arts."

19       Q.    So does critical thinking mean inherently

20   that something is related to the curriculum?

21       A.    What I learned is that, no.  But if it's not

22   related to the curriculum, then you have to have an

23   extensive definition of how you're going to -- how

24   you're going to present critical thinking skills within

25   the club.

1      Q.    So if something's not related to the
2   curriculum, it can still be approved if it satisfies
3   critical thinking, performing arts, business skills and
4   athletic skills; is that correct?
5           MS. McCULLOCH:  Object to the form.
6           THE WITNESS:  That's what I learned.  I
7       learned that when I was -- when I did the
8       applications.  When I did the applications I
9       thought it had to be an extension of the school
10      curriculum.  When I learned differently -- you
11      didn't ask me anything.
12  BY MR. TILLEY:
13      Q.    I'm sorry?
14      A.    No, I was -- I was rambling on.  You didn't
15  ask me a question, so I stopped.
16      Q.    When did you come to that understanding?
17      A.    I can't remember when it was.
18      Q.    Do you think it was around the beginning of
19  the school year, or some --
20      A.    No, it was later.  It was after I had
21  approved or not approved the club.
22      Q.    So once you began not approving clubs, that's
23  when you learned this understanding?
24      A.    When I learned of that, I sent -- contacted
25  the principal immediately and said, let the teacher

1    know she can reapply.

2         Q.    I'm sorry.  What I'm asking is when you came

3    to the understanding that a club could be related to

4    the curriculum, or --

5         A.    Or.

6         Q.    -- it could satisfy one of those critical

7    thinking criteria, et cetera --

8         A.    Yes.

9         Q.    When was that?

10        A.    I can't tell you when, but it was probably a

11   few months after I had approved or disapproved clubs.

12        Q.    Why was it months after you had begun to

13   approve or disapprove clubs?

14        A.    And I guess it was just a misunderstanding on

15   my part.  And, of course, some middle school

16   principals, too, because a lot of them didn't even send

17   them in, because all of us -- we were thinking that it

18   had to be -- when it said they're an extension of the

19   school curriculum, we thought it had to be an extension

20   of the school curriculum.  Had I not thought that, I

21   wouldn't have written that (indicating).  And so when I

22   found out differently, I then communicated with people

23   to say, like for example, I did not -- I can't

24   remember.  That's all right.  Go on.  I tell it all, I

25   have to be careful.

1     Q.     So you learned that it doesn't have to be
2   related to the curriculum, as long as it's related to
3   these other criteria --
4     A.     Exactly.
5     Q.     -- sometime after you wrote the comment on
6   the GSA application?
7     A.     Yes.
8     Q.     When I say "GSA application," I mean
9   Gay-Straight Alliance.
10    A.     I know.  If you check the date on the e-mail
11  you'll just about know.  It was in that area.
12    Q.     So you sent an e-mail to --
13    A.     I either sent an e-mail or I called the
14  principal at that time.  But she e-mailed me back to
15  say that she had, you know, communicated with the
16  teacher.
17    Q.     Based on your new understanding of the
18  policy --
19    A.     Yes.
20    Q.     -- what would you today write on that
21  application, instead of what you wrote?  And I'm
22  talking about the GSA application.
23         MS. McCULLOCH:  Object to the form, but you
24     can answer.
25         THE WITNESS:  Okay.  What I would have

1          suggested is under her school purpose and goal,

2          when she says to promote critical thinking by

3          discussing how -- now, give me a little more

4          information on how critical thinking is going to

5          actually be used in the classroom. And, you know,

6          with the club. And then it would have been okay.

7          That's all. She just needed to expound on that.

8     BY MR. TILLEY:

9          Q.  So if another application were submitted that

10    expounded more on the part of the charter where it

11    talks about critical thinking, about what they would be

12    doing in class, you would approve the application?

13              MS. McCULLOCH:  Object to the form.

14              THE WITNESS:  That's different -- I don't

15         know. I mean, I would have this one (indicating).

16         I don't know -- I can't say that the others,

17         because I have seen this one, and I know what's

18         written. And I would have made a note and said,

19         this is what you need to do, you know, and sent it

20         back.

