UNITED STATES DISTRICT COURT
MIDDLE DISTRICT O FLORIDA
OCALA DIVISION
CASE NO.:  5:13-cv-00623-WTH-PRL


CARVER MIDDLE SCHOOL GAY-STRAIGHT
ALLIANCE et al,
           Plaintiffs,
vs.
SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

           Defendant.


DEPOSITION OF:      BILL MATHIAS
                    Taken on behalf of Plaintiff

DATE:               WEDNESDAY, OCTOBER 1, 2014

TIME:               10:38 A.M. - 12:12 P.M.

LOCATION:           1000 W. MAIN STREET
                    LEESBURG, FLORIDA

REPORTER:           Courtney L. Wear, RMR, CRR, FPR
                    Court Reporter
                    Reported by Stenographic Means


CAB REPORTING, INC.
Post Office Box 1684
Ocala, Florida  34478
(352) 401-0080

A P P E A R A N C E S

DANIEL B. TILLEY, Esquire
ACLU FOUNDATION OF FLORIDA
4500 Biscayne Boulevard, Suite 340
Miami, Florida 33137
     E-mail: dtilley@aclufl.org
     On behalf of the Plaintiffs

BENJAMIN JAMES STEVENSON, Esquire
ACLU FOUNDATION OF FLORIDA
P.O. Box 12723
Pensacola, Florida 32591
     E-mail: bstevenson@aclufl.org
     On behalf of the Plaintiffs


STEPHANIE McCULLOCH, Esquire
McLIN BURNSED
100 West Main Street
Leesburg, Florida 34749
     E-mail: stephm@mclinburnsed.com
     On behalf of Defendants



\*    \*    \*    \*    \*    \*

# I N D E X

TESTIMONY OF BILL MATHIAS                          PAGE

Direct Examination by Mr. Tilley.................4

Certificate of Oath ............................70
Reporter's Certificate .........................71
Read and Sign Letter to Attorney McCulloch.......72
Errata Sheet ...................................73

\*   \*   \*   \*   \*   \*

# E X H I B I T S

PLAINTIFF'S EXHIBIT                                PAGE

AX ............................................18
AZ ............................................20
BA ............................................48

```
 1                  P R O C E E D I N G S
 2            THE REPORTER:  Raise your right hand.
 3            Do you swear the testimony you're about to
 4        give will be the truth, the whole truth, and
 5        nothing but the truth?
 6            THE WITNESS:  I do.
 7    Whereupon,
 8                      BILL MATHIAS,
 9      a witness herein having been first duly sworn, was
10              examined and testified as follows:
11                    DIRECT EXAMINATION
12    BY MR. TILLEY:
13        Q.   Good morning.
14        A.   Good morning.
15        Q.   My name is Daniel Tilley, I represent the
16    Carver Middle School Gay-Straight Alliance and the
17    student, HF, in a lawsuit against the Lake County
18    School Board.
19            Are you represented by legal counsel today
20    here at the deposition?
21        A.   Is that yes?  Yes, I guess I am.
22        Q.   Is there a written retainer agreement between
23    you and Ms. McCulloch?
24            MS. McCULLOCH:  Just object to the form.  And
25        I don't know what the relevance of that is.  We
```

1    represent the School Board of Lake County, Florida.

2    We don't represent him, individually, as a person.

3    BY MR. TILLEY:

4    Q.    Are there any medications that you're taking

5    today that would prevent you from being able to recall

6    things in the past or --

7    A.    No.

8    Q.    Is there any other reason that you wouldn't

9    be able to focus today or wouldn't be able to recall

10   things from the past?

11   A.    Other than old age.

12   Q.    Have you been deposed before?

13   A.    Yes.

14   Q.    When was that?

15   A.    Oh, gosh, probably 20 years ago.  Had to do

16   with my business.

17   Q.    So you understand today, as then I'm sure,

18   that you're under oath and you're required to give

19   truthful and accurate answers?

20   A.    Hundred percent.

21   Q.    If you don't understand a question, you'll

22   let me know, right?

23   A.    Yes, sir.

24   Q.    How did you prepare for the deposition today?

25   A.    I met with Stephanie.  That's Stephanie,

1    right (indicating)?  Yesterday or the day before.  And

2    reviewed the minutes.  That's all I've done.

3         Q.    When you say "the minutes," you mean the

4    minutes of School Board meetings?

5         A.    Correct.

6         Q.    Were those meetings from the spring of 2013,

7    or were they from some other time, as well?

8         A.    No.  From 2013.

9         Q.    And that was it?

10        A.    That was it.

11        Q.    Can you tell me about your educational

12   background, just in summary?

13        A.    Yeah, I have a Bachelor's degree in business

14   administration and I have a master's degree in

15   organizational management.

16        Q.    Where did you earn those degrees?

17        A.    At Jones Business College in Jacksonville and

18   the University of Phoenix, Orlando.

19        Q.    Are you from Florida?

20        A.    Yes.  Jacksonville.

21        Q.    And you're current in your position with the

22   Lake County School Board; is that correct?

23        A.    District one, uh-huh.

24        Q.    Do you hold any other positions?

25        A.    I'm with the -- Lake County School Board?

1      Q.    Generally.

2      A.    I own Matt Food Service Company.

3      Q.    Other than that and the Lake County School

4  Board, that's it?

5      A.    I have a couple of investment companies.  Two

6  land investments.

7      Q.    And other than those items --

8      A.    That's it.  Yeah, that's it.

9      Q.    Okay.  I assume you've heard of the

10  Carver Middle School Gay-Straight Alliance, correct?

11     A.    No.  Yes, I have.

12     Q.    So when I say Carver GSA, you know that I am

13  referring to that group, right?

14     A.    Yes, sir.

15     Q.    What is your understanding of what a GSA is?

16     A.    Gay-Straight Alliance.

17     Q.    What do you understand the purposes and goals

18  of a Gay-Straight Alliance to be?

19     A.    This is just my interpretation.

20     Q.    Yes.

21     A.    And it is a group brought together of guys

22  and bisexuals and transgenders and questioning, in

23  Florida, and straights.  And for them to be able to

24  just meet and have understandings of each other's --

25  sort of a support group, I guess.

1    Q.    So you understand it to be a support group?

2    A.    Yeah, pretty much.  Yeah.  It's a club,

3    obviously.

4    Q.    Is there anything else you think, other than

5    acting as a support group, that -- any other roles that

6    it serves?

7    A.    No.  I think that they are what I have

8    followed, that they tend to be activists.  And one of

9    their main focuses, again with understanding, is that

10   they speak a lot about bullying of those folks.

11   Q.    When you say "those folks," you mean LGBT

12   folks --

13   A.    Sort of both.  All students.

14   Q.    Okay.  Other than talking about bullying,

15   what is your understanding of what, if anything else,

16   that is discussed at GSA meetings?

17   A.    I don't have any firsthand knowledge of

18   anything else.

19   Q.    Do you have any secondhand knowledge, things

20   that you've read or heard about what else students

21   would discuss at GSA meetings, other than bullying?

22        MS. McCULLOCH:  I am just going to object to

23        the form.

24        THE WITNESS:  What does that mean?

25        MS. McCULLOCH:  I am going to be making

1       certain objections for the record.

2               THE WITNESS:  I can go ahead and speak about

3       it?

4               MS. McCULLOCH:  You can answer, unless I

5       instruct you otherwise.  Just for the judge to read

6       later.

7               THE WITNESS:  I haven't really followed that,

8       to be honest.  I think that's -- mainly that's what

9       I have heard, is a clear understanding of both

10      those that are straight and those that aren't.  And

11      the bullying.  That's pretty much it.

12  BY MR. TILLEY:

13      Q.   **What do you understand the activities of a**

14  **GSA to be?**

15      A.   Well, we certainly know they want to have

16  meetings.

17              MS. McCULLOCH:  Sorry.  I am going to object

18      to the form, but you can answer.

19              THE WITNESS:  They certainly want to have

20      meetings.  That's pretty much -- I mean, I really

21      don't know.

22  BY MR. TILLEY:

23      Q.   **Other than meetings, you're not aware of any**

24  **other activities that the GSA would want to do?**

25      A.   I mean, you know, that they have, like, a --

1    or they, at least, participate in community activities.

2    And I know that they have been active in Orlando, maybe

3    even a conference, I think.  And so -- but that's all

4    that I know of.  Or even think.

5         Q.    And where did you learn about the conference

6    in Orlando?

7         A.    There's a Facebook site.  And it's

8    Lake County GSA, and they have posted on it.

9         Q.    Have you visited other Facebook sites or

10   other websites talking about GSAs?

11        A.    I was trying to get up to speed, quite

12   honestly, with the whole discussion.  So -- the answer

13   is yes.

14        Q.    Do you remember what sites those were?

15        A.    No, not really.

16        Q.    Other than the Facebook page you mentioned

17   and any websites, did you talk to anyone about the GSA?

18        A.    Hundred percent, yes.

19        Q.    And who did you speak with, other than your

20   attorneys?

21        A.    I didn't speak to them about it.  I really

22   wanted to get an understanding from the gay community.

23   And the leader of -- and it was about seven -- the only

24   one I remember is the one who's my friend, which is

25   Jay Scott Barry, local activist here.  And having sort

1  of a round-table to see whether or not -- I was just
2  trying to get information, really, because it's not
3  something that I'm familiar with.  So it was really
4  information.  And so I got a keener understanding about
5  where they saw the need, if you will.

6       **Q.   You said that your friend, Jay Scott Barry,**
7  **had a round-table.  Do you mean that you spoke just to**
8  **him, or you spoke to other people who were there --**

9       A.   No, no, he brought -- it was either or seven.
10  And we actually met at Two Old Hags and had a beer and
11  wine, and talked about it.  I mean, it was that formal.

12       **Q.   And what did you discuss at that meeting?**

13       A.   We really -- well, I'll just tell you what
14  came out of it, for me.  Is that typically one realizes
15  they're different, but they really can't put a handle
16  on it.  And that at about the 8th grade or 9th grade,
17  then, really they know that they're different.  And we
18  spoke about with them what that experience is like.
19  And the experience could be with their peers, and/or --
20  what I remember carrying away, more than anything, is
21  that within that person's home is where they get the
22  most pressure.  And that in the case of Scott, for
23  example, and he's from Wildwood -- and he actually was
24  their class president.  This is going back in the '80s.
25  And so it wasn't among his peers that he wasn't

1    accepted, that it really was within his -- actually, it

2    was his dad.

3             And that seemed to be the most resonant tone

4    of the meeting that came away, is that it really the

5    support of the GSA is more about these young people

6    being able to get together and learn how to face it, or

7    how to come out, or whatever, when it comes to their

8    family.  So that's what I carried away from the

9    meeting.

10        Q.    Was that view expressed by a number of

11   individuals at the meeting?

12        A.    Yes.

13        Q.    How old, approximately, were the individuals

14   at the meeting, to your best understanding?

15        A.    Probably.  I think Scott's probably 50,

16   maybe, I think.  The same age as my wife.  Most were in

17   their late 40s.

