Heather Jablonski   Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida   September 13, 2014

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT O FLORIDA
OCALA DIVISION
CASE NO.:   5:13-cv-00623-WTH-PRL


CARVER MIDDLE SCHOOL GAY-STRAIGHT
ALLIANCE et al,
          Plaintiffs,
vs.
SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

          Defendant.


DEPOSITION OF:          HEATHER JABLONSKI
                        Taken on behalf of Defendant
DATE:                   TUESDAY, SEPTEMBER 30, 2014
TIME:                   1:10 P.M. - 3:36 P.M.
LOCATION:               1000 WEST MAIN STREET
                        LEESBURG, FLORIDA


REPORTER:               Courtney L. Wear, RMR, CRR, FPR
                        Court Reporter
                        Reported by Stenographic Means


CAB REPORTING, INC.
Post Office Box 1684
Ocala, Florida  34478
(352) 401-0080

Heather Jablonski          Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida          September 13, 2014

Page 2

A P P E A R A N C E S

STEPHANIE McCULLOCH, Esquire

McLIN BURNSED

100 West Main Street

Leesburg, Florida  34749

    E-mail: stephm@mclinburnsed.com

    On behalf of Defendants


DANIEL B. TILLEY, Esquire

ACLU FOUNDATION OF FLORIDA

4500 Biscayne Boulevard, Suite 340

Miami, Florida 33137

    E-mail:  dtilley@aclufl.org

    On behalf of the Plaintiffs


BENJAMIN JAMES STEVENSON, Esquire

ACLU FOUNDATION OF FLORIDA

P.O. Box 12723

Pensacola, Florida 32591

    E-mail:  bstevenson@aclufl.org

    On behalf of the Plaintiffs


\*     \*     \*     \*     \*     \*

Heather Jablonski          Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida          September 13, 2014

Page 3

I N D E X

TESTIMONY OF HEATHER JABLONSKI                    PAGE

Direct Examination by Ms. McCulloch...............4
Cross-Examination by Mr. Tilley..................96
Redirect Examination by Ms. McCulloch...........103

Certificate of Oath ............................109
Reporter's Certificate .........................110

          *      *      *      *      *      *

E X H I B I T S

DEFENDANT'S EXHIBIT                               PAGE

A-B ...........................................63
C-D ...........................................89

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 4

```
 1                    P R O C E E D I N G S
 2            THE REPORTER:  Raise your right hand.
 3            Do you swear the testimony you're about to
 4       give will be the truth, the whole truth, and
 5       nothing but the truth?
 6            THE WITNESS:  I do.
 7   Whereupon,
 8                    HEATHER JABLONSKI,
 9     a witness herein having been first duly sworn, was
10            examined and testified as follows:
11                    DIRECT EXAMINATION
12   BY MS. McCULLOCH:
13       Q.   Would you state your name please, ma'am.
14       A.   Heather Lynn Jablonski.
15       Q.   Ms. Jablonski, my name is
16   Stephanie McCulloch, I represent the School Board of
17   Lake County, Florida in the lawsuit that's been filed
18   on behalf of a Carver Middle school student, her
19   mother, and yourself, as it relates to a club
20   application for a club in Carver Middle school.
21            Have you ever had your deposition taken
22   before?
23       A.   No, ma'am.
24       Q.   I am going to tell you some of the ground
25   rules.  I am going to be asking you some questions
```

Heather Jablonski   Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida   September 13, 2014

Page 5

```
 1   today about your background and history.  I am going to
 2   talk to you about your role as a teacher at
 3   Carver Middle School and your participation in the
 4   attempted formation or formation of the Gay-Straight
 5   Alliance student club.
 6           If at any time I ask you a question that
 7   calls for a yes-or-no response, please try to remember
 8   to say yes or no out loud versus nodding or shaking
 9   your head.  That way when we read the transcript we'll
10   know if you meant yes or no.
11       A.    Okay.
12       Q.    And if you'll wait 'til I finish my question
13   before you answer my question so we're not speaking
14   over one another, that will make her job easier.
15           Also, if you know need to stop to take a
16   break for any reason, let me know, we'll be happy to do
17   that.  But I don't anticipate this deposition will be
18   too terribly long, okay?
19       A.    Okay.
20       Q.    If you answer a question that I ask, I am
21   going to assume that you understood the question and
22   intended to give the answer.
23       A.    Okay.
24       Q.    Is that fair?
25       A.    Yes.  If I have any questions, I'll ask.
```

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 6

1    Q.    Okay.  Are you currently employed?

2    A.    Yes, ma'am.

3    Q.    Where are you employed?

4    A.    Carver Middle School.

5    Q.    How long employed at Carver Middle School?

6    A.    I believe that this is my 16th year at

7    Carver, 20th year with the county.

8    Q.    Okay.

9    A.    I lose track after a while.

10   Q.    What is your current position at

11   Carver Middle School?

12   A.    I have three, Response to Intervention, RTI

13   coach.  ELL coach, which is English Language Learners.

14   And PBS coach, which is Positive Behavioral Support

15   System coach.

16   Q.    How long have you held those positions?

17   A.    This is my first year, so since August of

18   this year.

19   Q.    Describe for me what each of those means,

20   because I am not a teacher and am not at Carver, and I

21   don't know what those things mean.  Are those

22   particular classes or --

23   A.    No.  It's a non -- I am an instructional

24   position, but I'm not a load-bearing teacher.

25   Q.    Okay.

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 7

1      A.   My job is -- for the ELL students, I test
2  students who are coming into the school system speaking
3  a different language at home.
4      Q.   Okay.
5      A.   I place them into the appropriate support
6  program based on their level of English proficiency.
7      Q.   Okay.
8      A.   For RTI, Response to Intervention, if a
9  student who's not ESE is slipping through the cracks,
10  whether it's behavioral or academically, I work with
11  the parent, the student and the teachers to get them
12  back on track.
13      Q.   Okay.
14      A.   And PBS is a school-wide initiative, it's
15  supposed to be a countywide initiative.  And it's just
16  the positive behavioral support system, it's trying to
17  catch the kids being good, hoping that positive
18  reinforcement will work better than negative
19  reinforcement.
20      Q.   Okay.
21      A.   And it's my job to head up that team.  It's a
22  team of people.
23      Q.   Do you have any special certifications other
24  than your teaching certificates to teach any of these
25  three things?

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 8

1    A.   No, ma'am.

2    Q.   **Okay.**

3    A.   Because it's an instructional position.

4    Q.   **Speaking of instructional position and**

5  **teaching certificates, do you hold a Florida teaching**

6  **certificate?**

7    A.   Several of them.

8    Q.   **Okay.  Could you tell me which ones you hold?**

9    A.   Elementary education.

10    Q.   **How long have you had your elementary**

11  **education certificate?**

12    A.   Since 1995.

13    Q.   **Okay.**

14    A.   And then middle school mathematics, and that

15  would be four years later in 1999 that I got that one.

16    Q.   **Okay.**

17    A.   High school mathematics, and I would have to

18  say that's approximately, maybe, 2005 that I got that

19  one.  But I am not exactly sure.

20        And then in -- got to count backwards.  14,

21  13, 12... In 2012 I got my middle school science

22  certification.

