Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 61

1    A.    My understanding was that we had to fill out

2    an application, which I did.  And then submit it to my

3    principal, along with the charter for the organization.

4    And then the principal would either approve or not

5    approve.  And then pass it on to the superintendent for

6    the final decision.

7    Q.    Okay.  We talked a little bit before about

8    the policies that existed before this, and you

9    mentioned that it was a closed campus for -- excuse me.

10   An open campus for high schoolers, and middle school

11   was under that same policy.  What was your

12   understanding of the change to this policy?

13            MR. TILLEY:  Object to the form.

14            THE WITNESS:  My understanding of the new

15       policy was that if it was a non-academic club,

16       which could not be specifically tied to an academic

17       subject taught at the school, that it had to go

18       through this approval process.  But more than

19       likely it would not be approved, because it was not

20       tied specifically to -- if I remember, there were

21       four different categories:  One was academics, one

22       was critical thinking, the arts and athletics.  And

23       our understanding was that we could tie this to

24       critical thinking because we were going to promote

25       that, and problem-solving, during the GSA meetings,

Heather Jablonski       Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida       September 13, 2014

Page 62

1           and how to deal with conflict and how to deal with

2           bullying.

3      BY MS. McCULLOCH:

4           Q.    Okay.  Under this policy, are you aware if

5      all clubs had -- all, you know, students wishing to

6      form a club had to submit an application, or was it

7      just limited to certain types?

8           A.    I was under the impression that all clubs had

9      to go through the process.  But my understanding, I

10     believe, is that the athletic groups don't.  The sports

11     groups don't, because they're not a club.  That they're

12     considered an athletic event.

13          Q.    Okay.  But any group of students wishing to

14     form a student club, whether it be related to the

15     curriculum or not related to the curriculum had to

16     submit an application?

17          A.    Yes, ma'am.

18          Q.    And did they have to name a sponsor or

19     teacher who was involved, as well?

20          A.    Yes.  The application itself has a spot for

21     the teacher's name on it.

22          Q.    And when it comes to submitting the

23     application, were you responsible for gathering the

24     information for the application?  Or was that something

25     that the students did?

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 63

1     A.    That was something HF came with the

2   application and the charter.

3        Q.    Okay.

4        A.    And I believe that I filled out -- when it

5   asked how many students would be in attendance, I

6   honestly did not know, so I put 25.  And then I signed

7   it.  And I believe I forgot to date it.

8             (Defendant's Exhibits A and B marked for

9        identification.)

10  BY MS. McCULLOCH:

11       Q.    If you could look through that document.  It

12  looks likes it's three pages.  Is that what you recall

13  submitting for the 2013/2014 school year for the GSA

14  application?

15       A.    I actually filled out the anticipated

16  membership, and then I signed it.  And HF actually is

17  the one who submitted it.

18       Q.    Okay.  So she attached the back two pages,

19  but you filled out the first page?

20       A.    Correct.

21       Q.    Is the club charter, is that something that

22  specifically was created by the students who wanted to

23  form the GSA at Carver Middle School?  Or where did

24  that come from?

25       A.    HF came with that, with the application.  I

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 64

```
 1    would assume, because of the way it's written, that she
 2    may have received some advice or input from her legal
 3    counsel.
 4         Q.   Okay.
 5         A.   But it does look very much like the purpose
 6    and goals of the GSA network, which is a national
 7    network.
 8         Q.   Okay.  And is the GSA network, the national
 9    network that you speak of, is that comprised only of
10    students?  Or is that adults, as well?
11         A.   My understanding of the organization is that
12    you can register your school-based GSA with the
13    national network.  And the national network has
14    activities that you can pull for these students, it has
15    a whole handbook of how to run a GSA in the schools.
16    It has different education and anti-bullying programs
17    that can be implemented in the schools.  It's a support
18    network.  But I would imagine the employees are adults.
19         Q.   Okay.  And as far as the membership goes, is
20    it adults, as well?  National GSA?  I mean, is it
21    primarily an adult thing or is it a school thing?
22         A.   It's meant to be school.
23         Q.   Okay.  And in the club charter, does it
24    reference anywhere this national organization that has
25    all of these, I guess, resource materials for
```

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 65

1    activities to conduct during the GSA meetings?

2        A.    I do not see it specifically mentioned, no.

3        Q.    Okay.  And if you look at the club charter

4    number three, to promote critical thinking by

5    discussing how to address bullying and other issues

6    confronting students at Carver Middle School --

7        A.    Yes, ma'am.

8        Q.    -- other than that sentence, is there any

9    reference to critical thinking, or any activities that

10   are going to promote critical thinking?

11       A.    Well, I would think one, where they're

12   discussing their experiences, challenges and successes,

13   would help promote their critical thinking on how to

14   deal with those challenges and experiences.  But it

15   doesn't specifically state critical thinking.

16       Q.    Are you familiar with a critical thinking

17   course that's taught in the district?

18       A.    Yes, we had it at Carver Middle School last

19   year.

20       Q.    Okay.  Is there any particular meaning to

21   critical thinking, other than -- you know, I mean, what

22   are you defining as critical thinking?  Or how do you

23   understand critical thinking?

24       A.    My understanding of critical thinking is how

25   to problem-solve and how to -- how to problem solve and

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 66

1    examine things to come up with solutions, or answers,
2    to problems that exist.  Or the class that was taught
3    at Carver was directed strictly to academics, to my
4    knowledge.  But I think problem-solving and critical
5    thinking can be used in all aspects of life.
6         Q.    Right.  I mean, so I could actually, you
7    know, critically think, under your definition, just
8    about any area of life?
9         A.    I would agree, yes.
10         Q.    But would you agree that critical thinking in
11    the curriculum setting and in the educational setting,
12    in particular, is a very distinct definition?
13         A.    Not to my knowledge, because I'm not sure
14    what the curriculum is for their critical thinking
15    class.  So I am not sure how critical thinking is
16    addressed in the academic situation, as far as the
17    class goes.
18         Q.    Okay.  But are you aware of any portions of
19    critical thinking as a class, or academically, that
20    involve particular strategies in different uses of
21    analytical skills and theories, and that sort of thing,
22    that are bit more structured than just saying, we're
23    going to sit around and seriously think about these
24    issues and discuss them?
25         A.    I do know part of the critical thinking

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 67

1   process is a four-step process, and I always forget the
2   four steps, but it's a problem-solving plan.  About
3   discussing the problem, analyzing the potential
4   solutions, creating an action plan, and then analyzing
5   whether or not that action plan was successful.  And
6   that would have been something that we would have used
7   to discuss issues as they came up.
8        Q.   And was that intent to use that type of
9   analytical-step process described anywhere in the
10  charter?
11       A.   No, it was not described in the charter.
12       Q.   The structure of the three meetings that you
13  did have in the 2012/2013 year, they were basically
14  general discussions that were initiated by you?  Is
15  that fair to say?
16       A.   I don't know that it was entirely initiated
17  by me.  But I did prompt the students, because they
18  were very nervous sitting there with the administrators
19  in the room.  And none of them wanted to take the first
20  step and talk about, you know, why they were there, or
21  their experiences.  And so I would ask them, you know,
22  what brought you to the meeting?  What have you
23  experienced?  Have you had any incidences of bullying
24  that you would like to share, because you have a
25  perfect audience here with administration.

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 68

 1       Q.     Right.  But, I mean, the topic of the
 2   discussion was generally a sharing of experiences that
 3   the students had that they felt were related to LGBT
 4   issues?
 5       A.     Yes, ma'am.
 6       Q.     Okay.
 7       A.     Had we had more time to plan meetings, we
 8   would have come up with a more -- well, we would have
 9   worked with BNS and HF on an agenda and activities and
10   specific points of conversation.
11       Q.     Okay.  But none of the proposed specific
12   points of conversation or, I guess, structure,
13   procedure of the meetings is really discussed in the
14   club charter; is that correct?
15       A.     No, ma'am.
16       Q.     No, it's not correct?  Or, yes, it's correct,
17   it's not discussed?
18       A.     I'm sorry.  It is not discussed.
19       Q.     Okay.  So did you submit an application once
20   HF gathered the other information for this event?
21       A.     HF is the one that actually submitted it.
22       Q.     So she turned it into Principal Cunningham?
23       A.     Yes, ma'am.
24       Q.     Okay.  And this letter that's attached to the
25   back, I am assuming -- it's blacked out, but I am

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 69

1   assuming that that was created by HF, as well?

2       A.   Yes, ma'am.

3       Q.   Okay.  Did you review the club charter and

4   HF's letter before HF submitted it, or did you just

5   fill out the top part give it to HF and let her submit

6   it, the remaining materials?

7       A.   No, I read through it.

8       Q.   Okay.  And it's not dated, but do you recall

9   roughly when you submitted the policy -- excuse me, the

10  application for the student club?

11      A.   I believe it was about the third week of

12  October.

13      Q.   Okay.  So not the beginning of the school

14  year, but basically about a month into the school year?

15      A.   At that point, it would have been closer to a

16  month and a half.

17      Q.   Okay.  And did you receive -- noted on the

18  top of this is essentially what looks like Ms. Cole's

19  handwriting, that the club is not an extension of the

20  school curriculum, per policy, not approved,

21  Aurelia Cole.  Did you receive this application back?

22  Did she notify you of that, or did that go to HF?

23      A.   Ms. Cunningham brought the copy of the

24  application to me while I was on lunch duty.

25      Q.   Okay.

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 70

1       A.    It was many months later, though.

2       Q.    **Was it before Thanksgiving break?**

3       A.    No, I believe it was into the beginning of

4    the next year, next -- not the next school year, but

5    the next calendar year. But I am not a hundred percent

6    on the date.

7       Q.    **Okay.**

8       A.    I am unaware of whether or not she told HF.

9    But when I had asked HF later on, she said she knew.

10      Q.    **Okay.  So you think that Ms. Cunningham may**

11   **have told HF before she told you?**

12      A.    I don't know whether she -- I have no idea

13   when -- what occurred with HF, I don't know whether she

14   received the information before or after I.