21    BY MR. TILLEY:

22         Q.  When you say "the others," what do you mean

23    the others?  Other club applications?

24         A.  Well, you asked me about if I would have done

25    it to the others, and I said I don't know.

1          Q.    Oh.

2          A.    I know I would have with this one.

3          Q.    Oh.   I'm talking just about this Plaintiff's

4    Exhibit F, the Carver GSA application.   What I'm asking

5    is:   If the students had --

6          A.    Expounded on the critical thinking area?

7          Q.    Correct.

8                MS. McCULLOCH:   Object to the form.

9                THE WITNESS:   Would I have -- okay.

10   BY MR. TILLEY:

11         Q.    Would you have approved it?

12         A.    Yes.   Had I known what I learned, that it did

13   not have to be relative to the curriculum.

14         Q.    And you came to that new understanding

15   following conversations with --

16               MS. McCULLOCH:   You don't have to tell him

17         about any legal consultations or anything like

18         that.   But if there's --

19               THE WITNESS:   Then I won't answer that one.

20   BY MR. TILLEY:

21         Q.    Did you talk to the superintendent about that

22   new understanding?

23         A.    Yes.

24         Q.    What did you discuss with the superintendent?

25         A.    The critical thinking part of it.

1        Q.    Did you talk about the critical thinking part

2   of it with the superintendent in the context of the GSA

3   application, or generally, or in the context of --

4        A.    Generally.

5        Q.    What did she say to you?

6        A.    Gosh... She just reminded me of, you know, we

7   take -- we teach a class called CRISS strategies, and

8   she just reminded me of when you start talking about

9   critical thinking, it's got to involve some of those

10  strategies.  So then I knew what to ask for.

11       Q.    Can you tell me the name again of that

12  course, CRISS strategies?

13       A.    Yeah.

14       Q.    And is that a class you take together, or

15  that's an activity?

16       A.    It's offered in the district.  You know,

17  different teachers take it.

18       Q.    You and the superintendent were taking it at

19  that time together?

20       A.    No.  I didn't take it.  She was just giving

21  me an example of what I needed to expect with the

22  critical thinking, and she used the CRISS strategies,

23  you know, the class, to do that.

24       Q.    So under your current understanding of the

25  middle school club policy, the GSA would be approved --

1      A.    Uh-huh.  If she had returned that

2   application -- and I was hoping she would -- I would

3   have approved it.

4      Q.    **Did you tell anyone that you were hoping that**

5   **they would resubmit the application?**

6      A.    No.  I just asked them to do that.

7      Q.    **When you wrote that comment at the top of the**

8   **GSA application, did you either e-mail or call the**

9   **principal that same day, or was there a delay?**

10     A.    No, we just -- our procedure was just we send

11  them back.  My assistant would send the applications

12  back.

13     Q.    **But at the time you wrote it and directed**

14  **that it be sent back, you had the old understanding of**

15  **the policy, correct?**

16     A.    Right.  Exactly.

17     Q.    **But at the time when you asked them to**

18  **resubmit it, what were you thinking at that time about**

19  **how they could resubmit it?**

20     A.    Well, if they had resubmitted it and

21  expounded on the critical thinking area that they had

22  on there already, I would have approved it.

23     Q.    **But this was before you learned about the new**

24  **policy, right?  Or the new -- before you gained your**

25  **new understanding of the policy, right?**

1    A.    No.  I would not have approved this -- when I
2  did all of my -- the majority of the applications, I
3  did it thinking this.
4    Q.    **Thinking what?**
5    A.    That it had to be an extension of the school
6  curriculum.
7    Q.    **Okay.**
8    A.    So, therefore, whenever it was that I
9  learned, oh, okay, then I started communicating, you
10  know, with the principal.
11    Q.    **So you wrote this, that it's not an extension**
12  **of the school curriculum, and then you later learned --**
13    A.    Yeah.
14    Q.    **-- you learned a new understanding of the**
15  **policy.**
16    A.    Uh-huh.
17    Q.    **Then you communicated to the principal; is**
18  **that correct?**
19    A.    Yes.
20    Q.    **And do you know the timeframe?**
21    A.    I don't.  I don't remember the timeframe.
22    Q.    **Do you think it was a few days, or a few**
23  **weeks, or a few months?**
24    A.    No.  It might have been -- might have been a
25  couple of months or so.  I don't know.