18        Q.    Did the individuals at that meeting express a

19   view on whether the GSA should be allowed in middle

20   schools in Lake County?

21             MS. McCULLOCH:  I will just object to the

22        form.  You can answer.

23             MR. TILLEY:  What's the objection?

24             MS. McCULLOCH:  The objection is twofold:

25        Did the individuals, I think you are referring to

1      them as a group.  And, also, I am not sure when

2      you're referencing the GSA throughout this, I don't

3      know if you can be more particular.  If you're

4      talking about the GSA particularly that was trying

5      to form at Carver Middle School, or if you're

6      talking about a GSA in high school, or if you're

7      talking about GSA, generally.  Because my

8      understanding is there's a national organization,

9      as well.

10   BY MR. TILLEY:

11       **Q.    Did any of the individuals at the meeting**

12   **express a view on whether a GSA should be allowed in**

13   **middle schools in Lake County?**

14       A.    They did.

15       **Q.    And what did they say?**

16       A.    They felt like it should.

17       **Q.    Do you feel that a GSA should be permitted in**

18   **middle schools in Lake County?**

19       A.    No.

20       **Q.    And why do you feel that they should not be?**

21       A.    I actually don't feel like there should be

22   any clubs outside of curricular clubs in middle school.

23   I do feel that when we have -- if we had the GSA -- and

24   for me it was never a GSA, I just need to say that up

25   front.  This was either about an open policy or closed

1   policy, for me.  And that having the GSA then opens the

2   door for multiple clubs, and we would be completely

3   inundated with club discussion that our students,

4   particularly with our test scorers in our middle-school

5   age children, need to be focused on their academics.

6   That's why I was really opposed to it.

7            I also was opposed, by the way, when I found

8   out.  I was a new board member when this all came up.

9   I was also told that we had a cup-stacking club at

10  Carver, I thought that was ridiculous.  Anyway, if you

11  could be the attorneys for the cup-stacking club, I

12  would say the same thing.

13       **Q.   Do you think that a GSA is age inappropriate**

14  **in middle schools?**

15       A.   I do.

16       **Q.   Why do you think that?**

17       A.   I just think that, again, 11, 12, 13 year

18  olds, my personal opinion is that it's just too young

19  for that subject matter.  That's just my personal

20  belief.

21       **Q.   When you say "that subject matter," what do**

22  **you mean?**

23       A.   I am talking about sexuality, in general.

24  Or, you know what I mean?  That's too young.

25       **Q.   Do you think it's inappropriate for a student**

1  to say in school that they are gay?

2          A.   Do I think it's inappropriate?

3              MS. McCULLOCH:  Object to the form.

4              THE WITNESS:  No, I don't think it's

5      inappropriate.

6  BY MR. TILLEY:

7          Q.   I may have misunderstood.  I believe you said

8  that you thought it was inappropriate -- discussions of

9  sexuality were inappropriate?

10         A.   Are you talking about -- excuse me, maybe

11 I -- I should ask you to reframe the question, I guess.

12             If I'm best friends with you and you say

13 you're gay, then I don't think there's any -- you know

14 what I mean?  There's no issue about that.  But I don't

15 know that you have an open -- I can't imagine the open

16 forum where people would attest to their orientation,

17 like everybody shouting out I'm heterosexual, or gay,

18 or whatever.

19             So if you and I are close, then I would

20 expect that we're friends, regardless, and that you

21 would say that to me.  That's all I'm saying.  That's

22 what I meant by that.

23         Q.   Would you say in a chess club if a student

24 announced to the club that he was gay, would you say

25 that would be inappropriate?

1              MS. McCULLOCH:  Object to the form.

2              THE WITNESS:  I don't see where it would have

3          any relevance to playing chess, you know what I

4          mean?

5     BY MR. TILLEY:

6          Q.    Does that mean that you think it would be

7     inappropriate?

8              MS. McCULLOCH:  Object to the form.

9              THE WITNESS:  Again, if you stood up and

10         wanted to attest in the middle of the chess

11         tournament, checkmate, I'm gay, then I think that

12         would be silly.  I just think it would be silly.

13    BY MR. TILLEY:

14         Q.    Do you think it would be inappropriate?

15             MS. McCULLOCH:  Object to the form.

16             THE WITNESS:  Yeah, probably.  It would be

17         the same as, check mate, I'm heterosexual.  I just

18         masturbated.  Stop it.

19    BY MR. TILLEY:

20         Q.    Do you equate saying I'm straight with I'm

21    masturbating, or --

22         A.    No, I was just -- it was, again, it's

23    ludicrous that it would be a statement that would be

24    made at a chess club.  That's all.  That was my point.

25         Q.    Do you think someone saying, I'm gay, is in

1    any way analogous to saying that they masturbate, or

2    that they --

3         A.    No.

4              MS. McCULLOCH:  Object to the form.

5              THE WITNESS:  Sorry, I shouldn't have gone

6         that.  Sorry.  Absolutely not.

7    BY MR. TILLEY:

8         Q.    Has your opinion of what GSA is or does

9    changed over time?

10              MS. McCULLOCH:  Object to the form.

11              THE WITNESS:  Changed over time... No.  Just

12         so you know, I don't have any problem with a GSA,

13         for the record.

14   BY MR. TILLEY:

15        Q.    What's your understanding of why students

16   wanted to form a GSA at Carver Middle School?

17        A.    The most relevant thing that I heard was that

18   they were concerned about bullying.

19        Q.    Were there other reasons that you heard other

20   than --

21        A.    That's all that I remember that was relevant.

22        Q.    Do you have any other reason for believing

23   that a GSA is not appropriate at a middle school other

24   than that you don't favor non-curricular clubs in

25   middle schools?

1    A.    That's the main reason.  I mean, that's
2  really the reason from a policy standpoint.
3    Q.    **Do you believe that it's also not appropriate**
4  **in middle school because of the subject matter of the**
5  **club?**
6    A.    That's correct.  But that's personal.  One's
7  policy, one's personal.
8         (Plaintiff's Exhibit AX marked for
9     identification.)
10  BY MR. TILLEY:
11    Q.    **I want to show you Exhibit AX.**
12    A.    Okay.
13    Q.    **Can you please review that and when you're**
14  **finished let me know what this is.**
15    A.    Okay.
16    Q.    **Other than just right now, have you seen this**
17  **letter before?**
18    A.    Not that I know of.  I'm sure it probably was
19  distributed to us, but I don't remember it.
20    Q.    **But you wouldn't be surprised if you had,**
21  **like you said, been distributed this letter after it**
22  **was sent --**
23    A.    It would not have surprised me.  Probably did
24  happen, actually, because this is like your mean letter
25  to us.

1      Q.   I want to show you what --

2      A.   Can I ask you a question, just to clarify?

3 Are we speaking about this lawsuit, or the one that's

4 current?

5      Q.   We are speaking about the current lawsuit.

6      A.   Okay.  You just want to know if I had seen

7 this one?

8      Q.   Correct.

9      A.   Got you.  Okay.

10     Q.   We're speaking about the time spanning both?

11     A.   Both?

12     Q.   But the lawsuit that we're sitting here for

13 is a different lawsuit that was discussed --

14     A.   Because this one was taken care of.

15     Q.   That's correct.

16     A.   Okay.

17          MR. TILLEY:  I want to show what you I am

18      marking as --

19          MR. STEVENSON:  As a point of reference, you

20      were referring to the letter, when you said "this

21      one".

22          THE WITNESS:  Yes, sir.

23          MR. STEVENSON:  Not the current one, is what

24      I mean.

25          THE WITNESS:  I don't have the current one.

1              MR. STEVENSON:  Just a problem with the court

2       reporter.  On the transcript it will simply read

3       "this one," which could be interpreted as --

4              THE WITNESS:  The letter dated January 23rd,

5       2013.

6              MR. STEVENSON:  Great.  Okay.

7              MR. TILLEY:  I'm showing you what I've marked

8       as Plaintiff's Exhibit AZ.  Bates number 4147.

9              (Plaintiff's Exhibit AZ marked for

10       identification.)

11  BY MR. TILLEY:

12       Q.    This appears to be an e-mail from you to

13  Sam Green dated February 15th, 2013.  Is that correct?

14       A.    That's correct.

15       Q.    And in this e-mail you state, I'm reading

16  from the first paragraph, last two lines, "I am

17  confident that the ACLU set the priority for the

18  review."  Is that correct?

19       A.    Yeah.  I don't know what little typo issue

20  with my -- yes, I am confident that you guys -- we were

21  speaking -- what this was about was when I came on the

22  board, and this was the first, very first policy we

23  were reviewing, and I was told by the district office

24  that it's cyclical, we review all policies on an

25  ongoing basis.  And that this one was just up for us to

 1    review.
 2              And what I meant by that, I'm sure just in my
 3    short time, that it was probably moved up, accelerated
 4    in that review process.  That's what the intent --
 5    that's what I was saying.  S-P-E-D, I don't know what
 6    that word is.  I don't get an A for typing.
 7         Q.    When did you come on to the School Board?
 8         A.    22 months ago.
 9         Q.    Do you remember what month it was?
10         A.    November.
11         Q.    Of 2012?
12         A.    Yes.
13         Q.    But who's counting.
14         A.    Eight hours.
15         Q.    When you say sped the priority, can you
16    explain for me how that -- what that process is?
17         A.    Well, that's what I just said.  Is that on a
18    regular cycle, just like we have three policies that
19    are in process right now being updated, that they
20    update policies.  With this being the very first one
21    that as a board member they were going to be
22    discussing.  So I was trying to explain that there is a
23    cycle.  But the fact that you folks got involved
24    probably pushed it up as a priority.
25         Q.    When you say it's a cycle, do you mean

1    there's a document that says, in this span of time --

2        A.    Uh-huh.

3        Q.    -- we're going to discuss policies, A, B and

4    C, and in this span of time of time --

5        A.    Yeah.  If you go to our policies, there's a

6    listing of the policy, its date, and then it's up, then

7    when it's been updated.  And the district office just

8    periodically, they want to just update the policy.

9    Like we're right in the middle of one on facilities

10   right now, and it is with a change in board demeanor,

11   that it has to do with.  I happen to be an advocate

12   that the public have access to our facilities.  And so

13   it prompted -- I mean, it was timely that we have a

14   review with different dynamics of the board, you know?

15       Q.    Who makes the decisions whether something

16   should be up for review?

17           MS. McCULLOCH:  Object to the form.

18           THE WITNESS:  I think that while the district

19       office has a review that a board member can ask for

20       a review, as well.  Like the facilities one, for

21       example.

22   BY MR. TILLEY:

23       Q.    Other than board members, is there any other

24   way a School Board policy comes up for review?

25       A.    Not that I know of.  I mean, I don't know how

1  the mechanics work, no, outside of what I just said.

2      Q.  So when you're talking about the regular

3  cycle, you're not sure who sets the cycle, who --

4      A.  I'm sure the superintendent ultimately, so...

5      Q.  So the superintendent is in charge of --

6      A.  Our district.  I mean, I don't know who her

7  appointee is.