23    Q.   **Okay.  Your elementary ed certificate, what**

24  **grades, in particular, does that qualify you to teach?**

25    A.   One through six.

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 9

1     Q.    And the middle school math certificate, what
2  grades does that qualify you to teach?
3     A.    Six through nine.
4     Q.    Okay.  And the middle school science, what
5  grades --
6     A.    Six through nine.
7     Q.    Six through nine.
8           And the high school math, what does that
9  qualify you to teach?
10    A.    It's labeled high school, but it's actually
11 6th through 12.
12    Q.    Okay.  What positions did you hold at
13 Carver Middle School before you took this position for
14 the three interventions and other topics?
15    A.    Immediately preceding this?  I was the
16 math/science instructional coach.  That's also non load
17 bearing.  It was my job to work with all the math and
18 science teachers to sure up instruction and lead the
19 departments.
20    Q.    What years were you in that position?
21    A.    The last two years, so that would be '13/'14
22 and '12/'13.
23    Q.    Okay.
24    A.    For the, I want to say, four years prior to
25 that I was an 8th grade math teacher.  And I taught

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 10

1    everything from 8th grade general math all the way up
2    to Algebra I Honors, which is technically a high school
3    class, but taught in middle school.
4        Q.   Okay.
5        A.   Prior to that I taught 6th grade for three
6    years.
7             And for my years at Carver prior to that it
8    was a combination of 7th and 8th grade.
9             For my first four years I taught 3rd grade at
10   a different school, Triangle Elementary.
11       Q.   **Have you ever taught in high school?**
12       A.   No, ma'am.
13       Q.   **Have you ever had any position in Lake County**
14   **other than as a teacher or an instructional member?**
15       A.   No, ma'am.
16       Q.   **Have you ever coached any teams, like**
17   **sporting --**
18       A.   No, ma'am.
19             MR. TILLEY:  If you could just be sure to
20        wait 'til she finishes the answer so there's no
21        cross-talking.
22             THE WITNESS:  Sorry.
23   BY MS. McCULLOCH:
24       Q.   **Other than the Gay-Straight Alliance that**
25   **formed in the 2012/'13 school year and the application**

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 11

```
 1    that was submitted in the '13/'14 school year, have you
 2    ever been a sponsor of a student club?
 3              MR. TILLEY:  Object to the form.  You can
 4        answer.
 5              THE WITNESS:  Oh.  Yes.  It was a math club
 6        that was requested that the school sponsor.  Our
 7        county department chair requested that a teacher
 8        from the school sponsor the math club.
 9    BY MS. McCULLOCH:
10        Q.   Okay.  Was that inter-countywide, or was it
11    just --
12        A.   It was countywide.  It was called
13    Math Counts.  But that was years ago, and I honestly
14    couldn't tell you what year it was.
15        Q.   Okay.  Any other instances where you've been
16    the sponsor of a student club or organization?
17        A.   No, ma'am.
18        Q.   When you talk about a math/science
19    instructional coach, that instructional coach part is
20    essentially just describing your role in interaction
21    with the other teachers that are teaching math and
22    science; is that fair to say?  You're in a leadership
23    role to kind of organize the math/science curriculum?
24    Or how does that work?
25        A.   I worked with the math and science department
```

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 12

1    on everything from implementing FSIM calendars,

2    blueprints.  It was not -- it was a leadership role,

3    but I am not an administrator.

4        Q.    Okay.

5        A.    I was a peer, not a boss.

6        Q.    Okay.  Could you just describe for me your

7    educational background before you became employed as a

8    teacher?

9        A.    I spent three years at Lake Sumter Community

10   College getting my AA in general education.  Then I

11   took a year off, and then did two more years.  It was

12   physically at Lake-Sumter, but it was a UCF degree,

13   called the Two-Plus-Two For Education.  And that was

14   elementary education.

15       Q.    Okay.

16       A.    And then --

17       Q.    Did you receive an Associate's degree for

18   that, or --

19       A.    That was a Bachelor's.

20       Q.    Okay.

21       A.    And then four years ago I went back to UCF

22   and started pursuing my Master's degree in math and

23   science education.  But due to some family issues, I

24   did not finish.  I have a thesis to finish.

25       Q.    Are you currently attending classes there?

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 13

1     A.   No, ma'am.

2     Q.   Okay.  Through the duration of your

3  employment as a teacher in the Lake County schools, or

4  particularly at Carver Middle School, we'll limit it to

5  that timeframe, have you held any other jobs?

6     A.   Not officially assigned jobs.  But if they

7  asked for volunteers for -- I have been a member of the

8  safety committee, I have been prior to this year also a

9  member of a PBS team.  I have been -- for a decade I

10  was math department chair before I became the

11  math/science coach.

12     Q.   Have you ever had any secondary employment,

13  say, within the last five years outside of the

14  Lake County School Board?

15     A.   No, ma'am.

16     Q.   Who is your immediate supervisor at

17  Carver Middle School?

18     A.   Mollie Cunningham, she's our principal.

19     Q.   Okay.  Was Ms. Cunningham the principal in

20  the '12/'13 school year, as well?

21     A.   This is '14/'15... Yes.  Hold on.  This is

22  '14/'15.  She was there with us the last two years.

23  Yes, she was.

24     Q.   Okay.  Are you familiar with a club or club

25  called the Gay-Straight Alliance?

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 14

1      A.    With the organization in general?

2      Q.    Yes, ma'am.  But, in particular, are you

3   familiar with a club that attempted to form at

4   Carver Middle School?

5      A.    Oh.  Yes, ma'am.

6      Q.    Okay.  My understanding is that club began or

7   tried to form a student club beginning in 2012/2013; is

8   that correct?

9      A.    To my knowledge it started earlier, but not

10  specifically as GSA.

11     Q.    Okay.  How did it start, to your knowledge?

12     A.    My daughter came out to me in 7th grade that

13  she was gay.

14     Q.    Okay.

15     A.    And requested my help in starting an

16  organization.  We did not know at the time about GSA,

17  but she wanted to start an LGBT club.

18     Q.    What is LGBT club?

19     A.    It's lesbian, gay, bisexual and transsexual.

20     Q.    What is the purpose of an LGBT club?

21     A.    Their thought in mind was that they wanted to

22  start an organization where they could meet together,

23  with other like-minded people that would help them.

24  And they would be able to talk about issues that they

25  face daily at school, including bullying and being

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 15

1    ostracized, and other difficulties they were

2    encountering.

3         Q.    Was the LGBT primarily for lesbian, gay,

4    bisexual and transgender students?

5         A.    If we had been able to form it, it would have

6    been open to anybody who wanted to join it, because

7    they also wanted straight allies to be able to come

8    support them.

9         Q.    But is it primarily a lesbian gay bisexual

10    and transgender type of club?

11         A.    Yes, it would be, I guess.  But it never got

12    off the ground.

13         Q.    Okay.  And how did you come to, I guess --

14    did you make any attempts to try to form that club, or

15    did the students just talk --

16         A.    I did not, but my daughter did.

17         Q.    Okay.  What's your daughter's name?

18         A.    DH.

19         Q.    Was DH a student at Carver Middle School at

20    the time?

21         A.    Yes, ma'am.

22         Q.    Is she currently a student at Carver Middle

23    School?

24         A.    No, ma'am.

25         Q.    When did she leave Carver Middle School?

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 16

1      A.   She's in 11th grade now.  So three year --

2   well, three years ago.

3      Q.   Okay.  So prior to any attempts at forming a

4   GSA, that was the time that your daughter was

5   attempting to form an LGBT club?

6      A.   Yes, ma'am.  She tried her 7th grade year and

7   then, again, in her 8th grade year.

8      Q.   What procedure did she go through to attempt

9   to form this club at Carver Middle School, if you know?

10     A.   When she was in 7th grade, she spoke to her

11  guidance counselor to see if she could start a club,

12  because we had lots of clubs on campus.

13     Q.   Let me kind of slow you down here, because I

14  am going to be asking you a lot of detail about certain

15  things.

16     A.   Okay.

17     Q.   What clubs were on campus back then?

18     A.   We had -- in addition to all the sporting

19  clubs that we had, we also had chess, FCA, Fellowship

20  of Christian Athletes.  We had, I believe they called

21  it a peace club, which featured cultures of different

22  students on campus.  Like a cultural awareness club.