15      Q.    **Okay.  Did Ms. Cunningham ever explain to you**

16   **why the application did not fit as an extension of the**

17   **school curriculum under the policy?**

18      A.    No.  She did not.  I just read the top of the

19   letter that came back, on the application that came

20   back.

21      Q.    **Did you understand the reasons why the club**

22   **wasn't approved when you read that?**

23      A.    Yes, ma'am.

24      Q.    **Did you agree with it?**

25      A.    Not really.  I understand -- my understanding

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 71

```
 1   is that it's not an extension of the curriculum means
 2   that if there is not a class specifically taught on
 3   that subject, then they cannot have it.  I don't agree
 4   with that decision, but that's my understanding.
 5           And I believe in one of the School Board
 6   meetings they talked about different examples.  For
 7   example, if there was no art class at a school, but
 8   they wanted to have an art club, that the art club
 9   would not qualify as a curriculum club because there
10   was not an academic class that matched it.
11       Q.   Okay.  So you didn't agree with the policy
12   itself because you wanted more clubs to be allowed in
13   the middle school, but you agreed that per the policy
14   that we just went over, that this club did not meet the
15   criteria in the policy, as you understood it?
16           MR. TILLEY:  Object to the form.
17           THE WITNESS:  To some extent, I even disagree
18       with that, because I do think that having the
19       organization can promote critical thinking skills
20       and problem-solving skills.  And even life skills
21       for these kids.
22   BY MS. McCULLOCH:
23       Q.   Okay.  The application as submitted, do you
24   believe that that application demonstrates how it's
25   going to promote critical thinking or that it fits into
```

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 72

```
 1    the critical thinking portion of the policy?
 2         A.   I believe that the club charter could have
 3    been more specific and more detailed as to how it could
 4    have fit into a critical thinking problem-solving
 5    aspect of the curriculum.
 6         Q.   Okay.  And if that was flushed out, would you
 7    have expected that to meet the criteria and be
 8    approved?
 9         A.   I would have hoped it would, but I honestly
10    did not expect it to.
11         Q.   Okay.  Why didn't you expect it to?
12         A.   It's just a personal feeling.  But I feel
13    that no matter what we would have tried to do, I think
14    it was going to be turned down, because it's a very
15    controversial subject.
16         Q.   Do you think that generally without, you
17    know, demonstrating that it fits within critical
18    thinking, that this club fits the criteria and the
19    policy?
20         A.   Not the new criteria, but the old criteria,
21    yes.
22         Q.   Right.  I am specifically talking about the
23    current policy that was in effect for the 2013/2014
24    school year that we looked at.
25              So you would agree that if it didn't
```

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 73

1    sufficiently flush out, that it met the criteria for
2    the critical thinking, that it would not fall into any
3    of the other approved categories under the policy?
4         A.    No, it did not fall under business skills,
5    athletic skills or visual performance art. But I do
6    think that if we had better outlined the club charter,
7    that we could have flushed it out and made a reasonable
8    explanation of how this would fit the critical thinking
9    and the problem-solving.
10        Q.    Okay.  When Ms. Cole informed you that the
11   club had not been approved, did she indicate to you
12   either at that time or at some time shortly thereafter
13   that you could resubmit the application?
14        A.    I never had any contact directly with
15   Aurelia Cole.  It was Ms. Cunningham that brought me
16   the application.
17        Q.    And did Ms. Cunningham inform you that you
18   could resubmit the application for consideration?
19        A.    No, ma'am.  I thought it was a done deal.
20        Q.    Okay.  Did she ever at any other point after
21   that day that she informed you that the club hadn't
22   been approved, did she ever let you know that you could
23   resubmit the application?
24        A.    No, she did not.  Because if she had, I would
25   have had HF work with her advisors to flush out and

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 74

1   resubmit -- flush out the charter, and then I would
2   have gladly resubmitted it did.
3      Q.    So Ms. Cole nor Ms. Cunningham contacted you
4   either verbally or by e-mail to let you know that the
5   application could be resubmitted?
6      A.    No, ma'am.
7      Q.    If Ms. Cunningham specifically recalls
8   informing you of that, is it your contention that
9   that's not accurate?  Or is it that you don't recall
10   having that conversation?
11      A.    I don't recall having that conversation,
12   because if I had had that conversation I definitely
13   would have asked HF to pursue it.
14      Q.    Are you aware of whether or not anyone,
15   whether it be Ms. Cunningham or Ms. Cole, probably
16   would have been Ms. Cunningham, spoke with HF regarding
17   the denial of the application as it was written?
18      A.    No.  They did not share any information with
19   me regarding their conversation with HF.
20      Q.    Okay.  Did HF tell you if they told her that
21   the club could resubmit the application?
22      A.    She did not say anything about being told
23   that to me.
24      Q.    Okay.  So I am assuming that at no point
25   after this application did you or HF to your knowledge

Heather Jablonski       Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida       September 13, 2014

Page 75

1    resubmit any application for the GSA in the 2013/2014

2    school year?

3         A.    No, ma'am.

4         Q.    Do you have any specific, factual knowledge,

5    other than what you said your gut feeling was that had

6    you properly supported it, under the critical thinking

7    prong, that the application for some reason would not

8    have been approved?

9         A.    It's just my own personal feeling.

10        Q.    Okay.  You didn't have any conversations with

11   anyone who said -- like a School Board member, or the

12   superintendent, who said this application wouldn't be

13   approved if it was properly supported?

14        A.    No, I did not have a conversation with a

15   School Board member, or anyone else that said that it

16   wouldn't.

17        Q.    Have you subsequently had any conversations

18   with anyone employed by the School Board about the

19   application and the reasons for its denial?

20        A.    No, ma'am.

21        Q.    Did you ever become aware through anyone

22   other than Ms. Cunningham or Ms. Cole that you had the

23   opportunity to resubmit the application?

24        A.    No, ma'am.  I thought once I got that note

25   that it was not an extension, that it was turned down,

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 76

```
 1    not approved.  I was under the impression that that was
 2    it, we were done.
 3         Q.   But if Ms. Cunningham did, in fact,
 4    communicate to you, you don't dispute it?
 5         A.   I don't recall her ever communicating that
 6    with me.
 7         Q.   Did you ever learn that later through any
 8    outside source, other than Ms. Cunningham or anyone at
 9    the school?
10         A.   No.
11         Q.   Did you ever go speak to anyone about the
12    club application not being approved, anyone at the
13    School Board, the superintendent, or Ms. Cunningham?
14         A.   No, I didn't follow up once it was turned
15    down.
16         Q.   Okay.  Are you aware of any other clubs at
17    the middle school level that applied under the new
18    policy that were not approved?
19         A.   No, ma'am.
20         Q.   Are you aware of any clubs under the new
21    middle school policy that were approved?
22         A.   The only thing that we have going now is
23    athletics.  So I -- I would assume that nothing's been
24    approved.  But I don't know whether it's because they
25    did not apply, or whether it's just not been approved.
```

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 77

1      Q.    Okay.

2      A.    I had read something somewhere about a

3 Kiwanis Club, but I don't remember whether it was in

4 middle school or high school.

5      Q.    Okay.

6      A.    That they were pursuing the issue.

7      Q.    Okay. But as far as you know, there's no

8 clubs at Carver Middle School this year?

9      A.    Not that I know of, no.

10      Q.    Are you aware of any clubs at Carver Middle

11 School that applied last year?

12      A.    No, I don't know of any that applied.

13      Q.    Okay. So were there any other clubs at

14 Carver Middle School last year, to your knowledge, that

15 were approved?

16      A.    At the beginning of the year, we did have an

17 FCA. But as things began to change, that was shutdown.

18      Q.    Okay. And you think that was the beginning

19 of the 2013/2014 year, or was that the 2012/2013 year?

20      A.    That would have been when BNS was in 8th

21 grade.

22      Q.    Okay. So that was the 2012/2013 school year

23 under the old policy?

24      A.    Correct. When they started to change the

25 policy, that's when the FCA quit meeting.

Heather Jablonski          Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida          September 13, 2014

Page 78

1      Q.    Okay.  As far as you're aware, has any

2  student member of the GSA ever been disciplined for

3  talking about some of the issues that they talk about

4  in the proposed GSA meetings during their own time at

5  school?  In other words, before school starts, in

6  between classes, at lunch, after school...

7      A.    Not that I am aware of.

8      Q.    Have you ever been disciplined or reprimanded

9  for discussing those types of issues with any of the

10 students, or with any of your peers on your time, in

11 other words, when you're not teaching?

12     A.    No, ma'am.

13     Q.    Have you ever been given any direction as an

14 instructional staff member to discipline students in

15 any way, or to direct them to cease communication of

16 that type on their own time?

17     A.    No, ma'am.  Anything like that would always

18 be held through administration, as --

19     Q.    But there's been no direction from

20 administration to you that you as a teacher -- there's

21 lots of things that if you see kids do, if you see kids

22 fighting you're supposed to interact and intervene and

23 do something to stop it.  Or if you see students, you

24 know, otherwise violating the code of conduct, or

25 something like that, I would imagine that as an

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 79

1    instructional staff member you're expected that if it
2    happens in your presence, you should do something about
3    it.
4            If you were to see, you know, two members of
5    the GSA at lunchtime, and they were discussing, you
6    know, I was called a name because -- you know, similar
7    to the things that you talked about that you discussed,
8    I was called a name because my mom is a lesbian, or
9    whatever the case may be.  That is not a situation that
10   you've been directed to intervene and stop
11   communication between the students as a school
12   employee, is it?
13        A.    No, I was not directed to intervene in any
14   kind of conversation that I might overhear.
15        Q.    Okay.  And are you aware of whether or not
16   the GSA, even if it is not an approved club, would have
17   the use of school facilities at Carver Middle School if
18   they requested it?
19        A.    My understanding is that if I -- if I read
20   the policy correctly, that we might be able to meet as
21   a non-school sponsored club.  But then it also would
22   require things like, I believe it's a million dollar
23   liability insurance policy.  It didn't say that in
24   here, but I think that's something I had read in other
25   documents.  So it would -- and we wouldn't be able to

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 80

1    advertise, we wouldn't be able to talk about the

2    organizations to other students on campus, things like

3    that.