1      Q.    Okay.  So after you wrote that it's not an

2  extension of the school curriculum, why did you wait

3  perhaps up to a couple months before telling --

4      A.    Because that's when I learned that they

5  didn't have to be.  Once I gained the knowledge -- and,

6  see, this is new this year.  We haven't done this

7  before.  Middle school principals, most of them and I

8  were thinking the same way, okay?  It had to be an

9  extension of the curriculum, that's the first thing.

10  And then it has to do this.  When I learned it could do

11  either one or the other, then I started addressing it.

12          MR. STEVENSON:  I don't know if this is a

13      good time to take a break, but I could use a

14      bathroom break.

15          THE WITNESS:  I can, too.

16          MR. STEVENSON:  Good.

17          MS. McCULLOCH:  Then it's a good time.

18          (Break taken.)

19          MR. TILLEY:  I want to show you

20      Plaintiff's Exhibit J marked 4.502, middle school

21      clubs and organizations.

22          (Plaintiff's Exhibit J marked for

23      identification.)

24  BY MR. TILLEY:

25      Q.    Can you review that and let me know when

1    you're finished?  When you are finished, let me know

2    what that is, please.

3        A.    Okay.  I'm familiar with this.

4        Q.    And what is it?

5        A.    It's the middle school student clubs and

6    organizations policy.

7        Q.    And subparagraph two is the paragraph where

8    it talks about it being an extension of the curriculum,

9    it lists critical thinking, business skills, et cetera,

10   correct?

11       A.    Yes.

12       Q.    In going back to your understanding of the

13   policy, your original understanding was that the clubs

14   had to be an extension of the curriculum, correct?

15       A.    Yes.

16       Q.    Your new understanding is that they can be an

17   extension of the school curriculum, or they can be --

18   or they can strengthen and promote critical thinking,

19   business skills, athletic skills and performing/visual

20   arts, correct?

21       A.    Yes.

22       Q.    So it could promote just critical thinking

23   and could be approved as a student club, correct?

24       A.    Yes.

25       Q.    And it could promote just business skills and

1    be approved, correct?

2        A.    Yes.

3        Q.    And it could promote just athletic skills and

4    be approved, correct?

5        A.    Yes.

6        Q.    And it could promote just performing and

7    visual arts and be approved, correct?

8        A.    Yes.

9        Q.    Without being curricular, correct?

10       A.    Without being an extension of the school

11   curriculum.

12            MS. McCULLOCH:    Object to the form.

13   BY MR. TILLEY:

14       Q.    Without being an extension of the school

15   curriculum, correct?

16       A.    Uh-huh.

17       Q.    You can say yes.

18       A.    Yes.

19       Q.    And the last sentence of that sub-part where

20   it says, "Schools may also establish organizations

21   relating to academic honor societies and student

22   government and clubs that are directly related to the

23   curriculum," what does that mean?

24       A.    It means that a National Honor Society or a

25   student council government/organization can be

1    established.

2        Q.    So could you have an academic honor society

3    that's not related to the curriculum, and that also

4    does not strengthen and promote critical thinking,

5    business skills, athletic skills and performing and

6    visual arts?

7            MS. McCULLOCH:   Object to the form.

8            THE WITNESS:   The information I was given is

9        that these clubs, student -- National Honor Society

10       and student government organizations were accepted.

11   BY MR. TILLEY:

12       Q.    They were exceptions --

13       A.    They were accepted as clubs, as middle school

14   clubs.

15       Q.    Okay.   Do you have an understanding of

16   whether an academic honor society has to be directly

17   related to the curriculum, or not?

18       A.    No, I did not think it had to be directly

19   related to the curriculum, only because as far as I'm

20   concerned with the grades, they have to have a certain

21   average to get in there.   So that would automatically

22   make it related to all subjects, because they have to

23   have a certain grade point average.