8      Q.  But it's the superintendent who says, we're

9  going to -- now we're going to look at this policy, now

10  we're going to look at this other policy, and now we're

11  going to look at a third policy?

12      A.  I would say that's accurate.  That's my

13  interpretation, yes.

14      Q.  And you said before that it was a regular

15  cycle.  So the superintendent at some interval does

16  this?

17      A.  Right.

18      Q.  Do you know what interval that is?

19      A.  I don't.

20      Q.  Do you know if it's a regular interval, or if

21  it's based on some other --

22      A.  I really don't understand the mechanics of

23  it.  What I said to you is exactly what I was told, and

24  I have seen it now in fruition, that there are policies

25  that have come up that just need to be updated.

```
 1        Q.    You said that a board member could also ask
 2   that a policy be --
 3        A.    That's right.
 4        Q.    -- given priority.  Is that fair?
 5        A.    That's fair.  That's fair.
 6        Q.    Are you aware of a board member asking that
 7   the priority be given to review of the club policy?
 8        A.    It was already -- the mechanism was already
 9   in place when I came on the board.  In other words, it
10   was already -- they were -- we were right in the midst
11   of it.  Or they were.  And then I came on board.
12        Q.    When you say "they were right in the midst of
13   it," you mean the School Board?
14        A.    The School Board, yes.
15        Q.    The midst of it, what do you mean by that?
16        A.    It was already in the process of being
17   reviewed, is my understanding.
18        Q.    It's your understanding that the school's
19   club policy was in the process of being reviewed?
20        A.    Yes.
21        Q.    In what capacity was it being reviewed?
22        A.    I don't know.  Until I got on the board, I
23   didn't pay much attention.
24        Q.    Is it your understanding that there were
25   board meetings at which the school club's policy was
```

1    **discussed?**

2        A.   No.  I think it was -- no, I didn't -- it

3    wasn't that deep.  It was on the cue.  In other words,

4    it was on the agenda, right after I got on the board.

5    So my assumption, it's an assumption, is that there had

6    obviously been some conversation to get it on the

7    agenda for it to be discussed, you know?

8        **Q.   And when you say "some conversation," what do**

9    **you mean?**

10       A.   I only mean that it would have been in that

11   cycle that I am speaking about.  And that it would have

12   been then put on an agenda.  The board chair has to --

13   excuse me, approves our agenda.  And so --

14       **Q.   But you mean some conversation at board**

15   **meetings, or in some sort of workshop, or at some other**

16   **forum?**

17       A.   Yes, to all the above.  That prior to me

18   coming on the board in November, it was as an agenda'd

19   item, which doesn't happen overnight.  And so there was

20   some schedule, or discussion.  None did I know

21   specifically the answer to that, whether it did or did

22   not happen.  It's just an assumption of me that it was

23   now on for us to just.

24       **Q.   How did something become an agenda'd item?**

25       A.   The board chair works with the

 1    superintendent.  And I can request, by the way.  In
 2    other words, I can request, asking through our clerk.
 3    And that's how it gets on the agenda.
 4         Q.    **That takes place outside the context of the**
 5    **board meeting, correct?**
 6         A.    That's correct.  That's direct communication
 7    between the superintendent and the board chair.
 8         Q.    **Once a request is made to have something be**
 9    **an agenda'd item, what is the next step in that process**
10    **for it to actually get on the agenda?**
11         A.    It normally goes into a workshop.  So it's
12    discussed at a workshop.  It doesn't go to a board
13    meeting.  When I say "board meeting," that's in the
14    round -- at the courthouse, it's a workshop to discuss
15    why you want it on the agenda.
16         Q.    **And how does something get on the topics of**
17    **discussion for the workshop?**
18         A.    That's what I am saying, if it is relevant to
19    the district, then the superintendent works with the
20    board chair.  If I have something that I want to
21    discuss, then I work through our clerk, who gets with
22    our board chair, who gets with the superintendent.
23         Q.    **And that's the only way that something**
24    **becomes a topic of discussion at a workshop?**
25              MS. McCULLOCH:  Object to the form.

```
 1              THE WITNESS:  As far as I know, yeah.
 2    BY MR. TILLEY:
 3         Q.   And if the board decides at a workshop, this
 4    is something that we want to make an agenda'd item,
 5    what's --
 6         A.   For the board meeting to vote on?
 7         Q.   Correct.
 8         A.   You can't vote in a workshop.  Only at a
 9    board meeting can you vote.  So a workshop is more like
10    you're gathering facts.  And then the board meeting is
11    when you actually are going to effect change.
12         Q.   So at the workshop, the School Board members
13    say, we want to talk about this at a board meeting.
14    What happens next?
15         A.   Well, I don't know that you can -- can you
16    give me more specific --
17         Q.   Sure.
18         A.   An example.  That's all.
19         Q.   If there's a new bullying policy that the
20    School Board is discussing at a workshop, and they want
21    to have a new policy to vote on at the School Board
22    meeting.
23         A.   Stay with that one.  That's a good one,
24    actually, since it's sort of relevant to what we're
25    talking about.
```

```
 1            So a workshop would be discussed, and it may
 2    be -- from that workshop where you say, talk about
 3    bullying, then it may be, we need more data.  And say
 4    we need more input.  And we want community input.  So
 5    it may go from that workshop into then having a
 6    committee formed that can then give input.  At then at
 7    another workshop it would sort of germinate into what
 8    action we want to take.  If it is policy, then
 9    typically -- again, I'm just speaking from my
10    prospectus, because Steve Johnson would get involved
11    because it has to be like legal.  So now we have this
12    policy, then it's read, and anyone can comment.  Then
13    there's a second reading.  And then usually it's
14    passed.  That's usually how it works.  None of this
15    moves fast, which sucks.
16        Q.   At what point is notification given to the
17    public that something is up for discussion?
18        A.   Our board clerk publishes all the notices.  I
19    don't exactly know how that works, but she handles it.
20        Q.   When do those notices appear, is it after a
21    workshop and then it's been --
22        A.   No, it's on the agenda.  In other words, if
23    we're going to talk about clubs, then it's published
24    well ahead of even the workshop.  So everyone knows
25    about it.  When I say "everyone," anybody's who's
```

1    watching the Internet, or -- I don't know how else it's

2    published.

3        Q.    You're not sure if it's published in the --

4        A.    I know it's on the Internet.

5        Q.    Is it on the board docs, on the Lake County

6    School Board website?

7        A.    Yes.    I think it's called In The News, or

8    something like that.

9        Q.    It's not on the agenda of the board meetings

10   themselves?

11       A.    No, you can go as an individual and look at

12   our board docs.    In other words, if you saw something

13   that peaks your interest, then there's a public site

14   where you can go and look and see what that's about,

15   and any attachments, by the way.    It's pretty

16   transparent.

17       Q.    But the notice itself is also on that

18   website, in a separate document, or part of the

19   School Board meeting agenda that is available on that

20   site?

21       A.    No, it's separate.    I think I understand your

22   question.    It is a separate notification, and that

23   notification -- for example, if I wanted to go to our

24   metropolitan planning organization, and I wanted to be

25   able to speak.    Debbie Stivender is actually the

1    appointee, the liaison.  If I wanted to be able to

2    speak, it would have to be published, and I think it's

3    10 days before.  So we can't, as you know, Sunshine, we

4    can't be together unless it's published.

5        Q.   Right.

6        A.   Or notified, or whatever you call it.

7        Q.   **Other than the meetings you had after this**

8    **letter was sent, and your understanding that the club**

9    **policy -- there were conversations about club policy**

10   **before you came on --**

11       A.   I believe that to be accurate, yes.

12       Q.   **But other than those times, are you aware of**

13   **any specific other instance that club policy was**

14   **discussed at a board meeting?**

15       A.   Prior to this?

16       Q.   **Correct.**

17       A.   I just took office in November and we went to

18   the holidays.  So really it was a vestiture (phonetic)

19   in November, we didn't meet again until January.  So

20   the answer would be, no, I don't remember it.

21       Q.   **In the meetings in spring 2013 discussing**

22   **club policy, did you state anything in those meetings**

23   **about the GSA, specifically?**

24       A.   I imagine that I did.  However, for me it was

25   always trying to be focused on a club policy.  I was

```
 1    really trying not to make it about a club specific.
 2    But I imagine that GSA came out, yeah.
 3         Q.    Why do you think that is?
 4         A.    Because y'all were fricken suing us.
 5         Q.    Do you recall individuals speaking in the
 6    public comment section of the --
 7         A.    No, that never happened.  Yes, of course.
 8    It's okay to say that --
 9              MS. McCULLOCH:  You may want to not be
10         sarcastic on the record, because when the judge is
11         reading it -- it doesn't come off that we're
12         laughing.
13              THE WITNESS:  I wasn't trying to be
14         sarcastic, I was trying to be humorous.  We all
15         know --
16              MS. McCULLOCH:  There were plenty of people
17         there.
18              THE WITNESS:  Yes, we had people speak.
19    BY MR. TILLEY:
20         Q.    Do you recall individuals speaking about
21    other clubs, other than GSA?
22         A.    Yes, I do.
23         Q.    Do you remember what clubs they were speaking
24    about?
25         A.    I do.  The Equanians, the Fellowship of
```

1 Christian Athletes, the Rotarians.  I met with all

2 those groups, by the way, too.

3   **Q. What did you discuss with those groups?**

4   A. Again, it was more listening than it was

5 speaking.  But each one was an advocate for their own

6 club to exist.  And at the -- again, for me, as I

7 processed it, I could never -- I always came back to

8 that our students need to be focused on their academic

9 performance, and not have the distraction.  Because of

10 the clubs that I just mentioned, then what would come

11 down the pike?  That's where my head was at.  It was

12 more of a global picture of now we're constantly going

13 to be inundated with a discussion of clubs.  And our

14 middle school students, where the foundation is being

15 built on academic success, it made no sense to me that

16 we would continue to have this ongoing dialogue of

17 clubs, when we haven't spoke nearly enough about math,

18 science and English, you know?  That's where I was.

19   Now, on the other hand, those clubs, and they

20 all do good work, to include GSA, I assume, that if

21 they wanted to have those clubs outside the arena of

22 the Lake County School District, then so be it, you

23 know?

24   **Q. Are there any topics of any of those other**

25 **clubs that you think would be inappropriate in a middle**

 1    school?
 2            MS. McCULLOCH:  Just object to the form.
 3            THE WITNESS:  Again, no.  The answer is no.
 4    BY MR. TILLEY:
 5        Q.  **But you think there are some topics of clubs,**
 6    **or of the GSA, that are age inappropriate in middle**
 7    **school?**
 8            MS. McCULLOCH:  Object to the form.
 9            THE WITNESS:  My personal opinion, yes.
10    BY MR. TILLEY:
11        Q.  **Did you discuss the GSA in the individual**
12    **meetings that you had with those other groups?**
13        A.  No.  The only time that I can remember is
14    when the Equanians came, and they actually met at my
15    house on a Sunday.  I don't know that structure, but
16    it's like they're generals, they're leaders from the
17    around the county.  And two of the members spoke of
18    their children being gay, and that they didn't find
19    that discussion -- or that they encouraged the GSA as
20    an organization.  That's the only time I can remember
21    that it ever was brought up specifically by someone in
22    the group.
23        Q.  **Did you bring it up yourself in discussing --**
24        A.  Never.  No, I was there to speak about their
25    clubs, or listen about their clubs.