23  We had a cup-stacking club.  That's all I can think of

24  offhand.

25     Q.   Okay.  And this would have been roughly the

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 17

1    2010/2011 and 2011/2012 school years?

2        A.    Yes, ma'am.

3        Q.    Are you aware of what the School Board's

4    policy was for middle school student clubs back in

5    2010/2011 or 2011 and 2012?

6        A.    After she asked me about starting a club, I

7    did read through the code of conduct about student club

8    policies.

9        Q.    Okay.  What was your understanding of this

10   student club policy in effect at that time?

11       A.    My understanding was that she needed to ask

12   somebody at the School Board -- not the School Board.

13   At the school on a leadership level if she could start

14   a club at that time.  That she needed principal

15   permission.

16       Q.    Who was the principal then?

17       A.    Dave Bordenkircher.

18       Q.    And did she request principal permission?

19       A.    Initially she went through the guidance

20   counselor.

21       Q.    Does the guidance counselor have the

22   authority to approve clubs back then at Carver Middle

23   School?

24       A.    No, she didn't.  But the guidance counselor

25   was going to go to Mr. Bordenkircher and ask his

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 18

1    permission.

2        Q.    Who was the guidance counselor?

3        A.    Shannon Sapp, S-A-P-P.

4        Q.    Okay.  And did Ms. Sapp go to

5    Mr. Bordenkircher and ask for permission?

6        A.    To my knowledge, yes.

7        Q.    Was the permission given?

8        A.    No, ma'am.

9        Q.    Are you aware of what information was given

10    to Mr. Bordenkircher about the LGBT at that time?

11        A.    No, I am not --

12            MR. TILLEY:  Object to the form.

13            THE WITNESS:  I'm not aware of what

14        specifically she -- what information she provided

15        to the principal.

16    BY MS. McCULLOCH:

17        Q.    Okay.  Are you aware of any reason

18    Mr. Bordenkircher may have given for not allowing the

19    club to have permission to meet?

20        A.    No, I am not aware of his reasons.

21        Q.    Okay.  Did your daughter ever have any

22    specific communications with Mr. Bordenkircher about

23    forming the club?

24        A.    I honestly don't know if she spoke to

25    Mr. Bordenkircher or she spoke to Ms. Sapp about it.

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 19

1  Q.    Okay.  Did you ever meet with

2  Mr. Bordenkircher about allowing the club to form?

3  A.    The second time that she tried, during her --

4  she tried the first time her 7th grade year.  The

5  second time I did meet with him when she presented him

6  with letters of request to formally start a GSA.

7  Q.    Okay.  So the second time she actually

8  requested to form a GSA and not an LGBT?

9  A.    Correct.

10  Q.    Okay.  What's the difference between the two

11  organizations?

12  A.    The GSA also includes GSA's Gay-Straight

13  Alliance.  So it specifically includes straight

14  supporters.

15  Q.    Okay.

16  A.    Along with anybody who would fall under the

17  category of gay.

18  Q.    What is your understanding of who would fall

19  under the category of gay?

20  A.    That would be -- it would be all the LGBT

21  students, the gay, lesbian, bisexual, transgender, or

22  anybody that might find themselves questioning.

23  Q.    Okay.  So then the second year, would that be

24  the 2011/2012 school year that your daughter requested

25  to form a GSA, rather than a LGBT?

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 20

1    A.    Correct.

2    Q.    Okay.  What is the mission back then as you

3 understand it of the GSA, when your daughter applied?

4    A.    The mission of the GSA is to build a

5 committee of like-minded students, to work together, to

6 bring awareness to other students, and to fight

7 bullying and conflicts that they find themselves in on

8 campus.

9    Q.    When you say "they find themselves in on

10 campus," is that primarily the gay, lesbian, bisexual,

11 transgender students?

12    A.    Yes, ma'am.

13    Q.    So one of the missions of the GSA is not

14 combatting bullying of all students, but combatting

15 primarily the bullying of gay, lesbian, bisexual and

16 transgender students?

17    A.    It really would be to combat bullying of all

18 students, but we focus primarily on the issues that the

19 students who are walking in our doors face.  But one of

20 the missions is to bring awareness that you can't be a

21 bystander, you need to do something, you need to report

22 it, regardless of whether it's for the gay students or

23 straight students, it doesn't matter .

24    Q.    And when you say that it was primarily

25 comprised of gay, lesbian, bisexual, transgender or

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 21

1    questioning students, what do you mean by "questioning

2    students"?

3        A.    Students who quite don't know whether they

4    fit into the LGBT group or whether they find themselves

5    straight, or somewhere in between.

6        Q.    So would it be fair to say that there are

7    students who are questioning what their sexual

8    preference is?

9        A.    Yes.

10           MR. TILLEY:  Object to the form.

11           THE WITNESS:  Yes, ma'am.

12    BY MS. McCULLOCH:

13        Q.    In the 2011/2012 school year when your

14    daughter was attempting to form a GSA, were there any

15    other students that were interested in participating at

16    that time?

17        A.    Yes, ma'am.  She had several friends, but gay

18    and straight, that were interested in helping her

19    pursue getting a GSA started.

20        Q.    Okay.  Were there any other teachers who were

21    sponsoring the group or helping to get the club

22    approved at that time?

23        A.    At that time I was willing to be the sponsor

24    for the group.  And I also had another teacher that I

25    worked with that wanted to assist.

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 22

1       Q.    Who was that teacher?

2       A.    Tracy Smith.

3       Q.    Are you aware of Ms. Smith's sexual

4  orientation or sexual preference?

5       A.    Yes, ma'am.

6       Q.    What is her sexual orientation?

7       A.    She is a lesbian.

8       Q.    And what is your sexual orientation?

9       A.    I'm straight.

10      MR. TILLEY:   Object to the form.

11 BY MS. McCULLOCH:

12      Q.    What did you do in 2011/2012 to attempt to

13 get the GSA as an approved student club at

14 Carver Middle School?

15      A.    My daughter wrote a letter of request.

16 Several of her friends that saw a need for the

17 organization also wrote letters of request. And she

18 also presented a -- we call it a letter of request, but

19 it was more of a petition signed by many students on

20 campus.

21      Q.    Okay.   Did your daughter approach any other

22 Lake County School Board employees and ask them to sign

23 the petition?

24      A.    I don't believe she did directly, no.

25      Q.    Did you approach any Lake County School Board

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 23

1      employees and ask them to sign a petition?

2          A.   I did not directly ask them.  However, I did

3      have several that knew what was going on.  And

4      volunteered to sign.

5          Q.   Were there any other volunteers for either

6      participating in some way in the meetings, or in

7      assisting the group to get club recognition, other than

8      yourself and Ms. Smith?

9          A.   There was one other teacher who volunteered

10     to assist if we got the meeting going.

11         Q.   Okay.  Who was that?

12         A.   Jennene, J-E-N-N-E-N-E, I believe.  Candell,

13     C-A-N-D-E-L-L.  It's a C.

14         Q.   Is Ms. Candell still employed at

15     Carver Middle School?

16         A.   Yes, ma'am.

17         Q.   Are you aware of what her sexual orientation

18     is?

19              MR. TILLEY:  Object to the form.

20              THE WITNESS:  I never asked.

21     BY MS. McCULLOCH:

22         Q.   Okay.  And Ms. Smith, is she still employed

23     at Carver Middle School?

24         A.   Yes, ma'am.

25         Q.   What conversations did you have, if any, with

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 24

1     Mr. Bordenkircher regarding the GSA back in 2011/2012?

2          A.     I remember going with my daughter when she

3     presented him with the letters and the petition.  And

4     the only conversation we had was that he would have to

5     look it over and get back to me.