4         Q.    Would you be able to talk to the other

5    students on campus during not instructional time in the

6    same way that students can pretty much talk about

7    whatever they want at lunch, the way we just described?

8         A.    The kids could.  But as a teacher, I'm always

9    on instructional time during the school day.  So it

10   would not be something that I could say, you know, hey,

11   I understand you're having these problems, you should

12   come to the organization.  If it's a non-school

13   sponsored club, my understanding is we wouldn't be

14   allowed to talk about it at all.

15        Q.    Okay.  But there is an avenue available to

16   use the facilities?

17        A.    I think there is, but I believe it requires

18   the insurance policy, and that we also have to pay a

19   janitor to stay after for custodial reasons.

20        Q.    Okay.  Are you aware of whether or not that

21   policy has been revised or is being revised?

22        A.    I have no idea.

23        Q.    I am not sure how much you participated in

24   responding to some of the discovery that we sent, so I

25   may go through some of these, and either you assisted

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 81

1    in answering them, or you didn't, okay?

2        A.   Okay.

3        Q.   But with respect to we sent a request for

4    production of documents to your attorneys, and we

5    requested a copy of any and all filings, including

6    newspaper articles identified in the filings.  Are you

7    aware of any particular newspaper articles related to

8    issues involved in this lawsuit?

9        A.   Yes, there are several in the

10   Orlando Sentinel and the Daily Commercial.

11       Q.   Okay.  Were those provided by you?

12       A.   They were just things I read at home or

13   online.

14       Q.   Okay.

15       A.   But nobody's asked me for them.

16       Q.   And just generally, the content of those were

17   that the middle school is not allowing the GSA, or the

18   GSA was not allowed in the middle school?

19       A.   Correct.  And outlining what a GSA was in

20   generic terms.  And I believe they also have through

21   the course of the -- did some interviews for both sides

22   of the -- not conflict, but both sides of the

23   positions.

24       Q.   What was your understanding of the School

25   Board's position on middle school clubs?

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 82

1     A.    After the change, that if it was non-academic
2  that it would not be permitted within the classroom
3  setting, within the school setting.
4     Q.    Okay.  Was anything ever said at any meeting
5  in particular that the GSA, in particular, was not
6  wanted to be formed by the School Board?
7     A.    To my knowledge, they didn't speak
8  specifically about the GSA, they just talked about the
9  school club -- or the school club policy in general.
10  But did not specifically name the GSA.
11     Q.    Do you recall the School Board addressing
12  concerns about middle school students and their
13  maturity levels at any of the meetings that you
14  attended?
15     A.    Yes, ma'am.
16     Q.    Okay.  Would you agree that the maturity
17  level of middle school students is different than the
18  maturity level of high school students?
19     A.    Yes, ma'am.
20     Q.    Would you also agree that there may be a
21  significant gap in the maturity level between a
22  6th grader and an 8th grader?
23     A.    At times, yes, ma'am.
24     Q.    You had mentioned before that although you
25  didn't receive any particular parent complaints, you're

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 83

1    aware that there were parent complaints and public

2    member complaints about the potential of a GSA in a

3    middle school.  Is it fair to say that there were a

4    number of people against those types of clubs being in

5    the middle school?

6        A.    I am unaware of anything that was said

7    specifically about Carver to our administration.  But I

8    do know at the School Board meetings there were people

9    that spoke in opposition.

10        Q.    Are you aware of any parent concerns for

11    allowing the students to participate in such a club in

12    the middle school level?

13        A.    At Carver, or in general?

14        Q.    Yes, ma'am.

15        A.    Not specifically at Carver.

16        Q.    Okay.  Was there any student that you are

17    aware of that wanted to be part of the GSA whose parent

18    would not allow it?

19        A.    There was one student.

20        Q.    Okay.  What was that student's name?

21        A.    MG.

22        Q.    Are you aware of any bullying issues that he

23    may have had related to LGBT issues?

24        A.    He did not go into specifics with me, but he

25    said that he did have some difficulty with the students

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 84

1    calling him gay, or calling him a fag.  But I also know

2    that he's a special ed student, I believe he's

3    autistic.  And so I don't know how much of it was

4    perceived and how much of it was actual.

5          Q.    Okay.  **Was it something that he reported to**

6    **you directly?**

7          A.    I believe he reported to administration.  But

8    then when we tried to start this organization, he did

9    say that he had some -- he did tell us that he had some

10   issues -- he spoke to me about the issues.

11         Q.    Okay.

12         A.    But in generic terms.

13         Q.    **Was he a member of the GSA?**

14         A.    No.

15         Q.    **Did the School Board policy for the '13/'14**

16   **school year require parental consent for a student to**

17   **participate in a club at a middle school?**

18         A.    I believe that that is one of -- yes, number

19   five.  "All student clubs and organizations shall

20   obtain a consent form from the parents of each

21   anticipating student."

22         Q.    Okay.  **Did you obtain consent forms for each**

23   **of the students seeking to participate in the GSA?**

24         A.    No, because the GSA had not formed that year.

25   It had formed for the three meetings the prior year.

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 85

1  And these rules, I don't believe, had been formalized
2  at that time.
3       Q.   Okay.  Other than the application that I
4  showed you today and the letters that were submitted by
5  BNS back in the 2012/'13 school year, are there any
6  other applications that exist that you submitted to the
7  school district for approval of the GSA?
8       A.   Not applications.  But when my daughter tried
9  to start it, she did have letters of request in the
10  petition that she submitted to Mr. Bordenkircher.
11       Q.   Right.  I guess -- I'm sorry, I should be
12  more clear.  I am specifically talking about the
13  actual -- the GSA in the 2012/'13 school year and the
14  '13/'14 school year.
15       A.   No, ma'am.
16       Q.   Okay.  And you have not submitted any
17  applications as of this school year?
18       A.   No, ma'am.
19       Q.   Is it your understanding or do you have an
20  understanding of whether each club wishing to form has
21  to submit an application every year?
22       A.   That's my understanding, that every year that
23  you want to participate, you would have to reapply.
24       Q.   Okay.  Is there any intention of the GSA to
25  submit an application for this school year?

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 86

1     A.   Not to my knowledge, because it was turned

2  down previously.

3     Q.   Okay.  After our discussions with respect to

4  critical thinking and that prong, are there any

5  students that have expressed any interest in forming a

6  GSA this year?

7     A.   Not specifically to me.

8     Q.   Okay.

9     A.   I would assume that HF is still interested,

10  and her friends.  But they have not approached me this

11  year about attempting, again.

12     Q.   Are you aware of whether or not any student

13  was teased or harassed for participation in the GSA?

14     A.   Not to my knowledge.

15     Q.   The information you suggested was contained

16  within the national GSA program, you said there was

17  some pretty extensive information and ideas and

18  activities for the meetings, and that sort of thing.

19  Has that ever been provided to the School Board, to

20  your knowledge?

21     A.   No, ma'am.

22     Q.   As part of the discovery in this case we've

23  asked your attorneys or we've served on your attorneys

24  what's called request for admissions, and they're just

25  questions of fact that we have asked the parties to

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 87

1    admit.  And I just would like to have you take a look

2    at them real quick.  Those are the questions.

3            Have you ever seen those before?  Were you

4    responsible for participating in some of the answers?

5        A.    I don't recall seeing the document prior to.

6    I think this is the first time I've seen that one.

7            MR. TILLEY:  Can you say which document

8        you're talking about when you say "that one"?

9            MS. McCULLOCH:  That will be our request for

10       admissions.  I can go ahead and mark those so it's

11       easier.  You can make that DC.  Then make the

12       response to the request for admissions DD.

13           THE WITNESS:  This is the first time that I

14       have seen these responses.

15   BY MS. McCULLOCH:

16       Q.    Okay.  Did you have any discussions about

17   formulating the responses?

18       A.    I honestly don't know.  I have had

19   conversations with members of the ACLU --

20       Q.    Right.  I don't need to know detailed

21   conversations with your lawyers.

22       A.    Okay.

23       Q.    But did you provide to them any information

24   for formulating that response?  I mean, maybe it will

25   be helpful if I just talk in specifics.  If we look at

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 88

1    number one, we asked that you admit that the
2    Carver Middle School GSA club was requested to submit a
3    revised application for the 2013/2014 school year after
4    the initial application was rejected.  And the answer
5    states there that it was denied.  And that the
6    attorneys were told that they could reapply, but there
7    was no specific request.
8           Were you aware that anyone was told that you
9    replied, or was that information that's supplied by
10   you?
11          MR. TILLEY:  Object to the form.
12          THE WITNESS:  I was not aware of the
13      information, no.
14          MS. McCULLOCH:  Okay.
15          THE WITNESS:  Had I known I definitely would
16      have reapplied.
17   BY MS. McCULLOCH:
18      Q.   I think I already asked and you answered
19   numbers two and three.  But basically the club never
20   submitted a revised application, correct?
21      A.   No, ma'am, you did not.
22      Q.   Other than the three pages contained in the
23   application, that was all that was submitted on behalf
24   of the GSA for the 2013/2014 school year?  If you look
25   at number two there, first page.

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 89

1          A.     Number two?

2          Q.     Yeah.    The application that we went over,

3     that was it, that was all that was submitted?

4          A.     Correct.

5                 MS. McCULLOCH:    Okay.    I'll go ahead and

6          attach that as Defendant's D, so DD.

7                 (Defendant's Exhibits DC and DD marked for

8          identification.)

9     BY MS. McCULLOCH:

10         Q.     Do you have any documents in your possession,

11    other than the newspaper articles that we discussed and

12    the policy and application that supports the claims of

13    the GSA that it should be allowed to form at the

14    Carver Middle School?

15         A.     The only thing I have in my possession is my

16    daughter's original attempt with the letters to form

17    it.

18         Q.     But not this particular GSA for the 2013/2014

19    school year?