24       Q.    Do you have an understanding of whether

25   academic honor societies need to strengthen and promote

1    either critical thinking, business skills, athletic

2    skills or performing and visual arts?

3                MS. McCULLOCH:  Object to the form.

4                THE WITNESS:  No.

5    BY MR. TILLEY:

6        Q.    You said no?

7        A.    No.

8        Q.    You said no in the answer to that question,

9    correct?

10       A.    Yes.

11       Q.    Okay.  So you don't have an understanding --

12   does an academic honor society need to promote critical

13   thinking, business skills, athletic skills or

14   performing and visual arts?

15               MS. McCULLOCH:  Object to the form.

16               THE WITNESS:  Do they have to?

17   BY MR. TILLEY:

18       Q.    Correct.  Do they have to?

19       A.    Not that I am aware of.  Now, from my

20   knowledge, and what I was -- it was explained to me,

21   those two clubs, National Honor Society and student

22   government were accepted on all levels, okay?  So...

23       Q.    And in your understanding, academic honor

24   societies and student government are subject to the

25   same standard?  Or are they different?

1          MR. STEVENSON:  There may be a
2     miscommunication.  I believe she keeps on saying
3     accept with an A, as opposed to except with an E.
4          THE WITNESS:  Right.  Accept.  Accepted.
5          MR. TILLEY:  No.  I understand.
6          THE WITNESS:  Okay.  My understanding is
7     national honor societies, student government
8     organizations are acceptable clubs.
9  BY MR. TILLEY:
10    **Q.    Period?**
11     A.    Period.  But they do have to have a charter,
12  okay?
13    **Q.    This new understanding that -- so your new**
14  **understanding is that a club does not have to be an**
15  **extension of the school curriculum as long as it**
16  **strengthens and promotes critical thinking, business**
17  **skills, athletic skills or performing and visual arts,**
18  **correct?**
19          MS. McCULLOCH:  Object to the form.
20          THE WITNESS:  Correct.
21  BY MR. TILLEY:
22    **Q.    And you did not have that understanding prior**
23  **to visiting this office, correct?**
24     A.    I did not.  Prior to what?
25          MS. McCULLOCH:  Object to the form.

1   BY MR. TILLEY:

2        Q.   **Prior to visiting this office?**

3        A.   No --

4             MS. McCULLOCH:  Visiting this office.

5             THE WITNESS:  Yeah, I am not saying that.  I

6        didn't visit this office to find that out.

7             MS. McCULLOCH:  And I don't think she's

8        testified to any of that, that it was based on a

9        legal opinion, as far as her understanding goes.

10       And any communications between her and Mr. Johnson

11       are not discoverable.

12  BY MR. TILLEY:

13       Q.   **Where did you learn this information?**

14            MS. McCULLOCH:  That's not discoverable --

15            THE WITNESS:  In my superintendent's office.

16  BY MR. TILLEY:

17       Q.   **In your superintendent's office?  And you**

18  **learned this from the superintendent?**

19       A.   Can I plead the Fifth on that one?  No.

20            MS. McCULLOCH:  I think she's already asked

21       and answered this.  I don't think you're entitled

22       to ask about any legal opinions that the

23       superintendent or that Ms. Cole may have been a

24       part of.  But, I mean, she's already talked to you

25       about her discussions with the superintendent with

1    regard to her understanding of the policy.

2    BY MR. TILLEY:

3       Q.   I don't want you to tell me anything that

4    Mr. Johnson said to you.

5       A.   Okay.

6       Q.   What I'm asking you is whether the

7    superintendent gave you this new understanding?

8            MS. McCULLOCH:  Object to the form.  You can

9        answer if --

10           THE WITNESS:  I don't remember.

11   BY MR. TILLEY:

12      Q.   You don't recall whether the superintendent

13   gave you this new understanding of the policy?

14      A.   I don't.

15      Q.   Do you remember whether the superintendent

16   discussed this new understanding of the policy with

17   you?

18      A.   Yes, I do remember us discussing it.

19      Q.   And what did she say to you?

20      A.   She -- I remember us discussing the critical

21   thinking part of it.  And she explained what would be

22   accepted for critical thinking.

23      Q.   And that explanation was what?

24      A.   The CRISS strategies, something similar to

25   that.