1      Q.    In April 2013, the School Board voted to
2   table a discussion of the proposed new school club's
3   policy, correct?
4      A.    If that was when we did it.  I know we did
5   table it, yeah.  I think I'm the one that made the
6   motion.  So, yes.
7      Q.    Why did you move to table the proposed club's
8   policy?
9           MS. McCULLOCH:  Object to the form.  You can
10          answer.
11          THE WITNESS:  Like most of the directives and
12          things that we follow at the School Board, it
13          didn't take me long to sort out that direction is
14          given by the state of Florida.  As I explored the
15          reason for the lawsuit, which was you were suing
16          then under the Equal Access Act, the Equal Access
17          Act, when I looked that up and reviewed it, it
18          applies to secondary education.  Secondary in
19          everyone's mind would be 9th grade -- high school.
20          I found that Florida defines secondary as
21          6th grade through 12th grade.  Which then gave
22          cause and merit, by the way, to, in my opinion,
23          your lawsuit.  So the only way to correct that
24          inequity of the state was for them to change that
25          designation .

1          So that's why I asked for it to be tabled,

2      because it was -- because I had initiated

3      conversation with Representative Metz and

4      Representative O'Toole and Senator Hays, had

5      brought it to their attention,-- and they were going

6      to move to get that language taken out of the

7      statute.

8  BY MR. TILLEY:

9      Q.   **Do you know the first names of those**

10 **individuals?**

11     A.   Allen Hays, state senator.  Larry Metz, state

12 representative.  And Marlene O'Toole, state

13 representative.

14     Q.   **Are you aware of other board members also**

15 **having discussions with state legislators about this**

16 **issue?**

17     A.   It is my understanding that Tod Howard did,

18 as well.  And I don't know if the others did.

19     Q.   **When you spoke to those legislators, Metz,**

20 **O'Toole and Hays, what did you say to them?**

21          MS. McCULLOCH:  Object to the form.

22          THE WITNESS:  I said, did you know that the

23      state of Florida identifies secondary education as

24      6th through 12?  I don't remember whether they did

25      or not.  Or what the comment was back.  But it

1      obviously did.

2          And that it is really causing us a problem,

3      because of the lawsuit (indicating).  And can you

4      fix it?  And basically, do you really believe that

5      secondary education is an 11-year-old child?  And,

6      I mean, just logical.  To me it was just logical

7      that it wasn't.

8          And that apparently appealed to them, because

9      we were able to get it changed.  They were able to

10     get it changed.  And the governor signed it in

11     July of that same year.

12  BY MR. TILLEY:

13     Q.  **Did you ask them if they could, or did you**

14  **explore the possibility of inserting a new definition**

15  **into --**

16     A.  I don't play in their sandbox.  However they

17  needed to fix it.

18     Q.  **But would you like to see a definition in the**

19  **state law that says that secondary schools are grades 9**

20  **through 12?**

21     A.  Yes.

22     Q.  **And I'm not sure if -- I may have -- did you**

23  **ask them to put such a definition into this --**

24          MS. McCULLOCH:  Object to the form.

25          THE WITNESS:  No.  I outlined what I saw as

1    the issue, and then how they fixed it was up to

2    them.  It would be obvious -- I mean, there are

3    some references to secondary, as being high school.

4    It would have been a lot easier, I think, had they

5    done -- had they inserted the 9th through 12th, but

6    they didn't.  But I didn't encourage them one way

7    or the other.

8    BY MR. TILLEY:

9         Q.   **Did they tell you how they were going to**

10   **execute this --**

11        A.   No.

12             MS. McCULLOCH:  Just object to the form.  And

13        try to let him answer the question -- or sorry,

14        finish his question before you answer, even though

15        I know you're anticipating what he is going to ask

16        you.  That way you're not speaking over each other.

17             THE WITNESS:  Got you.

18             MS. McCULLOCH:  Okay.

19   BY MR. TILLEY:

20        Q.   **Are you aware now of how the repeal was**

21   **accomplished, in terms of how that measure was taken**

22   **out?**

23        A.   Meaning that they tagged it in with another

24   bill that was going?

25        Q.   **Correct.**

1    A.    Yes.

2    Q.    Are you aware that the definition of

3  secondary school that we've been discussing that was

4  repealed was part of a larger act, that was also --

5  that was repealed in its entirety in that bill?

6    A.    I don't understand.

7    Q.    Is it your understanding that as part of this

8  bill that repealed definition, we're talking about --

9    A.    Uh-huh.

10    Q.    -- that it repealed solely that definition of

11  secondary school?  Or if it repealed the larger act

12  that that definition was situated at?

13    A.    I think it only -- I don't know.  But I am of

14  the -- as I remember, it took out just the 6 through

15  12, is what I remember.

16    Q.    Are you aware of other individuals, other

17  than board member Howard, who contacted the legislators

18  to advocate for this change in secondary school

19  definition?

20    A.    Specifically, none.

21    Q.    But you're aware that others did, you just

22  can't say their names?  Or --

23    A.    Oh, no, no, no.  The fact is that I don't

24  know.  I am hoping that they would have.

25    Q.    Okay.  The School Board provided final

1    approval to amended the School Board club's policy in

2    August 2013, correct?

3         A.    That's correct.

4         Q.    And you voted to approve that, correct?

5         A.    That's correct.

6         Q.    For the reasons that we've been discussing,

7    because you thought that clubs should be academically

8    based, and that you think that certain topics are

9    inappropriate for middle school students; is that

10   correct?

11        A.    Are we talking about the entire policy, or

12   are you just talking about middle school --

13        Q.    Just the middle school policy.

14        A.    That's correct.

15        Q.    I want to show you what's marked Exhibit J.

16   And this is the school club's policy for middle

17   schools, correct?

18        A.    That's correct.

19        Q.    That's the policy that you voted to give

20   final approval for in August 2013?

21        A.    That looks correct.

22        Q.    And that's still the policy, correct?

23        A.    Right this minute.  Uh-huh.

24        Q.    And under this policy, the superintendent or

25   her designee decides whether to approve or disapprove a

1    club, correct?

2        A.   As of this date, that's correct.

3        Q.   **Do you expect that to change?**

4        A.   Uh-huh.

5        Q.   **Is that yes?**

6        A.   Yes.

7        Q.   **How do you expect that to change?**

8            MS. McCULLOCH:  Just object to the form.  You

9        can answer.

10           THE WITNESS:  In the future, which is

11       probably next week, the superintendent will have

12       more control over that.  It won't be -- it will not

13       strictly be a site-based decision.

14   BY MR. TILLEY:

15       Q.   **What do you mean by "site-based decision"?**

16       A.   I mean the principal at the school.

17       Q.   **Are you saying that the principal will have**

18   **less authority than they have under the current policy**

19   **to approve or disapprove clubs?**

20       A.   That's correct.

21       Q.   **And what's your understanding of the**

22   **principal's authority under the current policy to**

23   **approve or disapprove clubs?**

24       A.   They have the authority to approve or

25   disapprove the club.

1      Q.   Is it your understanding of the current

2   policy that the principal decides, and it stops there

3   if they approve or disapprove?  Or does it go to some

4   other person?

5      A.   That it would pretty much stop there.

6      Q.   And that's the authority that you voted for

7   when you voted for this policy in August 2013?

8      A.   That's right.

9           MS. McCULLOCH:  Just object to the form.

10           THE WITNESS:  That's correct.

11   BY MR. TILLEY:

12      Q.   And under this current policy, there's no

13   opportunity for review by the School Board, correct?

14           MS. McCULLOCH:  Object to the form.

15           THE WITNESS:  In any case, someone could come

16      before the School Board.  And then if someone

17      wanted to, I'm talking about another board member,

18      that we would discuss this.

19   BY MR. TILLEY:

20      Q.   When you say "could come before the

21   School Board," do you mean come to the public comments

22   section?

23      A.   That's correct.

24      Q.   Is there any other way that an individual

25   could appeal the denial of their club application to

1     the School Board through some process other than coming
2     to public comment?
3                    MS. McCULLOCH:  Object to the form.
4                    THE WITNESS:  Again, I suppose that if
5          someone went to the superintendent, the
6          superintendent could bring it to the board.  I
7          mean, that would be another method.  I don't know
8          protocol for that, but...
9     BY MR. TILLEY:
10         Q.   And you're not aware of any protocol for
11    that?
12         A.   No.
13         Q.   Before this club policy, policy 4.502
14    received final approval, were you aware of any problems
15    with clubs in the past at middle schools --
16         A.   I need to correct myself.  This is actually
17    the policy we approved when the superintendent was
18    going to be in charge.  I'm sorry.  I was mistaken.
19    This is the one -- this is the main change that the
20    superintendent would have more authority over -- sorry.
21         Q.   Okay.
22         A.   Okay.  The one prior to this.
23         Q.   Under current policy the superintendent has
24    the final word on whether clubs get --
25         A.   That's correct.  Sorry.

1      Q.    Okay.    Before this policy 4.502 received

2  final approval, were you aware of any problems with any

3  clubs at middle schools in the past, in Lake County?

4      A.    Any problems?

5      Q.    For instance, you mentioned hate groups

6  before.    Were you aware of any hate groups in middle

7  schools in the past?

8      A.    When did I say hate groups?

9      Q.    Sorry?

10     A.    When did I use the word hate groups?

11     Q.    I may have misheard you.    Sorry.

12     A.    Oh, okay.

13     Q.    That's the kind of thing I'm talking about.

14  So if you didn't say it, I'll say it now.

15     A.    Okay.    Yeah, no, I didn't.

16     Q.    So there's no reason for you to think that

17  students in middle schools in Lake County would want to

18  form those groups?

19              MS. McCULLOCH:    Just object to the form.

20              THE WITNESS:    Again, when -- this is my

21          prospectus.    When we are speaking about 11, 12 and

22          13 year olds, their parents are very influential in

23          their life and their direction.

24              Did I hear conversations about groups that

25          would be far right and far left that would want to

1    come to the school in forum?  The answer is, yes.

2    Not specifically.  And hate groups, by the way, are

3    prohibited by federal law, so I don't want to

4    invite sensationalism.  That's why I second-guessed

5    on that.

6         But there was a specific club that my father

7    was a member, my grandfather, not me, which was --

8    is, it's called Sons of the Confederacy.  It is a

9    historical club, you have to be linage to be in a

10   confederate soldier to belong to it.  Little past

11   our time, you know what I'm saying?  But that club

12   isn't about hate, but it is about history and the

13   preservation.  If that club came to Carver Middle

14   School, or any middle school, using the word

15   confederacy, it would be a slap -- it would incite

16   things, you know what I mean?