6          Q.     Okay.  When, approximately, in this school

7     year did you approach him for permission to form the

8     club?

9          A.     The first time or the second time?

10         Q.     For your daughter, on your daughter's behalf,

11    the 2011/2012 school year?

12         A.     That would have been approximately -- oh, it

13    was right before Thanksgiving vacation.  So it would

14    have been November.

15         Q.     Okay.  Did the club form that year?

16         A.     No, ma'am.

17         Q.     Did Mr. Bordenkircher ever give you any

18    specific reasons why the club didn't form, or wasn't

19    given permission to form?

20         A.     He said it was not an academic club, and so

21    therefore we were not given permission.

22         Q.     Are you aware of any other requests for clubs

23    at Carver Middle School during the 2011/2012 school

24    year that were denied?

25         A.     No, ma'am.

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 25

1    Q.   Other than the GSA and the LGBT, did you ever

2 participate in requesting that a club be formed at

3 Carver Middle School?

4    A.   The following year BNS asked me if I would

5 sponsor her GSA.

6    Q.   You mean BNS?

7    A.   Yes, ma'am.

8    Q.   We'll get to that in a second.  But other

9 than the GSA and the LGBT, have you ever had any

10 involvement in requesting that a club be allowed to

11 form at Carver Middle School, any type of club, whether

12 it be math club, chess club, whatever type of club?

13    A.   No, ma'am.

14    Q.   Have any other students asked you to sponsor

15 or help them get a club formed, other than the GSA and

16 the LGBT?

17    A.   At that time?

18    Q.   Throughout your year.

19    A.   Or since then?  Just BNS and HF.

20    (Discussion off the record.)

21 BY MS. McCULLOCH:

22    Q.   In the 2011/2012 school year, did you ever

23 speak to anyone else after Mr. Bordenkircher said that

24 the club would not be allowed to form?

25    A.   I let Ms. Smith know that DH had been turned

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 26

1  down.

2     Q.    Did you approach any School Board members or

3  the superintendent?

4     A.    No.   Not that year, no.

5     Q.    Did you talk to anyone else at the

6  administrative office of the Lake County School Board?

7     A.    No, ma'am.

8     Q.    The next year, 2012/2013, I am assuming you

9  would have been employed as the math/science coach?

10     A.    Yes, ma'am.

11     Q.    How were you familiar with BNS?

12     A.    BNS was a friend of my daughters. She had

13  been one of the co-signors of the original -- I believe

14  she even wrote a letter, but she was also one of the

15  co-signors of the original petition to start the GSA

16  the previous year. And she asked me if we could start

17  one this year.

18     Q.    Do you know how old BNS was at the time that

19  she asked you to start a GSA, or to help her start a

20  GSA at Carver Middle School?

21     A.    I would assume 13, because most 8th graders

22  are 12 going on 13, 13 going on 14.

23     Q.    So she was in 8th grade that year?

24     A.    Yes, ma'am.

25     Q.    But she had also signed the petition the year

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 27

1    before in 7th grade?

2        A.    As a 7th grader, yes.

3        Q.    Are you aware if she signed any petition or

4    participated in trying to get the LGBT formed in the

5    2010/2011 year?

6        A.    No, ma'am.  My daughter did not know her at

7    that time.

8        Q.    Okay.  Did BNS ever tell you what her sexual

9    orientation was?

10        A.    Yes, ma'am.

11        Q.    What was it?

12        A.    I believe at the time she said she was

13    bisexual.  I think -- I can't swear to it, but she

14    would consider herself a lesbian now.

15        Q.    Are you still familiar with BNS --

16        A.    I see her from time to time.  Mostly at high

17    school events.

18        Q.    Is your daughter still friends with BNS?

19        A.    I would say they're more acquaintances than

20    friends.

21        Q.    Do they attend the same high school?

22        A.    Yes, ma'am.

23        Q.    Is that Leesburg High?

24        A.    Yes, ma'am.

25        Q.    Did you ever have any communications with

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 28

1   BNS's parents when she was requesting your assistance
2   in attempting to form a GSA at the middle school?
3        A.   I don't believe that I had any communication
4   with her mom until we started going to School Board
5   meetings.
6        Q.   When you say "we," who do you mean by we?
7        A.   My daughter and I would go to School Board
8   meetings.  BNS, her father, I think it's her
9   stepfather, I think, and BNS would go.
10       Q.   What's her stepdad's name, if you know?
11       A.   I honestly don't know.
12       Q.   Okay.  And her mother's name?
13       A.   Erica, E-R-I-C-A.  And I don't know that it's
14   Silberstein.  I think she has remarried.
15       Q.   Okay. When's the last time you spoke with
16   Ms. Silberstein?
17            MR. TILLEY:  Object to the form.
18            THE WITNESS:  Maybe two months ago.
19   BY MS. McCULLOCH:
20       Q.   Was it about any of the issues related to the
21   GSA?
22       A.   Yes, ma'am.
23       Q.   What was the content of that conversation?
24       A.   We had a conversation about how things were
25   going for our girls at the high school, if they were

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 29

1    experiencing any difficulties.  If there was a need to

2    maybe pursue the GSA at the high school level.

3         Q.    Are you familiar with Lake County

4    School Board's policy for student clubs in high

5    schools?

6         A.    I am now, yes, ma'am.

7         Q.    Okay.  What is your understanding of whether

8    or not a GSA would be permissible in a high school in

9    Lake County under the current policy?

10        A.    My understanding is the current policy does

11   allow it.  It's an open campus, so they do allow the

12   formation of almost any club.  But they do have to fill

13   out an application, they have to have a charter, they

14   have to have a teacher sponsor.

15        Q.    Okay.  Prior to this school year, has your

16   daughter or BNS, to your knowledge, attempted to form a

17   GSA at the high school level?

18        A.    My daughter did try, both her 9th grade and

19   10th grade year, to get one going.  But we had -- her

20   9th grade year, she was initially told yes by

21   Bill Miller.  But then when it hit the news about BNS,

22   Mr. Miller said that he wanted to wait and see how

23   things go, and whether BNS's club was approved before

24   she could pursue it at the high school.

25              The following year she had difficulty finding

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 30

1    a teacher that would be willing to sponsor it.

2    Q.   Okay.   So when you're talking about the year

3    that she asked for Mr. Miller's permission, that was

4    the 2012/2013 school year?

5    A.   Sorry, I have to think backwards.

6    Q.   That's okay.

7    A.   So this is '14/'15, then so her 11th grade or

8    10th grade year was '13/'14.   Yeah, it would have been

9    '12/'13.

10    Q.   Okay.   Are you aware of whether or not the

11    School Board has changed its policy for student clubs

12    and organizations since 2012/2013 school year?

13    A.   Yes, ma'am.

14    Q.   Have they changed the policies?

15    A.   Yes, ma'am.

16    Q.   Do you remember when that was, approximately?

17    A.   That was, I believe, in April or May of 2013,

18    I believe.

19    Q.   So the policy that was in effect for this

20    past school year, the 2013/2014 school year, was

21    different than the policy that was in effect at the

22    time that your daughter asked Mr. Miller for

23    permission --

24    A.   Yes, ma'am.

25    Q.   -- to form a GSA?

Heather Jablonski   Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida   September 13, 2014

Page 31

1    A.    It changed during that school year.

2    Q.    **Okay.  And you said for the last school year**

3  **your daughter couldn't find a teacher to sponsor the**

4  **club?**

5    A.    Correct.

6    Q.    **Did she ever submit a formal application for**

7  **the club?**

8    A.    No, she did not submit a formal application.

9    Q.    **Okay.  So it wasn't that she submitted an**

10 **application and it was denied, she just hasn't been**

11 **able to find a sponsor to fill the criteria to submit**

12 **an application?**

13   A.    Correct.  Because the application

14 specifically requests a teacher sponsor name.