20         A.     Not this one, no, ma'am.

21         Q.     We talked quite a bit about the School Board

22    meetings that you attended and the expression of

23    concern of the board members regarding the difference

24    in maturity levels between middle school students and

25    high school students when they changed the policy that

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 90

```
 1    we're talking about now, correct?  Do you have any
 2    information to doubt or cast doubt on the
 3    School Board's representation that they feel concerned
 4    that there's a difference in maturity level between
 5    middle school students and high school students?
 6              MR. TILLEY:  Object to the form.
 7              THE WITNESS:  In the meeting they expressed
 8         concern about whether the kids were old enough and
 9         self-aware enough to know of their own orientation.
10         And I disagreed, because in my 20 years of
11         teaching, I've had kids in elementary school that
12         have expressed interest in the same sex, and have
13         said that they know that they're different from
14         other kids.
15              And in my experience I have found that kids,
16         by the time they get to middle school have a pretty
17         good idea of whether they're gay, straight,
18         bisexual.
19    BY MS. McCULLOCH:
20         Q.   Is there any discussion -- I thought that you
21    had already said that there were no discussions in
22    particular by any School Board member at a School Board
23    meeting related specifically to the GSA, or sexual
24    orientation?
25              MR. TILLEY:  Object to the form.
```

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 91

1          THE WITNESS:  I don't recall them

2     specifically mentioning the GSA, but I do recall

3     them mentioning that they were concerned whether or

4     not the kids at that age were aware enough to know

5     their orientation.

6   BY MS. McCULLOCH:

7          Q.    Okay.  Do you recall who specifically said

8     that at a School Board meeting?

9          A.    It was either Mathias or Howard.  I do

10    remember it was a male.

11         Q.    And you believe it was at a meeting?

12         A.    Yes, ma'am.

13         Q.    Was there any other discussion about the

14    appropriateness of any non-curricular clubs at the

15    middle school level based on maturity of students?

16         A.    I don't recall the School Board members

17    having the conversation.  But I do recall either

18    opponents or people who were in favor of speaking on

19    the situation.

20         Q.    But other than the GSA, I guess what I'm

21    saying is:  Was there an overall concern expressed by

22    the School Board that middle school students needed a

23    different club policy than high school students because

24    of maturity level?

25         A.    I don't know if it was because of maturity

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 92

1    level.  I don't know if that was their reasoning.

2        Q.    **But was there an expression of general**

3    **philosophy that middle school students and student**

4    **activities and clubs should be more related to the**

5    **curriculum?**

6        A.    Yes.

7        Q.    **Okay.**

8        A.    And differentiated between the two grade

9    levels, or the two --

10       Q.    **And do you have any reason to doubt the**

11   **veracity of that concern, or statement?**

12       A.    No.  I understand.

13           MS. McCULLOCH:  If we could just take a

14       two-minute break.  I think I'm almost done.

15           (Break taken at 3:10 P.M.  Resumed at

16       3:16 P.M.)

17   BY MS. McCULLOCH:

18       Q.    **Ms. Jablonski, have you had any conversations**

19   **with anyone regarding this lawsuit, other than your**

20   **attorneys.**

21       A.    Yes.  I am a member of PFFLG.

22       Q.    **What is PFFLG?**

23       A.    It's Parents, Friends and Family of Lesbians

24   and Gays.

25       Q.    **Is this a local organization or a national**

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 93

1   organization?

2       A.   We are the local chapter of a national

3   organization.

4       Q.   **What kinds of conversations did you have with**

5   **that group?**

6       A.   I started going in December of my daughter's

7   7th grade year to find out what kind of support they

8   could offer us, what kind of information.  If they knew

9   what my daughter's legal rights may be as far as

10  forming a GSA.  At that time I didn't know what a GSA

11  was, but an LGBT organization.

12      Q.   **What conversations have you had specifically**

13  **about this particular lawsuit, which is brought by you**

14  **and HF and the GSA?**

15      A.   Just updates on how it was going with the

16  other members of PFFLG.  And they're the ones that

17  familiarized me with the equal access.  It was just

18  generic updates on how we were doing.

19      Q.   **Do you have any understanding of how the**

20  **Lake County School Board defines secondary school?**

21      A.   Now, or before, because it's changed?

22      Q.   **During the 2013/2014 school year.**

23      A.   Last school year, then?

24      Q.   **Yes.**

25      A.   My understanding is there has been a change

Heather Jablonski       Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida       September 13, 2014

Page 94

1    and high school is considered secondary, but middle

2    school is not.

3          Q.    Okay.    This may sound like a basic question,

4    but maybe I presumed.    I assume that these two

5    gentlemen here are your attorneys?

6          A.    Yes.

7          Q.    That they've been retained to represent you?

8          A.    Yes, they've been retained.

9          Q.    In this lawsuit?

10         A.    Yes.

11         Q.    Have you spoken with anyone else about the

12   issues in the lawsuit other than the PFFLG?

13         A.    Just my immediate family.

14         Q.    Okay.

15         A.    And Ms. Smith.

16         Q.    What kinds of discussions have you had with

17   Ms. Smith?

18         A.    Just the general updates that, you know, we

19   turned in the application, the application was turned

20   down.    I know that there were some filings, I believe

21   back in April of last year, and I know just based on

22   what I've read online that we did not get granted the

23   ability to meet until the case was decided, and I

24   shared that with Tracy.    And my family.

25         Q.    Did you ever have any discussions with

Heather Jablonski        Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida        September 13, 2014

Page 95

```
 1   Ms. Smith around -- revolving around any other
 2   information you could provide to support that the club
 3   might meet the criteria in the policy?
 4        A.    We brainstormed different ideas on how we
 5   could tie it in directly with critical thinking.  And I
 6   would have been happy, or we would have been happy to
 7   help HF with the charter.  But she came with it in
 8   hand, so that's why we went with the one that she had
 9   helped craft.
10        Q.    Okay.  Did you act on any of the
11   brainstorming you did to help fit it within the policy?
12        A.    No.
13        Q.    Did you ever reduce that to writing or
14   anything?
15        A.    I believe she may have written down some
16   ideas that she had on how we could directly tie it.
17        Q.    "She" being Ms. Smith?
18        A.    Yes, ma'am.
19        Q.    Okay.
20        A.    But, no, we never put that into a document to
21   submit.
22        Q.    Okay.  And did you do anything to prepare for
23   your deposition today?
24        A.    I just met with my legal counsel.
25        Q.    Did you review any documents?
```

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 96

1          A.    Just the club application.

2          Q.    Just the club application?

3          A.    Yes, ma'am.

4                MS. McCULLOCH:  Okay.  I don't have any

5     further questions.  Thank you for your time.

6                THE WITNESS:  All right.

7                MR. TILLEY:  I have a few questions.

8                     CROSS-EXAMINATION

9     BY MR. TILLEY:

10         Q.    Looking at the club application, which is

11    Defense Exhibit B, DB, is it fair to say that the only

12    communication you received about why the club was

13    denied is what is written on this application at the

14    top?

15         A.    That is what I recall.

16               What I remember is Ms. Cunningham came into

17    lunch duty with this folded, without the back two

18    pages, and handed it to me and said, this is for you.

19    And that's the extent of my communication about why it

20    was denied.

21         Q.    What was your understanding of why it was

22    denied based on reading this page?

23         A.    That it was not tied directly to a curriculum

24    currently being taught in an academic class at Carver.

25         Q.    And there's no indication on this form that

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 97

1  it was denied because of failure to correctly elaborate

2  on critical thinking?

3         MS. McCULLOCH:  Just object to the form.

4  BY MR. TILLEY:

5        Q.  Is that correct?

6        A.  No, there's no indication that there was

7  anything wrong with the form of the charter.  Just that

8  it's not an extension of a school curriculum, per

9  policy.

10       Q.  Did you state before that you did not believe

11 there was a way to amend this club application?

12        MS. McCULLOCH:  Object to the form.

13        THE WITNESS:  No.  I believe that the

14     decision was made.  I did not know that we could

15     reapply.  And I had assumed that if we did reapply,

16     we would have the same results.

17 BY MR. TILLEY:

18       Q.  So you thought any amendment would be futile?

19        MS. McCULLOCH:  Object to the form.

20        THE WITNESS:  Yes, sir.  I didn't think that

21     they would ever allow us, the club.  That no matter

22     what I said, or how we changed the document, I did

23     not think that it would meet their standards.

24 BY MR. TILLEY:

25       Q.  When you expressed before that certain parts

Heather Jablonski          Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida          September 13, 2014

Page 98

1    of the charter in your personal opinion could have been
2    clearer, did you think that the application that was
3    submitted was deficient, such that it should not have
4    been approved?
5              MS. McCULLOCH:  Object to the form.
6              THE WITNESS:  The way it was written, I
7         believe that we did have a fighting chance of
8         getting it approved.  Afterwards I thought that we
9         could have included more detail in the club
10        purposes and goals, specifically tying it to
11        critical thinking, and problem-solving, and to some
12        extent probably even civics, which is an academic
13        class at Carver.
14   BY MR. TILLEY:
15        Q.   Do you if I think if that had been done that
16   the application would have been approved based on what
17   you know about why it was not approved?
18             MS. McCULLOCH:  Object to the form.
19             THE WITNESS:  I can't honestly say.  I really
20        do think that they would have found a reason to
21        turn us down because it is a controversial subject.
22        I am not sure if any amount of amending it would
23        have been to their satisfaction.  But that's my
24        personal opinion.
25   BY MR. TILLEY:

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 99

1       Q.    Why do you think the changing -- strike that.

2          When you say the word "controversial," who

3  believes, in your understanding, that the club is

4  controversial?

5         MS. McCULLOCH:  Object to the form.

6         THE WITNESS:  From going to the meetings and

7      hearing the different people oppose it, that's what

8      made me believe that it was controversial.

9      Specifically with the word "gay", the parents -- I

10     think if we had called it an anti-bullying club, if

11     we had called it a civics club, or something else,

12     I think we would have flown under the radar, and

13     everything would have been fine.  But because it

14     had the word "gay" in it, I think that ruffled a

15     lot of feathers.  And that's what made us

16     controversial.