1      Q.    And she didn't say anything else about

2   critical thinking?

3      A.    No.  I think that was it.

4      Q.    Did she say anything else about any other

5   aspect of the policy, other than critical thinking?

6      A.    Not that I recall.

7      Q.    When you requested information from

8   teachers -- excuse me.  When you requested more

9   information from applicants when you were reviewing

10  club applications, the additional information that you

11  got was resubmitted with the application; is that

12  correct?

13     A.    Yes.

14     Q.    So you said, I need more information on X,

15  and they would resubmit the application with whatever

16  those additional materials were?

17     A.    Yes.

18     Q.    And did you only consider -- when you were

19  deciding whether to approve a club, did you only

20  consider what was in this application with any

21  resubmissions, or did you consider other things, as

22  well?

23     A.    No.  Some people would apply for the club,

24  send me an application, there would be nothing

25  attached, no charter or anything.  I would send it back

1    and say I would need the charter.

2        Q.    And then they would resubmit it with the

3    charter?

4        A.    Yes.  Yes.

5        Q.    And when you were reviewing the application,

6    in deciding whether to approve it, you only looked at

7    the application itself, or did you --

8        A.    And the charter.

9        Q.    And the charter?

10       A.    Yes.

11       Q.    And did you consider other things outside of

12   the application and charter?

13       A.    I only considered those things that were in

14   the policy, that I was aware of.

15       Q.    What I mean is, when you were deciding

16   whether to approve an application or disapprove an

17   application --

18       A.    Yes.

19       Q.    -- you would read the charter and application

20   in front of you, then you would decide.  Would you do

21   additional research, would you talk to the teachers?

22       A.    No, no, no, no.  You got to understand, when

23   you saw the book of high schools, and you saw the book

24   of middle schools, and you saw the -- I don't know if

25   you saw the elementary --

1      Q.    I saw --

2      A.    You know, no, I didn't -- I didn't talk to --

3   I would write what I would need, and then send it back.

4   You know, like over here when I wrote, need principal's

5   signature.  I would just write what I need and send it

6   back.

7      Q.    But you wouldn't consider outside

8   information, correct?

9      A.    No.

10     Q.    No, you would not?

11     A.    No.  No.

12     Q.    No, you would not --

13     A.    No, I would not consider any other

14  information that wasn't pertinent to what was received

15  and the policy.

16     Q.    When you say "pertinent to what was

17  received," you mean the application and charter?

18     A.    Yes.

19     Q.    So you didn't consider anything but the

20  application and charter, correct?

21          MS. McCULLOCH:  Object to the form.

22          THE WITNESS:  Okay.  Because, you know, some

23      of the organizations have like a national criteria,

24      you know?  And they would even attach that.

25  BY MR. TILLEY:

1        Q.    I guess what I'm asking is:  So you have an

2    application in front of you.  You got to decide, am I

3    going to approve or disapprove this?

4        A.    Yes.

5        Q.    So you read the application, you read the

6    charter.  Was there ever a time when you said, I want

7    to learn more about Future Farmers.  I am going to go

8    look at the Future Farmers' website and see what that's

9    all about?

10       A.    No, not when you're approving as many

11   applications as I'm approving.  And that's only one

12   phase of the job.  No.  I either asked for more

13   information, told them what was wrong with it, they

14   would have to get back to me.  But, no, I didn't

15   communicate with anybody.

16       Q.    Okay.  And you didn't do this outside

17   research?

18       A.    No.

19       Q.    No, you didn't do --

20       A.    No, I did not.  I did not.

21            (Plaintiff's Exhibit H marked for

22       identification.)

23   BY MR. TILLEY:

24       Q.    I want to briefly discuss with you

25   Plaintiff's Exhibit H.  Could you please review this,

1  and when you've reviewed it, let me mow what it is.

2      A.    Okay.   They were working on the teacher

3  contract.

4      Q.    **First, can you tell me what that is?**

5      A.    Oh, okay.   This is an e-mail I sent to

6  principals on December 6th.

7      Q.    **And in that e-mail you said that --**

8      A.    That yearbook and newspaper are no longer

9  listed as clubs.   They're considered activities.