17        And so, again, going back to my core belief

18   is:  Why do we have to keep talking about clubs?

19   And that's where my head has always been.  I gave

20   you just my feelings about it.

21   BY MR. TILLEY:

22        Q.   **Did you hear that members of the a Sons of**

23   **the Confederacy were interested in their being Sons of**

24   **Confederacy club at middle schools in Lake County?**

25        A.   No, that's a reference.  That's one that I

1   know intimately its history and tradition, and decided

2   it was not maybe for then, you know what I mean?  So

3   that's just an example of a club that isn't based on

4   hate, you know what I mean?  But could be perceived.

5      **Q.**    **Were there other groups -- or I should say**

6   **were there groups that you heard of being interested in**

7   **forming in middle schools in Lake County that concerned**

8   **you?**

9      A.    No, not specifically.

10      **Q.**    **I believe that you've said in the past that**

11   **students are better equipped in high school to engage**

12   **in the critical thinking and deal with peer pressure to**

13   **manage clubs; is that correct?**

14        MS. McCULLOCH:  Object to the form.

15        THE WITNESS:  I have made that statement.  I

16     made that statement.  I believe that.

17 BY MR. TILLEY:

18      **Q.**    **Do you feel that students in middle school**

19   **are not able to engage in the type of critical thinking**

20   **necessary to participate in the non-curricular club?**

21        MS. McCULLOCH:  Object to the form.

22        THE WITNESS:  As I said just a minute ago, I

23     believe that the parents have a lot more influence.

24     And so... I guess I'm answering the question.

25 BY MR. TILLEY:

1      Q.    But do you think that middle school students
2    are not able to engage in that type of critical
3    thinking to properly participate in non-curricular
4    clubs?
5             MS. McCULLOCH:  Object to the form.
6             THE WITNESS:  I suppose the answer to that
7        is, yes.  I mean, I see -- I can see them in a math
8        club, because it's directly tied to their
9        curriculum.  I can see a National Honor Society
10       that has some leadership and integrity and
11       community service components being built in.  I
12       just don't see this constant conversation about
13       clubs.
14   BY MR. TILLEY:
15      Q.    In going back to Exhibit J in front of you.
16      A.    Okay.
17      Q.    This is the policy 4.502.  Do you see in
18   paragraph two that it states that, "Middle school clubs
19   must be sponsored by the school and are limited to
20   organizations that strengthen or promote critical
21   thinking, etc."
22            Why did you vote to include the critical
23   thinking component in that policy?
24      A.    I actually, as I remember how this was
25   evolving, I think it was one of the board members that

1    wanted that added.  And I don't -- only part that I
2    really was focused on was an extension of the school
3    curriculum.  So I think this was developed through one
4    those workshops and conversations.
5         Q.   So your understanding of the policy, you
6    voted the clubs must be curricular; is that correct?
7         A.   That was my focus, yes.
8              MS. McCULLOCH:  Object to the form.
9    BY MR. TILLEY:
10        Q.   Do you know the board member who wanted to
11   include critical thinking --
12        A.   No.
13        Q.   How did you become aware that it was a board
14   member who wanted the --
15        A.   I just remember that part of this language
16   right here, there was conversations about it
17   (indicating).  And if someone wanted critical thinking
18   in there, so be it.  It's kind of like compromising.  I
19   don't remember that.
20        Q.   Were there conversations with somebody other
21   than your attorney, what --
22        A.   I didn't talk about this with my attorney.
23        Q.   When you say conversations with, who were
24   those with?
25        A.   No, in the workshop.  In other words, there

1    are opinions going back and forth.  I see what you're
2    saying, as it's being developed.  Yeah.  But I didn't
3    have a one-on-one with the attorney.  So if someone
4    said, for example, I go, I'm in favor of curriculum
5    only.  Start there.  And then if, I don't know who --
6    you're deposing all of us, right?  You're doing all of
7    us, all the School Board members?
8              MR. STEVENSON:  Most.
9              MR. TILLEY:  Most.
10             THE WITNESS:  You can ask them.
11             MR. TILLEY:  Many.
12             THE WITNESS:  I honestly don't remember which
13        one wanted that wording in there.  I don't
14        remember.
15             MS. McCULLOCH:  You can't turn the table and
16        ask the lawyers a question, because you see we all
17        panic when asked a question.
18             MR. TILLEY:  Right.
19             THE WITNESS:  What part about that sarcasm
20        can you do and I can't?  I see how this club is.
21        One way.
22             MR. TILLEY:  I would like to show you
23        Plaintiff's Exhibit BA.
24             (Plaintiff's Exhibit BA marked for
25        identification.)

1           MR. TILLEY:  Bates number 4232.  This is an
2      e-mail, appears to be an e-mail from you to
3      Sam Green dated June 3rd, 2013.
4   BY MR. TILLEY:
5      Q.   Is that correct?
6      A.   That's correct.
7      Q.   This appears to be an accurate --
8           MS. McCULLOCH:  Take your time and go over
9      it.
10          THE WITNESS:  Yeah.  I need to read them a
11     little closer.  Sorry.
12          MS. McCULLOCH:  Yeah.
13          THE WITNESS:  Yes, I remember this.  His
14     stepchildren are actually named Mathias, last name.
15          MR. TILLEY:  Oh.
16  BY MR. TILLEY:
17     Q.   In that last paragraph of your portion, it
18  states, "The district already has a policy against
19  bullying.  We are looking at programs to introduce
20  tolerance in elementary, middle and high school."  Is
21  that correct?
22     A.   That's correct.
23     Q.   Are you aware of any programs to carry that
24  out since you wrote that statement?
25     A.   We're beginning to hone in.  It's actually

1    falling under our Safe Schools now, has the
2    responsibility.  There is an anonymous tip line now to
3    report bullying.  There is a comprehensive -- and this
4    is where I think you end bullying, is when you start at
5    kindergarten, and it follows all the way through high
6    school.  With focus on complete diversity, whether or
7    not you have crooked teeth, or you're fat, or you're
8    skinny, black, white, red, whatever color.  And so
9    educating our young people about respecting our
10   differences.  Educating is the key word in you stop
11   bullying.
12        Q.    Other than the anonymous tip line, are you
13   aware of specific programs that have been introduced
14   since you wrote that?
15        A.    I don't know the name of the comprehensive
16   program.  But we have -- I call it inter-safe schools,
17   when they bring it up.  That's whose department it
18   falls under.  And we have been given two or three
19   updates since then.
20             But even at the time of this action, there
21   was like over a hundred different programs.  So trying
22   to hone in on one that works was really the focus.
23   This hasn't been a bad experience, to examine
24   yourself --
25        Q.    When you say "this," what do you mean?

1      A.    Y'all's lawsuit.

2      **Q.    Okay.**

3      A.    And so there's been some good come out of it,

4    out of the lawsuit.

5      **Q.    And what good is that, would you say?**

6      A.    Really self-examination of where do we

7    want -- understanding if the primary impetus of this

8    club was bullying.  And that if a child is bullied

9    because of their orientation, it's not acceptable.  I

10   don't think it's acceptable to anyone, by the way.  So

11   now then -- let's don't just limit it to that.  Let us

12   then look at the whole spectrum of why children are

13   bullied.  And it typically is some prejudice, or

14   bigotry, or something that's built in, and normally at

15   these young ages they're bringing that home from their

16   families.  And so, hence, let's begin to educate early.

17   That's all I'm saying.  This is 100 percent just my

18   opinion of the benefit.

19     **Q.    The comprehensive program that you discussed,**

20   **Safe Schools --**

21     A.    Yes.

22     **Q.    -- is that something that came up -- when did**

23   **that come up?**

24     A.    Well, like I said before, before even the

25   lawsuit, there was like 100 different.  So now that it

1    was honed in on that which seems to be the most

2    comprehensive, and that's kind where it's at now.

3         Q.    When did that change start, the honing in?

4         A.    Probably over 22 months.  So that's all I can

5    speak about.

6         Q.    You don't know what specific time since you

7    started, though --

8         A.    No, sir.  No.

9         Q.    Would you know if it happened before or after

10   the time that you wrote this e-mail?

11        A.    It was in that period.  I mean, that was part

12   of the impetus of, we are addressing it, you know?

13        Q.    The lawsuit was --

14        A.    The bullying.

15             MS. McCULLOCH:  Just object to the form.  Let

16        him finish his question, too.  Just a reminder.  I

17        won't kick you, but just a reminder.

18             THE WITNESS:  It was pretty credible, it was

19        on my right foot.

20   BY MR. TILLEY:

21        Q.    When you say the bullying, you mean the

22   public discussion of bullying, or --

23        A.    No, no, no.  There's policy -- there is --

24   okay.  So you have policy that says, we won't have

25   bullying, right?  Okay.  We have a policy.  But then go

1   beyond the policy, and how are we really going to
2   effect change?  And that is an introduction as part of
3   the student training.  So really you have our policy,
4   which we have, that says you will not bully for all
5   these different reasons.  And it's pretty
6   straightforward, it covers most everything, the policy.
7   But the policy isn't in the classroom when the kid's
8   being picked on.
9           So it was looking at, if we have children
10  that feel threatened, which was sort of the impetus
11  behind this (indicating), this lawsuit, that -- I'll
12  learn.
13          MS. McCULLOCH:  When you say "this lawsuit,"
14      you are referring, again, to the prior lawsuit?
15          THE WITNESS:  The prior lawsuit.
16          MS. McCULLOCH:  Okay.  Not the incident we're
17      here for.
18          THE WITNESS:  Not the one today, or the
19      one -- probably you're going to file tomorrow.  I
20      don't know.  Seems like we're sued every day.
21          But should there be a feeling that we
22      listened?  I will tell you the answer is, yes.  The
23      bottom line is, are we going to have better
24      citizens because of this lawsuit/action of last
25      year (indicating)?  The answer is, yes.  So that's

```
 1        where my head's at.
 2             MR. TILLEY:  Kind of you to say.
 3             THE WITNESS:  Excuse me?
 4             MR. TILLEY:  That's kind of you to say.
 5             THE WITNESS:  Yeah.  I believe it.
 6   BY MR. TILLEY:
 7        Q.   You agree that school club policy's an
 8   important issue, correct?
 9        A.   I believe it's an important issue for you
10   guys.  I think we've wasted way too much time on it,
11   myself.
12        Q.   But you would agree that it's an important
13   issue in that from your perspective, it should be a
14   certain way, correct?
15             MS. McCULLOCH:  Object to the form.
16             THE WITNESS:  Yes.
17   BY MR. TILLEY:
18        Q.   And given that it's an important issue if it
19   were discussed at a School Board meeting, it would be
20   reflected in the minutes of that meeting, correct?
21        A.   Oh, yes.
22        Q.   It's fair to say, then, that if it was
23   discussed at a meeting, School Board club's policy was
24   discussed at a meeting, and it didn't -- sorry.  Strike
25   that.
```

1          Is it fair to say that if mention of a

2     discussion of school club's policy did not appear in

3     the minutes, that the discussion did not happen?