15   Q.    **Okay.  During the 2012/2013 school year at**

16 **Carver Middle School, are you aware of what the policy**

17 **required for student clubs at the middle school level?**

18   A.    That was the year it changed.  I believe at

19 the beginning of the school year the middle school was

20 considered a secondary school, and it was an open

21 policy.  It needed principal -- it needed an

22 application with a sponsor, principal permission and

23 superintendent permission.

24   Q.    **That was your understanding as of the first**

25 **request that BNS submitted to form a GSA?**

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 32

1        A.    Yes, ma'am.

2        Q.    **Were you listed as the GSA sponsor at that**

3    **time?**

4        A.    I honestly don't recall doing an official

5    application.  We did the letters of request.  I am not

6    sure at the time that I could find -- I don't recall

7    being able to find the actual application.

8        Q.    **Are you aware of whether an official**

9    **application was actually required under that policy, or**

10   **if it was just principal permission?**

11       A.    I think it was just principal permission.

12   Because I do remember looking at the code of conduct

13   about the club policy.  And I don't remember finding

14   any PDFs anywhere on county site for a club.

15       Q.    **Okay.  At some point during the 2012/2013**

16   **school year, and I believe it was in the spring of**

17   **2013, was the GSA given permission to meet --**

18       A.    Yes.

19       Q.    **-- at Carver Middle School?**

20       A.    Yes.  It was May.

21       Q.    **Okay.  Where were those meetings held?**

22       A.    They were held in Ms. Tracy Smith's room.

23       Q.    **At Carver Middle School?**

24       A.    Yes, ma'am.

25       Q.    **Okay.  What time were they held?**

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 33

```
 1        A.   8:00 A.M.

 2        Q.   Was that before school?

 3        A.   Yes, ma'am.

 4        Q.   What time did school start at Carver Middle

 5   School?

 6        A.   8:45 A.M.

 7        Q.   8:45.  What time did it get out?

 8        A.   At that time it got out exactly at 4:00.

 9        Q.   What was the lunch hour, if you remember, the

10   lunch period?

11        A.   I don't remember because we have three

12   different lunch periods, and they've all been adjusted

13   slightly every single year.

14        Q.   Okay.  No problem.

15             Roughly how long were they, though?

16        A.   Each lunch period is 30 minutes long, and we

17   have three lunches, 6th grade lunch, 7th grade lunch,

18   8th grade lunch.

19        Q.   Are those students allowed to arrive on

20   campus before school and after school?  I mean, is

21   there a window of time that they're allowed to be there

22   early in the morning before class starts, and late, or

23   after class gets out?

24        A.   If they have a meeting to go to, it's

25   whatever time the meeting starts.  And at that time it
```

Heather Jablonski          Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida          September 13, 2014

Page 34

1    was usually 8:00 A.M.

2         Q.   Okay.

3         A.   Officially the School Board policy is that

4    they're only supposed to be on campus 30 minutes before

5    and 30 minutes after school, unless they have

6    sports/clubs.

7         Q.   Right.  Did Ms. Smith attend the meetings, as

8    well?

9         A.   She attended two of the three.  She was sick,

10   or out, for one of them.

11        Q.   Were they still held in her classroom?

12        A.   Yes, ma'am.

13        Q.   What does Ms. Smith teach, or what did she

14   teach back then?

15        A.   She is an ESE teacher.  At the time she had,

16   I believe, one reading class, one science class.  And

17   then she co-taught with other teachers for the other

18   classes.

19        Q.   Were there any other faculty members or staff

20   that attended the three -- you said there were three

21   meetings of the GSA for the 2012/2013 school year?

22        A.   Yes, ma'am.

23        Q.   Who also attended?

24        A.   Ms. Cunningham, the principal, attended, I

25   believe, two of the meetings.

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 35

1     Q.   Was she there for the entire meetings?

2     A.   For the two meetings that she was at, she

3 stayed for the entire time.

4     Q.   Okay.  And I am going to assume the meeting

5 were roughly 40, 45 minutes long?

6     A.   45 minutes.  But we also had two assistant

7 principals that also attended.

8     Q.   What were their names?

9     A.   Kim Locker Lawrence.  She was our AP-I.  And

10 I believe she attended two or three of the meetings, I

11 don't recall exactly how many.  And Greg Smallridge,

12 he's our AP-II.  And I believe he attended one or two

13 of the meetings.

14     Q.   Were either Ms. Lawrence or Mr. Smallridge

15 members of the organization, or did they participate in

16 the process?  Or were they just there in a custodial

17 capacity?

18     A.   They were not members of the GSA, because you

19 have to be a student to be a member of the GSA.  They

20 came and they asked questions when the kids were

21 talking about bullying.  And they would ask questions

22 about what's occurring, when is it occurring, where is

23 it occurring.

24     Q.   Did any of the Carver Middle School employees

25 who attended the meetings discuss sexual orientation

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 36

1  with the group?

2     A.   No, ma'am.

3     Q.   Did the students who attended -- well, let's

4  back up a minute.

5          How many students, approximately, attended

6  the three meetings in the 2012/2013 school year?

7     A.   I want to say our largest meeting was eight.

8     Q.   Okay.

9     A.   But we usually had, I think -- the first

10  meeting was eight, and the other ones I think we had

11  around six.  But we did not take role because I did not

12  want those, you know -- the kids didn't want their

13  names put down.

14     Q.   Okay.  Of the six to eight students that

15  attended, were all of them either in the lesbian, gay,

16  bisexual, transgender or I don't know category?

17     A.   No.  The majority of them are straight

18  supporters.

19     Q.   Okay.  How many student members were gay,

20  bisexual, lesbian, transgendered or uncertain as to

21  their sexual orientation?

22     A.   I honestly don't remember any of the ones

23  specifically, other than BNS, mentioning their

24  sexuality.  The others were, I have a brother who is

25  gay.  Or one young man has two moms.

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 37

1       Q.   Were the students that either, like BNS, fell

2  into one of the LGBT categories or, as you said, had a

3  relative, perhaps, who did, did they discuss, in

4  particular, sexual orientation?

5          MR. TILLEY:  Object to the form.

6          THE WITNESS:  No, we didn't delve into the

7     orientation other than if you would like to say who

8     you are and why you decided to come.  And that

9     was -- that was it, as far as the

10    sexual-orientation conversation went.  From there

11    the conversation was most definitely related to the

12    bullying.

13  BY MS. McCULLOCH:

14      Q.   Okay.  Was there any particular student who

15  reported an incident of bullying to you that was

16  related to being lesbian, gay, bisexual or transgender?

17      A.   Within the club?

18      Q.   Yes.

19      A.   Or -- okay.  BNS had expressed that she had

20  several problems throughout the school year.

21      Q.   What were those problems?

22      A.   Name-calling, being pushed, and being taunted

23  because of her orientation.  And I encouraged her to

24  fill out bullying reports and let administration know.

25      Q.   Did she do that?

Heather Jablonski          Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida          September 13, 2014

Page 38

1    A.    I don't know, because those records are

2  confidential, and she didn't say anything to me about

3  them.

4    Q.    Okay.  In the 2012/2013 school year, did this

5  School Board have any sort of anti-bullying program, or

6  initiative of its own?  In other words, was there a

7  report and investigation mechanism in place?

8    A.    Yes.

9    Q.    Okay.

10    A.    Yes.  We, to my knowledge, for quite a while,

11  and I don't know when it started, have had a bullying

12  report form that was held at the time in the two -- in

13  AP's office, assistant principal's office.  If a

14  student had a difficulty they were supposed to go to

15  the assistant principal's office, fill out a report,

16  and either drop it in the -- there's a box they can

17  drop it in.  Or give it to the AP's secretary.