17  BY MR. TILLEY:

18       Q.    Do you think it's fair to say that the fact

19  that feathers were ruffled is a reason why the club

20  should exist?

21         MS. McCULLOCH:  Object to the form.

22         THE WITNESS:  No.  I think the club should

23     exist because our students, our LGBT students need

24     the support, they need a sense of community, they

25     need a safe space where they can talk to other

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 100

1      people about the issues they face.  And learn how

2      to handle situations as they arise in their life,

3      whether it's within the confines of school or

4      outside of school.

5   BY MR. TILLEY:

6      **Q.   And you think the GSA would provide something**

7   **that is not currently provided in the school**

8   **environment now?**

9            MS. McCULLOCH:  Object to the form.

10           THE WITNESS:  Correct.  I believe that it

11      would provide for them a safe space to do these

12      things, and to have a social network of support.

13      And I do believe that the kids feel like there's

14      safety in numbers.  And when they're in teams, like

15      they are in the middle school, they think they're

16      the only ones.  And when they get the opportunity

17      to join an organization of like-minded individuals,

18      they see that they are just one of many.

19   BY MR. TILLEY:

20      **Q.   Do you think that 6th graders generally are**

21   **too immature to be members of a GSA?**

22           MS. McCULLOCH:  Just object to the form.

23           THE WITNESS:  From my personal experience,

24      no, I don't believe they're too young.

25      Conversations I've had with my own daughter and her

Heather Jablonski        Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida        September 13, 2014

Page 101

```
 1        network and circle of friends, most of them came to
 2        middle school already knowing their orientation.
 3        They knew that they were straight, or they knew
 4        that they were gay, or they knew they were
 5        somewhere in between, before they even got to
 6        6th grade.
 7   BY MR. TILLEY:
 8        Q.   Looking at the club charter on the second
 9   page, I think it's Exhibit DB, I think you might have
10   gotten cut off before when you were talking about what
11   other aspects of this charter, other than paragraph
12   three, discuss critical thinking.
13        I believe you stated that paragraph one,
14   providing a safe supportive environment to discuss
15   experiences, challenges and successes, would promote
16   critical thinking.  Do you recall that that's what you
17   said earlier?
18        MS. McCULLOCH:  Object to the form.
19        THE WITNESS:  Yes, I do.  Because while they
20        discuss their experiences, if they're having a real
21        road block with a person or situation in their
22        life, they can discuss with other students who have
23        successfully overcome that roadblock or that
24        challenge and learn from that experience of how to
25        apply looking at things analytically,
```

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 102

1           problem-solving, see which really is the best way
2           to respond.  Not necessarily responding
3           emotionally, but responding intellectually to
4           things as they come up in their life.
5      BY MR. TILLEY:
6           Q.    **Looking at paragraph two, would you also say**
7      **that what is described in that paragraph, "Creating and**
8      **executing strategies to confront and work to end**
9      **bullying, discrimination, and harassment," et cetera,**
10     **also involves critical thinking?**
11              MS. McCULLOCH:  Object to the form.
12              THE WITNESS:  Yes, because when you create
13          strategies to deal with situations, you do have to
14          analyze the problem, you have to come up with a
15          solution, you have to implement the solution, and
16          then evaluate whether or not that worked.  And that
17          is definitely a critical thinking/problem-solving
18          process.  That can definitely be, you know, applied
19          to the bullying and harassment that not just LGBT
20          students, but all students face.
21              MR. TILLEY:  That's all that I have.
22              MS. McCULLOCH:  Okay.  I just have a quick,
23          few follow-up questions based on that.
24
25

Heather Jablonski      Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida      September 13, 2014

Page 103

                    REDIRECT EXAMINATION
1
2    BY MS. McCULLOCH:
3        Q.    When you submitted this application,
4    Ms. Jablonski, you were submitting it with the
5    understanding that critical thinking was the category
6    of the policy that you would have a chance at getting
7    it approved, correct?
8        A.    Yes, ma'am.  And I felt that we could also
9    tie it in with, although it's not addressed in detail
10   in here, with civics.
11       Q.    Right.  Now, after the fact, you thought
12   civics.  But at the time you said that you and
13   Ms. Smith were brainstorming as to how you could make
14   it fit under the critical thinking prong, correct?
15       A.    And the civics aspect.
16       Q.    Okay.
17       A.    And the civil liberties and --
18       Q.    But then when BNS -- sorry.  HF came to you
19   with the application and the charter already filled
20   out, you just used her charter and didn't add any
21   additional information, correct?
22       A.    Correct.
23       Q.    Was there ever any confusion by you or
24   Ms. Smith as to which prong of the club policy you were
25   trying to get the club approved under?  In other words,

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 104

```
 1    at all times you were trying to get it approved as a
 2    promotes-critical-thinking-type of club, correct?
 3         A.    Yes, ma'am.
 4         Q.    Okay.  And when you read the reason for the
 5    denial, "club is not an extension of the school
 6    curriculum per policy," did you understand that to mean
 7    that it did not meet the criteria that you had
 8    attempted to demonstrate that it met?
 9              MR. TILLEY:  Object to the form.
10              THE WITNESS:  I thought that it meant that
11         because it was not tied to a specific academic
12         class, that we were not approved.  And that they
13         likely felt that it didn't promote the critical
14         thinking.
15    BY MS. McCULLOCH:
16         Q.    So you understood that the portion of the
17    policy that you were submitting the application under,
18    which was the critical thinking prong, that the words
19    that Ms. Cole wrote when she denied the application
20    meant that you did not fit that criteria per the
21    policy?
22              MR. TILLEY:  Object to the form.
23              THE WITNESS:  Correct.
24    BY MS. McCULLOCH:
25         Q.    You didn't limit it, and when you read it and
```

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 105

```
 1    think, oh, well, I know this isn't a class, or this
 2    isn't a class, and that's why it was denied.  You knew
 3    that if it were considered to promote critical
 4    thinking, per the policy, that that was also an
 5    approvable category, correct?
 6              MR. TILLEY:  Object to the form.
 7              THE WITNESS:  Yes.  I knew that if we could
 8         demonstrate it thoroughly enough that it would --
 9         it could, not that it would, but that it could be
10         approved.
11    BY MS. McCULLOCH:
12         Q.   As a critical thinking --
13         A.   As critical thinking.
14         Q.   Okay.  And you mentioned that at the
15    School Board meetings there were people voicing out in
16    opposition.  Were those people -- those people were
17    primarily members of the public and parents?
18         A.   Yes, ma'am.
19         Q.   You weren't referring directly to
20    School Board members, or any School Board member in
21    particular, were you?
22         A.   Not during the meeting, no.
23         Q.   Okay.  With respect to considering it a
24    controversial topic, you consider it a controversial
25    topic based on the fact that there were parents and
```

Heather Jablonski    Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida    September 13, 2014

Page 106

1    other members of the public speaking out against a GSA

2    in a middle school?

3        A.   Yes, ma'am.  That, and the fact that it was

4    not approved as every other club that, to my knowledge,

5    had ever applied had been approved.

6        Q.   We're going to have to back up on that one.

7    Because I asked you before if you were aware of any

8    clubs that had applied during the 2013/2014 school

9    year, and you said, no, that you weren't aware.

10        A.   Not during that school year.

11        Q.   Okay.

12        A.   But previous clubs like FCA --

13        Q.   Under the old policy?

14        A.   Yes.  Just that I want to be a club, the

15    principal said, yes, and they were a club.

16        Q.   But with respect to any clubs that submitted

17    applications for the 2013/2014 school year, you're not

18    aware of any clubs that applied and were either denied

19    or accepted at Carver Middle School?

20        A.   No, ma'am.

21        Q.   And would you say that there was still at

22    least no known opposition to the formation of the club

23    by parents?

24        A.   I would assume there was still opposition.

25        Q.   In the 2013/2014 school year?

Heather Jablonski          Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida          September 13, 2014

Page 107

1          A.    Yes, ma'am, I would assume.  I did not speak

2    directly with parents.

3          Q.    Did you attend any School Board meetings

4    during the 2013/2014 school year after you submitted

5    the application?

6          A.    I have been to one recently.

7          Q.    Okay.  Did it involve any discussion of the

8    GSA's application?

9          A.    No.

10          Q.    Okay.  And are you aware of any School Board

11    meeting after that application was submitted where the

12    GSA's application was in any way discussed at the

13    School Board meeting?

14          A.    Not to my knowledge.

15          Q.    Are you aware of whether or not any

16    School Board member was even aware of whether or not

17    the GSA had applied to form a club in the middle school

18    during the 2013/2014 school year prior to this lawsuit?

19          A.    I have no idea what they know and what they

20    don't know.

21          Q.    Okay.  You haven't had any particular

22    conversations with anyone at the School Board about the

23    application or the denial of the application?

24          A.    I've never spoken directly to a School Board

25    member, other than addressing the entire group.

Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 108

1    Q.    And you never did anything to attempt to get
2    the superintendent to reconsider Ms. Cole's decision?
3        A.    No, ma'am.
4        Q.    Did you ever contact Ms. Cole or
5    Ms. Cunningham and ask them to reconsider the decision?
6        A.    No, ma'am.
7            MS. McCULLOCH:    Okay.    I don't have any
8        further questions.
9            MR. STEVENSON:    Thanks.    Get out while you
10       still can, right?
11           THE WITNESS:    Okay.
12           (This proceeding concluded at 3:36 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Heather Jablonski        Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida        September 13, 2014

Page 109

```
1              C E R T I F I C A T E    O F    O A T H

2

3    STATE OF FLORIDA   }

4    COUNTY OF LAKE     }

5              I, COURTNEY L. WEAR, Registered Professional

6    Reporter, Certified Realtime Reporter, a Notary Public

7    for the State of Florida and Court Reporter, do hereby

8    certify that HEATHER JABLONSKI personally appeared

9    before me 9-30-2014 and was first duly sworn.

10             SIGNED this 10-14-2014.

11

12

13

14

15

16

17             COURTNEY L. WEAR
               Notary Public-State of Florida
               Comm No:  EE016705
18             Expires:  December 12, 2014

19

20

21   Type Identification Produced: FL Driver's License

22

23

24

25
```



Heather Jablonski     Carver Middle School Gay-Straight Alliance, et al v. School Board of Lake County, Florida     September 13, 2014

Page 110

```
 1                    C E R T I F I C A T E
 2      STATE OF FLORIDA   }
 3      COUNTY OF LAKE     }
 4              I, COURTNEY L. WEAR, a Notary Public for the
 5      State of Florida and Court Reporter, do hereby certify
 6      that I was authorized to and did stenographically
 7      report the foregoing deposition of HEATHER JABLONSKI;
 8      that a review of the transcript was not requested; and
 9      that pages 4 through 108, is a true record of my
10      stenographic notes.
11              I further certify that I am not a relative,
12      employee, or attorney or counsel of any of the parties,
13      nor am I a relative or employee of any of the parties'
14      attorney or counsel connected with the action, nor am I
15      financially interested in the action.
16              Signed this day of 10-14-2014.
17
18
19
                        COURTNEY L. WEAR
20
21
22
23
24
25
```

*CHAPTER 4.00 - CURRICULUM AND INSTRUCTION*

*4.502*

## MIDDLE SCHOOL STUDENT CLUBS AND ORGANIZATIONS

(1) This policy applies to all school clubs and organizations at all District Middle Schools.

(2) Middle School clubs and organizations are an extension of the school curriculum. Middle School clubs must be sponsored by the school and are limited to organizations that strengthen and promote critical thinking, business skills, athletic skills, and performing/visual arts. Schools may also establish organizations relating to academic honor societies and student government and clubs that are directly related to the curriculum.

(3) All student clubs and organizations must be approved by the Superintendent before they can operate at a school.

(4) All prospective clubs must submit a District approved application. The application shall include a club charter which shall set forth the purposes, qualifications for members, and the rules of conduct and shall be maintained on file for reference by all students and school employees.

(5) All student clubs and organizations shall obtain a Consent Form from the parents of each participating student, on a form provided by the District.

(6) A student club or organization shall not conduct any activity or act which violates Florida Statutes, School Board rules, or the regulations of the school.

(7) Any club or organization which engages in an initiation ceremony for its members shall prepare and submit the program of initiation exercises to the school principal for review and approval.

(8) There shall be no type of hazing in any club or organization within any school. Hazing is defined as any action or situation for the purpose of initiation or admission into or affiliation with any club or organization operating at a school pursuant to this policy, which recklessly or intentionally endangers a student's mental or physical health or safety.

(9) The decision of the members of an organization shall not be one of the factors in selecting additional members.

Page 1 of 2

Lake 4.502

Exhibit A

DX    A

WMS  H. Jaslowski

K. Wenz, RPR, CRR   9-9-14

**Exhibit 2**

(10) Secret societies, fraternities and sororities are prohibited per Section 1006.14, Florida Statutes.

(11) Clubs/ organizations will be assigned an employee/sponsor by the principal. The employee/ sponsor shall be present at all meetings.

(12) All social events shall be adequately chaperoned.

(13) At the discretion of the School Board and consistent with School Board policy, the employee/ sponsor may be compensated by the school.

(14) All monies accruing to a club or organization shall be accounted for through the school's internal accounting system.

(15) All meetings shall be held on School Board property. This may be waived for special meetings and events upon the faculty sponsor's request and principal's approval.

(16) Any dues charged shall be reasonable and not prohibitive. Admission fees will not be charged.

**STATUTORY AUTHORITY:**                    1001.41; 1001.42, F.S.

**LAWS IMPLEMENTED:**                    1001.43; 1006.07;
1006.09; 1006.63, F.S.

**HISTORY:**                    ADOPTED: 8/12/13
REVISION DATE(S):
BOARD REVIEW: 5/13/13

Lake 4.502

**Exhibit 2**

*CARVER*

**LCS LAKE COUNTY SCHOOLS**

*Leading our Students to Success*

*Club is Not an extension of the school curriculum, per policy.*

*not approved*

Superintendent
Susan Moxley, Ed.D.
Lake County School Board
Bill Mathias, District 1
Rosanne Brandeburg, District 3
Tod Howard, District 3
Debbie Stivender, District 4
Kyleen Fischer, District 5

## Middle School
## CLUB/Organization Application
### (ALL STUDENT CLUBS/ORGANIZATIONS MUST BE APPROVED
### BY THE SUPERINTENDENT BEFORE THEY CAN OPERATE AT A SCHOOL.)

Middle School clubs and organizations are an extension of the school curriculum. Middle School clubs must be sponsored by the school and are limited to organizations that strengthen and promote critical thinking, business skills, athletic skills, and performing/visual arts. Schools may also establish organizations relating to academic honor societies and student government and clubs that are directly related to curriculum.

Applicant: Heather Jablonski

(Circle one)  (Teacher)   Administrator

Official Club Name: Carver Middle School Gay-Straight Alliance

Club Purpose & Goals: Attach a Charter that sets forth the purposes, goals, qualifications for members and the rules of conduct.

Anticipated Activities for the Year:
Please see attached club charter.

Club Meeting Day, Time and Place: (Meetings must be held at the school unless otherwise approved.)
Tuesdays at 8:00 a.m.; Building 2, Room 120

Anticipated membership number: 25
(Parent consent forms for each member must be submitted to principal.)

Club By-Laws:

Each club/organization must establish written by-laws within the first 90 days after receiving approval, and provide a copy as a supplement to the application.

The Club/Organization agrees to comply with the Code of Student Conduct and Policy Guide and all School Board policies at all club meetings and events. (Policy 4.602 is attached)

Heather Jablonski _____  *Heather Jablonski* _____  _____
Print Name                        Teacher Signature                    Date

*Principal Approval: _____
                     Signature                                          Date

Superintendent/Designee Approval: _____
                                   Signature                            Date

*Principal will determine the staff member assigned to supervise and/or sponsor the club/organization.

LAKE COUNTY SCHOOLS
201 W. Burleigh Blvd., Tavares, Fla., 32778-2496 • Phone 352-253-6500 • Fax 352-343-0198

WNS _____
C. West, RPR, CRR  9-30-14

**Exhibit 3**

**Club Charter**

Carver Middle School Gay-Straight Alliance

Club Purposes and Goals:

(1) to create a safe, supportive environment at school for students to discuss experiences, challenges, and successes of LGBT students and their allies
(2) to create and execute strategies to confront and work to end bullying, discrimination, and harassment against all students, including LGBT students
(3) to promote critical thinking by discussing how to address bullying and other issues confronting students at Carver Middle School

Qualifications for Members:

Membership is open to all students, so long as the individual shows respect for all other members and does not interfere with the club purposes described above. There are no dues.

Rules of Conduct:

The GSA shall operate consistent with and comply with all school policies, rules, regulations, and state law, which include the requirements that members must comply with school policy, rules, regulation, and state law during meetings.

Anticipated Activities for the Year:

- hold regular meetings
- design and market student-awareness campaigns
  - create educational pamphlets, fliers, posters, and/or artistic displays related to bullying and other issues facing students—including LGBT students--at Carver Middle School
  - educate students about civil rights
- engage in after-school or weekend volunteer work in the local community

**Exhibit 3**

Dear Principal Cunningham and Superintendent Moxley,

My name is ███████████ and I am in seventh grade at Carver Middle School. I really want to make sure that the Gay-Straight Alliance started last school year keeps going this year. Bullying can make school tough for some kids, and I think helping people understand more about bullying and how to stop it will help make a lot of people more comfortable in school. Plus, we think it would be good for us to get more involved in the community by doing volunteer work. Please let us continue the GSA this year – I think it will make Carver an even better school.

Sincerely,



**Exhibit 3**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARVER MIDDLE SCHOOL GAY-
STRAIGHT ALLIANCE et al.,

Plaintiffs,                                    No. 5:13-cv-00623-WTH-PRL

v.

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

Defendant.

_____/

### REQUESTS FOR ADMISSIONS

Pursuant to Rules 36 of the Federal Rules of Civil Procedure, Defendant School Board of
Lake County, Florida ("School Board") hereby requests that Plaintiffs Carver Middle School
Gay-Straight Alliance, and H.F., a minor by and through parent Janine Faughnan, respond in
writing to the following requests for admission:

1.      Admit that the Carver MS GSA club was requested to submit a revised
application for the 2013-14 school year after the initial application was rejected.

2.      Admit that after learning that the application to form the Carver MS GSA club
was rejected for the 2013-14 school year another application was not submitted.

3.      Admit that the club did not submit a revised application.

I hereby certify that on the **8th day of August, 2014**, I e-mailed the foregoing to the
following: Daniel B. Tilley at dtilley@aclufl.org, ACLU Foundation of Florida, Inc., Suite 340,

Exhibit C
DY
WNS  H Jablonski
C. Wall, RPR, CRR   9-30-14

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARVER MIDDLE SCHOOL GAY-
STRAIGHT ALLIANCE et al.,

      Plaintiffs,

No. 5:13-cv-00623-WTH-PRL

v.

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

      Defendant.

_____/

## REQUESTS FOR ADMISSIONS

Pursuant to Rules 36 of the Federal Rules of Civil Procedure, Defendant School Board of

Lake County, Florida ("School Board") hereby requests that Plaintiffs Carver Middle School

Gay-Straight Alliance, and H.F., a minor by and through parent Janine Faughnan, respond in

writing to the following requests for admission:

    1.    Admit that the Carver MS GSA club was requested to submit a revised

application for the 2013-14 school year after the initial application was rejected.

    2.    Admit that after learning that the application to form the Carver MS GSA club

was rejected for the 2013-14 school year another application was not submitted.