10  Therefore, club applications are not required, and will

11  no longer be processed.

12      Q.    **And what were you going to say about this**

13  **document, that you started to say before you**

14  **interrupted you?   Sorry.**

15      A.    When I was approving clubs, they were also in

16  the middle of the teacher bargaining to complete the

17  contract.   Well, I didn't realize -- see, in years --

18  every year past, including '12/'13, yearbook and

19  newspaper were listed as clubs.   Well, when they did

20  the new contract, I then found out, you know, if I sent

21  this out to six, I probably found out the sixth or the

22  fifth, that they changed it in the contract.   So I

23  don't do the bargaining, I don't do the contract.   They

24  changed it so that they were no longer clubs, they were

25  then considered activities, and they had moved it in

1    the contract.

2        Q.    **When you say "the contract," are you talking**

3    **about a union contract?**

4        A.    The teacher contract, yes.  Union contract.

5        Q.    **The teacher union contract?**

6        A.    Yes.  And we pay supplements, you see, so...

7    The supplements either fall under clubs or --

8        Q.    **So under the teacher union contract it states**

9    **that the teachers are going to get extra money for**

10   **clubs, and under the new contract they will no longer**

11   **be receiving the money because those activities are no**

12   **longer considered clubs; is that correct?**

13       A.    No, that's not correct.

14       Q.    **Can you explain to me --**

15       A.    Okay.  We have supplements for clubs.  Those

16   two, yearbook and newspaper, were both under the club

17   supplement, and in the new contract they were moved

18   over.  So they are not clubs any longer, they then put

19   them under activities.  Now, that had nothing do with

20   what the supplement is, and I don't know what it is.

21   But just moved them to activities, rather than clubs.

22   I deal with the clubs, not activities.  So then I

23   didn't need -- they didn't have to submit applications

24   for those.

25       Q.    **Do you know the significance of moving them**

1    from clubs to activities?

2          A.    No, I have nothing to do with the bargaining

3    or the teacher contract.

4          Q.    Do you know what activities means, in that

5    context?

6          A.    No.  I don't know what they meant.

7          Q.    What does activities mean to you, in the work

8    that you do?

9          A.    Well, see, I have athletics under my purview,

10   so of course I think about athletic activities.  But I

11   don't do the contract, so I don't know what they had in

12   mind.  The only thing I knew is that yearbook and

13   newspaper, I didn't have to worry about those any

14   longer.  And, therefore, it was okay with me.

15         Q.    Was that solely because of this change in the

16   teacher contract, or were there additional reasons?

17         A.    No, it was just the change.

18               MS. McCULLOCH:  Object to the form.

19   BY MR. TILLEY:

20         Q.    And you don't know why the change was made?

21         A.    I have no idea.

22         Q.    Did you ever talk to anyone about the change?

23         A.    No.  Well, I found out because the girl who

24   does the bargaining actually brought -- she said, Oh, I

25   need to show you this, that it's changed.  I am like,

```
1    oh, okay.  All right.  So immediately I wanted to
2    communicate that to our principals.
3         Q.   And who does the bargaining?
4         A.   Lorrie Marshal (phonetic).
5         Q.   Lorrie Marshal?
6         A.   Lorrie Marshal.
7              MR. TILLEY:  That's all the questions that I
8    have.
9              MS. McCULLOCH:  Ms. Cole, I just have one
10   question, just to kind of clarify.
11             THE WITNESS:  Okay.
12                     CROSS-EXAMINATION
13   BY MS. McCULLOCH:
14        Q.   You've been talking about the policy and your
15   interpretation originally about -- related to the
16   curriculum.
17        A.   Right.
18        Q.   And I just want to be a little bit more
19   specific.  When your first understanding of the policy
20   was related to the curriculum, do you interpret that to
21   be related to a class that's offered in the
22   curriculum --
23        A.   Yes.
24        Q.   Is that how you're defining it?
25        A.   Yes.
```