4          MS. McCULLOCH:  Object to the form.

5          THE WITNESS:  I am not the person taking the

6     minutes, so I can't speak to if something is

7     omitted, or not.  But I would hope that anything

8     that we're discussing is in the minutes, yes.

9     BY MR. TILLEY:

10    Q.    Any important issue?

11         MS. McCULLOCH:  Object to the form.

12         THE WITNESS:  I think they pretty much put

13    everything in there.  Not in detail, but you know

14    what I'm saying.

15    BY MR. TILLEY:

16    Q.    And you approve the minutes of School Board

17    meetings at a later meeting, correct?

18    A.    That's correct.

19    Q.    And each of the five of you vote on -- to

20    approve minutes?

21    A.    That's correct.

22    Q.    Is it generally the case that you approve

23    them?

24    A.    Every one that I have been to, yes.

25    Q.    That's because they accurately reflect what

1   you think occurred at those meetings?

2        A.    At that moment in time, yes.

3             MS. McCULLOCH:  Do you mind if we take a

4        two-minute break?

5             MR. TILLEY:  Sure.

6             (Break taken at 11:51.  Resumed at

7        11:55 A.M.)

8   BY MR. TILLEY:

9        Q.    As you understand it, a GSA is non

10  curricular, correct?

11       A.    It is not a curricular club.

12       Q.    And the policy that you -- what you intended

13  when you passed, voted to approve policy 4.502, is to

14  pass a policy that did not permit non-curricular clubs,

15  correct?

16            MS. McCULLOCH:  Object to the form.

17            THE WITNESS:  Not exactly.  There's still an

18       avenue for a club to exist, it's just not under the

19       purview of the Lake County system.  So, in other

20       words, we weren't saying you cannot form a club, it

21       is just that under our policy it's not going to be

22       a club, it's not going to be -- you know what I'm

23       saying?  Not going to be within Lake County --

24       we're kind of going through that now, so...

25  BY MR. TILLEY:

1        Q.    So recognizing that students could get
2    together and form a club somewhere else, you intended
3    that based upon -- it would be non-curricular clubs as
4    school clubs, correct?
5            MS. McCULLOCH:  Object to the form.  You can
6        answer.
7            THE WITNESS:  Yes, that's accurate.
8    BY MR. TILLEY:
9        Q.    I believe you said that you were in the
10   process of revising the facilities use policy; is that
11   correct?
12       A.    That's correct.  Yes.
13       Q.    You envision that that policy would allow a
14   GSA to meet on school property, even if it were not an
15   official student club; is that correct?
16           MS. McCULLOCH:  Object to the form.
17           THE WITNESS:  That is 100 percent, yes.
18   BY MR. TILLEY:
19       Q.    And the School Board is revising that policy
20   because of the prior lawsuit; is that correct?
21           MS. McCULLOCH:  Object to the form.
22           THE WITNESS:  No, no.  Again, when I was
23       speaking about cycles, and the facilities use came
24       up, and it was probably 14 pages of how you would
25       get access to use our building, then all these

```
 1        exceptions and that business.  My advocacy, as well
 2        as in the board support, was to streamline it and
 3        make it where it is easier for the public, and that
 4        would be not just -- again, I don't want to stay
 5   --   focused on just a club discussion.  But it would be
 6        that other organizations would be able, and the
 7        public, who pays for these buildings, would have
 8        access to use the facilities.  It would be easier.
 9   BY MR. TILLEY:
10        Q.    Were you aware of other groups, outside
11   groups, that wanted access to the schools?
12        A.    I was told stories of groups that because it
13   was so cumbersome, could not get access, yes.
14        Q.    Do you remember which groups those were?
15        A.    It was a real estate group out of
16   Sumterville.  Not Sumterville, Sorrento.  There was
17   another group, I don't -- some civic group in south
18   Lake, and those -- not the specifics of them.  I know
19   the real estate group because they were pretty vocal.
20        Q.    In revising the policy, the goal is to make
21   it easier for groups to come?
22        A.    Yes, sir.
23        Q.    Including school groups?
24        A.    Of course.
25              MS. McCULLOCH:  Object to the form.
```

1    BY MR. TILLEY:

2        Q.    You said that this policy was up for review

3    in the regular cycle; is that right?

4        A.    I would think so, because it -- I mean, no

5    one asked specifically for it.  So it came up.

6        Q.    The implication being that it came up because

7    the superintendent decided it should come up?

8        A.    Whatever that cycle is, yes.

9        Q.    You previously, I believe, mentioned support

10   for the idea of -- or I should say you previously said

11   a GSA could have a positive influence on students; is

12   that correct?

13           MS. McCULLOCH:  Object to the form.

14           THE WITNESS:  Yeah, I think I did.

15   BY MR. TILLEY:

16       Q.    But you think it's age inappropriate for

17   middle schools, correct?

18       A.    That's correct.

19       Q.    Why, again, do you think it's age

20   inappropriate for middle schools?

21       A.    I think if we are to bring it in the middle

22   school, talking about 11, 12, 13 year olds that would

23   have access to it, I just don't think 11 and 12,

24   particularly, are able -- they just don't have t

25   maturity.

1    Q.    The maturity to --

2    A.    To critically think, you know what I mean?

3 To exchange ideas, should it come up, should it go

4 beyond the discussion of bullying and start talking

5 about the experience of being gay, or whatever.  I just

6 don't think that -- now, 13, just being fair, is sort

7 of -- that's when your hormones are coming out, anyway.

8 But you can't isolate it and go, we're going to have

9 this 13-year-old club, you know?  So it's not age, in

10 my personal opinion, it's not age appropriate.

11    Q.    When you say discuss the experience of being

12 gay, what do you mean?

13    A.    Whatever the feelings are.  Or whatever --

14 again, since I am not gay, and tried to at least

15 understand and become empathetic to it.  But there's a

16 point where I thought, I'm heterosexual, or not.  So

17 just know that around 13 that things are changing,

18 right?  But I was a nerd, just for the record, that

19 played in the band, so I don't think I came out until I

20 was 13, matured.  In the discussions, and actually in

21 this e-mail where I sent it to Mr. Green, I spoke about

22 how -- what I learned, which is to have that support.

23 And if you notice I said without parental support,

24 which goes all the way back to our beginning

25 conversation about where bullying actually happens is

 1    in the home.  And so I was an advocate of the policy
 2    where you could join, a 9th grader could join, and not
 3    have to face their family, you know what I'm saying?
 4    And get that counsel.  So -- am I answering your
 5    question?  I think I'm rambling, which I was told not
 6    to.  Strike that.  Just wanted to say it.
 7              MR. STEVENSON:  That was a joke.
 8    BY MR. TILLEY:
 9        Q.    I forget the exact words you just used, but
10    you were saying you supported not having parental
11    permission required in high school?
12        A.    Correct.  And that came from that group
13    meeting with Scott and his friends.
14        Q.    Going back to the discussion of the
15    experience of being gay.  Is it your understanding that
16    that would mean that students would discuss sex?
17              MS. McCULLOCH:  Object to the form.
18              THE WITNESS:  I think whether you're
19        straight, gay or indifferent, when you reach that
20        age that at some point you discuss sex, I would
21        think.  I mean, I remember I did.  I mean, you
22        stole a Playboy magazine, or whatever.  So, yeah, I
23        would imagine that would become a topic.  Just
24        reasonable.
25    BY MR. TILLEY:

1    Q.    Reasonable because they were a group of

2    students getting together?  Or because it was a --

3    A.    Just kind of where you are when you're

4    growing up, you know?

5    Q.    Do you think those discussions would come up

6    in a cup-stacking club?

7         MS. McCULLOCH:  Object to the form.

8         THE WITNESS:  Do I think they would?  I think

9    when you're a 16 year-old boy, you're talking about

10   it, when I was an altar boy serving just before

11   mass.  That's all you talk about.  So, yeah, I

12   don't know that in the midst of your cup stacking,

13   which I oppose, by the way, also, that you would.

14   But when you and I are standing by the lemonade

15   stand, you know what I'm saying, it's just guy and

16   girl talk.

17   BY MR. TILLEY:

18   Q.    So you would think that discussion could also

19   come up in a math club meeting?

20        MS. McCULLOCH:  Object to the form.

21        THE WITNESS:  As part of a side bar, but not

22   part of the --

23   BY MR. TILLEY:

24   Q.    Not as part of the core mission of the math

25   club?

1       A.      Yeah.  Normally that's not part of the core
2   mission of a math club.
3       Q.      **Is it your understanding that the core**
4   **purpose of the GSA is to discuss sex?**
5       A.      No, no, no.
6               MS. McCULLOCH:  Object to the form.
7               THE WITNESS:  My belief is that they
8   represent that the core mission is to really to
9   fight bullying.  But part of that bullying
10  discussion is, when we spoke about it earlier, when
11  you speak about one's difference and you speak
12  about diversity, that it would seem reasonable that
13  what is different about you and I -- and I don't
14  know if you're gay, or not.  But if you were, then
15  you would speak about your experience, and I would
16  listen, because I'm part of the straight part, and
17  then I would speak about my experience.  And that
18  way we would understand each other.  There would be
19  that kind of context of discussion.  It may not be
20  sexual, by the way.  You may not -- until I got out
21  of high school I couldn't tell you about sex,
22  because I didn't have it.  And it may not be that,
23  but that you would speak about the differences, you
24  know what I mean?
25              Like I'll give you a good example.  Again,

1    Scott not only is -- he's a real friend to me.  And

2    so when we -- when he's been over to my house, and

3    I am 60 years old, and we speak not of the act of

4    sex, but that many -- we speak about our

5    differences, you know what I mean?  And I think

6    that's healthy that we understand each other.  But

7    that's adults, high school kids.  Not 11 year olds.

8  BY MR. TILLEY:

9       Q.    Do you think it's possible to have a

10  discussion about sexual orientation that isn't about

11  sex?

12            MS. McCULLOCH:  Object to the form.

13            THE WITNESS:  That's what I just said, when

14      we speak, we're not speaking about sex.  But we're

15      speaking about relationships, you know what I

16      mean -- a gay -- actually, most of our discussions

17      are political, by the way.  But there's never a

18      discussion about the act.

19  BY MR. TILLEY:

20      Q.    And for middle schoolers for a middle

21  schooler to say, I am gay, and to have a discussion

22  about how it feels to be bullied because that person is

23  perceived to be gay, without discussing sex or

24  relations, you know, do you consider that to be

25  inappropriate discussion?

1            MS. McCULLOCH:  Object to the form.

2            THE WITNESS:  No.  That's being bullied

3       because -- here is what I would expect.  And I have

4       a 28 year old and 18-year-old son.  And both of

5       them are both color blind and both of them have

6       friends that are gay.  They are just friends.  At

7       the end of the day, there is no difference, they're

8       friends.  And that's the world that we need to move

9       to.  You know what I'm saying?

10  BY MR. TILLEY:

11       Q.  I guess what I am trying to --

12       A.  And if you are bullied, regardless of whether

13  you're gay, fat, crooked teeth, then those of us that

14  are stronger have an obligation to stand up for you,

15  you know?  That's where you stop it.  You stop it when

16  you say, that's not acceptable, when it's happening.