18    Q.    Okay.  You, as an instructional staff member,

19  if a student reports to you that they feel they're

20  being bullied, do you have any obligation to report

21  that to administration?

22    A.    Yes, ma'am.

23    Q.    Okay.  Did you report any of the problems

24  that BNS told you about to the administration?

25    A.    I believe I spoke to Greg Smallridge about

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 39

1    some of her issues.

2        Q.   Did you specifically report it as bullying,

3    so that a bullying investigation would be conducted?

4        A.   I don't recall if I specifically said it was

5    bullying.

6        Q.   Okay.  Just so we understand each other,

7    because we're going to be using the word bullying a

8    lot.  In your mind, what is your understanding of what

9    bullying consists of?

10       A.   Either a real or perceived imbalance of

11   power.  Where the one person is picking on,

12   name-calling, either physical or verbally harassing

13   another student.  And it can be based on orientation,

14   race, religion, economics, any number of reasons.

15       Q.   Is there a difference to you between bullying

16   and, you know, just common interpersonal conflict among

17   students?

18       A.   Definitely.

19       Q.   Okay.  What would be the main difference for

20   you?

21       A.   For me, I see bullying as very one-sided,

22   where there's somebody who's a victim.  Where conflict

23   is two people having a disagreement, saying things back

24   and forth.  But it's a two-way street for conflict.

25       Q.   Are you aware of whether BNS had engaged in

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 40

1    any sort of conflict versus, you know, what she was

2    telling you about?  Had she engaged in any conflict in

3    those situations versus being the target of bullying?

4             MR. TILLEY:  Object to the form.

5             THE WITNESS:  Not that she shared with me.

6    And I don't have access to discipline records.  So

7    I wouldn't know anything else.

8    BY MS. McCULLOCH:

9        Q.  Did BNS ever communicate to you that she had

10    reported the problems with bullying?

11        A.  I believe that she said that she had told her

12    teacher.

13        Q.  What teacher, do you recall?

14        A.  I don't know for sure, but I want to say

15    Ms. Keiser, Christine Keiser.  But I am not certain.

16        Q.  Are you aware of whether or not BNS ever

17    filed any sort of formal report?  Did she ever mention

18    that to you?

19        A.  No, she did not mention it to me.

20        Q.  Okay.  There's a student code of conduct that

21    says sport, rules, students in the district, as well?

22    I think you referenced it a couple times.  Are you

23    familiar with that?

24        A.  Yes.

25        Q.  If a student was found to be guilty of

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 41

1   bullying another student, would they be disciplined or

2   subject to discipline under the Student Code of

3   Conduct?

4        A.    Yes, ma'am, they would be subject to

5   discipline.

6        Q.    Okay.   Other than the conversations you had

7   with BNS about the issues that she felt she was having,

8   were there any other students who reported any issues

9   with bullying?

10       A.    Not at that time.   But prior to that, when my

11  daughter was trying to start the organization.

12       Q.    Okay.   But during the 2012/2013 school year,

13  there were no members of the GSA who reported any

14  instances of bullying based on the LGBT categories that

15  you described?

16       A.    Not to me.

17       Q.    Okay.  Did they report any of those instances

18  of bullying during the meetings?

19       A.    They did, but they did not use any names

20  because they were speaking with administrators.

21       Q.    Was it just a general conversation?

22       A.    They did talk about specific events, but not

23  specific people.

24       Q.    Were any of those events involving people

25  that were not students at Carver Middle School?   In

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 42

```
 1    other words, you mentioned that some family members
 2    fell under the LGBT category.  So some family members
 3    of GSA students fell under that category.  Were they
 4    talking about events like that, like my sister had this
 5    happen, that kind of thing, people that were not
 6    students at Carver Middle School?
 7            MR. TILLEY:  Object to the form.
 8            THE WITNESS:  No.  To my recollection they
 9       talked specifically about things that they had
10       encountered while on campus.
11    BY MS. McCULLOCH:
12       Q.   Which two -- because you said there were only
13    a couple of students that actually fell under the LGBT
14    umbrella, that would have been BNS and -- is there any
15    other student that you recall specifically?
16       A.   She's the --
17            MR. TILLEY:  Object to the form.
18            THE WITNESS:  She's the only one that I
19       recall, specifically, mentioning her orientation.
20    BY MS. McCULLOCH:
21       Q.   Okay.  Did the other members of the GSA
22    discuss sexual orientation in particular when they were
23    talking about these incidents that occurred on campus?
24            MR. TILLEY:  Object to the form.
25            MS. McCULLOCH:  What's the objection?
```

Heather Jablonski        Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida        September 13, 2014

Page 43

1          MR. TILLEY:  I don't know what you mean by

2      "discuss sexual orientation".

3    BY MS. McCULLOCH:

4          Q.    Was sexual orientation mentioned in

5    conjunction with these incidents?  For example, you

6    indicated that BNS had said that she had been taunted

7    based on her orientation.  When the other students

8    other than BNS were talking about the incidents that

9    you referred to on campus, did they make any reference

10   as those incidents being related to sexual orientation

11   in any form?

12         A.    Not their own personal orientation.  But

13   orientation of relatives of theirs, and the teasing

14   that they had received because of the relatives'

15   orientation.

16         Q.    Okay.  Walk me through how the meetings were

17   conducted from beginning to end.  I know there were

18   three.  If you can just tell me generally what you did

19   to start the meeting.

20         A.    I usually provided like juice and donuts.

21   And we had a few minutes of social time while people

22   trickled in.

23                And then we would talk about the purpose and

24   the mission of GSA.

25         Q.    And what would you say specifically about the

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 44

1  purpose and the mission?

2      A.    It is to spread awareness of anti bullying.

3  And acceptance of the LGBT community within the school

4  community.

5      Q.    **Did you have any gay student, like, president**

6  **of the GSA, or officers of the GSA?**

7      A.    At our second meeting we had several

8  volunteers, and then from the volunteers the students

9  voted on who they wanted to represent them as

10  president.

11      Q.    **And who was that?**

12      A.    That was HF.

13      Q.    **And was that the first year or the second**

14  **year?**

15      A.    This was the first year.  This was during the

16  three meetings.

17      Q.    **Okay.**

18      A.    BNS was moving on to the high school.

19      Q.    **Okay.**

20      A.    So they didn't see a purpose of her --

21      Q.    **Right.  Running it for one meeting.**

22      A.    Right.  And then they elected J -- and I am

23  sorry, I don't know J's last name.

24      Q.    **Okay.**

25      A.    I have it written down in my office -- as

Heather Jablonski  Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida  September 13, 2014

Page 45

1 vice president.

2  Q. Okay. And so HF was a 6th grader at the

3 time, or 7th grader?

4  A. HF was a 7th grader. Wait a minute. She's

5 8th grade now.

6  Q. So she would have been a 6th grader.

7  A. So she would have been in 6th grade at the

8 time. Sorry.

9  Q. That's okay.

10  A. So was J.

11  Q. J was a 6th grader?

12  A. Yes.

13  Q. How old was HF at that time, if you know?

14  A. I would assume 11, but I don't know for sure.

15  Q. Okay. Same for J?

16  A. Yes, ma'am.

17  Q. Are the 6th graders at Carver Middle School

18 typically 11 --

19  A. 11 going on 12, unless they've been held

20 back.

21  Q. Okay. So who would run the meeting, then?

22 Would it be you, or would it be the students?

23  A. The students were extremely nervous to speak

24 up because administration was in the room. And so I

25 prompted them along, and asked them about their

Heather Jablonski   Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida   September 13, 2014

Page 46

1    experiences with bullying.