    3.    Admit that the club did not submit a revised application.

I hereby certify that on the **8th day of August, 2014**, I e-mailed the foregoing to the

following: Daniel B. Tilley at dtilley@aclufl.org, ACLU Foundation of Florida, Inc., Suite 340,

Exhibit
DX _C_
WNS H. Jablonski
C Wai. RPR, CRR  9-30-14

4500 Biscayne Blvd, Miami, FL 33137; Benjamin Stevenson, at bstevenson@aclufl.org, ACLU

Foundation of Florida, Inc., P.O. Box 12723, Pensacola, FL 32591-2723; and Leslie Cooper at

lcooper@aclu.org; American Civil Liberties Union Foundation, Inc., 18th Floor, 125 Broad

Street, New York, NY 10004-2400.

BY:  /s/ Stephen W. Johnson
     STEPHEN W. JOHNSON, ESQ.
     Florida Bar No. 269867
     STEPHANIE J. MCCULLOCH, ESQ.
     Florida Bar No. 0638161
     McLinBurnsed
     Post Office Box 491357
     Leesburg, Florida 34749-1357
     (352) 787-1241 Telephone
     (352) 326-2608 Facsimile
     Email: SteveJ@mclinburnsed.com
     StephM@mclinburnsed.com
     Trial Counsel for Defendant, The School
     Board of Lake County, Florida

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARVER MIDDLE SCHOOL GAY-
STRAIGHT ALLIANCE et al.,

      Plaintiffs,

                                  No. 5:13-cv-00623-WTH-PRL

v.

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

      Defendant.

---

## PLAINTIFFS' RESPONSE TO DEFENDANT'S
## REQUESTS FOR ADMISSION AND PRODUCTION

Plaintiffs respond as follows to Defendant's 8/8/14 requests for admission.

1. Admit that the Carver MS GSA club was requested to submit a revised application for the 2013-14 school year after the initial application was rejected.

    **Response**: Denied. Plaintiffs' attorneys were told that the Carver GSA could reapply, but it was not requested that the group do so. Moreover, when Plaintiffs' counsel inquired of Defendant's counsel what changes would be necessary for approval of the application, the School Board did not respond.

2. Admit that after learning that the application to form the Carver MS GSA club was rejected for the 2013-14 school year another application was not submitted.

    **Response**: Admitted.

3. Admit that the club did not submit a revised application.

    **Response**: Admitted.

Plaintiffs respond as follows to Defendant's 8/8/14 requests for production.

1. A copy of any and all filings (including newspaper articles identified in those filings) as described in Plaintiffs' First Amended Initial Disclosures #4.

   **Response**: Plaintiffs object to producing these documents on the basis that the documents can be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(i). Defendant is already in possession of all filings in this lawsuit by virtue of it being a party.

2. Any and all attorneys fee contracts with any of the Plaintiffs related to this lawsuit.

   **Response**: Plaintiffs object to this request to the extent that it seeks documents protected by the attorney-client privilege, attorney work product, or both. Subject to the objection(s), Plaintiffs produce the retainer agreement redacted to show only portions pertaining to attorneys' fees.

3. Any and all documents concerning the formation of the Carver MS GSA club.

   **Response**: Plaintiffs object to this request to the extent that it seeks documents protected by the attorney-client privilege, attorney work product, or both. Defendant is already in possession of school board minutes and recordings and all correspondence to and from district employees, and therefore Plaintiffs object to producing these documents on the basis that the documents can be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(i). Subject to these objection(s), Plaintiffs note that the application packet to form a GSA for the 2012-13 school year can be found in Defendant's Supplemental Response to Plaintiff Carver GSA's Request for Production #4 at PDF pages 5-13. The application packet to form a GSA for the 2013-14 school year is at Docket Entry 4-11.

4. All applications with the School District for the Carver MS GSA club.

   **Response**: Plaintiffs object to producing these documents on the basis that the documents can be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(i). Subject to these objection(s), Plaintiffs note that the application packet to form a GSA for the 2012-13 school year can be found in Defendant's Supplemental Response to Plaintiff Carver GSA's Request for Production #4 at PDF pages 5-13. The

application packet to form a GSA for the 2013-14 school year is at Docket Entry 4-11.

5. All correspondence between any representative of the Carver MS GSA and the School Board, the Lake County School District, or any employee or agent of either.

    **Response**: Plaintiffs object to this request to the extent that it seeks correspondence between the Carver GSA's attorney and the School Board's attorney, which the School Board's attorney should already have, on the basis that the documents can be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(i). Subject to these objection(s), Plaintiffs note that a letter concerning bullying from H.F. (daughter of Janine Faughnan) can be found at Docket Entry 4-11 at 3.

Date: September 9, 2014

Certificate of Service: I certify that a true and correct copy of the foregoing was served via e-mail on opposing counsel on September 9.

## Respectfully Submitted,

**/s/ Daniel B. Tilley**
Daniel B. Tilley
Trial Counsel
Florida Bar No. 102882
ACLU Foundation of Florida
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
(786) 363-2700
dtilley@aclufl.org

**Benjamin James Stevenson**
Fla. Bar. No. 598909
ACLU Foundation of Florida
P.O. Box 12723
Pensacola, FL 32591-2723
T. (786) 363-2738
F. (786) 363-1985
bstevenson@aclufl.org

Leslie Cooper
ACLU Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2627
LCooper@aclu.org

*Counsel for Plaintiff*

# AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA, INC.

## RETAINER AGREEMENT







3



## ATTORNEYS' FEES

13.    The Clients will not be charged attorneys' fees for any work done in this action by the attorneys of record other than as set forth in this Agreement.

14.    The Clients understand that the primary purpose of this litigation is to have the GSA recognized and that monetary damages, other than nominal damages of $1, will not be sought.

15.    This is a civil case in which attorneys' fees may be statutorily available to the prevailing party. The Clients and the attorneys of record agree to seek attorneys' fees as part of any judgment, settlement, or other resolution of this action. In seeking attorneys' fees, the Clients and attorneys of record specifically agree to seek attorneys' hourly fees (computed by multiplying the attorneys' regular hourly rates by the number of hours of attorneys' time expended), plus any enhancement that may be legally justified under the circumstances of this

4

action.

16.  If attorneys' fees are awarded by the court or designated in a settlement agreement to be paid by the opposing party, the Clients and the attorneys of record agree that all such fees shall belong to the ACLU.





*CHAPTER 4.00 - CURRICULUM AND INSTRUCTION*

4.502

## MIDDLE SCHOOL STUDENT CLUBS AND ORGANIZATIONS

(1) This policy applies to all school clubs and organizations at all District Middle Schools.

(2) Middle School clubs and organizations are an extension of the school curriculum. Middle School clubs must be sponsored by the school and are limited to organizations that strengthen and promote critical thinking, business skills, athletic skills, and performing/visual arts. Schools may also establish organizations relating to academic honor societies and student government and clubs that are directly related to the curriculum.

(3) All student clubs and organizations must be approved by the Superintendent before they can operate at a school.

(4) All prospective clubs must submit a District approved application. The application shall include a club charter which shall set forth the purposes, qualifications for members, and the rules of conduct and shall be maintained on file for reference by all students and school employees.

(5) All student clubs and organizations shall obtain a Consent Form from the parents of each participating student, on a form provided by the District.

(6) A student club or organization shall not conduct any activity or act which violates Florida Statutes, School Board rules, or the regulations of the school.

(7) Any club or organization which engages in an initiation ceremony for its members shall prepare and submit the program of initiation exercises to the school principal for review and approval.

(8) There shall be no type of hazing in any club or organization within any school. Hazing is defined as any action or situation for the purpose of initiation or admission into or affiliation with any club or organization operating at a school pursuant to this policy, which recklessly or intentionally endangers a student's mental or physical health or safety.

(9) The decision of the members of an organization shall not be one of the factors in selecting additional members.

**Page 1 of 2**

**Lake 4.502**

Exhibit A

WNS H. Jaslonski

C. Woor RPR, CRR   9-9-14

**Exhibit 2**

(10) Secret societies, fraternities and sororities are prohibited per Section 1006.14, Florida Statutes.

(11) Clubs/ organizations will be assigned an employee/sponsor by the principal. The employee/ sponsor shall be present at all meetings.

(12) All social events shall be adequately chaperoned.

(13) At the discretion of the School Board and consistent with School Board policy, the employee/ sponsor may be compensated by the school.

(14) All monies accruing to a club or organization shall be accounted for through the school's internal accounting system.

(15) All meetings shall be held on School Board property. This may be waived for special meetings and events upon the faculty sponsor's request and principal's approval.

(16) Any dues charged shall be reasonable and not prohibitive. Admission fees will not be charged.

STATUTORY AUTHORITY:                              1001.41; 1001.42, F.S.

LAWS IMPLEMENTED:                                 1001.43; 1006.07;
                                                  1006.09; 1006.63, F.S.

HISTORY:                                          ADOPTED: 8/12/13
                                                  REVISION DATE(S):
                                                  BOARD REVIEW: 5/13/13

Lake 4.502

**Exhibit 2**

*[handwritten: CARVER]*

*[handwritten across top: Club is not an extension of the school curriculum, Not the school policy. Per policy. Not approved]*

## LAKE COUNTY SCHOOLS

**Leading our Students to Success**

Superintendent
Susan Moxley, Ed.D.

Lake County School Board
Bill Mathias, District 1
Rosanne Brandeburg, District 2
Tod Howard, District 3
Debbie Stivender, District 4
Kyleen Fischer, District 5

## Middle School
## CLUB/Organization Application

(ALL STUDENT CLUBS/ORGANIZATIONS MUST BE APPROVED
BY THE SUPERINTENDENT BEFORE THEY CAN OPERATE AT A SCHOOL.)

---

Middle School clubs and organizations are an extension of the school curriculum. Middle School clubs must be sponsored by the school and are limited to organizations that strengthen and promote critical thinking, business skills, athletic skills, and performing/visual arts. Schools may also establish organizations relating to academic honor societies and student government and clubs that are directly related to curriculum.

Applicant: Heather Jablonski

(Circle one)  **Teacher**  ·  Administrator

Official Club Name: Carver Middle School Gay-Straight Alliance

Club Purpose & Goals: Attach a Charter that sets forth the purposes, goals, qualifications for members and the rules of conduct.