1          MS. McCULLOCH:  Okay.  That's all the
2     questions that I have, then.  No further questions.
3          MR. TILLEY:  Okay.  That's all.  Thanks.
4     Let's conclude.
5          MS. McCULLOCH:  Ms. Cole, I am going to
6     suggest that you read your deposition, just because
7     it was fairly long.  The court reporter will let
8     you know when it's ready, when the transcript's
9     available, and then you can read it and make any
10    corrections, if there are any.  If not, we'll sign
11    off saying there's no corrections.  Okay?
12          THE WITNESS:  All right.
13          (This proceeding concluded at 9:49 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

```
 1              C E R T I F I C A T E   O F   O A T H
 2
 3    STATE OF FLORIDA}
 4    COUNTY OF LAKE  }
 5              I, COURTNEY L. WEAR, RMR, CRR, FPR, a Notary
 6    Public for the State of Florida and Court Reporter, do
 7    hereby certify that AURELIA COLE personally appeared
 8    before me on 6-25-2014, and was duly sworn.
 9              Signed this day of 7-1-2014.
10
11
12
13
14
15
16
                                COURTNEY L. WEAR
17                              Notary Public-State of Florida
                                Comm No:  EE016705
18                              Expires:  December 12, 2014
19
20    Type Identification Produced: Florida Driver's License
21
22
23
24
25
```



```
 1                    C E R T I F I C A T E
 2   STATE OF FLORIDA  }
 3   COUNTY OF LAKE     }
 4            I, COURTNEY L. WEAR, a Notary Public for the
 5   State of Florida and Court Reporter, do hereby certify
 6   that I was authorized to and did stenographically
 7   report the foregoing deposition of AURELIA COLE; that a
 8   review of the transcript was requested; and that pages
 9   4 through 70, is a true record of my stenographic
10   notes.
11            I further certify that I am not a relative,
12   employee, or attorney or counsel of any of the parties,
13   nor am I a relative or employee of any of the parties'
14   attorney or counsel connected with the action, nor am I
15   financially interested in the action.
16            Signed this day of 7-1-2014.
17
18
19
20                    COURTNEY L. WEAR
21
22
23
24
25
```

```
 1                    N O T I C E
 2
      DATE: 7-1-2014
 3
 4    TO:   STEPHANIE McCULLOCH, Esquire
            McLIN BURNSED
 5          C/O AURELIA COLE
            100 West Main Street
 6          Leesburg, Florida  34749
 7
 8    IN RE:6-25-2014 deposition of AURELIA COLE
            CARVER MIDDLE SCHOOL GAY-STRAIGHT ALLIANCE, et al
 9    vs. SCHOOL BOARD OF LAKE COUNTY, FLORIDA
10    Dear Madam:
                 This letter is to advise that the transcript
11    for the above-referenced deposition has been completed
      and is available for review.  Please contact our office
12    at (352)401-0080 to make arrangements for read and sign
      or sign below to waive review of this transcript.
13               It is suggested that the review of this
      transcript be completed within 30 days of your receipt
14    of this letter, as considered reasonable under Federal
      Rules; however, there is no Florida Statute to this
15    regard.
                 The original of this transcript has been
16    forwarded to the ordering party and your errata, once
      received, will be forwarded to all ordering parties for
17    inclusion in the transcript.
18                       Sincerely,
19                       Courtney L. Wear
                         CAB Reporting, Inc.
20
      cc:  [courtesy copy all ordering parties]
21
      Waiver:
22
      I, _Aurelia M. Cole_ hereby waive the reading
23    & signing of my deposition transcript.
24    Aurelia M. Cole      8/1/14
25    AURELIA COLE         Date
```

1    * Federal Civil Procedure Rule 30(e)

     Florida Civil Procedure Rule 1.130(e)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    ERRATA SHEET
 2       DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE:
 3    IN RE:       CARVER v. LAKE COUNTY SCHOOL
 4    CASE NO.:    5:13-cv-00623-WTH-PRL
 5    PAGE NO.:    LINE NO.:  CHANGE:          REASON:
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
      Under penalties of perjury, I declare that I have read
23    my deposition and that it is true and correct subject
      to any changes in form of substance entered here.
24
      DATE:  8/11/14              Aurelia M. Cole
25                                AURELIA COLE
                                  No Change
```