17  You know what I mean?  Or you educate where one

18  appreciates the difference from the get-go.  That's

19  just where I'm at.  I know I'm not supposed to ramble.

20       Q.  It's your understanding that from the -- I

21  should say:  Have you ever read the club application or

22  club charter at the Carver Middle School GSA?

23            MS. McCULLOCH:  Object to the form.

24            THE WITNESS:  I saw the application.

25  BY MR. TILLEY:

1        Q.    Is it your recollection that part of that --
2    the purpose and missions of the GSA were to discuss
3    sex?
4              MS. McCULLOCH:  Object to the form.
5              THE WITNESS:  What I remember of the
6        application was that it was really weak, that it
7        didn't -- it didn't -- it was very -- extremely
8        broad, like wanted to just cover some basics.  In
9        other words, it was a weak application.  That's
10       what I remember.
11   BY MR. TILLEY:
12       Q.    Is it your understanding that the
13   Carver Middle School GSA would discuss sex?
14             MS. McCULLOCH:  Object to the form.
15             THE WITNESS:  I don't know that for a fact.
16   BY MR. TILLEY:
17       Q.    Do you believe that discussing the experience
18   of being gay means that sex will be discussed?
19             MS. McCULLOCH:  Object to the form.
20             THE WITNESS:  No, I don't -- I don't know
21       that it has to be.
22   BY MR. TILLEY:
23       Q.    Would you expect that it would be?
24       A.    I would certainly hope not if it was 11, 12
25   and 13 year olds.  I would expect that it would be

1     teenagers that it would probably be discussed with.

2          Q.     Because they're gay, or because --

3          A.     No, because they're older.  No, they're

4     older.  I just spoke about it.  I mean, their hormones

5     are going crazy.

6          Q.     So not the fact that they're saying I'm gay,

7     it means they're discussing sex, right?

8          A.     No, no.  That's correct.

9          Q.     Do you support equal protection of the law

10    for gays and lesbians?

11         A.     Yes.

12               MS. McCULLOCH:  Object to the form.

13    BY MR. TILLEY:

14         Q.     For example, that it should be a violation of

15    the law to deny housing to someone because they're a

16    gay or lesbian, or refuse to hire someone because

17    they're gay or lesbian?

18               MS. McCULLOCH:  Object to the form.  You can

19        answer.

20               THE WITNESS:  I think it's wrong.

21    BY MR. TILLEY:

22         Q.     And that it should be against the law?

23               MS. McCULLOCH:  Object to the form.

24               THE WITNESS:  I think it should be against

25        the law.

```
 1    BY MR. TILLEY:
 2         Q.   Do you support marriage for same-sex couples?
 3              MS. McCULLOCH:  Object to the form.
 4              THE WITNESS:  Actually, I just evolved to
 5         this.  And the answer is, yes.
 6    BY MR. TILLEY:
 7         Q.   When you say "just evolved," what do you mean
 8    just evolved?
 9              MS. McCULLOCH:  Object to the form.
10              THE WITNESS:  That I never quite understood
11         why it had to be marriage.  I mean, I always agreed
12         with protection.  And Scott and I literally -- this
13         is about a month ago, and he lost his partner in a
14         car accident.  And he was explaining to me why it
15         has to be marriage and not -- I was going, why
16         can't it be garriage (phonetic)?  As long as you're
17         being protected.  I'm serious.  And so, I guess,
18         legally it can't.  So, hence, if I -- if I want to
19         protect my friend, and you want him to have -- he
20         should have been there, you know what I'm saying?
21         And so, then, I have to then support marriage.  If
22         it was some other -- being fair.  If there was some
23         other way to do it, then I would be okay with that.
24         But I don't think -- until, until you really are
25         treated equally, then -- and I am not speaking --
```

1    again, I don't know what you are.  But I am just

2    saying that I think it's -- I think about that a

3    lot since that conversation, so...

4  BY MR. TILLEY:

5        Q.  **And to the extent that you had objections in**

6  **the past, were they religious objections, or were they**

7  **other types of objections?**

8            MS. McCULLOCH:  Object to the form.

9            THE WITNESS:  Yeah, yeah.  I'm Catholic, and

10    so there was obviously that influence, the faith

11    side of it.  I don't see that conflict now.

12    Actually, I met with my priest, I don't see that

13    there's any conflict.  We had a discussion about

14    it.

15  BY MR. TILLEY:

16        Q.  **Which church do you attend?**

17        A.  St. Paul's.

18        Q.  **And you've attended there for a while?**

19        A.  30 years.

20            MR. TILLEY:  That's all the questions we

21    have.

22            MS. McCULLOCH:  Okay.  I don't have any

23    questions.  We'll read.

24            (This proceeding concluded at 12:12 p.m.)

25

```
 1              C E R T I F I C A T E   O F   O A T H
 2
 3     STATE OF FLORIDA}
 4     COUNTY OF LAKE  }
 5              I, COURTNEY L. WEAR, RMR, CRR, FPR, a Notary
 6     Public for the State of Florida and Court Reporter, do
 7     hereby certify that BILL MATHIAS personally appeared
 8     before me 10-1-2014 and was first duly sworn.
 9              Signed this day of 10-27-2014.
10
11
12
13
14
15
```

 

```
                COURTNEY L. WEAR
16              Notary Public-State of Florida
                Comm No:  EE016705
17              Expires:  December 12, 2014
18
       Type Identification Produced: Florida Driver's License
19
20
21
22
23
24
25
```

```
 1                  C E R T I F I C A T E
 2     STATE OF FLORIDA   }
 3     COUNTY OF LAKE     }
 4            I, COURTNEY L. WEAR, a Notary Public for the
 5     State of Florida and Court Reporter, do hereby certify
 6     that I was authorized to and did stenographically
 7     report the foregoing deposition of BILL MATHIAS; that a
 8     review of the transcript was requested; and that pages
 9     4 through 69, is a true record of my stenographic
10     notes.
11            I further certify that I am not a relative,
12     employee, or attorney or counsel of any of the parties,
13     nor am I a relative or employee of any of the parties'
14     attorney or counsel connected with the action, nor am I
15     financially interested in the action.
16            Signed this day of 10-27-2014.
17
18
19
20
21
                  COURTNEY L. WEAR
22
23
24
25
```

```
1                     N O T I C E
2
    TO:   STEPHANIE McCULLOCH, Esquire
3         McLIN BURNSED
          100 West Main Street
4         Leesburg, Florida  34749
               E-mail: stephm@mclinburnsed.com
5
6   CASE: CARVER vs. SCHOOL BOARD OF LAKE COUNTY
7   DATE: 10-27-2014
8   RE:   Your client's deposition taken on 10-1-2014
9         This letter is to advise that your client's
    deposition has been typed and is enclosed.
10        It is suggested that the review of this
    transcript be completed within 30 days of your receipt
11  of this letter, as considered reasonable under Federal
    Rules; however, there is no Florida Statute to this
12  regard.
          The original of this transcript has been
13  forwarded to the ordering party and your errata, once
    received, will be forwarded to all ordering parties for
14  inclusion in the transcript.
15
                       Sincerely,
16
17                     Courtney L. Wear
                       CAB Reporting, Inc.
18
    cc:   [courtesy copy all ordering parties]
19
    Waiver:
20
    I,_____, hereby waive the reading
21  & signing of my deposition transcript.
22

23  _____     _____
    BILL MATHIAS             Date
24  * Federal Civil Procedure Rule 30(e)
      Florida Civil Procedure Rule 1.130(e)
25
```

```
 1                     ERRATA SHEET
 2      DO NOT WRITE ON TRANSCRIPT -- ENTER CHANGES HERE:
 3   IN RE:       CARVER v. SCHOOL BOARD OF LAKE COUNTY
 4   CASE NO.:    5:13-cv-00623-WTH-PRL
 5   PAGE NO.:   LINE NO.:  CHANGE:          REASON:
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
     Under penalties of perjury, I declare that I have read
23   my deposition and that it is true and correct subject
     to any changes in form of substance entered here.
24
     DATE:
25                            _____
                              BILL MATHIAS
```

Randall C. Marshall
rmarshall@aclufl.org
Legal Director
ACLU Foundation of Florida
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
T/786.363.2700 F/786.363.1108



Superintendent Susan Moxley                         January 23, 2013
Lake County School Board
Attn: Stephen Johnson, Sch. Bd. Atty           VIA U.S. MAIL & Email:
201 West Burleigh Blvd.                                  MoxleyS@lake.k12.fl.us
Tavares, FL 32778                                          SteveJ@mclinburnsed.com

Re:   **Carver Middle School Gay-Straight Alliance**

Dear Mr. Johnson,

We represent a student at Carver Middle School, Bayli Silberstein, along with her mother, Erica Silberstein. Bayli wishes to form a Gay-Straight Alliance ("GSA") at Carver Middle School in order confront bullying, educate the school community, and promote acceptance and equality for lesbian, gay, bisexual, and transgender ("LGBT") students at Carver Middle School. To this end, she wishes the GSA to be recognized as an official student club with all the attendant benefits afforded any other noncurricular student club. However, despite her efforts, school officials have thus far not permitted her to form this club. She asked that if the request were denied that she be provided reasons in writing for the denial; instead of denying the request, school officials have simply avoided providing her an answer either way. We therefore request the Superintendent and the School Board's assistance in reversing the school's inaction and ensuring that the GSA is immediately approved as a student club.

As we understand it, students tried to form a GSA at Carver Middle School during the last school year, but then-Principal David Bordenkircher denied it. This school year, one of Bayli's friends submitted on their behalf a packet of materials regarding the club in early November, and they have yet to receive a statement from the school that the club has been approved or denied. After submitting the packet of materials, Bayli and her friend also had a lengthy conversation with current Principal Mollie Cunningham, who acknowledged the potential utility of the club but indicated that she needed to consult with the school board. Since then, there has been no definitive statement that the request to form the club has been approved or denied.

Both the First Amendment of the U.S. Constitution and federal law require that school officials treat GSAs the same as any other noncurricular clubs at the

Exhibit PX - AY                 PX-AX

WNS  b.matrier
C. West, RPR, CRR  10-1-14

school. As explained by the United States Department of Education, the Equal Access Act (20 U.S.C. §§ 4071-4074) guarantees students the right to form and participate in school clubs, with wide latitude given to the proposed content of their discussions.[1] Where schools have refused to allow GSAs to form or have otherwise denied these groups equal treatment, federal courts in Florida and across the country have repeatedly held them to be in violation of the law.[2]

Under the Equal Access Act, schools may not pick and choose among clubs based on what they think students should or should not discuss. If a public school allows any student group whose purpose is not directly related to the school's curriculum to meet on school grounds during lunch or before or after school, then it cannot deny other student groups the same access to the school because of the content of their proposed discussions. The Act specifically provides that a school cannot deny equal access to student clubs because of the "religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a). Thus, school officials cannot prohibit a GSA because of their personal views about LGBT people or issues. As a federal judge concluded in one GSA case:

> The Board Members may be uncomfortable about students discussing sexual orientation and how all students need to accept each other, whether gay or straight. . . . [But School Officials] cannot censor the students' speech to avoid discussions on campus that cause them discomfort or represent an unpopular viewpoint.