2        Q.   What did you ask specifically, what are your

3    experiences with bullying?  I mean --

4        A.   To my knowledge, I asked them if they had any

5    experiences with bullying here on campus that they

6    would like to make administration aware of.  And what

7    kind of issues that they faced, you know, on a

8    day-to-day basis.

9        Q.   And what kind of issues would they face on a

10   day-to-day basis?  Was that qualified on their status

11   as LGBT students, or was that just generally?

12       A.   That was just generally.  I would never ask a

13   student to divulge any information about their

14   orientation if they weren't comfortable with it.

15       Q.   Did any student divulge their own orientation

16   during these meetings?

17       A.   Other than BNS, not to my knowledge.

18       Q.   What kinds of things did BNS talk about that

19   related to her sexual orientation or sexual preference?

20       A.   She talked about some of the name-calling

21   that she had received because of her orientation.  I

22   believe she mentioned a time or two that she was pushed

23   or tripped, and they would say something derogatory

24   about her as they were doing it.

25       Q.   Did she ever engage in any conversations or

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 47

1  discussions about how she discovered that she felt she
2  was one particular orientation over another?
3      A.   No, ma'am.
4      Q.   Did she ever discuss her sexual preferences,
5  other than in the context of somebody called her a
6  name?  In other words, just generally?
7          MR. TILLEY:  Object to the form.
8          THE WITNESS:  I believe she stated she was
9    bisexual.
10 BY MS. McCULLOCH:
11     Q.   Did she --
12     A.   But that was it.
13     Q.   Did she describe what that meant?
14     A.   No, ma'am.
15     Q.   Did she ever talk about dating boys and
16 dating girls, or anything of that nature?
17     A.   No, we didn't talk about dating.
18     Q.   Was the topic of sex ever discussed?
19     A.   Never.  That would be inappropriate.
20     Q.   Did any of the other adults participate in
21 leading the discussion, other than you?
22     A.   I wouldn't say leading.  But the
23 administration did ask questions about the different
24 bullying instances.  They were primarily interested in
25 when and where they were occurring.  And if there was

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 48

1    any adult supervision at the time.

2        Q.    And when and where were these incidents

3    occurring?

4        A.    The kids said most of the instances were

5    occurring primarily in our back hallways, because we

6    have a front side and backside.  And our gym locker

7    rooms.  And sometimes at lunch.

8        Q.    What else was discussed at the GSA meetings?

9        A.    Outside of the bullying, we really didn't

10    discuss much, other than what we had hoped to

11    accomplish if we could continue the club next year.

12        Q.    And what was that?

13        A.    That was just spreading the acceptance of our

14    LGBT students, and building awareness that bullying

15    cannot be tolerated.  And we had hoped to spread the

16    message of what students needed to do if they witnessed

17    bullying, or if they were a victim of it.

18        Q.    Is what students need to do if they're a

19    victim of bullying or if they're a witness to bullying,

20    is that addressed in any of the district's

21    anti-bullying program?

22        A.    It is now, but it was not at the time.

23        Q.    Okay.  In the 2013/2014 school year, was it?

24        A.    Yes, ma'am.  Last year the county revamped

25    its bullying program.  And being a bystander was

Heather Jablonski       Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida       September 13, 2014

Page 49

1    definitely addressed, and what to do in those cases?

2         Q.   Was that referenced anywhere else, like the

3    Student Code of Conduct, or --

4         A.   I don't think it specifically addresses

5    bystanders and what should be done.  I just think it

6    expresses the definition of bullying, and the fact that

7    it needs to be reported.

8         Q.   Okay.  And to your knowledge had any of the

9    students who had discussed the incidents at the GSA

10   meetings, had any of them reported the bullying

11   incidents?

12        A.   I do not know.  None of them said that they

13   did or did not.

14        Q.   Okay.  Did any student other than BNS, and I

15   apologize if I may have already asked you this --

16        A.   That's okay.

17        Q.   Did any student other than BNS specifically

18   tell you that they had felt they had been bullied?

19        A.   At the meeting they didn't tell me

20   specifically.  But it was a topic of discussion when

21   they had issues with bullying on campus.

22        Q.   Did you do anything to formally report those

23   incidents?

24        A.   No, I did not, because we had administrators

25   in the room.  And I assumed that if the administrators

Heather Jablonski  Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida  September 13, 2014

Page 50

1 heard it and felt that it was substantial, that they

2 would investigate.  Because they were who I would have

3 had to report it to anyhow, and they were sitting right

4 there.

5    Q. And there was an administrator present at

6 each of the three meetings?

7    A. Yes.

8    Q. Did you do anything at the end of the school

9 year as it relates to talking to anyone about forming

10 the club in the following school year?

11    A. HF had said that she wanted to continue

12 pursuing the club next year.  And she was our president

13 for our three meetings.

14    Q. You said the membership ranged from basically

15 six to eight students, perhaps?

16    A. Yes, ma'am.

17    Q. Are you aware of how many students are in

18 Carver Middle School, or who were enrolled at that

19 time?

20    A. Close to --

21    Q. Roughly.

22    A. Sorry.

23    Q. Go ahead.

24    A. Close to 830.

25    Q. Are you aware as we sit here today of any

Heather Jablonski   Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida   September 13, 2014

Page 51

1    particular student by name that had mentioned a
2    bullying incident at the GSA meetings?
3         A.   I'm sorry.  Can you repeat the question?
4         Q.   Sure.  Are you aware of any other student who
5    mentioned -- are you aware of any other student by name
6    that you can sit here today that you know the name of
7    the student that referenced a specific bullying
8    incident at Carver Middle School as it relates to LGBT
9    issues?
10        A.   Not that was part of the group, no.
11        Q.   What about outside of the group?
12        A.   Outside of the group, the year that my
13   daughter was in 8th grade, one of my students reported
14   an incident that happened at another classroom and the
15   teacher reported it.
16        Q.   And who was that student?
17        A.   His name is JB.
18        Q.   And was he a proposed member of the LGBT that
19   your daughter was trying to form?
20        A.   Yes, ma'am.  He did definitely want to be
21   part of the club, the organization.
22        Q.   Was his sexual orientation known?  Did he
23   ever describe it, or --
24        A.   Yes.  During the course of the conversation
25   in another classroom, he told another student that he

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 52

1    was gay.  A student overheard it and then threatened to

2    hang him in the car-rider area to make an example out

3    of him.  And then a couple days later that same

4    student, when he got in the back of his parent's car,

5    held up a noose and pointed to JB.

6        Q.   Is this information that JB told you, or that

7    the other teacher told you, or your daughter?

8        A.   This is information that the teacher involved

9    told me.

10       Q.   And who was that?

11       A.   Dan Cox, C-O-X.

12       Q.   As far as you're aware, the teacher reported

13   the incident?

14       A.   Yes.  Definitely.

15       Q.   Are you aware of whether or not a bullying

16   incident was conducted -- or, sorry.  An investigation?

17       A.   I know a referral was written.  I don't know

18   whether that included a bullying report or a bullying

19   investigation.  But I know that it led to a 10-day

20   suspension.

21       Q.   Okay.  Are you aware of whether or not that

22   student repeatedly harassed or did things to JB, the

23   student, or if it was a one-time incident?

24       A.   I do not know because the other student

25   involved was not a student of mine.

Heather Jablonski        Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida        September 13, 2014

Page 53

1    Q.   Okay.

2    A.   So I didn't know about his discipline record.

3    Q.   Did the student JB, GB, sorry, did he ever

4    report any further incidents to you, or were you ever

5    aware of anything?

6    A.   He did not report anything further to me, no.

7    Q.   Did you hear of any other incidents that he

8    was involved in?

9    A.   Offhand, not that I can remember.

10   Q.   Okay.  Any other students that you are aware

11   of that specifically reported an issue as a result or

12   related to their LGBT status?