Anticipated Activities for the Year:
Please see attached club charter.

Club Meeting Day, Time and Place: (Meetings must be held at the school unless otherwise approved.)
Tuesdays at 8:00 a.m.; Building 2, Room 120

Anticipated membership number: 25
(Parent consent forms for each member must be submitted to principal.)

Club By-Laws:

Each club/organization must establish written by-laws within the first 90 days after receiving approval, and provide a copy as a supplement to the application.

The Club/Organization agrees to comply with the Code of Student Conduct and Policy Guide and all School Board policies at all club meetings and events. (Policy 4.602 is attached)

| Heather Jablonski | *Heather Jablonski* (signature) | |
|---|---|---|
| Print Name | Teacher Signature | Date |

*Principal Approval: _____

Signature                                   Date

Superintendent/Designee Approval: _____

Signature                                   Date

*Principal will determine the staff member assigned to supervise and/or sponsor the club/organization.

Exhibit

WNS *[signature]*

C Waar RPR, CRR 9-10-14

**Exhibit 3**

<u>Club Charter</u>

Carver Middle School Gay-Straight Alliance

<u>Club Purposes and Goals</u>:

(1) to create a safe, supportive environment at school for students to discuss experiences, challenges, and successes of LGBT students and their allies

(2) to create and execute strategies to confront and work to end bullying, discrimination, and harassment against all students, including LGBT students

(3) to promote critical thinking by discussing how to address bullying and other issues confronting students at Carver Middle School

<u>Qualifications for Members</u>:

Membership is open to all students, so long as the individual shows respect for all other members and does not interfere with the club purposes described above. There are no dues.

<u>Rules of Conduct</u>:

The GSA shall operate consistent with and comply with all school policies, rules, regulations, and state law, which include the requirements that members must comply with school policy, rules, regulation, and state law during meetings.

<u>Anticipated Activities for the Year</u>:

- hold regular meetings
- design and market student-awareness campaigns
  - create educational pamphlets, fliers, posters, and/or artistic displays related to bullying and other issues facing students—including LGBT students—at Carver Middle School
  - educate students about civil rights
- engage in after-school or weekend volunteer work in the local community

**Exhibit 3**

Dear Principal Cunningham and Superintendent Moxley,

My name is [REDACTED] and I am in seventh grade at Carver Middle School. I really want to make sure that the Gay-Straight Alliance started last school year keeps going this year. Bullying can make school tough for some kids, and I think helping people understand more about bullying and how to stop it will help make a lot of people more comfortable in school. Plus, we think it would be good for us to get more involved in the community by doing volunteer work. Please let us continue the GSA this year – I think it will make Carver an even better school.

Sincerely,



**Exhibit 3**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARVER MIDDLE SCHOOL GAY-
STRAIGHT ALLIANCE et al.,

                                     No. 5:13-cv-00623-WTH-PRL

     Plaintiffs,

v.

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

     Defendant.

_____/

## REQUESTS FOR ADMISSIONS

       Pursuant to Rules 36 of the Federal Rules of Civil Procedure, Defendant School Board of

Lake County, Florida ("School Board") hereby requests that Plaintiffs Carver Middle School

Gay-Straight Alliance, and H.F., a minor by and through parent Janine Faughnan, respond in

writing to the following requests for admission:

     1.     Admit that the Carver MS GSA club was requested to submit a revised

application for the 2013-14 school year after the initial application was rejected.

     2.     Admit that after learning that the application to form the Carver MS GSA club

was rejected for the 2013-14 school year another application was not submitted.

     3.     Admit that the club did not submit a revised application.

       I hereby certify that on the **8th day of August, 2014**, I e-mailed the foregoing to the

following: Daniel B. Tilley at dtilley@aclufl.org, ACLU Foundation of Florida, Inc., Suite 340,

Exhibit C
DX
WNS H. Jablonski
C. Weber, RPR, CRR 9-30-14

4500 Biscayne Blvd, Miami, FL 33137; Benjamin Stevenson, at bstevenson@aclufl.org, ACLU

Foundation of Florida, Inc., P.O. Box 12723, Pensacola, FL 32591-2723; and Leslie Cooper at

lcooper@aclu.org; American Civil Liberties Union Foundation, Inc., 18th Floor, 125 Broad

Street, New York, NY 10004-2400.

BY: /s/ Stephen W. Johnson
STEPHEN W. JOHNSON, ESQ.
Florida Bar No. 269867
STEPHANIE J. MCCULLOCH, ESQ.
Florida Bar No. 0638161
McLinBurnsed
Post Office Box 491357
Leesburg, Florida 34749-1357
(352) 787-1241 Telephone
(352) 326-2608 Facsimile
Email: SteveJ@mclinburnsed.com
StephM@mclinburnsed.com
Trial Counsel for Defendant, The School
Board of Lake County, Florida

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARVER MIDDLE SCHOOL GAY-
STRAIGHT ALLIANCE et al.,

    Plaintiffs,

                              No. 5:13-cv-00623-WTH-PRL

v.

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

    Defendant.

---

## PLAINTIFFS' RESPONSE TO DEFENDANT'S
## REQUESTS FOR ADMISSION AND PRODUCTION

Plaintiffs respond as follows to Defendant's 8/8/14 requests for admission.

1.    Admit that the Carver MS GSA club was requested to submit a revised application for the 2013-14 school year after the initial application was rejected.

    **Response**:    Denied. Plaintiffs' attorneys were told that the Carver GSA could reapply, but it was not requested that the group do so. Moreover, when Plaintiffs' counsel inquired of Defendant's counsel what changes would be necessary for approval of the application, the School Board did not respond.

2.    Admit that after learning that the application to form the Carver MS GSA club was rejected for the 2013-14 school year another application was not submitted.

    **Response**:    Admitted.

3.    Admit that the club did not submit a revised application.

    **Response**:    Admitted.

Plaintiffs respond as follows to Defendant's 8/8/14 requests for production.

1. A copy of any and all filings (including newspaper articles identified in those filings) as described in Plaintiffs' First Amended Initial Disclosures #4.

   **Response**: Plaintiffs object to producing these documents on the basis that the documents can be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(i). Defendant is already in possession of all filings in this lawsuit by virtue of it being a party.

2. Any and all attorneys fee contracts with any of the Plaintiffs related to this lawsuit.

   **Response**: Plaintiffs object to this request to the extent that it seeks documents protected by the attorney-client privilege, attorney work product, or both. Subject to the objection(s), Plaintiffs produce the retainer agreement redacted to show only portions pertaining to attorneys' fees.

3. Any and all documents concerning the formation of the Carver MS GSA club.

   **Response**: Plaintiffs object to this request to the extent that it seeks documents protected by the attorney-client privilege, attorney work product, or both. Defendant is already in possession of school board minutes and recordings and all correspondence to and from district employees, and therefore Plaintiffs object to producing these documents on the basis that the documents can be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(i). Subject to these objection(s), Plaintiffs note that the application packet to form a GSA for the 2012-13 school year can be found in Defendant's Supplemental Response to Plaintiff Carver GSA's Request for Production #4 at PDF pages 5-13. The application packet to form a GSA for the 2013-14 school year is at Docket Entry 4-11.

4. All applications with the School District for the Carver MS GSA club.

   **Response**: Plaintiffs object to producing these documents on the basis that the documents can be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(i). Subject to these objection(s), Plaintiffs note that the application packet to form a GSA for the 2012-13 school year can be found in Defendant's Supplemental Response to Plaintiff Carver GSA's Request for Production #4 at PDF pages 5-13. The

application packet to form a GSA for the 2013-14 school year is at Docket Entry 4-11.

5.    All correspondence between any representative of the Carver MS GSA and the School Board, the Lake County School District, or any employee or agent of either.

        **Response**:    Plaintiffs object to this request to the extent that it seeks correspondence between the Carver GSA's attorney and the School Board's attorney, which the School Board's attorney should already have, on the basis that the documents can be "obtained from some other source that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(i). Subject to these objection(s), Plaintiffs note that a letter concerning bullying from H.F. (daughter of Janine Faughnan) can be found at Docket Entry 4-11 at 3.

<u>Date</u>: September 9, 2014

<u>Certificate of Service</u>: I certify that a true and correct copy of the foregoing was served via e-mail on opposing counsel on September 9.

**Respectfully Submitted,**

<u>/s/ Daniel B. Tilley</u>
**Daniel B. Tilley**
Trial Counsel
Florida Bar No. 102882
ACLU Foundation of Florida
4500 Biscayne Blvd., Suite 340
Miami, FL 33137
(786) 363-2700
dtilley@aclufl.org

**Leslie Cooper**
ACLU Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2627
LCooper@aclu.org

**Benjamin James Stevenson**
Fla. Bar. No. 598909
ACLU Foundation of Florida
P.O. Box 12723
Pensacola, FL 32591-2723
T. (786) 363-2738
F. (786) 363-1985
bstevenson@aclufl.org

*Counsel for Plaintiff*

# AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA, INC.

## <u>RETAINER AGREEMENT</u>







3



## ATTORNEYS' FEES

13.    The Clients will not be charged attorneys' fees for any work done in this action by the attorneys of record other than as set forth in this Agreement.

14.    The Clients understand that the primary purpose of this litigation is to have the GSA recognized and that monetary damages, other than nominal damages of $1, will not be sought.

15.    This is a civil case in which attorneys' fees may be statutorily available to the prevailing party. The Clients and the attorneys of record agree to seek attorneys' fees as part of any judgment, settlement, or other resolution of this action. In seeking attorneys' fees, the Clients and attorneys of record specifically agree to seek attorneys' hourly fees (computed by multiplying the attorneys' regular hourly rates by the number of hours of attorneys' time expended), plus any enhancement that may be legally justified under the circumstances of this

4

action.

16. If attorneys' fees are awarded by the court or designated in a settlement agreement to be paid by the opposing party, the Clients and the attorneys of record agree that all such fees shall belong to the ACLU.





6