---

[1] *See* U.S. Dep't of Education Secretary Duncan's Letter to Colleagues Announcing Release of *Legal Guidelines Regarding the Equal Access Act and the Recognition of Student-Led Noncurricular Groups* (June 14, 2011), available at http://www2.ed.gov/policy/elsec/guid/secletter/110607.html; *see also* U.S. Dep't of Education, Legal Guidelines Regarding the Equal Access Act and the Recognition of Student-Led Noncurricular Groups, available at www2.ed.gov/policy/elsec/guid/secletter/groupsguide.doc.

[2] *See Gay-Straight Alliance of Yulee High Sch. v. Sch. Bd of Nassau Cnty.*, 602 F. Supp. 2d 1233 (M.D. Fla. 2009); *Gonzalez v. Sch. Bd. of Okeechobee Cnty.*, 571 F. Supp. 2d 1257 (S.D. Fla. 2008); *see also* Consent Decree & Order (DE 23), *Vanguard High Sch. GSA v. Yancey*, No. 5:12-cv-268 (M.D. Fla. Aug. 14, 2012); *Straights and Gays for Equality v. Osseo Area Schs.-Dist. No. 279*, 540 F.3d 911 (8th Cir. 2008); *White Cnty. High Sch. Peers Rising in Diverse Educ. v. White Cnty. Sch. Dist.*, No. 2:06-cv-29, 2006 WL 1991990 (N.D. Ga. July 14, 2006); *Boyd Cnty. High Sch. Gay Straight Alliance v. Bd. of Educ. of Boyd Cnty.*, 258 F. Supp. 2d 667 (E.D. Ky. 2003); *Franklin Cent. Gay-Straight Alliance v. Franklin Township Cmty. Sch. Corp.*, No. IP01-1518, 2002 WL 32097530 (S.D. Ind. Aug. 30, 2002); *Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135, 1148 (C.D. Cal. 2000); *E. High Gay-Straight Alliance v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 81 F. Supp. 2d 1166 (D. Utah 1999).

*Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135, 1148 (C.D. Cal. 2000). Silencing ideas because some people do not like them is not only incompatible with the educational values of open inquiry and wide-ranging debate that are central to our free political system – it is against the law.

Our understanding is that Carver Middle School does have noncurricular clubs. For instance, Bayli contends that there is a "speed stacking club," and that the club formerly known as Fellowship of Christian Athletes ("FCA") now meets under the name "BR8" at the same time and place that the former FCA met. Because these clubs are noncurricular, the school must provide equal treatment to all clubs – including the GSA – pursuant to the Equal Access Act.

Allowing the proposed GSA to form is not just a legal duty, but it would also be beneficial to the school community. It is well documented that LGBT students face significant bullying, violence, and isolation in schools.[3] Some of the most common epithets that teens use today to disparage each other are "faggot," "dyke," and "queer." GSAs are part of the solution. A recent national survey on school safety found that the presence of a GSA at a school significantly reduces the amount of bullying experienced by LGBT students and makes them feel safer.[4] As one federal judge wrote in a GSA case, "[t]his injunction [to allow the GSA to form] is not just about student pursuit of ideas and tolerance for diverse viewpoints. As any concerned parent would understand, this case may involve the protection of life itself." *Colin*, 83 F. Supp. 2d at 1150.

The benefits of having a GSA on campus do not flow only to LGBT students. A disproportionate amount of physical violence against LGBT people of all ages is perpetrated by teenage boys. Creating an atmosphere in which bullying and violence are not tolerated and everyone is valued and respected will help make all students better citizens and better equipped for participation in the workforce that is comprised of people from all walks of life.

By protecting students' right to form a GSA, you are not only obeying the law and avoiding potential legal liability, you are promoting school safety and helping address the serious problem of anti-LGBT bullying. Given the legal

---

[3] *See* Gay, Lesbian & Straight Education Network (GLSEN), The 2011 National School Climate Survey, available at http://www.glsen.org/binary-data/GLSEN_ATTACHMENTS/file/000/002/2105-1.pdf, (finding that more than 80% of LGBT students experienced harassment at school and nearly two-thirds felt unsafe).

[4] *See* note 3, *supra*.

obligation to provide equal access and the perfectly appropriate subject matter of the proposed GSA, we expect this situation can be resolved quickly. Please advise us by February 1, 2013, that the request to form a GSA at Carver Middle School has been approved and that it may immediately begin having meetings and activities as an approved noncurricular student club.

Sincerely,

Randall C. Marshall

c:    Bayli Silberstein
      Erica Silberstein

004147

# Daniel Tilley

| | |
|---|---|
| **From:** | Mathias, Bill |
| **Sent:** | Friday, February 15, 2013 12:10 PM |
| **To:** | Sam Green |
| **Subject:** | Re: 21st Century |

I have no problem with GSA. That is why I am supporting open curriculum clubs in high school.
I am new to the board, so I cannot speak to the club policy review. I am told that it was up for review (we approved changes to 7 policies last week) this year. I am confident that the ACLU sped the priority for the review. However I was not told that.

I have not seen lake county on the national news. In my short time I have seen my position on issues sensationalized for the benefit of the news media, NOT the truth. So I am more concerned about serving the children through good governance than worried about a news report. After all people attention span is about 6 weeks, sad but true.

From Bill Mathias, sent from my iPad

On Feb 15, 2013, at 10:29 AM, "Sam Green" <sam@samnellen.com> wrote:

> Mr. Mathias,
> Thank you for responding to my email. I still have many unanswered questions. What do you find objectionable about the GSA? Why wasn't the club policy a problem until a student wanted to start a GSA? What open curriculum clubs are now active in the Lake County School System? Is the Board considering banning all open curriculum clubs? I am still shocked that in this day and age there is any controversy surrounding this issue. Once again Lake County is making negative national news and I find it very embarrassing.
> I am looking forward to your response.
> Sam Green

> On Feb 15, 2013, at 9:20 AM, "Mathias, Bill" <MathiasB@lake.k12.fl.us> wrote:

> Mr Green:

> Thanks for your concern. Contrary to public media, the review of the club policy is not about GSA specifically. The federal government through directives and the ACLU through law suits has limited the "club" distinction to open curriculum (any club) or closed curriculum (club based on curriculum in school). If we have open then ANY club has the federal right to exist on the campus.

> I am still meeting with various groups to get input. I totally empathize with students that are teased or bullied; for me that is a separate discussion from the club policy.

> From Bill Mathias, sent from my iPad

> On Feb 13, 2013, at 5:59 PM, "Sam Green" <sam@samnellen.com> wrote:

1

PX-A2

Exhibit AZ
WNS b. Mathias
C. Wear, RPR, CRR 10/1/14

February 13, 2013

Dear Bill,

Why isn't the Lake County School Board allowing a Gay-Straight Alliance Club to be formed at Carver Middle School in Leesburg? Shouldn't the School Board welcome a club whose goals include fighting discrimination, harassment and violence in schools? Are you really considering banning all non-academic clubs in middle school and high school just so you don't have to allow the GSA? What kind of negative feedback are you going to get from other clubs such as Key Club and Fellowship of Christian Athletes. What are you afraid of? Why is this even a controversy? This sounds like a great script for a low budget Hollywood B movie. Please tell me that I am wrong.

Since the board created this controversy I have talked to several gay relatives and friends about this issue. I am stepfather of two gay children who went from K through 12 in the Lake County School System. They both were bullied and harassed and could not wait to get out of Lake County. They both have gone on to college, grad school and successful careers far away from here but will never forget their negative experiences from growing up in Lake County. I have communicated with one former Lake County student who talked of considering suicide in middle school because he was gay and had no one to talk to. You probably have a friend or relative whose son or daughter is going through the same thing. Please help them and allow the GSA.

GLBTs are the only group that it is still acceptable to discriminate against and Lake County Schools has a record of supporting this discrimination. For example, Jerry Buell is still teaching here. Totally off the subject, but I still can't forget that students weren't allowed to see President Obama's speech on education. Times are changing and it is time for Lake County to move into the 21st century. Please don't make us the laughing stock again. Do the right thing and allow the GSA.

Sincerely yours,

Sam Green

Under Florida's "Public Records" law, absent a specific exclusion, written communications to or from Lake School District employees are considered public records. E-mail communication with this correspondent may be subject to public and media disclosure upon request.

# Daniel Tilley

| | |
|---|---|
| **From:** | Mathias, Bill |
| **Sent:** | Monday, June 03, 2013 10:46 AM |
| **To:** | Sam Green |
| **Subject:** | Re: $14,000 |

Mr Green:

I appreciate your concern about waste in our school district. I assure you that when the ACLU filed for the emergency hearing and our district attorney advised that Carver Middle currently had clubs that were not curriculum based; hence considered "open". The Federal Equal Access Act applied to Carver because the change in the Florida statue did not take effect until June 1,the district had no defense to the club, we settled.

What bothers me is, the ACLU knew from the beginning they were on solid ground with the protection of the Federal Equal Access Act. Why did they wait so long to file the action? It seems their interest was to bill hours as they sat through public meetings then serve their client. Before the first policy discussion, had they filed suit the club would have been allowed.

I really don't understand "embarrassed Lake County again". The fact that we disagree on policy does not make you or me an embarrassment. I actually appreciate civil discourse, if both parties can listen as well as they speak then both can walk away with a better understanding of the issue. What I was not prepared for was the aggressive name calling and personal attacks.

I do not support an open club policy in middle, however I do support an open policy (with no parental signature) for high school. I reached this position after speaking to Gay supporters who shared their stories of coming out. In many cases the parents applied the most pressure on the child and most likely would not sign the consent; the GSA can be a needed support group. I understand that LGBT children may feel different in middle (some elementary) without exception I was told real social pressure was high school and college.

"Bullying" was framed as the main reason for the GSA. The district already has a policy against bullying. We are looking at programs to introduce tolerance in elementary,middle and high school. I believe that we have a responsibility to protect all students and this is a positive step to stop bullying no matter "who" or "what" the student is.


From Bill Mathias, sent from my iPad

On May 30, 2013, at 7:56 PM, "Sam Green" <sam@samnellen.com> wrote:

> Thank you Mrs. Brandeburg for doing the right thing. To Board members
> Bill Mathias, Tod Howard, Kyleen Fisher and Debbie Stivender: I can't believe you have wasted $14,000 of Lake County Tax Payer's money and embarrassed Lake County again.
> Sam Green
> 352-357-2994

Under Florida's "Public Records" law, absent a specific exclusion, written communications to or from Lake School District employees are considered public records. E-mail communication with this correspondent may be subject to public and media disclosure upon request.

Exhibit
PX BA    PX-008

WNS  B. Mathias
C. Wear, RPR, CRR 10/1/14

1