13   A.   My own daughter had issues.  I encouraged her

14   to fill out the bullying report, and I talked to

15   guidance.  But she didn't want me to go any further

16   because she knows that it's related to -- that I work

17   there at the school and it made for an uncomfortable

18   situation.

19   Q.   Okay.  So you didn't report it as a bullying

20   incident?

21   A.   No, because I didn't know the extent until

22   after she left Carver Middle School and went to

23   Leesburg High School.  I didn't know how bad it really

24   was for her.

25   Q.   What did she tell you was the incident that

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 54

1    occurred while she was at Carver Middle School?

2         A.    At the time she told me that kids were

3    teasing her about her orientation, calling her a dike,

4    pushing her, ostracizing her.  She lost a couple people

5    she felt were friends.  After she left Leesburg High

6    School -- or after she left Carver Middle School,

7    rather, she told me further about some other incidences

8    where she was hit.  On one occasion she was pushed down

9    a couple stairs.  And on at least one occasion she was

10   spit on and called a lesbo.  But by the time I knew

11   that it was too late to report it because she was a

12   high school student.

13        Q.    Did you report any of the issues that she did

14   tell you about?

15        A.    I talked to her guidance counselor, because I

16   didn't know exactly how to handle the situation.  It

17   was my second year of working with Dave Bordenkircher,

18   and quite honestly I didn't -- I worried about my job

19   security.  And she didn't want me to push the issue.

20        Q.    Did any School Board employee ever tell you

21   that if you reported an incident of bullying or

22   perceived bullying on behalf of your daughter that you

23   would have jeopardy with your job?

24        A.    No.

25        Q.    Let's talk about the 2013/2014 school year.

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 55

1    You were still employed at Carver, I assume, correct?

2        A.    Yes.

3        Q.    And you were in the same position as the

4    math/science team leader?

5        A.    Yes, ma'am.

6        Q.    Okay.    Towards the end of the school year for

7    the 2012/2013 year, are you aware that the policy for

8    middle school student clubs and organizations changed?

9        A.    Yes, ma'am.

10       Q.    And I think we've talked about that.    I am

11   going to show you.

12            MS. McCULLOCH:    I'll mark this as Defense

13       Exhibit A.

14            MR. STEVENSON:    Do you mind if we start with

15       like DA?

16            MS. McCULLOCH:    DA?

17            MR. STEVENSON:    Like Defense --

18            MS. McCULLOCH:    That's fine.

19            MR. STEVENSON:    That way we won't have two

20       As.

21            MS. McCULLOCH:    Got you.

22   BY MS. McCULLOCH:

23       Q.    Have you reviewed that policy before?

24       A.    Yes, ma'am.

25       Q.    And when did you first become aware that the

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 56

1    middle school student club and organization policy had

2    changed?

3         A.    I had been attending School Board meetings,

4    encouraging -- I did speak at several of them,

5    encouraging them to allow the GSA to start at the

6    school.  And that's when they started changing the --

7    evaluating the policy and then making the subsequent

8    changes.

9         Q.    Okay.  Are you aware of whether or not the

10   School Board also changed its high school student club

11   and organization policy at the same time?

12        A.    I believe so.  I believe that at the time the

13   middle school was under the high school umbrella, it

14   was just a secondary umbrella.  And then from what I

15   understand, that's when they changed and differentiated

16   between the middle school and high school.

17        Q.    Are you aware of whether there's a separate

18   policy for elementary school students, as well?

19        A.    I believe there is.

20        Q.    You indicated that you attended the

21   School Board meetings.  Are you referring particularly

22   to the 2012/'13 school year, the end, when the GSA was

23   allowed to form and have three meetings?

24        A.    Yes, ma'am.

25        Q.    Okay.  And that's when the School Board was

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 57

1  talking about needing to change its club and

2  organization policies?

3       A.    Correct.

4       Q.    Okay.   Since you were attending those

5  meetings, do you ever recall being at a meeting where a

6  School Board member, in particular, referenced the GSA

7  specifically as a reason for the School Board to change

8  its policies for student clubs and organizations?

9       A.    I think they may have brought up the GSA, but

10  I don't say that -- I don't recall them saying that

11  that was the reason for the change.

12       Q.    Okay.   Do you recall the School Board

13  discussing what the reason for the change was?

14       A.    I'm sure they did, but I honestly don't

15  recall.

16       Q.    Okay.   But there was no comment made by any

17  School Board member, to your knowledge, that

18  particularly we're changing our club policy because of

19  the GSA, or because we don't want the GSA, or anything

20  like that?

21       A.    Not within the context of the meeting, but

22  outside of the meeting.

23       Q.    Okay.   We'll get to that in a second.

24       A.    Okay.

25       Q.    When there were people there speaking about

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 58

1    the GSA, were those people individuals that were not

2    School Board members?  In other words, it was during

3    the public comment section?

4         A.    Yes, ma'am, it was during the public comment

5    section.

6         Q.    Okay.  So for the most part, the people there

7    that were talking either on behalf of the GSA or

8    against the GSA were people that were addressing the

9    School Board at the public meeting?

10        A.    Yes, ma'am.

11        Q.    Are you aware of whether there were any

12   comments made by parents or members of the public that

13   specifically were against having a GSA in a middle

14   school?

15        A.    Yes, ma'am.

16        Q.    Okay.  Were there?

17        A.    Yes, there were.  There were some parents who

18   were against the organization being in middle school.

19   And I believe there may have been a representative, or

20   two, from a church that was against it, as well.

21        Q.    Okay.  Are you aware of any parents coming to

22   Carver Middle School or voicing a complaint to the

23   Carver Middle School about the formation of this club

24   in a middle school?

25        A.    No, I am not aware.  That information was not

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 59

1    shared with me.

2         Q.    Okay.  Would that be addressed to

3    administrators, those types of complaints?

4         A.    Yes, ma'am.

5         Q.    Did you ever receive any particular

6    complaints about your involvement in forming the GSA,

7    or assisting the students to form it?

8         A.    No.

9         Q.    Did any School Board member ever voice any

10   displeasure or anything of that nature towards you for

11   attempting to assist the students in forming the GSA?

12        A.    No, I have not spoken with the School Board

13   members other than to address members during the

14   general meeting.

15        Q.    Okay.  Did Ms. Cunningham in any way say that

16   your job was in jeopardy as a result of your

17   participation or involvement in assisting the GSA --

18        A.    No, ma'am.

19        Q.    -- to form?

20        A.    No, ma'am.

21        Q.    Okay.  Did anybody in a supervisory capacity

22   over you and your employment dis/KOPBLG you from

23   participating in assisting the GSA?

24        A.    No, ma'am (discourage you).

25        Q.    For the 2013/'14 school year, were you aware

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 60

1    that this policy would be the policy that any student

2    club in the middle school would have to abide by in

3    order to be an approved student club?

4         A.    Yes, ma'am.

5         Q.    Okay.  And how did it come to pass that you

6    were the sponsor, again?  Did HF ask you to be the

7    sponsor for the GSA for the 2013/2014 school year?

8         A.    Yes, ma'am.  She asked me if I would be

9    willing to help her establish the GSA at that school

10   year.

11        Q.    Okay.  And obviously you agreed.  Correct?

12        A.    Yes, ma'am.

13        Q.    Okay.  Do you know if she asked anyone else?

14        A.    Not to my knowledge.

15        Q.    Okay.  Were there any other school employees

16   that were interested or voiced any interest to you in

17   participating in the GSA, as well?

18        A.    Tracy Smith said that she would continue to

19   assist if we could get the club going.

20        Q.    Okay.  At some point did you submit an

21   application for the GSA for the 2013/2014 school year?

22        A.    Yes, ma'am.

23        Q.    What was your understanding of what was

24   required for a middle school club to be an approved

25   student club under this policy?