IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

Case No. 5:13-cv-623-Oc-10PRL

March 2, 2015
Ocala, Florida

CARVER MIDDLE SCHOOL GAY-
STRAIGHT ALLIANCE, et al.,

      Plaintiffs,

vs.

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

      Defendant.

_____/


TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE WM. TERRELL HODGES,
SENIOR UNITED STATES DISTRICT JUDGE




Appearances of Counsel:

| | |
|---|---|
| For the Plaintiffs: | Mr. Benjamin James Stevenson<br>Mr. Daniel B. Tilley |
| For the Defendant: | Mr. Stephen Warfield Johnson<br>Ms. Stephanie Jo McCulloch |
| Reported by: | Dennis Miracle, Court Reporter |

P R O C E E D I N G S

THE COURT:  Thank you.  Be seated, everyone, please, and good morning to you.

We have scheduled for a bench trial this morning the case of Carver Middle School Gay-Straight Alliance, plaintiff, against the School Board of Lake County, which is Case Number 13-civil-623-Ocala.

I see that Mr. Tilley is here as trial counsel for the plaintiff.

Mr. Johnson --

MR. JOHNSON:  And Ms. McCulloch, Your Honor.

THE COURT:  -- and Ms. McCulloch are here for the defense.

You might introduce those seated with you at counsel table.

MR. STEVENSON:  Good morning, Your Honor.  I'm Benjamin Stevenson, counsel for the plaintiff.  And this is...

THE COURT:  A senior moment, Mr. Stevenson.

MR. STEVENSON:  Yeah.  Right.  Thank you.  Hannah Faughnan, our plaintiff.

THE COURT:  All right.  Thank you.

First of all, let me say I regret that the press of business has prevented me from making a ruling up to this point on the pending motions for summary judgment,

both the motion made by the plaintiff with respect to the
Equal Access Act claim and the defendant with respect to
both claims, but I will simply carry those with the case at
the moment and take the evidence.

I think there are issues of fact as identified in
the pretrial statement that need to be resolved, and it's
best to go forward with the trial as a means of disposition
reducing the likelihood to some extent that the case may
have to be retried in the event the Court of Appeals takes
a different view from whatever I come to at the conclusion
of the trial.

I do have one question, however -- and I think
it's addressed to plaintiffs' counsel -- I had overlooked,
I think, before when we conducted the pretrial conference.

Looking at the pretrial statement, page 25, which
is a part of paragraph nine, subparagraph J -- excuse me --
subparagraph R, it is listed as one of the facts that is
not in dispute that following the December 5, 2013, denial
the Carver GSA did not submit a second application for the
2013-14 school year. The Carver GSA did not submit an
application for the 2014-15 school year.

The fact that a second application was not
submitted with respect to the last school year I think is
inconsequential in view of the application that had been
made and denied in December, and this suit was filed

1  shortly thereafter, almost immediately thereafter.  But the

2  failure to submit an application for the 2014-15 school

3  year, or the school year in which is presently in progress,

4  causes me to wonder whether this case is moot.

5       I may have caught you by surprise, Mr. Stevenson,

6  but have you thought of that?

7       MR. STEVENSON:  Yes.  Can I address the Court on

8  that issue?

9       THE COURT:  Come to the lectern, please.

10      MR. STEVENSON:  Thank you.

11      I think the issue that the Court has identified

12  comes directly within the purview of the exception to the

13  standing requirement.  I believe what you're pointing

14  towards is the question of standing, how our plaintiff has

15  standing to assert this claim when she hasn't reapplied

16  this school year.

17      And I think our answer is that it's directly

18  applicable -- or the ruling in Rowe about the exception to

19  standing is capable of repetition yet evading review.

20      If we had to apply every year without ever getting

21  a judicial decree or a judgment with respect to the

22  plaintiffs' rights, I think we would be prejudiced and not

23  be able to go forward.

24      THE COURT:  Well, if you win the case, what would

25  the injunctive relief that I would award say?

             MR. STEVENSON:  Ideally it would say that the
plaintiff can form a Carver GSA at the school and meet on
equal terms as the other school groups.
             THE COURT:  Well, it would have to -- it would
have to address itself to the School Board and order the
School Board either to do something or refrain from doing
something.
             MR. STEVENSON:  Refrain from prohibiting and --
and do something would be the -- approve the school
application --
             THE COURT:  Well, exactly --
             MR. STEVENSON:  -- approve the --
             THE COURT:  And that's -- in simple terms that's
where the problem lies, I think.  Injunctive relief would
be to order the School Board to accept the application or
to recognize the plaintiff on the making of an appropriate
application, but there is no application.
             MR. STEVENSON:  Well, if I could entertain a
hypothetical?  I mean, had we submitted the exact same
application, I don't think there's any question that it
would have -- I estimate we would get the exact same
result.
             Said another way, at any time the School Board
wanted to approve the student group, the student club, the
Carver GSA, it could, but it hasn't.

1        THE COURT:  Well, it doesn't have an application

2 before it at the moment.

3        I think the only answer that you can give is the

4 one you've stated, and that is whether or not it's

5 recurring and --

6        MR. STEVENSON:  If I could speak further?

7        THE COURT:  -- not capable of review, but I'm not

8 sure that would apply.

9        MR. STEVENSON:  I would imagine in a scenario

10 where -- of a licensing challenge, a person was denied a

11 license, and pursuant to state law you have to require --

12 request that license every year, I'm not sure it's

13 incumbent upon the plaintiff in that case to continually

14 request licenses that they know they're going -- that are

15 the subject matter and are currently part of the litigation

16 every year to sustain their ability to get relief from the

17 Court.

18        THE COURT:  Well, I think it's questionable, and

19 the law of the circuit is very acute, for lack of a better

20 word, with respect to the subject, and it's jurisdictional.

21 I don't think it can be waived.  If at any time it appears

22 that there's no longer a live case or controversy, then the

23 matter is moot, and the Court is not authorized to issue

24 advisory opinions.

25        MR. STEVENSON:  If I --

THE COURT:  That said, here we are at trial, and what I said a few moments ago I think applies.  I don't understand this is going to be a long or protracted proceeding.  We might as well get the evidence in, and then we can take up, perhaps, the question of mootness when the counsel have had a better opportunity to address it.  I know it hasn't been raised up to this point, and it may need some briefing.

MR. STEVENSON:  If I could entertain one further argument, Your Honor?

THE COURT:  Go ahead.

MR. STEVENSON:  Yes.  I think another thing to consider would be the question of what -- at what point in time -- if a second application is required, at what point in time must that be made?

If it's not made on the first day of school, does that mean the case is moot on the first day of school?  Probably not.

If it's not made within the first week, I don't know.

But at some point, you know, it -- the question of if the -- trying to identify that point in time undercuts the idea that there actually is a point in time that we have to submit a -- a new application to keep --

THE COURT:  Well --

1  MR. STEVENSON:  -- a case in controversy.

2  THE COURT:  -- what does the policy of the School

3  Board say about the timing of applications?  Does it set a

4  window in time in which applications must be made annually,

5  or is -- is it a circumstance in which, once an application

6  is granted, it continues in force without necessity of

7  annual repetition?

8  MR. STEVENSON:  My understanding is it does

9  require an annual submission.  On the flip side it doesn't

10  specify the time of the annual submission, so that the

11  annual submission could occur, for example, on March 2.

12  THE COURT:  Okay.  Well, I will carry that issue

13  with the case as well, as I just stated.

14  Are you ready to proceed with your case?

15  MR. STEVENSON:  We are, Your Honor.

16  THE COURT:  Would you care to make an opening

17  statement?

18  MR. TILLEY:  Yes, Your Honor, although --

19  THE COURT:  Mr. Tilley?

20  MR. TILLEY:  Yes, sir.

21  First, I would like to invoke the rule and ask

22  that the witnesses be sequestered and be instructed to

23  refrain from speaking with one another.

24  THE COURT:  All right.  The rule of sequestration

25  has been invoked.  Any persons present in the courtroom not

1  presently seated at counsel table who do expect that they

2  may be called as a witness during this proceeding by either

3  side, it will be necessary that you withdraw from the

4  courtroom and wait outside until you are called to testify.

5      And witnesses while waiting to testify should have

6  no discussion among or between themselves concerning

7  anything having to do with the subject matter of the case.

8      And I'll rely on counsel from this point on to see

9  that the rule is observed.

10     MR. TILLEY:  Your Honor, the mother of the

11  individual plaintiff who -- the mother of the individual

12  plaintiff who is seated at counsel table is also present

13  and also has been named as a potential witness on the

14  defendant's side.  Would you expect that she would be

15  sequestered as well or --

16     THE COURT:  Well, she's a representative of the

17  minor plaintiff.  It would seem that would make her a party

18  for purposes of the rule of sequestration.

19     Is there any dispute about that?

20     MR. JOHNSON:  No objection, Your Honor.

21     THE COURT:  All right.  She may remain.

22     Mr. Tilley?

23     MR. TILLEY:  Yes, sir.

24     Your Honor, this is a case about a group of

25  students getting together to talk about bullying and

1    getting together on equal terms with all other student

2    groups.

3            There are a couple of acronyms that are going to

4    come up over the next couple of days that are quite

5    relevant to this case.  Those acronyms are GSA and LGBT.

6            "LGBT" simply means lesbian, gay, bisexual or

7    transgender.

8            "GSA" simply means gay-straight alliance.  That's

9    a student club.

10           And the evidence that you'll see and hear over the

11   next couple of days will show that the purpose of a GSA is

12   to provide a safe, supportive environment for students to

13   talk about bullying, both the challenges of being bullied

14   and ways to confront and end bullying, and this is bullying

15   against all students, including LGBT students, but not just

16   LGBT students.

17           The evidence will show that the Carver Middle

18   School GSA is a club like any other made up of some

19   students who are gay, some students who are not.  And those

20   students aren't there at that club to talk about sexual

21   activity or dating; they are there to talk about bullying.

22           Nothing inappropriate was discussed at the

23   meetings that did take place, and no administrators there

24   felt that there was any reason to believe that anything

25   inappropriate would be discussed at future meetings.

1        And that's because, again, the purpose of a GSA is

2   not to talk about sexual activity but to talk about

3   bullying.  Students want a supportive environment to figure

4   out how they can make their school a safer place.

5        And so our request is that, in considering that

6   evidence and acknowledging that context, that the Court

7   return a verdict that the School Board's actions violated

8   the Equal Access Act and the First Amendment.

9        Thank you.

10       THE COURT:  All right.  Do you wish to make an

11  opening, Mr. Johnson?

12       MR. JOHNSON:  Ms. McCulloch will make a brief

13  opening, Your Honor.

14       THE COURT:  All right.

15       MR. JOHNSON:  And, Your Honor, if I may introduce

16  Dr. Susan Moxley who is the superintendent of the Lake

17  County School District and the corporate representative.

18       THE COURT:  All right.  Thank you.

19       Ms. McCulloch?

20       MS. McCULLOCH:  Yes, sir.  Good morning,

21  Your Honor.

22       The School Board will present evidence and

23  testimony today about a couple of different things.  The

24  first aspect is that Carver Middle School, the school that

25  we're addressing here today, is not a secondary school for

1    purposes of the Equal Access Act.

2           With that in mind, the School Board was not

3    limited by the Equal Access Act when it decided to change

4    its student club policies for elementary, middle school and

5    high school students.

6           As that Act did not apply to middle schools, the

7    School Board decided to change its school policies for

8    elementary, middle school and high school students as

9    follows.

10          High school was a limited open forum similar to

11   the way it's defined in the Equal Access Act.

12          For elementary schools the Board determined that

13   there would be no student clubs and that most activities

14   would require parental permission.

15          And for middle schools the Board determined that

16   parental permission would again be required for any student

17   clubs but that all student clubs in the middle schools

18   would be school sponsored only.

19          The Board also determined and voted based on the

20   fact that prior to enacting these three policies there had

21   seemed to be some inconsistency amongst all the middle

22   schools and high schools with respect to student clubs, and

23   the reason for that was principals were making the decision

24   at their own schools as to which clubs would be permitted

25   and which clubs wouldn't be permitted.

1          So the School Board members, in addressing that

2   inconsistency, determined that they wanted a couple of

3   things for middle school policies.  They wanted, one,

4   uniformity.  They wanted there to be specific criteria that

5   was implemented through Board policy and through the

6   superintendent and her staff to determine what clubs would

7   meet what the School Board defined as an extension of the

8   school curriculum for middle schoolers.

9          The School Board also determined that it wanted

10  its middle school clubs to be related to the curriculum and

11  focus more on the curriculum than high school clubs, which

12  were allowed pretty much almost any club you could think

13  of.

14         So the School Board enacted some criteria that

15  they determined was related to the curriculum.  The biggest

16  criteria that you'll hear talked about throughout this case

17  is a club -- a student club or organization that promotes

18  or strengthens critical thinking.  That was the prong that

19  the GSA attempted to form their club under.

20         The School Board members also wanted parental

21  permission for middle school students to participate in a

22  club.  This was also important because they wanted the

23  parents and the superintendent and the School Board to have

24  some level of control over what kinds of activities and

25  student clubs these middle school students were

1    participating in.  This is because middle school students
2    range in age from 11 to 14.  The students had to have --
3         THE COURT:  That's grades six, seven and eight?
4         MS. McCULLOCH:  Yes, sir, sixth, seventh and
5    eighth grade at Carver Middle School.
6         THE COURT:  Is that uniform throughout the State?
7         MS. McCULLOCH:  I don't believe it's uniform
8    throughout the State.  There may be some differences.  I
9    think there's a K through eight school that I'm aware of
10   that encompasses middle school.  But for our district it's
11   primarily sixth, seventh and eight graders in middle
12   school.
13        The students also were required to have a faculty
14   sponsor in order to be an approved student club, and all
15   the meetings would be held at the school.
16        The School Board essentially delegated the
17   authority to the superintendent, or her designee, to
18   determine which club applications met the criteria in the
19   policy.
20        They did that for a couple of reasons:  one, to
21   address the uniformity concerns that they were having the
22   year before and take the decision away from the principals
23   at each school site and make it more centralized, and the
24   other reason was because the superintendent is an educator
25   and has experience in education, and they wanted her to

1  make the decision as to what was related to the school

2  curriculum or an extension of the school curriculum as

3  defined in the policy.

4  There will be evidence presented that when the GSA

5  was allowed to meet during the 2012-13 school year before

6  the new policies were in effect, that there were several

7  adult members -- faculty members that were present at those

8  meetings.  In fact, there were almost as many adults

9  present as there were students.

10  These adult faculty members were not attending as

11  part of their duties.  They were attending for personal

12  reasons and were not required to attend by any school

13  administrator.

14  There were also parents who did not want the

15  students to be attending, and there were parent complaints

16  received with respect to their student attending the club

17  and the club meetings, as well as some literature that was

18  distributed at the club meetings.

19  This is particularly important because

20  Your Honor -- as Your Honor pointed out at the pretrial,

21  there is a great amount of control over the sexual

22  education -- it's commonly referred to as "sexual education

23  curriculum" -- at the School Board.  But for our purposes

24  it's called "human growth and development."  And that has a

25  very separate curriculum for sixth graders, seventh graders

and eighth graders.

The information presented as part of the curriculum is very controlled.  It's very brief.  It's covered within two weeks or less as part of another class. It's not its own class, per se.

It's very scientific in its presentation, and it's focused primarily on anatomy, particularly for sixth and seventh graders.

There is no reference to sexual orientation or sexual preference to sixth or seventh graders, and for eighth graders you'll find, Your Honor, that the evidence will show that there is a very brief, limited definition of "sexual orientation," which is very benign, and essentially just describes these are the sexual orientations: heterosexual, homosexual, bisexual.  There was no further discussion or information presented on sexual orientation or sexual preference.

And also important to note:  The parents are made aware of what's going to be taught, and they are allowed to opt their child out of participating.

During the 2013-14 school year, the GSA applied to form a club, and their application wasn't approved.

Now, initially you'll hear some testimony that there was some confusion in implementing the new policy as to what the criteria specifically meant.

1    Originally there was some confusion that perhaps

2  it had to be related to a specific class.  However,

3  those -- that confusion was remedied fairly quickly.  And

4  within a couple of months the administrators applying the

5  policy were given clarification, and the GSA was given

6  another opportunity to demonstrate that its proposed club

7  met the criteria in the policy.

8    And I think that's what makes that fact important

9  that we were just discussing about the pretrial is that

10  there will be evidence presented that the administrators

11  gave the GSA an opportunity to resubmit their application,

12  not simply turn in the same application, but provide more

13  information to demonstrate that the club met the criteria.

14    In fact, the teacher sponsor, Ms. Jablonski, who

15  you will hear from, testified that she understood all along

16  that the GSA could get approved potentially under the

17  critical thinking component of the policy.

18    She also testified that she agreed that there

19  could have been more specific information to tie the club

20  to that component of the policy.

21    She indicated that herself and another teacher,

22  Ms. Smith, discussed ways to tie it into the critical

23  thinking component of the policy, but they didn't include

24  that -- any of that information in the charter.  They

25  simply allowed the student to submit the charter that she

1  had already prepared with her counsel and passed it along

2  to the powers that be.

3          Nonetheless, after they were given the opportunity

4  to resubmit the application, plaintiff had testified that

5  she and her lawyers decided they would rather pursue

6  litigation than revise and resubmit the application.

7          The evidence will show finally, Your Honor, that

8  the middle school policy that was enacted in 2013 complied

9  with the First Amendment.

10          The evidence will conclusively demonstrate, as

11  this Court has already alluded to in your prior rulings,

12  that the standard announced in the Hazelwood case and its

13  progeny is what applies to this case.

14          The speech at issue was clearly school sponsored;

15  and, nonetheless, no standard of First Amendment protection

16  would actually require the School Board to waive the

17  neutral requirements of its policy.

18          After hearing and reviewing the evidence, it will

19  become clear to the Court that the School Board's intent to

20  limit middle school school-sponsored clubs to only those

21  clubs that they deemed to be an extension of the school

22  curriculum was reasonable, and it was based on a number of

23  legitimate educational purposes.

24          This was well within the School Board's authority

25  to control and operate the schools in the Lake County

1    School District.

2              Therefore, we believe the evidence will show that

3    entry of judgment in favor of the School Board on all

4    counts of the complaint is appropriate.

5              Thank you.

6              THE COURT:  All right.  Is the plaintiff ready to

7    proceed with the calling of witnesses?

8              Mr. Tilley?

9              MR. TILLEY:  Yes, Your Honor, although first I

10   would ask to move certain exhibits into evidence that were

11   not objected to in the pretrial statement, if I may.

12             THE COURT:  I notice that you have caused to be

13   placed on the bench some binders --

14             MR. TILLEY:  Yes, sir.

15             THE COURT:  -- of plaintiffs' exhibits.

16             Have you supplied copies to the clerk?

17             MR. TILLEY:  We have those copies right here and

18   can do that right now, Your Honor.

19             THE COURT:  Those that you intend to offer in

20   evidence?

21             MR. TILLEY:  Yes, Your Honor.

22             THE COURT:  Well, all right.  I suggest you do

23   that, although actually the clerk can use this binder as

24   far as that's concerned.

25             MR. TILLEY:  The exhibits are 1 through 5 --

1  Plaintiffs' Exhibits 1 through 5, 7 through 14, 24 to 25,
2  and 30.
3          THE COURT:  I take it there's no objection to any
4  of those, Mr. Johnson or Ms. McCulloch?
5          MR. JOHNSON:  1 through 5, 7 through 14, and what?
6          MR. TILLEY:  24 to 25 and 30.
7          THE COURT:  Well, let's do it this way.  I take
8  it, Mr. Tilley, you have a good-faith belief that no
9  objection was raised to those exhibits in the pretrial
10  statement?
11          MR. TILLEY:  Yes, sir.  That's correct.
12          THE COURT:  Well, I'll receive them in evidence.
13  And if there's any question about that, you can always move
14  to strike it later on, Mr. Johnson.
15          MR. JOHNSON:  Yes, sir.  Thank you, Your Honor.
16          THE COURT:  Those exhibits, then, are received in
17  evidence.
18          MR. TILLEY:  Thank you, Your Honor.
19          Your Honor, there are also four additional
20  exhibits that -- or three, I should say, that received
21  objections that I would also move in -- that they be moved
22  into evidence now, if we could.
23          THE COURT:  What are those?
24          MR. TILLEY:  The first is Exhibit 28.  The
25  objection from defendant was exhibit not specifically

1   identified.

2          This is available minutes from all School Board

3   meetings from August 2009 through January 2013 arranged

4   chronologically by category of meeting type.

5          THE COURT:  And they were listed in the pretrial

6   statement, I take it?

7          MR. TILLEY:  Yes, sir, at Document 55, page 11.

8          MR. JOHNSON:  Your Honor, we had an opportunity to

9   review them after we got the pretrial statement.  We don't

10  have any objection.

11         THE COURT:  All right.  Plaintiffs' Exhibit 28 is

12  received.

13         MR. TILLEY:  Thank you, Your Honor.

14         There are also -- I would also move that Exhibits

15  31, 32 and 41 be admitted into evidence.

16         31 and 32 received relevancy objections from the

17  defendant.

18         41 was part of the supplemental exhibits, and so

19  no objection was made but I -- I -- I assume the same

20  objection would apply, although I can't speak for the

21  defendant.

22         THE COURT:  Well, let's find out.  What do you say

23  to 31, 32 and 41, Mr. Johnson?

24         MR. JOHNSON:  Your Honor, our objection to

25  those -- those were the complaint and orders related to the

1 prior lawsuit. Our objection is to relevance for this
2 particular lawsuit. The fact that they filed a lawsuit
3 before, which was resolved by consent decree, we would say
4 that that's really not relevant to the current claim of the
5 current club.

6 THE COURT: What is the relevance of that,
7 Mr. Tilley?

8 MR. TILLEY: Your Honor, it goes to our viewpoint
9 discrimination claim under the First Amendment because
10 it -- it shows the motivations for the School Board's
11 actions.

12 The club at some point, the evidence will show,
13 was allowed to meet for a time where it had not been
14 allowed to meet at any time before and then was after --
15 subsequently to that not allowed to meet, and it shows the
16 motivations for the School Board's action in allowing the
17 club for that specific time.

18 THE COURT: Well, I'll carry that with the case
19 for a moment until I've heard your testimony.

20 MR. TILLEY: Thank you.

21 THE COURT: 31, 32 and 41 are not presently
22 received, but they have been offered and the objection --
23 the only objection is relevance.

24 MR. TILLEY: Your Honor, I would call B.N.S. as
25 the first witness.

1    Your Honor, I'd ask a question about
2    confidentiality and decorum.  The witness is a minor.  She
3    was a plaintiff in prior litigation against the School
4    Board, and in that litigation she waived the
5    confidentiality protections of 5.2.
6    And my understanding is that today she is
7    comfortable with -- and her mother who is sitting here is
8    comfortable with -- her full name being used in the
9    courtroom today, and I would ask if that -- for the Court's
10   permission for that and to use her first name when
11   addressing her.
12   THE COURT:  All right.  That's permissible, and
13   you may ask the witness as usual.
14   THE CLERK:  Raise your right hand.
15   Do you solemnly swear that the testimony you're
16   about to give will be the truth, the whole truth, and
17   nothing but the truth?
18   THE WITNESS:  Yes, ma'am.
19   THE CLERK:  Please state your full name, and spell
20   your last name for the record.  And make sure you speak
21   into the microphone.
22   THE WITNESS:  Bayli Silberstein,
23   S-I-L-B-E-R-S-T-E-I-N.
24   THE COURT REPORTER:  Bailey, B-A-I-L-E-Y?
25   THE WITNESS:  B-A-Y-L-I.

<pre>
                        BAYLI SILBERSTEIN,
</pre>

being duly sworn, testified as follows:

<pre>
                        DIRECT EXAMINATION
</pre>

BY MR. TILLEY:

Q.    Good morning, Bayli.

A.    Hi, Daniel.

Q.    My name is Daniel Tilley, and I represent the plaintiffs in this lawsuit.

Are you feeling a little nervous today?

A.    Yeah, a little bit.

Q.    Okay.  No need to worry.  We're just going to have a short conversation.

How old are you, Bayli?

A.    Sixteen.

Q.    Do you understand the difference between the truth and a lie?

A.    Yes, sir.

Q.    And can you just make sure to speak up a little bit so that the court reporter can hear you?

A.    Okay.

Q.    Do you understand that you're required to tell the truth here in court today?

A.    Yes, sir.

Q.    What city do you live in, Bayli?

A.    Leesburg.

1   Q.    And where do you attend school?

2   A.    Leesburg High School.

3   Q.    What grade are you in?

4   A.    I'm a sophomore.

5   Q.    So you're in tenth grade?

6   A.    Yes, sir.

7   Q.    Where did you attend middle school?

8   A.    Carver Middle.

9   Q.    Do you know that when I say "GSA," I mean

10  gay-straight alliance?

11  A.    Yes, sir.

12  Q.    And when I say "Carver GSA," I mean the Carver Middle

13  School Gay-Straight Alliance.

14  A.    Yes, sir.

15  Q.    Do you know what the Carver GSA is?

16  A.    Yes, sir.

17  Q.    Was the Carver GSA ever recognized as an official

18  student club at Carver Middle School?

19  A.    Yes, sir.

20  Q.    Were you involved in efforts to form the Carver GSA?

21  A.    Yes, I was.

22  Q.    When did you get involved in those efforts?

23  A.    My seventh grade year.

24       MS. McCULLOCH:  I object, Your Honor, to the

25  relevance of this line of questioning.  This deals with the

1    year prior under the old policy and the lawsuit prior.

2            THE COURT:  Well, I'm inclined to overrule that

3    objection.  Some historical background, I think, might be

4    relevant in the case.

5            Overruled.  You may proceed, Mr. Tilley.

6            MR. TILLEY:  Thank you, Your Honor.

7    BY MR. TILLEY:

8    Q.    When did you get involved in those efforts, Bayli?

9    A.    My seventh grade year.

10   Q.    And was that in the 2011-2012 school year?

11   A.    Yes, sir.

12   Q.    How did you go about trying to form the GSA that year

13   in your seventh grade year?

14   A.    We sent an application in to the principal to start

15   the club, but he said no.

16   Q.    And why did he say no?

17   A.    He said that it was against people's religions, that

18   we couldn't have it in our school.

19   Q.    And who was the principal at that time?

20   A.    David Bordenkircher.

21   Q.    Did you take any steps in your eighth grade year to

22   try to form the GSA?

23   A.    Yes, sir.

24   Q.    What steps did you take in your eighth grade year?

25   A.    We sent an application in to the new principal, and

1  she said that she had to have it approved by the School

2  Board before she could do anything.

3  Q.     And when you say you sent an application, what did --

4  what do you mean?

5  A.     A friend of mine and I sent in an application to have

6  the club at our school, and she said that she had to have

7  it approved by the School Board.  And then we didn't hear

8  anything back.

9  Q.     What was the application made of?

10  A.     There was the sheet that we had to get from the

11  office to fill out, and then we sent in letters from

12  students who wanted the club and why we thought that it

13  would be helpful in our school.

14  Q.     Did you give those letters directly to

15  Ms. Cunningham, or did you give them to someone else?

16  A.     I personally did not give them to Ms. Cunningham, but

17  another student did.

18  Q.     About how many letters were in that packet?

19  A.     About twenty.

20  Q.     And what did the letters address?

21  A.     Our experiences with bullying in Carver and why we

22  think that the GSA would have helped out our school.

23  Q.     Was Mr. Bordenkircher still the principal at that

24  time during your eighth grade year?

25  A.     No, sir.

Q.    Who was the principal at that time?

A.    Mollie Cunningham.

Q.    And when were those materials given to
Ms. Cunningham?

A.    The fall of my eighth grade year.

Q.    So that's the fall of 2012?

A.    I believe so.

Q.    Did you ever speak with Ms. Cunningham about the GSA?

A.    I did.

Q.    And what did she tell you?

A.    She told me that she would allow it, but the School
Board hadn't gotten back to her yet so she couldn't.

Q.    Was the Carver GSA recognized as an official student
club at any time in the fall of your eighth grade year?
That's fall of 2012.

A.    No, sir.

Q.    Did Ms. Cunningham ever update you on further steps
that had been taken to find out whether the club was
permitted?

A.    No, sir.

Q.    Did you take any steps in 2013 -- any further steps
to get recognition of the GSA?

A.    Yes, sir.

Q.    Did you seek legal counsel?

A.    My mother did.

Q.    And your attorneys assisted you in establishing the
GSA?

A.    Yes, sir.

Q.    Did your attorneys send a letter to the School Board?

A.    Yes.

Q.    Bayli, if you will take out Plaintiffs' Exhibit 17.
It's tab 17 of the binder that's marked "plaintiffs'
exhibits" next to you.

A.    All right.

Q.    Have you seen this letter before, Bayli?

A.    Yes, sir.

Q.    When did you first see this letter?

A.    A couple of days after it was sent to the School
Board.

Q.    And what is the letter?

A.    The letter was a -- it was basically asking
permission to have the GSA at Carver.

Q.    Do you see that there are redaction blocks in this
letter?

A.    Yes, sir.

Q.    Do you know the name, or names, that are redacted
from this letter?

A.    Mine and my mother's.

        MR. TILLEY:  Your Honor, I would ask that this
exhibit be moved into evidence.

1  THE COURT: Plaintiffs' Exhibit 17 is offered. Is

2  there any objection?

3  MR. JOHNSON: No, Your Honor.

4  THE COURT: It's received.

5  BY MR. TILLEY:

6  Q. In the days following the sending of this letter,

7  Bayli, was the Carver GSA recognized as an official student

8  club?

9  A. No, sir.

10  Q. Did the School Board meet after the sending of this

11  letter to discuss school club policy?

12  A. Yes, sir.

13  Q. Was there a lawsuit filed on your behalf in May 2013

14  seeking recognition of the Carver GSA?

15  A. Yes, sir.

16  Q. In the months between the sending of the January 2013

17  letter and the May 2013 lawsuit, were there School Board

18  meetings to discuss amending -- potentially amending school

19  club policy?

20  A. Yes, sir.

21  Q. Did you attend any of those meetings?

22  A. All but one, I believe.

23  Q. During that time period between January 2013, the

24  sending of the letter, and the May 2013 lawsuit, was the

25  Carver GSA ever recognized as an official student club at

1   Carver Middle School?

2   A.    No, sir.

3   Q.    Was the GSA discussed at those School Board meetings

4   in the spring of 2013?

5   A.    Yes, sir.

6   Q.    Was there -- were there public comment periods at

7   those meetings where members of the public could get up and

8   express their views?

9   A.    Yes, sir.

10  Q.    Did members of the public at those meetings in spring

11  2013 talk about the GSA?

12  A.    Yes.

13  Q.    Were people supportive of the GSA or opposed to the

14  GSA, or both?

15  A.    Both.

16  Q.    You said that there was a lawsuit filed in May 2013

17  on your behalf --

18  A.    Yes.

19  Q.    -- is that right?

20        Bayli, if you could take a look at Plaintiffs'

21  Exhibit 31 in your binder.  Can you tell me what that is?

22  A.    The complaint filed on my behalf.

23  Q.    That was the complaint in your lawsuit?

24  A.    Uh-huh.

25        MR. TILLEY:  And, Your Honor, I assume the -- your

1    ruling on the entrance of that into evidence will come at a
2    later time, or would you like --
3            THE COURT:  Well, I reserve ruling on it, yes.
4            MR. TILLEY:  Yes, sir.  Thank you.
5    BY MR. TILLEY:
6    Q.    As a result of that litigation was the Carver GSA
7    able to meet at Carver Middle School?
8    A.    Yes, sir.
9    Q.    Can you take a look at Plaintiffs' Exhibit 32,
10   please.  Can you tell me what that is?
11   A.    The consent order.
12   Q.    And what did that order do?
13   A.    Told the School Board they had to allow the GSA at
14   Carver.
15   Q.    Is that litigation over?
16   A.    Yes.
17   Q.    Can you take a look at Plaintiffs' Exhibit 41,
18   please.  Can you tell me what that exhibit is, please?
19   A.    Final order ending the case.
20   Q.    So as a -- so the case is over now?
21   A.    Yes, sir.
22   Q.    About how many meetings did the Carver GSA have
23   before the end of your eighth grade year?  That was the
24   2012-2013 school year, right?
25   A.    Yes.  I believe four.

1    Q.    Let's talk about some of those meetings.  What is the
2    purpose of a GSA, Bayli?
3    A.    A GSA is a safe space for students to talk about
4    successes and challenges they faced in Carver and to
5    discuss ways to combat bullying.
6    Q.    About how many students were there at the meetings of
7    the GSA in May and June 2013?
8    A.    About seven or eight kids.
9    Q.    About how many teachers or administrators were there?
10   A.    All three administrators and two teachers.
11   Q.    When you say "all three administrators," what do you
12   mean?
13   A.    The overall principal and then the seventh and eighth
14   grade principal and then the sixth-grade principal.
15   Q.    What did you discuss at those meetings?
16   A.    We were discussing a buddy system from between
17   classes so we didn't have to walk alone.
18         We were talking about doing volunteer work to get our
19   club out there and known so kids knew it was a place they
20   could go.
21   Q.    What are "hot spots," Bayli?  Hot spots.
22   A.    Hot spots?  What do you mean?
23   Q.    Were there places in the school where teachers were
24   not always --
25   A.    There were blind spots in the hallways, certain

1   hallways where the teachers weren't always patrolling.

2         There was a back hallway on the eighth grade building

3   where I had been pushed on the stairs two or three times

4   where teachers hadn't seen anything, and they said that

5   they couldn't see anything on the camera so they couldn't

6   do anything.

7   Q.    Do students frequently get bullied in those spots?

8   A.    Definitely.

9   Q.    In those meetings did some students -- and I'm

10  talking about the Carver GSA meetings in May and

11  June 2013 -- did some students say whether or not they were

12  gay?

13  A.    We did not discuss who was what sexuality.

14  Q.    Did it ever come up in passing?

15  A.    Possibly.  I mean...

16  Q.    Did students discuss sex at the meetings?

17  A.    Definitely not.

18  Q.    Did you expect students to discuss sex at the

19  meetings?

20  A.    No.

21  Q.    Why not?

22  A.    I was 14.

23  Q.    Did students discuss dating at the meetings?

24  A.    No.

25  Q.    Did you expect students to discuss dating at the

1  meetings?

2  A.    No.

3  Q.    Why not?

4  A.    It wasn't -- that wasn't the purpose of the club.

5  The club was supposed to be against bullying and to help

6  out our students.

7  Q.    Were there any activities that you wanted GSA members

8  to engage in?

9  A.    We wanted to do volunteer work in the community.

10 Q.    Did any adult in those meetings express disapproval

11 about what was being said by the students?

12 A.    No.

13 Q.    Bayli, have any of your friends told you that they're

14 gay?

15 A.    Quite a few.

16 Q.    About how many, would you say?

17 A.    About ten or 15.

18 Q.    Were any of those students in middle school when they

19 told you?

20 A.    A majority, yes.

21 Q.    Thank you.

22        THE COURT:  Ms. McCulloch?

23                         CROSS-EXAMINATION

24 BY MS. McCULLOCH:

25 Q.    Good morning, Ms. Silberstein.

A.    Good morning.

Q.    We've met before.  My name is Stephanie McCulloch.
Again, I believe we've met before, correct, at your
deposition?

A.    Yes, ma'am.

Q.    Okay.  And you're currently a high school student?

A.    Yes.

Q.    And those efforts that you talked about in obtaining
a GSA when you were at Carver Middle School, was that under
an old middle school club policy or under the new one that
we're here for today?

A.    The old one.

Q.    Okay.  And you attended meetings where the School
Board changed its policy for middle schools, correct?

A.    Yes.

Q.    Okay.  And so you're aware that the School Board
policy changed and that high schools are allowed to have
more clubs than middle schools now?

A.    Yes.

Q.    Okay.  You didn't participate in any way in
attempting to get a GSA club during the 2013-14 school year
at Carver Middle School, did you?

A.    No, ma'am.

Q.    Okay.  You were in ninth grade then?

A.    Yes.

Q.    And when you attended that School Board meeting where
they tabled the vote on the club policies for elementary,
middle and high school students, you didn't think there
were any references about the GSA made by any School Board
members, correct?

A.    No.

Q.    No, there weren't?

A.    Not directly, no.

Q.    They were made by the parents and members of the
public?

A.    Yeah.

Q.    Okay.  When you were in your eighth grade year and
the GSA met a few times under the old policy, is that when
you met H.F., the plaintiff in this case?

A.    I knew her before that.

Q.    Okay.  What grade was she in, if you know, when you
were meeting under the old policy?

A.    She was a sixth grader.

Q.    Okay.  So you were an eighth grader, and she was a
sixth grader?

A.    Yes, ma'am.

Q.    Okay.  You had at least one friend who was picked on
for her sexual orientation, and you told Ms. Jablonski and
Ms. Smith about it, correct?

A.    Yes, ma'am.

Q.    And they told you that they couldn't do anything
about telling -- and I'm just going to use her initial --
K.'s parents because she was closeted from her parents,
correct?

A.    No.  When we went to the school counselor, she said
that they would have to tell the parents, so we withdrawed
our complaint.  And then we went to the teachers, and they
did something about it.  And the girl got a referral.

Q.    But you testified in your deposition that they
couldn't tell K.'s parents because she was closeted from
them?

A.    Yes, ma'am.

Q.    Okay.  And, in fact, some of your friends that were
attending the GSA meetings were closeted, as you described
it, and they didn't want their parents to know --

A.    Yes.

Q.    -- correct?

      Weren't they also scared that their parents would
find out that they were one of the LGBT criteria by
attending the meetings?

A.    Some of them, yes.

Q.    And some of those who weren't under the LGBT criteria
were also scared that their parents would think that they
were and were just hiding it from them if they attended the
meetings?

1  A.    Yes.

2  Q.    Okay.  And some of your friends' parents didn't want

3  them to attend the GSA meetings, correct?

4  A.    Yes.

5  Q.    And they were not allowed to attend even though they

6  wanted to?

7  A.    Yes.

8  Q.    Okay.  During those meetings how many students were

9  there, approximately?  Does six or seven sound about right?

10  A.    Yeah.

11  Q.    Okay.  And there were several adults aside from

12  Ms. Jablonski there that worked at the school?

13  A.    Yes.

14  Q.    Okay.  Ms. Smith was there?

15  A.    Yes.

16  Q.    She was a teacher?

17  A.    Yes.

18  Q.    And Deputy Cameron was there?

19  A.    Uh-huh.

20  Q.    And she was a school resource officer?

21  A.    Yes, ma'am.

22  Q.    Okay.  And during the meetings you would all sit

23  around in a semicircle and talk about experiences?

24  A.    Yes.

25  Q.    And that included the adults?

1    A.    No.

2    Q.    Do you recall when we talked at your deposition about

3    the adults sitting around in a semicircle?

4    A.    They were in the circle, but they weren't putting in

5    input; they were listening.

6    Q.    Okay.  But they sat in a semicircle with you while

7    you were talking about experiences?

8    A.    Yes, ma'am.

9    Q.    Okay.  At at least one of the meetings wasn't there

10   some discussion about their fear -- students' fear that, if

11   their parents found out they were under the LGBT criteria,

12   what would happen?

13   A.    Yes, ma'am.

14   Q.    Was there also a discussion about how do you tell

15   your parents that you're under one of those criteria?

16   A.    Yes, ma'am.

17   Q.    And you talked about how to slowly give the message

18   to your parents that you might be under the LGBT criteria?

19   A.    Yes.

20   Q.    And you also described your own experience and how

21   you told your brother first?

22   A.    I did.

23   Q.    Okay.  If I speak to you about a student named M.G.,

24   do you know who I'm speaking about?

25   A.    Yes.

1    Q.    Okay.  When M.G. came to the meetings, his mother

2    didn't want him to come either, did she?

3    A.    No, ma'am.

4    Q.    Okay.  When you were at Carver Middle School, you

5    were never disciplined or you didn't get in trouble by any

6    adult for talking about any of the issues that you believe

7    are related to the GSA at any time, did you?

8    A.    No, ma'am.

9    Q.    Okay.  And you didn't participate in any way or help

10   Hannah or any member of the GSA for the 2013-14 school year

11   prepare their application or charter?

12   A.    No, ma'am.

13   Q.    Okay.  Thank you.

14        MS. McCULLOCH:  I have no further questions,

15   Your Honor.

16        THE COURT:  Redirect?  Mr. Tilley.

17                 REDIRECT EXAMINATION

18   BY MR. TILLEY:

19   Q.    Bayli, you said that some students talked about

20   coming out to their parents; is that right?

21   A.    Yes, sir.

22   Q.    And was that part of the goal of the GSA to create an

23   environment where students felt comfortable doing that?

24   A.    Yes.

25   Q.    So that they would tell their parents?

1  A.     Yeah.

2  Q.     Is it your understanding that the current school club

3  policy for middle schools has a parental permission

4  requirement?

5  A.     Yes, sir.

6  Q.     So that if parents did not want their students --

7  their children attending a GSA meeting, that the child

8  would then not be able to attend?

9  A.     Yeah.

10 Q.     You mentioned that a bullying complaint was

11 withdrawn.

12 A.     Yes, sir.

13 Q.     Why was that withdrawn?

14 A.     They said that we would have to tell the other

15 student's parents what was going on, and her parents were

16 extremely religious and would probably have kicked her out

17 if they found out that she liked girls.

18 Q.     And the student was a female student?

19 A.     Yes.

20 Q.     Thank you.

21        THE COURT:  Any recross?

22        MS. McCULLOCH:  No, sir.

23        THE COURT:  Thank you, Bayli.  You may step down.

24        THE WITNESS:  Thank you.

25        MR. STEVENSON:  Plaintiffs call Hannah Faughnan.

THE CLERK:  Would you please stand, and raise your right hand.

Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I swear.

THE CLERK:  Please state your full name, and spell your last name for the record.

THE WITNESS:  Hannah Faughnan, F-A-U-G-H-N-A-N.

HANNAH FAUGHNAN,

being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. STEVENSON:

Q.    Good morning.

A.    Good morning.

Q.    How old are you?

A.    Fourteen.

Q.    A little nervous now?

A.    Yeah, a little bit.

Q.    Take a deep breath.  It's going to be okay.

Do you understand the difference between the truth and a lie?

A.    Yes.

Q.    Do you understand that you are required to tell the truth today in court?

```
1   A.    Yes.

2   Q.    Where do you attend school?

3   A.    Carver Middle School.

4   Q.    What grade?

5   A.    Eighth.

6   Q.    Have you attended school at Carver Middle for the

7   last three years?

8   A.    Yes.

9   Q.    Was a GSA at your school in the spring of 2013?  That

10  would have been when you were in sixth grade.

11  A.    Yes.

12  Q.    What does "GSA" stand for?

13  A.    Gay-straight alliance.

14  Q.    Did you attend any GSA meetings?

15  A.    Yes.

16  Q.    How many?

17  A.    Two.

18  Q.    Did any adults also attend the meetings?

19  A.    Yes.

20  Q.    Did any administrators?

21  A.    Yes.

22  Q.    Any teachers?

23  A.    Yes.

24  Q.    A resource officer?

25  A.    Yes.
```

Q.      Approximately how many adults were attending the meetings?

A.      About a handful.  Probably five.

Q.      And did they participate in the meetings?

A.      They were in charge of it, but they weren't in discussion with the students.

Q.      How many students attended the meetings?

A.      Six or seven.  A handful.

Q.      What did you discuss?

A.      We discussed, like, hot spots where bullying was happening around the school where teachers weren't, and where, you know, teachers should be made aware of where they should be in between classes.

        And we spoke about -- we spoke -- I'm sorry.

        We spoke about, you know, what to do if you're being bullied and, you know, where you could go, like what teachers, and always make sure you have a friend around just so that, you know, you're less approachable by somebody who would want to pick on you.

Q.      Can you explain to us a little bit more about what hot spots are, and where does that word -- or phrase come from, or what does that mean?

A.      A hot spot is like there aren't any teachers around; nobody can see.  And everybody knows that.  If you know the school, you know where those places are, and that's where

1   bullying can occur.

2         So, you know, certain hallways, certain hall -- or

3   hallways -- we call them pods at Carver, because it's an

4   outdoor campus.  So certain pods, areas, things like that.

5   Q.    Were there any pamphlets distributed at the club

6   meeting?

7   A.    Yes.

8   Q.    What pamphlets?

9   A.    There were pamphlets for the Trevor Project.

10  Q.    What is the Trevor Project?

11  A.    The Trevor Project is a nationwide project for LGBT

12  people, and it provides suicide telephone numbers -- they

13  call them hotlines -- and in the pamphlets it gave those

14  numbers.  And then it also said how to know if someone you

15  know may be depressed or suicidal and what to do if someone

16  you know is depressed, suicidal or you are even depressed

17  and suicidal.  And it literally said on the pamphlet "You

18  are not alone."

19  Q.    Did you discuss the pamphlets at the club meeting?

20  A.    Yes.  We went over them.

21  Q.    Did students discuss sexual activity at the club

22  meeting?

23  A.    No.

24  Q.    Dating?

25  A.    No.

Q.     Making out?

A.     No.

Q.     Did any student identify themselves as LGBT?

A.     Yes.

Q.     How many students openly identified themselves as LGBT at the meeting?

A.     The meetings I attended, only one person did.

Q.     Did the adults ever tell a student that she could not talk about something or share something?

A.     No.

Q.     Did the adults ever tell a student that what the student was saying was inappropriate?

A.     No.

Q.     Were the adults supportive of the students' concerns about bullying?

A.     Yes.

Q.     Did they encourage students to come to them for help?

A.     Yes.

Q.     Have any of your friends told you that they are gay?

A.     Yes.

Q.     How many friends have told you that they are gay?

A.     Five to seven.

Q.     How old were they when they told you that they were gay?

A.     Ranging from ten to probably 12.

1  Q.     Have any of them ever come to the conclusion that

2  they are not gay later?

3  A.     Not that I'm aware of.

4  Q.     Were you elected an officer of the GSA?

5  A.     Yes.

6  Q.     What position?

7  A.     Vice president.

8  Q.     Did the GSA that existed in the spring of 2013

9  continue into your seventh grade?

10 A.     No.

11 Q.     Were you happy about that?

12 A.     No.

13 Q.     Were you interested in starting a GSA?

14 A.     Yes.

15 Q.     Why were you interested in starting a GSA?

16 A.     Because after I attended the meetings at the end of

17 my sixth grade year, it made me feel safer walking around

18 the school knowing that I had a place to go.  And I wanted

19 that environment to be started up again and maybe have the

20 chance to get bigger and more school-wide.

21 Q.     So what did you do?

22 A.     I spoke to counsel and approached Ms. Jablonski, one

23 of the teachers that attended the GSA meetings when I was

24 in sixth grade, and we spoke about starting up a club and

25 forming a club charter.

1    Q.    Did you work on the club charter and application with

2    Mrs. Jablonski?

3    A.    Yes.

4    Q.    When did you apply?

5    A.    The fall of 2014, I believe.

6          Or 2013.  I'm sorry.

7    Q.    I'd like to direct your attention to Plaintiffs'

8    Exhibit 5, which I believe is in the notebook in front of

9    you.  So if you can go to tab 5.  Do you understand how to

10   work the tab system?

11   A.    Yes.

12   Q.    Okay.  That exhibit has been admitted into evidence.

13   A.    There we go.

14   Q.    There you go.  That looks a little better.

15         So the first page of that exhibit is your application

16   form, correct?

17   A.    Yes.

18   Q.    And then the third page is a letter from you, right?

19   A.    Yes.

20   Q.    And on the second page is the club's charter, right?

21   A.    Yes.

22   Q.    And you signed page 3 where the blackout box is?  We

23   call that a redaction.

24   A.    Yes.

25   Q.    What were the proposed purposes of the Carver GSA?

A.     It was to create a safe place for anyone to go, no
matter what they were, to speak out about bullying and how
they felt about it, and also to recognize the issues of
bullying on campus and, you know, troubleshoot ways to end
it.

Q.     Was the Carver GSA application denied?

A.     Yes.

Q.     Who told you it was denied?

A.     Ms. Jablonski.

Q.     Did Ms. Jablonski tell you why it was denied?

A.     No.

Q.     Did you talk to Mrs. Cunningham, the principal at
Carver Middle, about the Carver GSA being disapproved?

A.     I tried to speak with Ms. Cunningham, but I never got
the chance to.

Q.     How did you try to speak with Mrs. Cunningham, the
principal?

A.     I went up to the front office and I asked the woman
up there -- I asked if I could speak with Ms. Cunningham or
make an appointment, however they have to do it because
I'm -- I was new to all of that.  And she said that
Ms. Cunningham was out.

Q.     Have you had a GSA at your school since the spring of
2013 when you were in sixth grade?

A.     No.

1  Q.   What benefits do you get if your GSA is approved as a
2  student club?
3  A.   Well, we get to form the club.  And, you know, we
4  would be able to function and meet the goals that, you
5  know, we talked about in the charter.
6  Q.   Are you able to meet on campus?
7  A.   Yes.
8  Q.   Are you able to use the school's P.A. and bulletin
9  board to advertise meetings?
10 A.   I would assume so, yes.
11 Q.   You might even be in the yearbook, right?
12 A.   Yes.
13 Q.   But if you're not approved as a student club, student
14 groups can't, you know, get those benefits, right?
15 A.   As of my understanding, yes.
16 Q.   Did you reapply to the School Board or to the
17 superintendent for your GSA to be approved when
18 Mrs. Jablonski first told you that the club had been
19 disapproved?
20 A.   No.
21 Q.   Why not?
22 A.   Well, I didn't know why it had been denied in the
23 first place, and I didn't know ways to further improve the
24 application.
25 Q.   Had you known before you filed the lawsuit that all

1   you had to do was flesh out how the club promoted critical

2   thinking, would you have resubmitted the application and

3   fleshed out critical thinking?

4   A.   Yes.

5   Q.   Later you did learn that you could reapply and flesh

6   out the critical thinking prong, right?

7   A.   Yes.

8   Q.   When did you learn that?

9   A.   The fall of 2014, so this school year.

10  Q.   This school year.  So eight months ago or something

11  like that?

12  A.   Yes.

13  Q.   Did you reapply?

14  A.   No.

15  Q.   Why did you not reapply?

16  A.   Because they gave Bayli the runaround, and she had

17  to, you know, figure out all these different ways to make

18  it so that we could have the club.

19       And then they gave me the runaround.  And, you know,

20  I was trying to figure out how I could improve this

21  application, you know, what we could do, other ways.

22       And then we start to pursue this litigation and, you

23  know, it's just -- there's no certainty.  I don't want to

24  be able to function the club -- or form the club this year

25  and have the club, and then next year students who want to

1  form it not be able to or have to go through all of this
2  again.
3  Q.    You're fearful that if you got the club approved this
4  year that next year it may just be denied once again?
5  A.    Yes.
6  Q.    Are you taking mathematics at Carver Middle School?
7  A.    Yes.
8  Q.    What class?
9  A.    Algebra one honors.
10  Q.   Congratulations.  That's good.
11  A.   Thank you.
12  Q.   Where is the class taught?
13  A.   Carver Middle School.
14  Q.   Just so I can paint a picture here, you have a
15  teacher who stands in front of a classroom full of students
16  at Carver Middle School teaching algebra one?
17  A.   Yes.
18  Q.   Do you get -- do you get high school credit for
19  taking that class?
20  A.   Yes.
21  Q.   Have you ever taken a virtual class?
22  A.   Yes.
23  Q.   Have you taken geometry on the virtual school?
24  A.   Yes.
25  Q.   Is that what you call it, "virtual school"?

1   A.     Yeah.

2   Q.     Okay.  If it's virtual, I assume you access the

3   virtual world from a computer somewhere, right?

4   A.     Yes.

5   Q.     And where do you access your virtual school to take

6   geometry?

7   A.     On my personal computer at home.

8   Q.     But just to be clear, algebra one is not a virtual

9   school.

10   A.     Yes.

11   Q.     Are you taking U.S. history?

12   A.     Yes.

13   Q.     Did you discuss career planning as part of that

14   class?

15   A.     Yes.

16   Q.     Did teachers pass out materials in U.S. history class

17   related to career planning?

18   A.     Yes.

19   Q.     What discussions or activities were had in U.S.

20   history involving career planning?

21   A.     We took personality assessments to see what our

22   personality types would work with best as in, like,

23   career-wise, you know, what we might enjoy the most, what

24   we might succeed at best.

25         And then we spoke about paths you could take after

1   high school and also how many high school credits you need
2   to graduate.
3   Q.      Thank you very much.
4           MR. STEVENSON:  Those are my questions.
5           THE COURT:  Ms. McCulloch?
6                       CROSS-EXAMINATION
7   BY MS. McCULLOCH:
8   Q.      Good morning, Ms. Faughnan.  How are you?
9   A.      Good.  How are you?  Good morning.
10  Q.      Good.
11          We met before in your deposition.  My name is
12  Stephanie McCulloch.  I represent the School Board.  I'll
13  be asking you some questions to follow up.
14          In your sixth grade year before the GSA was allowed
15  to form, there were no other clubs at Carver Middle School,
16  correct?
17  A.      No.
18  Q.      No, it's not correct, or no, there were no other
19  clubs?
20  A.      Not correct.
21  Q.      Okay.  Do you recall giving a deposition in this case
22  where you told me that there weren't any other clubs until
23  the GSA was allowed to form?
24  A.      No, I don't recall that.
25  Q.      Okay.  With respect to the students who were trying

1    to start the GSA during the 2012-13 school year, some of

2    them were open about their sexual orientation, correct?

3    A.    Yes.

4    Q.    And you attended two meetings, I believe you said,

5    during --

6    A.    Yes.

7    Q.    -- the 2012-13 school year?

8    A.    Yes.

9    Q.    And those were held in Ms. Smith's classroom?

10   A.    Yes.  Ms. Tracy Smith's.  We have multiple Smiths.

11   Q.    Okay.  And Ms. Tracy Smith was not the sponsor of the

12   GSA, but the meetings were held in her classroom?

13   A.    Yes.

14   Q.    And she was present?

15   A.    Yes.

16   Q.    Ms. Jablonski was present?

17   A.    Yes.

18   Q.    Ms. Candell was present?

19   A.    Yes.

20   Q.    Ms. Cameron, Deputy Cameron, was present?

21   A.    Yes.

22   Q.    And there was also an administrator who may have

23   stopped in at one of the meetings or both of the meetings?

24   A.    Yes.

25   Q.    Okay.  The administrator didn't speak at all at the

1  meetings?

2  A.     They did every now and then, but it wasn't like they

3  were involved in the discussion.

4  Q.     Okay.  But Ms. Jablonski and Ms. Smith, Ms. Candell

5  and Ms. Cameron all spoke at the meetings, didn't they?

6  A.     Yes.

7  Q.     Okay.  And they all told you that it was a safe

8  place, that you could talk to them about anything?

9  A.     Yes.

10  Q.     Okay.  And Ms. Jablonski shared with you that the

11  reason she supported the club was because her daughter was

12  under one of the LGBT categories --

13  A.     Yes.

14  Q.     -- is that correct?

15         Okay.  And she also told you that her daughter didn't

16  come out until high school?

17  A.     Yes.

18  Q.     You understand what "come out" means?

19  A.     Yes.

20  Q.     What do you determine that to mean?

21  A.     It means that you tell people that you fall under the

22  LGBT category.

23  Q.     Okay.  And Ms. Jablonski's daughter was in high

24  school at the time?

25  A.     Yes.

1  Q.    And she told you that Ms. -- that her daughter

2  actually hid it from her as well?

3  A.    Yes.

4  Q.    And they also -- the adults there told you that you

5  could attend regardless of your orientation?

6  A.    Yes.

7  Q.    Okay.  At the meetings everybody would kind of sit

8  down and Ms. Jablonski would announce that the meeting had

9  started, correct?

10 A.    Yes.

11 Q.    Okay.  Then you would go around the room and

12 introduce yourselves and say what your orientation is if

13 you wanted to --

14 A.    Yes.

15 Q.    -- correct?

16       And also whatever you were comfortable discussing at

17 that point?

18 A.    Yes.

19 Q.    Okay.  Even the adults did it, and they sat in the

20 semicircle with you so it was like you all were on the same

21 level?

22 A.    Yes, but the adults -- they didn't, you know, say

23 their orientation, or anything like that, because it didn't

24 apply to them.

25 Q.    Okay.  But they sat in the semicircle, and they

1  participated in sharing the experiences?

2  A.    Yes.

3  Q.    Okay.  Would some of the students sometimes share

4  experiences related to specifically being LGBT?

5  A.    Yes.

6  Q.    And would sometimes students share experiences

7  regarding an adult family member who was LGBT?

8  A.    Yes.

9  Q.    And a lot of times other than B.N.S. who you're --

10  you know, correct?

11  A.    Yes.

12  Q.    -- other than B.N.S. most of the students who were

13  talking about LGBT experiences were talking about family

14  members and their experiences outside of Carver Middle

15  School, correct?

16  A.    Yes.

17  Q.    During your sixth-grade year when you first attended

18  the GSA meetings, you never spoke with Ms. Jablonski or

19  Ms. Smith about any alleged bullying you may have

20  experienced, correct?

21  A.    I did at the club meetings but not -- I didn't

22  approach them outside of the club.

23  Q.    So is it your testimony today that you reported some

24  sort of bullying or girls picking on you during your sixth

25  grade year?

1   A.   Yes.

2   Q.   Okay.  But you never reported any alleged bullying of

3   any other student that was in the GSA, did you?

4   A.   No.

5   Q.   And you didn't file a formal report of bullying?

6   A.   No.

7   Q.   And Ms. Jablonski nor Ms. Smith filed a formal report

8   or bullying complaint on your behalf?

9   A.   What do you mean?  Did they or did they not?

10  Q.   Yes.

11  A.   No, they didn't.

12  Q.   Okay.  Were you aware that there were two other

13  students -- two or three other students, at least, that

14  wanted to be in the GSA but their parents wouldn't let

15  them?

16  A.   Yes.

17  Q.   Okay.  And after your sixth-grade year, you were

18  aware that the School Board changed its policy for middle

19  school clubs, correct?

20  A.   I'm sorry.  Can you restate that?

21  Q.   Sure.

22       After your sixth-grade year when you attended these

23  meetings, you stated earlier that the next year you decided

24  to try to form your own GSA, correct?

25  A.   Yes.

Q.   Okay.  And at that point you were aware, though, the School Board had changed its policy for student clubs in the middle school, correct?

A.   Yes.

Q.   Okay.  And Ms. Jablonski never told you specifically what the new policy required?

A.   Yes.

Q.   You were aware that the high school was allowed to have more clubs than the middle school --

A.   Yes.

Q.   -- after the new policy?

Okay.  During your seventh-grade year, which is the year that we're primarily discussing here today, the 2013-14 school year, when you attempted to form a GSA club, you didn't fill out an application until probably a month and a half in the school year or later?

A.   Yes.

Q.   Okay.  And you worked with your lawyer, Mr. Tilley, on the club application and charter, and you worked with Ms. Jablonski on the application, correct?

A.   Yes.

Q.   Okay.  When you sat down with Ms. Jablonski, the two of you wrote down criteria, the number of members, and that sort of thing, but you started working on the club charter?

A.   Yes.

1   Q.    Ms. Jablonski told you that for middle school clubs
2   to be approved, they had to be an extension of the
3   curriculum and have some sort of curriculum aspect and not
4   just something for fun, right?
5            MR. STEVENSON:  Objection.
6            THE WITNESS:  Yes.
7            MR. STEVENSON:  Hearsay.
8            THE COURT:  I'm inclined to overrule that
9   objection.  It would be offered in any event, I take it, to
10  prove the statement was made as it would relate to her
11  understanding relative to making an application.
12           Go ahead, Ms. McCulloch.
13           MS. McCULLOCH:  Yes, sir.
14  BY MS. McCULLOCH:
15  Q.    Ms. Jablonski also told you that it expanded on
16  civics with civil liberties and had a critical thinking
17  aspect to it?
18  A.    Yes.
19  Q.    And if you could take a look at what your attorney
20  showed you as Number 5, which is a club application and the
21  attachments that you identified earlier.
22        That's the club application that -- and the
23  attachments are what you helped prepare in order to submit
24  the application for approval as a student club in 2013-14?
25  A.    Yes.

Q.    Okay.  And if you could go to the charter, in Number
3, other than the reference to promote critical thinking
there, there is no other reference to critical thinking in
the charter or how critical thinking skills are going to be
used, correct?

A.    Yes.

Q.    When you were in middle school before you applied for
this club, you had taken a critical thinking class,
correct?

A.    Yes.

Q.    And at that particular class you did things like
thinking maps, strategies, deeper thinking, reading and
interpreting different options and scenarios, models and
projects, correct?

A.    Yes.

Q.    You didn't do any of those types of things at the GSA
meetings, correct?

A.    Well, bullying is a difficult problem, and we talked
about ways to solve it so -- and critical thinking is
partly problem and solution.

Q.    But you didn't do any of those particular critical
thinking class components at the GSA meetings, correct; it
was more of an open group discussion?

A.    Yes.

Q.    Okay.  Ms. Jablonski did inform you that the club

1 application was not approved, correct?

2 A.    Yes.

3 Q.    Okay.  And you were told that you could resubmit the

4 application but you stated not until 2014?

5 A.    Yes.

6 Q.    And your attorney told you that?

7 A.    Yes.

8 Q.    You didn't talk to any School Board member or the

9 superintendent about the club application after it was not

10 approved, correct?

11 A.    Correct.

12 Q.    And you didn't talk to Ms. Cole about why it wasn't

13 approved?

14 A.    No.

15 Q.    Okay.  You never attended any Board meetings after

16 the club application was not approved?

17 A.    I didn't.

18 Q.    Okay.  And the GSA never revised the application or

19 resubmitted the application with more information other

20 than what had previously been provided?

21 A.    Never resubmitted.

22 Q.    Okay.  You didn't look at any web sites or any other

23 materials regarding what a GSA can do in their meetings

24 before you filled out the charter?

25 A.    What do you mean?

1  Q.    Well, you never looked at any national GSA charters

2  or what other GSAs are doing around schools as part of

3  their group meetings?

4  A.    No.

5  Q.    Okay.  You never talked to Ms. Jablonski about other

6  ways that the GSA could meet the criteria in the policy?

7  A.    No.

8  Q.    And isn't it true that you actually got picked on a

9  lot after you went to the GSA meetings because students

10  were mad at you because they thought that you were trying

11  to start the GSA and they wouldn't have any clubs?

12  A.    Yes.

13  Q.    And it was your understanding that during your

14  seventh-grade year there were no clubs at Carver Middle

15  School, correct?

16  A.    Yes.

17  Q.    And you're not aware if there were any other clubs

18  that applied or did or did not get approval other than the

19  GSA?

20  A.    I'm not aware of any of them.

21  Q.    After you were made aware that the application wasn't

22  approved, you didn't discuss it any further with

23  Ms. Jablonski?

24  A.    No.

25  Q.    And you've never been disciplined or gotten in

1  trouble for talking about any of the GSA's topics while you
2  were at school, have you?
3  A.      No.
4  Q.      And no administrator that sat in the meetings before
5  ever tried to censor your speech in any way or say you
6  can't speak about this or that while they were there?
7  A.      Correct.
8  Q.      And Ms. Jablonski told you that if there was not a
9  school sponsor at an approved club that you couldn't meet?
10 A.      She didn't tell me that, but that was my
11 understanding.
12 Q.      Okay.  Were you aware of what particular benefits any
13 student club in the middle school would be allowed to
14 receive if they were approved?
15 A.      Well, I mean, I would assume they'd be able to meet
16 and, you know, advertise around campus and things like
17 that.
18 Q.      But those were your assumptions.  Did you have any
19 direction from the principal about what would be allowed
20 for student clubs?
21 A.      No.
22 Q.      You attended also a meeting at Rogers Park over the
23 summer between your sixth and seventh-grade year of the
24 GSA?
25 A.      Yes, but that wasn't a school GSA.  It was separate

1  from the school.

2  Q.    Ms. Jablonski was there?

3  A.    Yes.

4  Q.    Ms. Smith was there?

5  A.    Yes.

6  Q.    And Ms. Jablonski's daughter, who at that time was a

7  high school student, was there?

8  A.    Yes.

9  Q.    B.N.S. was there?

10  A.    Yes.

11  Q.    Okay.  And one other student attended?

12  A.    A student that I know.

13  Q.    Okay.  Another student attended?

14  A.    Uh-huh.

15  Q.    You didn't address any bullying issues at that

16  meeting?

17  A.    We mainly addressed, you know, like, how we're going

18  to get the club at Carver for the upcoming year and things

19  like that.

20  Q.    Okay.  Isn't it true that during your eighth-grade

21  year, at the beginning of your eighth-grade year, you

22  wanted to form a GSA, but you didn't contact Ms. Jablonski

23  or any other teacher because you decided you would rather

24  pursue litigation?

25  A.    Yes.

Q.    You never discussed with Ms. Jablonski or any of the other would-be members of the GSA as to whether they would rather reapply to have the club rather than pursue litigation, did you?

A.    No.

Q.    And you understand that under the new policy you must fill out an application and submit a charter in order to apply to have a club in middle school, correct?

A.    Yes.

        MS. McCULLOCH:  I don't have any further questions, Your Honor.

        THE COURT:  Redirect, Mr. Stevenson?

        MR. STEVENSON:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. STEVENSON:

Q.    Does the school have a policy against bullying?

A.    Not that I know of.

Q.    Have you ever heard of something called a "bully box"?

A.    Yes.

Q.    What is that?

A.    It's, I guess, a shoebox covered in paper, and it has a slit in the top.  And it's, like, closed so nobody can just come by and open it.  It has a slit in the top, and they're placed -- I know there's one in the media center,

1  and there's probably -- I've heard there's a couple more in

2  other places, you know, like assistant principals' offices

3  and things like that around the school.

4      And basically the purpose of it is, if you see

5  bullying or are being bullied or aware of it, you write it

6  down on a piece of paper.  And it can be anonymous.  It can

7  have your name.  It can have names on it.  And you put it

8  in the box, and then supposedly administration checks it

9  and then deals with it from there.

10 Q.    So you can anonymously report bullying by depositing

11 a piece of paper into a box on an assistant principal's

12 desk?

13 A.    Yes.

14 Q.    Why haven't you reported more instances of bullying

15 to the teachers?

16 A.    I didn't know where we could go with it, because it's

17 really hard to report bullying, because if other students

18 find out, time -- or chances are they're going to get mad

19 at you and, like, they -- it just gets worse.  Unless it's

20 dealt with immediately, as soon as you tell somebody

21 something, it's going to get worse, and you're going to get

22 picked on because you told somebody.

23 Q.    If a student reports to the administration that she's

24 bullied because she's gay, do you think the administrator

25 would tell the student's parents?

1   A.    I don't know.

2   Q.    What does the GSA do for you and LGBT students that

3   the school's policy against bullying does not do?

4   A.    At the GSA I can sit with other students who have

5   been through what I'm going through or I've been through

6   what they're going through or, you know, maybe neither, and

7   we can talk about it.  And, you know, there's other people.

8   There's real interaction there.

9         And, you know, it's an environment where, no matter

10  what's going on, you always have somebody you can come to.

11  Q.    You've mentioned a couple of times "share

12  experiences."  I'd like to be clear about what you mean.

13  What experiences are you sharing?

14  A.    We're talking about bullying, whether it's related to

15  your orientation or, you know, just in general, your

16  clothes, whatever.  You know, it's middle school; it's

17  going to happen to everybody at some point.  We all know

18  that.

19        It's never inappropriate or anything like that.

20  That's really gross.

21  Q.    We're not talking about, like, sexual experiences --

22  A.    Yeah.

23  Q.    -- correct?

24  A.    Of course not.

25  Q.    I believe opposing counsel asked you about what club

1    activities in the spring of 2013 involved critical

2    thinking.

3        I want to ask you about your application, the

4    proposed activities.  Can you identify what proposed

5    activities involved critical thinking?

6    A.    Well, bullying is a very, very difficult problem, and

7    it's an issue for everybody.  You know, everybody goes

8    through bullying.

9        And the GSA is to find solutions to bullying that's

10   happening on campus.  And since bullying is so complex,

11   it's kind of like snowflakes.  No one case is like another.

12       And so there's so many different solutions to so many

13   different problems, and the GSA finds ways to solve all of

14   these issues.

15   Q.    Did you expect, based upon your application, that the

16   GSA would -- I believe it's mentioned in your

17   application -- that you would design and market a student

18   awareness campaign to confront bullying?

19   A.    Yes.

20   Q.    What about create and execute strategies to confront

21   bullying?

22   A.    Yes.

23   Q.    To promote critical thinking by discussing how

24   bullying -- or how to address bullying and other issues

25   confronting students?

A.      Yes.

Q.      You testified that you were the -- elected the vice president of the GSA, correct?

A.      Yes.

Q.      Did the club members decide that you would be the representative with respect to this litigation?

A.      Yes.

Q.      Thank you.

        THE COURT:  Anything further of the witness?

        MS. McCULLOCH:  No, sir.

        THE COURT:  Thank you.  You may step down.

        THE WITNESS:  Thank you.

        MR. STEVENSON:  Your Honor, before we call our next witness, I didn't know if the Court would want to have a brief recess for a bathroom break.

        THE COURT:  Indeed.  It's --

        MR. STEVENSON:  Thank you.

        THE COURT:  -- the middle of the morning.  Let's take a 15-minute break.

        MR. STEVENSON:  Thank you, Your Honor.

        (A recess was taken.)

        THE COURT:  Thank you.  Be seated, everyone.

        Next witness, Counsel.

        MR. STEVENSON:  The plaintiffs call Dr. Moxley.

        THE CLERK:  Raise your right hand.

1  Do you solemnly swear that the testimony you're
2  about to give will be the truth, the whole truth, and
3  nothing but the truth?
4  THE WITNESS:  Yes.
5  THE CLERK:  Please have a seat.
6  Please state your full name, and spell your last
7  name for the record.
8  THE WITNESS:  Susan Moxley, M-O-X-L-E-Y.
9  SUSAN MOXLEY,
10  being duly sworn, testified as follows:
11  DIRECT EXAMINATION
12  BY MR. STEVENSON:
13  Q.   Good morning.  Good to see you again.
14  A.   Good morning.
15  Q.   The Carver GSA applied to operate a student club and
16  was denied.  If I refer to the gay-straight alliance as
17  "GSA," we understand what I mean?
18  A.   Yes.
19  Q.   You are the superintendent of Lake County schools,
20  correct?
21  A.   Yes.
22  Q.   You were appointed by the School Board, correct?
23  A.   Correct.
24  Q.   You held that position -- you have held that position
25  since November 2008, correct?

1    A.    Correct.

2    Q.    I took your deposition twice, right?

3    A.    Yes.

4    Q.    The first time in June 2014, right?

5    A.    I believe so.

6    Q.    During that deposition you gave testimony as the

7    defendant's Rule 30(b)(6) designee --

8    A.    Yes.

9    Q.    -- right?

10          The Carver GSA applied to start a student club at

11   Carver Middle School in the fall of 2013, right?

12   A.    Yes.

13   Q.    And I would like to direct your attention to what has

14   been admitted into evidence as Plaintiffs' Exhibit 5.  That

15   should be at the tab 5 in that binder.

16          That was the application the Carver GSA submitted,

17   correct?

18   A.    Yes.

19   Q.    And you denied that application, correct?

20   A.    Mrs. Cole.

21   Q.    I would like to direct your attention to your

22   deposition that you gave in June, which is in front of you.

23   The other book is full of depositions.

24          I'd like to direct your attention to page 104.  We'll

25   begin on line 11 when you're ready -- or I will begin when

1   you're ready.

2   A.    I just need to find mine.

3   Q.    Yes.  Take your time, Dr. Moxley.

4         I apologize.  Maybe I'm not being clear on helping

5   you with this.  It should be at tab 14.

6   A.    Thank you.

7   Q.    That's where your deposition is.  I should have told

8   you that.

9   A.    And I'm sorry.  Would you tell me the page again.

10  Q.    Yes.  Of course.  Page 104.  And I'm looking at --

11  I'm going to begin on line 11.

12        Question:  And you were involved in the decision?  As

13  opposed to your designee, you personally were?  The

14  superintendent was personally involved in the decision to

15  disapprove this club application, correct?

16        Answer:  Correct.

17        Did I ask you that question?

18  A.    Yes, you did.

19  Q.    Did you give me that answer?

20  A.    Yes, I did.

21  Q.    And you denied the Carver GSA's application because

22  it did not comply with the School Board policy number

23  4.502?

24  A.    Yes.

25  Q.    I'm going to switch gears slightly.  I want to look

1    at Exhibit 4, Plaintiffs' Exhibit 4, which has already been
2    admitted into evidence.  That's on tab 4.  Thank you.
3    You've got it.
4         This is the School Board's student club and
5    organization policy number 4.50, correct?
6    A.   Correct.
7    Q.   And this policy was in effect during the 2012-2013
8    school year, correct?
9    A.   Correct.
10   Q.   So this is what would have been in play or effective
11   at the time that Bayli submitted an application to form a
12   GSA in 2012, right?
13   A.   Yes.
14   Q.   Under this policy the approval of student clubs was
15   not centralized and uniform, correct?
16   A.   Correct.
17   Q.   In fact, the principals decided what student clubs to
18   approve, correct?
19   A.   Correct.
20   Q.   The School Board first discussed changing club policy
21   4.50, what we just reviewed, in the spring of 2013,
22   correct?
23   A.   I believe it was along the time of February.
24   February or March.
25   Q.   Of 2013?

A.    Correct.

Q.    And since 2008, when you became the superintendent, the School Board has not considered any draft revisions of 4.50 or ever discussed it, discussed amending or changing policy 4.50 until the spring of 2013, correct?

A.    Correct.

Q.    I'd like to direct your attention to what is marked as Plaintiffs' Exhibit 17.

Plaintiffs' Exhibit 17 is the letter from Randall Marshall of the ACLU to you, and this has already been admitted into evidence.

Did you receive this letter from the ACLU in January 2013?

A.    I believe so.

Q.    And about five days later, after you received the letter on January 28, 2013, you notified the School Board that it would begin a review of School Board policy dealing with the clubs at the time, 4.50, correct?

A.    I don't -- I would need to look at my calendar.  I don't recall that specific date.

Q.    Okay.

A.    Uh-huh.

Q.    Later at the February 4th meeting of 2013, the School Board meeting, this is the letter that was referenced in the School Board minutes when it said "a communication was

1   received from the ACLU," right?

2   A.    I would need to refer to those minutes to be certain.

3   Q.    Yes.  That's a good idea.  Let's turn to Plaintiffs'

4   Exhibit 7.

5         Plaintiffs' Exhibit 7 is the School Board minutes for

6   February 4, correct?

7   A.    Correct.

8   Q.    And those -- this exhibit has already been admitted

9   into evidence.

10  A.    Correct.

11  Q.    I'd like to direct your attention to page 3, line 49.

12  Does that refresh your recollection?

13  A.    That is a statement that I believe was made by our

14  School Board attorney.

15  Q.    Okay.  But this is the letter that they were talking

16  about?

17  A.    I would need to refer to our School Board attorney to

18  confirm that.

19  Q.    Okay.  The issue of whether -- or how -- the issue of

20  the ACLU's demand or the -- Bayli's demand to allow at

21  Carver -- a GSA at Carver Middle School and whether to

22  change the policy was at issue at the School Board meeting

23  on February 4, right?

24  A.    Yes, it was.

25  Q.    The School Board sets the policy for the district,

1  right?

2  A.    Correct.

3  Q.    And it enacted School Board policy number 4.502?

4  A.    Yes.

5  Q.    And the School Board enacted policy number 4.502 in

6  the summer of 2013, right?

7  A.    Correct.

8  Q.    And I don't want to hide the ball.  That's Exhibit 1.

9  I'm going to turn to that right now.

10 A.    Uh-huh.

11 Q.    Pursuant to that policy's paragraph 3, the

12 superintendent decides whether to approve or disapprove of

13 a middle school club, right?

14 A.    Yes.

15 Q.    You further delegated that authority to Mrs. Cole,

16 right?

17 A.    Yes.

18 Q.    But you retained authority as, quote, the final

19 decision-maker, end quote, as you stated in paragraph 7 of

20 an affidavit you submitted to this Court and signed on

21 February 3, 2014; isn't that right?

22 A.    Yes.

23 Q.    The School Board does not prescribe a means in the

24 policy 4.502 to appeal the superintendent's decision to

25 disallow a club, right?

1    A.    Not in this policy, no.

2    Q.    And it doesn't prescribe it in any other written

3    notice, correct?

4    A.    No.  Repeat your question.

5    Q.    Sure.

6          And the School Board does not prescribe it in any

7    other written notice?

8    A.    There may be other policies that would have a special

9    provision in that specific policy.  I'm not recalling any,

10   but there is a possibility.

11   Q.    Yeah.  I appreciate -- maybe I'm not being clear.

12   I'm not talking about appeals in general; I'm talking about

13   the appeal -- appealing the decision to disallow or

14   disapprove a middle school student club.

15   A.    No.

16   Q.    So that's not written or -- the appellate procedure

17   or how to bring it before the School Board is not written

18   anywhere?

19   A.    No.

20   Q.    Correct?

21   A.    That is correct.

22   Q.    Thank you.

23         And during the school year 2013 to 2014, no club ever

24   tried to appeal your decision to disapprove the club,

25   correct?

1    A.    Not that I'm aware of, no.

2    Q.    To become a student club an application and a charter

3    must be submitted, right?

4    A.    Correct.

5    Q.    Student clubs were approved based on the information

6    contained in their application and charter without

7    consideration to outside information, right?

8    A.    Correct.

9    Q.    And I want to talk about now the substantive

10    requirements for a middle school club to be approved

11    pursuant to School Board policy number 4.502, and I would

12    direct your attention to Exhibit 1, Plaintiffs' Exhibit 1.

13         I want to look at subsection 2 of the School Board

14    policy 4.502.

15         One way to qualify to become a student club is if the

16    club strengthens and promotes critical thinking, business

17    skills, athletic skills, or performing and visual arts,

18    right?

19    A.    Correct.

20    Q.    And I think we talked about this during your

21    deposition, but I want to make sure everyone is on the same

22    page, that -- that that last -- that "and" above the pen

23    right there, the "and" that occurs between "athletic

24    skills" and "performing and visual arts skills," actually

25    should be an "or," correct, or at least the School Board

1    and school district enforces it as if it were an "or,"

2    correct?

3    A.    Yes.

4    Q.    A second way to qualify to become a student club is

5    if the club relates to an academic honor society, right?

6    A.    Yes.

7    Q.    And it's fair to say that if it relates to an

8    academic honor society, it doesn't need to promote critical

9    thinking, right?

10   A.    Yes.

11   Q.    A third way for a group to be qualified as a middle

12   school student club is if the group is a student

13   government, right?

14   A.    Yes.

15   Q.    And, similarly, if a club qualifies as a student

16   government, it need not promote critical thinking, right?

17   A.    Yes.

18   Q.    The fourth way is if it is directly related to the

19   curriculum so -- is that correct?

20   A.    Yes.

21   Q.    And so it's fair to say a club is directly related to

22   the curriculum if it directly relates to a part of a course

23   taught in a middle school, right?

24   A.    Yes.

25   Q.    Said another way, it doesn't have to relate to every

1    part or topic covered in the course, right?

2    A.    It needs to relate to the course.

3    Q.    Okay.  For example, a French club could relate to

4    informal conversation, culture and cooking but not involve

5    congregating verbs or writing French, and it would still

6    qualify as being directly related to the curriculum, right?

7    A.    I can't speculate to that.

8    Q.    I'm not asking you to speculate.  I'm asking for

9    the -- for your opinion as the person who is designated by

10   the School Board to enforce a policy.

11   A.    I would review the application and the merits and

12   what was contained in that application, sir.

13   Q.    So today you're not able to say whether a French club

14   that wanted to talk about conversation, culture and cooking

15   would actually be approved?

16   A.    I would review that application and that charter that

17   was contained within that application.

18   Q.    If a club passes -- we've gone over four

19   requirements, right?

20   A.    Yes.

21   Q.    And if a club passes just one of those four

22   requirements, it would qualify as a student club, correct?

23   A.    If it meets any of the items outlined in item two,

24   yes.

25   Q.    My question is:  We've gone over four requirements.

1    If a club passes just one of the four requirements, it
2    would qualify as a student club, correct?
3    A.    Yes, as outlined in paragraph 2.
4    Q.    So if it promotes critical thinking, it doesn't have
5    to relate to the curriculum to be a student club, correct?
6    A.    Correct.
7    Q.    And, in fact, the School Board has no further
8    requirements to become a student club other than satisfying
9    the four substantive requirements that we've just gone over
10   and the procedural requirements of filling out an
11   application and submitting a charter, correct?
12   A.    Correct.
13   Q.    And this has always been the defendant's
14   interpretation of its policy 4.502?
15   A.    As I understand it, correct.
16   Q.    And the requirement that the club be, quote, school
17   sponsored -- and I'm probably a line or so above -- or
18   maybe I'm a line below -- yeah, the second line of
19   subsection 2 says that middle school clubs must be school
20   sponsored -- the requirement that a club must be school
21   sponsored means only that it must be approved by the
22   superintendent, correct?
23   A.    It is sponsored by the school, and it meets the
24   criteria as outlined in paragraph 2 and approved by the --
25   the superintendent.

1   Q.    Said another way, if it's approved by the

2   superintendent, it is, by definition, school sponsored?

3   A.    Yes.

4   Q.    School sponsor is not an extra requirement; it is

5   simply de facto -- if the superintendent signs it and

6   approves it, it's school sponsored by definition, right?

7   A.    In this policy, yes.

8   Q.    I want to draw your attention to another attribute of

9   the school club policy in subsection 5.  Once the club is

10  approved, the School Board requires parents to approve

11  their child's involvement in any middle school student

12  club, correct?

13  A.    Yes.

14  Q.    If the parent does not approve, then the school will

15  not allow the student to be involved in the club, right?

16  A.    Correct.

17  Q.    And this way the School Board makes sure that

18  students are not exposed to materials or activities that

19  the parents deem inappropriate, right?

20  A.    The parents must give consent.

21  Q.    Right.

22        And in this way the School Board makes sure that

23  students are not exposed to the materials or activities the

24  parents deem inappropriate?

25  A.    Yes.

1  Q.      Pursuant to the School Board policy number 4.502, the

2  same one we're talking about, there's no requirement that

3  the club impart specific skills or knowledge, correct?

4  A.      No.

5  Q.      I think we maybe -- is -- is my statement correct?

6  A.      Repeat your statement.

7  Q.      Sure.

8  A.      I'm sorry.

9  Q.      Pursuant to the School Board policy number 4.502,

10 there's no requirement that the club impart specific skills

11 or knowledge?

12 A.      It does not specifically state that, no.

13 Q.      So my statement was correct?

14 A.      Correct.

15 Q.      A club can be approved even if it doesn't -- or even

16 if it is not designed to impart specific knowledge or

17 skills, correct?

18 A.      It does not specifically state that, no.

19 Q.      I understand it doesn't state that.  I'm saying as

20 it's enforced by you, the superintendent, a club can be

21 approved even if it is -- even if it is not designed to

22 impart specific skills or knowledge?

23 A.      Well, we're looking at the charter, and we're looking

24 at the application as it relates to -- how it relates to

25 one of those areas outlined in paragraph 2.

**Dennis Miracle, Court Reporter**
Affiliated with Joy Hayes Court Reporting
(352) 726-4451 * Inverness, Florida

1    And so if you're talking about a curricular club,
2  then there would be knowledge and skills as part of that.
3  Q.    Sure.
4  A.    So I think it has to depend on the area that it's
5  being attributed to in paragraph 2.
6    In paragraph 2 it talks about business skills.  It
7  talks about athletic skills.  We're imparting knowledge and
8  skills in curriculum.
9  Q.    Sure.  But, for example, a student government doesn't
10  have to impart -- be designed to impart skills to be
11  approved as a student club, correct?
12  A.    No, but it could.
13  Q.    Certainly it could, but it doesn't have to, is my
14  point.
15  A.    Not in that situation, no.
16  Q.    Once approved middle schools provide various benefits
17  to approved student clubs, correct?
18  A.    Correct.
19  Q.    And if a group wants to avail itself of those
20  benefits of being a student club, it must be approved,
21  right?
22  A.    Yes.
23  Q.    A student group approved as a student club realizes
24  benefits that unapproved groups simply do not enjoy, right?
25  A.    Correct.

Q.   The school district's decision to approve or deny the
Carver GSA was based solely on the application and the
charter that was submitted, right?

A.   Yes.

Q.   I'd like to direct your attention now to Plaintiffs'
Exhibit 5, which is the application and charter.

     The club's application does not suggest students
would discuss sexual activity, right?

A.   Correct.

Q.   And you agree a student can talk about challenges she
faces because she's gay, like bullying and acceptance,
without discussing sexual acts, right?

A.   Yes.

Q.   You understand -- I'm sorry -- you understood that
this application was sincere and honest, that the students
were not trying to say one thing in their application and
get it approved with the intent to do something else once
it's approved, right?

A.   I don't know their intent.  I know what's on the
application and the charter.

Q.   All right.  I'd like to direct your attention to page
108 of your deposition, which is the same tab 4 -- 14.  I'm
sorry.

A.   I'm sorry.  The page again?

Q.   108.

1          I want to begin on line 8:  Is the district aware of
2    any information or have any basis to doubt, say, that's not
3    what the club is really about; it's about something else?
4          Answer:  No.
5    A.    Uh-huh.
6    Q.    Did I ask you that question?
7    A.    Yes, you did.
8    Q.    Did you give me that answer?
9    A.    Yes, I did.
10    Q.    The Carver GSA was designed to teach students
11    something, right?
12    A.    It speaks to create an environment, to create and
13    execute strategies and to promote.  That is what the
14    charter says.
15    Q.    Yes.  Thank you.
16          And the Carver GSA was designed to teach students
17    something, right?
18    A.    I know what's written on this charter here.
19    Q.    And I would like you to direct your --
20    A.    Uh-huh.
21    Q.    -- attention to my question.
22    A.    Uh-huh.
23    Q.    The Carver GSA was designed to teach students
24    something, right?
25    A.    It is talking about creating an environment.  It is

1    talking about discussing experiences.  That could be a
2    conversation.  That may not be teaching anything.  I can't
3    speak to that.
4        I can speak to that they are going to discuss and
5    have a conversation.  They are going to create an
6    environment.  That does not address teaching anything.
7    Q.    Wonderful.
8        I would like to address your attention to your
9    deposition, tab 14 again, the same page, 108.  108.  We're
10   going to begin on line 18.
11       Question:  Would you agree that the Carver Middle
12   School GSA has reflected in the club charter that it's
13   designed to impart knowledge and skills?
14       Answer:  Knowledge, yes.  Skills, no.
15       Did I ask you that question?
16   A.    Yes, you did.
17   Q.    Did you give me that answer?
18   A.    I did.
19   Q.    The Carver GSA's stated goals include discussing
20   challenges and successes of LGBT students, right?
21   A.    Yes.
22   Q.    The stated goals include developing strategies to
23   confront bullying, correct?
24   A.    Yes.
25   Q.    Its stated goals include executing strategies to end

1   bullying through a student awareness campaign.  I believe

2   that's in the "activities" section, a little further down.

3   A.     Yes.

4   Q.     The Carver GSA filled out an application and

5   submitted a charter or constitution, right?

6   A.     A charter, yes.

7   Q.     It complied with all the procedural requirements,

8   right?

9   A.     Yes.

10  Q.     And you were involved in the decision to disapprove

11  the Carver GSA, right?

12  A.     Yes.

13  Q.     Your decision to disapprove the Carver GSA, like your

14  decision to approve or disapprove all clubs, complied with

15  School Board policy 4.502, right?

16  A.     Yes.

17  Q.     And the policy does not -- does not discuss age

18  appropriateness, correct?

19  A.     No.

20  Q.     I'm sorry.  Is -- was my statement correct?

21  A.     Repeat your statement.

22  Q.     And the policy does not discuss age appropriateness?

23  A.     Correct.

24  Q.     It's not one of the listed requirements to be a club,

25  right?

1    A.    No.  Correct.

2    Q.    Thank you.  Sorry.  It's the double negative.

3    A.    Uh-huh.

4    Q.    Thanks for working with me.

5          And the policy does not direct you to consider

6    whether a club is age appropriate, right?

7    A.    It does not, no.

8    Q.    In fact, the school district does not have an opinion

9    that the Carver GSA would be age inappropriate, right?

10   A.    Correct.

11   Q.    Whether a topic is age appropriate is a pedagogical

12   concern, though, right?

13   A.    Yes.

14   Q.    And there would be a valid educational reason not to

15   teach the existence of Santa Claus to elementary students

16   or the nonexistence?

17   A.    I can't speculate on that.

18   Q.    You can't speculate on that.  Okay.

19         Had the Carver GSA satisfied one of the four

20   substantive requirements, no valid educational reason

21   existed to disapprove it, right?

22   A.    If they met one of the criterion outlined in

23   paragraph 2 of the policy, yes, it would have been

24   approved.

25   Q.    And one of the criteria -- we're talking about the

1   four criteria we've just gone over, right?

2   A.    The -- all the criterion in number 2.  I believe

3   there were the four areas plus the honor society, plus SGA,

4   and the curricular component.  So there's actually six or

5   seven areas.

6        But yes, your -- your four areas that you talked

7   about.  Yes.

8   Q.    Okay.  We're not -- I mean, your testimony is not

9   changing any?

10  A.    No.

11  Q.    Okay.  So had it satisfied one of the four

12  requirements, -- and you're right.  I think I am putting

13  business skills and athletic skills and critical thinking

14  and visual arts --

15  A.    As one --

16  Q.    -- under one category.

17  A.    Uh-huh.

18  Q.    You're right.

19       Had it satisfied any one of those four requirements,

20  no valid educational reason existed to disapprove it,

21  right?

22  A.    Correct.

23  Q.    Had you thought the Carver GSA would have promoted

24  critical thinking, you would have approved it, right?

25  A.    If it met the criteria of critical thinking, yes.

1  Q.    Right.

2      If you had thought the Carver GSA promoted critical

3  thinking, you would have approved it?

4  A.    Yes.

5  Q.    And you disapproved of the Carver GSA because it did

6  not meet one of those four requirements, right?

7  A.    Correct.

8  Q.    And that was the sole reason, right?

9  A.    Yes.

10  Q.    The school district doesn't have any factual basis to

11  believe that the Carver GSA will present a challenge to the

12  order and discipline of the school, right?

13  A.    Correct.

14  Q.    And the School Board doesn't have any factual basis

15  to believe that the Carver GSA would present a challenge to

16  the well-being of the students at Carver Middle School,

17  correct?

18  A.    Correct.

19  Q.    The School Board does not have any factual basis to

20  believe that the Carver GSA would be lewd or disruptive,

21  right?

22  A.    Not that I'm aware of, no.

23  Q.    Bullying exists at Carver Middle School, right?

24  A.    I don't have personal knowledge of every incident, so

25  I would need to direct that to the principal for certainty.

1  Q.    Okay.  Let me direct your attention to your

2  deposition --

3  A.    Uh-huh.

4  Q.    -- page 25.  That's tab 14.

5  A.    Uh-huh.

6        I'm sorry.  What page again?

7  Q.    Page 25.

8  A.    Thank you.

9  Q.    I'm going to begin on line 12.

10       Question:  Does bullying exist in the Lake County

11 schools?

12       Answer:  Bullying exists in every school.

13       Question:  So yes; it's correct?

14       Answer:  Yes.

15       Did I ask you those questions?

16 A.    You did.

17 Q.    Did you give me those answers?

18 A.    I did.

19       I also said that I could not personally talk about

20 every one of them because I do not know the personal

21 incidents of every one.

22 Q.    I'd like to again direct your attention to

23 Plaintiffs' Exhibit 5, which is the application.

24       The Carver GSA's club charter includes -- and I'm

25 reading number one now -- to create a safe and supportive

1    environment for -- at school for students to discuss

2    experiences, challenges and successes of LGBT students.

3    Right?

4    A.    Yes.

5    Q.    Number two:  To create and execute strategies to

6    confront, essentially, bullying.  Right?

7    A.    Yes.

8    Q.    They -- in number three they talk about how they want

9    to promote critical thinking by discussing how to address

10   bullying.  Right?

11   A.    Yes.

12   Q.    And down below under the "activities," they talk

13   about how they want to design and market student awareness

14   campaign to end bullying, right?

15   A.    Yes.

16   Q.    The club -- or the school tries to curb bullying

17   through discipline and reporting.  Does that sound about

18   right?

19   A.    Yes.

20   Q.    And the School Board is very strategic and systematic

21   in addressing bullying, isn't it?

22   A.    Yes.

23   Q.    Nevertheless, bullying persists in the schools,

24   right?

25   A.    Yes.

1    Q.    Bullying is a complex problem, wouldn't you say?

2    A.    It depends on how you define "complex."

3    Q.    I would like to direct your attention to your

4    deposition.

5    A.    Uh-huh.

6    Q.    Page 27.  We'll begin on line 19.

7          Question:  What causes bullying?

8          Answer:  I think there's a variety of causes for

9    bullying.

10         Question:  Fair to say it's a complex problem?

11         Answer:  Yes.

12         Did I ask you those questions?

13   A.    You did.

14   Q.    Did you give me those answers?

15   A.    I did.

16   Q.    Would you also agree that bullying is a complex

17   problem that doesn't have a simple solution?

18   A.    Correct.

19   Q.    In fact, it requires critical thinking for the Board

20   to address bullying, right?

21   A.    Critical thinking in writing their policy, yes, is

22   what I believe I stated.

23   Q.    Okay.  Does it require critical thinking for the

24   school to address bullying within the district?

25   A.    It could.

1  Q.    It could, but not necessarily?

2  A.    Uh-huh.

3  Q.    Okay.  I would like to direct your attention to your

4  deposition.  Page 111.  We'll begin on line 23.

5        Question:  Okay.  So developing a policy -- School

6  Board policy to confront a complex issue like bullying

7  would require critical thinking, correct?

8        Answer:  Yes.

9  A.    I'm sorry.  What page?  I'm sorry.

10 Q.    I'm sorry.  It should be 111.

11 A.    Okay.  Sorry.

12 Q.    Would you like me to repeat that?  I will.

13       The question begins on line 23.

14       Okay.  So developing a policy -- School Board policy

15 to confront a complex issue like bullying would require

16 critical thinking, correct?

17       Answer:  Yes.

18       Did I ask you that question?

19 A.    Yes, you did.

20 Q.    Did you give me that answer?

21 A.    Yes, I did.

22 Q.    I would like to direct your attention to page 29 of

23 your deposition.  We'll begin on line 9.

24       I'm not trying to hide the ball here.  I'm trying to

25 say it's a complex problem that requires creative thinking

1    to solve.  That's all I'm trying to say.  Would you agree
2    with that?
3         Object to the form.
4         Answer:  I think it needs careful review.
5         Question:  Careful review?  Careful study?
6         Answer:  Yes.
7         Question:  Critical thinking?
8         Object to the form.
9         Answer:  Yes.
10         MR. STEVENSON:  And, Your Honor, I'd move the
11    Court to strike the objections as inappropriate.
12         THE COURT:  Well, I'm not sure what that
13    accomplishes, Mr. Stevenson.
14         MR. STEVENSON:  Fair enough.
15         THE COURT:  You have published the question and
16    answer of the witness which, by the way, would be
17    admissible under Rule 32, in any event.  So you may
18    proceed.
19         MR. STEVENSON:  Okay.
20    BY MR. STEVENSON:
21    Q.    So it requires critical thinking for the School Board
22    to address bullying, right?
23    A.    Yes.
24    Q.    And it also requires critical thinking for the Carver
25    GSA to address and confront bullying, right?

1  A.    It could.

2  Q.    As stated in the application -- in its application?

3  A.    I don't know how they're addressing critical thinking

4  through -- as represented in their application.  I can't

5  infer that from the application.

6  Q.    So in your view, the Carver GSA needed to detail a

7  specific plan to confront bullying to establish that the

8  club involved critical thinking?

9  A.    I could not infer what they meant by "critical

10 thinking" in their application as presented here in this

11 exhibit.

12 Q.    So had they provided a specific plan to confront

13 bullying, you might be able to tell whether that activity

14 involved critical thinking?

15 A.    I would have been able to make further determination

16 based on that information.

17 Q.    And is that what -- is that the deficiency that you

18 are identifying, that they didn't explain how they were

19 going to -- what strategy or what plan they had to confront

20 the bullying; is that the deficiency?

21 A.    That is one of the deficiencies, yes.

22 Q.    Okay.

23 A.    Uh-huh.

24 Q.    Aren't you putting the cart before the horse?  I

25 mean, wasn't one of the purposes of the club to figure out

1  how to confront bullying?

2  A.    I don't know that from this.

3  Q.    Okay.  You don't know it from subsection 2 where it

4  says "to create and execute strategies to confront

5  bullying"?

6  A.    I don't know what those are.

7  Q.    But had they told you the strategies, you might be

8  able to tell --

9  A.    I could with more information.

10 Q.    The school district applied a uniform procedure and

11 policy in deciding to approve or disapprove middle school

12 student clubs, right?

13 A.    Yes.

14 Q.    Said another way, the clubs were approved based on

15 the information contained in the application and charter

16 without consideration of outside information, right?

17 A.    Correct.

18 Q.    I'd like to direct your attention to Plaintiffs'

19 Exhibit 42.

20        MR. JOHNSON:  Your Honor, we object.  42 is

21 going to -- wants to talk to the superintendent about a --

22        THE COURT:  I'm having difficulty hearing you over

23 there, Mr. Johnson.  Come to the lectern, if you would.  It

24 might help Mr. Miracle as well.

25        MR. JOHNSON:  Yes, Your Honor.

1      Exhibit 42 of the plaintiffs is an application for
2  another school.  I anticipate that counsel is going to be
3  asking the superintendent about a criteria for approving
4  some other club based on the School Board policy at the
5  time.

6      I believe you had already indicated in your
7  earlier order that was entered in this case, Your Honor,
8  that there is no equal protection issue here and that the
9  issue of whether some other club was approved or not
10 approved under the provisions of the policy was not
11 relevant to our particular case, and we would object on
12 that basis.

13     THE COURT:  Well, I'm inclined to overrule that
14 objection.  There may be an issue in the case concerning
15 the basis of the rejection of the plaintiffs' application
16 or the -- and/or the motivation of the decision-makers with
17 respect to it.  And I assume that's what you intend to
18 explore in this line of examination.

19     MR. STEVENSON:  Precisely, Your Honor.
20     THE COURT:  I'll overrule the objection.
21     MR. JOHNSON:  Yes, sir.
22 BY MR. STEVENSON:
23 Q.    Could you identify what is marked as Plaintiffs'
24 Exhibit 42?
25 A.    This is a middle school club organization application

1   for, I believe, Mount Dora Middle School for a chess club.

2         MR. STEVENSON:  I would move it to be admitted

3   into evidence.

4         THE COURT:  I'll receive it and overrule the

5   objection, which the record will reflect.

6         MR. STEVENSON:  Thank you, Your Honor.

7         THE COURT:  No need to thank me, Mr. Stevenson.  I

8   get paid either way.

9         MR. STEVENSON:  All right.

10        THE COURT:  Not very much but some.

11        MR. STEVENSON:  Certainly not enough.

12  BY MR. STEVENSON:

13  Q.   So the Mount Dora chess club, Plaintiffs' Exhibit 42,

14  was approved, correct?

15  A.   It was.

16  Q.   And we know that it was approved because there's a

17  signature at the bottom of the first page that says --

18  under the line of "superintendent designee approved,"

19  right?

20  A.   Correct.

21  Q.   It was approved because it promoted critical

22  thinking, right?

23  A.   Correct.

24  Q.   It would not have qualified in any of the other three

25  ways, because it's not a student government, right?

1   A.    Correct.

2   Q.    It's not an honor society, right?

3   A.    Correct.

4   Q.    And it's not directly related to the curriculum,

5   right?

6   A.    Correct.

7   Q.    Now, the club charter, which is on the second page,

8   states that chess teaches many skills, including focusing,

9   visualizing and weighing options.

10       Do you see that at the bottom of the page?

11   A.    I do.

12   Q.    Would you agree, though, that the charter does not

13   explain how it teaches focusing, visualizing and weighing

14   options, right?

15   A.    Other than they have explained that they are looking

16   at a sequence of actions before something happens; they've

17   built out their terminology and how they would be

18   approaching that.

19   Q.    Sure.  But the terminology following the headers -- I

20   mean, there's a header there --

21   A.    Uh-huh.

22   Q.    -- for focusing.

23   A.    Uh-huh.

24   Q.    And then the words that follow are merely a

25   description or a definition of what "focusing" means.

1    Focusing means observing and concentrating.

2         If you look at the second one, "visualizing";

3    imagining a sequence of events.

4    A.    Uh-huh.

5    Q.    I mean, it's just expounding upon what the definition

6    of the words are, but they don't explain how chess is going

7    to teach these things, does it?

8    A.    Not specifically, no.

9    Q.    And is it also fair to say that the chess club

10   application does not rely on or cite to the critical

11   thinking curriculum?

12   A.    It is referencing areas that are part of critical

13   thinking where you weigh options, where you look at

14   analysis.  It talks about the planning, looking at those

15   options, making decisions, doing those analysis, planning

16   ahead.  All those things are part of critical thinking and

17   part of critical thinking curriculum.

18   Q.    But it wasn't approved as being directly related to

19   the curriculum?

20   A.    No, it was not.

21   Q.    Okay.  But the club was approved based on this

22   application because it promoted critical thinking, right?

23   A.    It was approved based on this application because of

24   the information on critical thinking that is part of

25   critical thinking, the components of critical thinking.

Q.    I want to move on to secondary schools.

     While there may be some disagreement about whether middle school classes constitute second -- constitute secondary education, there's no doubt that high school classes constitute secondary education, correct?

A.    High school courses are, yes.

Q.    Are secondary education?

A.    Yes.

Q.    I'd like to direct your attention to what is marked as Plaintiffs' Exhibit 43.  Could you identify this exhibit for us?

A.    This is a section of the Florida course code directory.

Q.    Okay.  And this lists the courses that are offered in high school, right?

A.    This section is, yes.

Q.    Right.

     And we can tell that by looking at the top where it's -- I know there's three different categories identified on page 1 at the top.  But it's the one that's underlined is the one that this pertains to, correct?

A.    Grades nine through -- nine to 12 and adult education courses.

Q.    Exactly.  Okay.

     THE COURT:  Is that a document that's issued by

1  the State Department of Education?

2          THE WITNESS:  Yes, it is.

3          MR. STEVENSON:  I would move to -- for it to be

4  admitted into evidence, Your Honor.

5          MR. JOHNSON:  No objection, Your Honor.

6          THE COURT:  It's received.

7  BY MR. STEVENSON:

8  Q.     So the -- this lists -- list is -- from the

9  Department of Education -- the Florida Department of

10 Education's perspective, this lists the schools -- I'm

11 sorry -- the high school classes that can be taught, right?

12 A.     Correct.

13 Q.     And by definition -- I mean, while we may dispute on

14 the fringe here, we can all agree that these are secondary

15 education courses, correct?

16 A.     Yes.

17 Q.     I want to direct your attention to page 26.

18         You would admit that algebra one is listed in the

19 course directory as a high school-level class, correct?

20 A.     Correct.

21 Q.     And that is the course with that course code that is

22 taught in middle schools at -- middle schools in the

23 district and at Carver Middle School specifically, correct?

24 A.     Correct.

25 Q.     I would like to direct your attention now to

**Dennis Miracle, Court Reporter**
Affiliated with Joy Hayes Court Reporting
(352) 726-4451 * Inverness, Florida

1   Plaintiffs' Exhibit 44.

2          Is it fair to say that 44 is -- based on the

3   underline at the top of page 1 this is -- are the courses

4   that the Florida Department of Education -- the courses

5   that can be offered in the schools within the State of

6   Florida, correct?  These are middle school courses, is what

7   I'm trying to get at.

8   A.     It talks about grade six to eight education courses.

9   Q.     Right.  So these are the courses middle schools

10  teach, right --

11  A.     Correct --

12  Q.     -- or that are geared for --

13  A.     -- or can.

14  Q.     Yeah, they are geared for grades six through eight --

15  A.     Uh-huh.

16  Q.     -- right?

17         I'd like to direct your attention to --

18         MR. STEVENSON:  Actually I'd like to move that

19  into evidence, Your Honor.

20         MR. JOHNSON:  No objection, Your Honor.

21         THE COURT:  It's received.

22  BY MR. STEVENSON:

23  Q.     Looking at page 11 and 12 where the mathematics

24  courses for middle school are listed, it's fair to say that

25  algebra one does not appear in the middle school course

1  directory, right?

2  A.     No, it does not.

3  Q.     Teachers teach algebra one to middle school students

4  in traditional classrooms at Carver Middle, correct?

5  A.     They offered algebra one courses at the middle school

6  level, yes.

7  Q.     But they not only offer it, but they actually

8  instruct --

9  A.     Yes.

10  Q.     -- the courses?

11  A.     If they have the correct certification.

12  Q.     If the teacher does?

13  A.     Uh-huh.

14  Q.     Thank you.

15         Is it fair to say that middle schools, like high

16  schools but unlike elementary schools, teach career-themed

17  elective courses?

18  A.     They teach electives.

19  Q.     Career-themed elective courses?

20  A.     They have CTE courses, yes.

21  Q.     Is it fair --

22         THE COURT:  Let me interrupt there to ask a couple

23  of questions, if I might.

24         MR. STEVENSON:  Yes, Your Honor.

25         THE COURT:  What is this document, or these

1   documents, Plaintiffs' Exhibits 43 and 44, Ms. Moxley?

2          They are issued by the State Department of

3   Education, as I understand your answer to my last question.

4   What -- what -- what's the nature of the document?

5          THE WITNESS:  The State of Florida identifies the

6   courses that are appropriate for levels of -- at the

7   various levels.

8          If you'll notice on the top of Exhibit 44, you'll

9   notice that they have elementary grades pre-K through five,

10  so they have a section of the courses that are designated

11  for that -- those levels.

12         This particular document is grades six to eight

13  education courses, so it's for the middle school level.

14  And then the other section is secondary grades nine through

15  12.

16         THE COURT:  Well, is that document mandatory with

17  respect to each of the districts in the State; that is to

18  say, the curriculum must conform to that document or not?

19         THE WITNESS:  These are the courses that we select

20  from to offer.  We don't have to offer all of them.  We can

21  select from them unless they are specifically mandated as a

22  graduation requirement at the high school level.

23         THE COURT:  And you go outside or beyond that

24  document in the formulation of a curriculum in a middle

25  school or high school, as the case might be?

1       THE WITNESS:  We can -- I'm not sure I completely

2   understand your question.

3       We offer courses that are contained in this

4   document.  There are situations where at a high school we

5   may offer a dual-enrolled course from the state community

6   college or state college system that are permissible.

7       And then at the middle school level we are

8   required to offer one acceleration course -- at least one

9   acceleration course for students that fit that criteria,

10  and algebra one would be that acceleration course.

11      THE COURT:  There was a time, I think -- correct

12  me if I'm wrong -- during which the principal of each

13  school in each district had considerable autonomy with

14  respect to the formulation of the curriculum in his or her

15  particular school; is that right?

16      THE WITNESS:  Yes.

17      THE COURT:  Is that still the case?

18      THE WITNESS:  Yes.  Principals do have the

19  autonomy to build their master schedules based on the needs

20  of the students served at that school.

21      It must be within the context of the course code

22  directory, but they can select.  That's why in one school

23  you might see certain electives that are not at another

24  school.

25      THE COURT:  Well, you said "electives."  In any

1  event, the curriculum at Carver Middle School may or may

2  not be precisely the same as the curriculum at some other

3  middle school in Lake County?

4  THE WITNESS:  In your core academic areas -- that

5  would be your math, science, social studies and English --

6  they would be pretty uniform and universal across each

7  middle school in our district.

8  Where they might have more choice that would

9  differ would be in elective courses like band, music, fine

10  arts, career and tech ed. courses, those kinds of elective

11  courses, but you're --

12  THE COURT:  It might differ from one school to the

13  next?

14  THE WITNESS:  Yes.

15  THE COURT:  Because of the principal's

16  determination?

17  THE WITNESS:  Yes, and the needs of the schools or

18  the -- or students, uh-huh.

19  THE COURT:  And subject, I presume, to your

20  approval?

21  THE WITNESS:  They -- they do get approved through

22  our district curriculum department.

23  THE COURT:  How many middle schools are there in

24  Lake County?

25  THE WITNESS:  We have ten middle schools.

THE COURT:  I may have some other questions, but I
don't mean to interrupt you.  Go ahead, Mr. Stevenson.

BY MR. STEVENSON:

Q.    And all ten teach algebra one, right?

A.    Yes.

Q.    In fact, that's a state law; Florida State
legislators mandate that algebra one be offered at every
middle school in the state of Florida, correct?

A.    Yes.

Q.    Is it fair to say also that middle schools, like high
schools but unlike elementary schools, include various
periods, multiple teachers, and end-of-year examinations?

A.    They do have different courses.  They change classes,
yes.  And end-of-course exams are now this year required K
through 5 -- or K through 12.

Q.    Fair enough.

      But last year it was only required in the middle
schools and high schools, right?

A.    Certain courses, but not every course in the middle
school had to have an end-of-course exam.

Q.    True.  And probably not every school in the high
school had to have an end-of-school exam?

A.    Not every one, no.

Q.    Right.

A.    Uh-huh.

Q.    But none had to have them in elementary school last
year, correct?

A.    No.  No, they did not have end-of-course exams.

Q.    Thank you.

     Middle schools use the same grading system as high
schools, right?

A.    All our schools use the same grading system.

Q.    Are you aware that in the summer of 2013 the Florida
Legislature repealed a law that explicitly defined
"secondary schools" as those that teach grades six through
12?

A.    It was redesigned -- redesigned that.

Q.    Uh-huh.

     And the repeal of this definition -- you would admit,
though, that the appeal -- the repeal of this definition
did not affect what courses and topics were taught in the
middle school in Lake County?

A.    I'm not sure about the repeal of the definition.  It
was a repeal of that statute --

Q.    Sure.

A.    -- that was inclusive of many things.  So that repeal
of that statute did not change anything in the way for
middle schools.

Q.    Of what education is provided --

A.    Correct.

1  Q.     -- in the middle schools?

2      Okay.  The Lake County School Board has a student

3  progression plan that outlines the program of study,

4  attendance and grading, right?

5  A.     Correct.

6  Q.     And the School Board passes one every year, right?

7  A.     Correct.

8  Q.     I'd like to direct your attention to what is marked

9  as Plaintiffs' Exhibit 2.  This exhibit has already been

10  admitted into evidence.

11      Is it fair to say that Plaintiffs' Exhibit 2 of

12  the -- is the School Board's student progression plan that

13  it passed for the 2014-2015 school year in the summer of

14  2014?

15  A.     This is identified as the 2013-2014.

16  Q.     I apologize.  Thank you.

17  A.     Uh-huh.

18  Q.     2013-2014.

19      But this was passed -- were you involved in the

20  passage of this student progression plan?

21  A.     I recommended it for tentative approval and for final

22  approval.

23  Q.     Okay.  My understanding is that this -- that page 1

24  of this student progression plan is actually mislabelled.

25  This is the plan that was approved in the summer of 2014

1  and should have been labeled the 2014-2015 school year;

2  isn't that right?  Take your time to review it if you need

3  to.

4  A.    No.

5        MR. JOHNSON:  Excuse me, Your Honor.  It was

6  presented as the 2013-14 pupil progression plan.  That's

7  what we approved -- admitted into evidence.  That's what's

8  listed on their exhibit list.  I don't know anything about

9  now presenting it -- the next year's pupil progression plan

10  as an additional exhibit.

11       THE COURT:  What do you understand the exhibit to

12  be?  For what school year, Mr. Stevenson?

13       MR. STEVENSON:  My understanding is for the

14  current school year.  This was filed, in fact, in -- in

15  support of our motion for summary judgment as Docket Entry

16  1 after we discovered that they had passed the student

17  progression plan in that a motion for summary judgment --

18  we reference the specific School Board meeting at which it

19  was approved and simply following the hyperlink on that

20  School Board meeting found this document.

21       THE COURT:  Well, do I interpret your objection to

22  be, Mr. Johnson, that this exhibit as it's now being

23  offered is not among the exhibits listed in the pretrial

24  statement?

25       MR. JOHNSON:  Yes, sir.

1       THE COURT:  What do you say to that?

2       MR. STEVENSON:  I would say it is.  I would say it

3   was -- it is -- it reflects the title that is on page 1.

4   The title we have given to the School Board is the title

5   that is reflected on page 1.

6       THE COURT:  Well -- but that doesn't answer the

7   question, I think, Mr. Stevenson.  Is it listed in the

8   pretrial statement as one of your exhibits?

9       MR. STEVENSON:  In all candor, I don't think so.

10      THE COURT:  Well, remember the discussion we had

11  about that.

12      MR. STEVENSON:  I appreciate that.

13      THE COURT:  I'm not sure you were present.

14      MR. STEVENSON:  I wasn't, Your Honor.  And I

15  wasn't trying to pull one over.  Frankly, I didn't realize

16  the change in date until right now.

17      THE COURT:  Well, I think Mr. Tilley will confirm,

18  if you haven't seen a transcript of the -- of the pretrial

19  conference, that I emphasized as clearly as I could that

20  when this question arose during trial, as it surely would,

21  that I would be governed by the pretrial statement one way

22  or the other.  And if it's not there, then I sustain

23  objection to it.

24      Is that not so, Mr. Tilley?

25      MR. TILLEY:  Yes, sir, Your Honor.  That was

1  correct.

2  MR. STEVENSON:  I don't know if the Court would be

3  willing to entertain one more argument.  It's that we

4  identified the document specifically by docket entry

5  number.

6  THE COURT:  Well --

7  MR. STEVENSON:  I mean, there's certainly no

8  question of what pages that we're talking about.

9  THE COURT:  No, I understand that, but the

10  governing document is the pretrial statement.  That's --

11  MR. STEVENSON:  Okay.

12  THE COURT:  -- why we have -- one of the principal

13  reasons for the pretrial statement is to govern just this

14  kind of disagreement --

15  MR. STEVENSON:  Yes, Your Honor.

16  THE COURT:  -- so we can resolve it.

17  Go ahead.  Put another question.

18  MR. STEVENSON:  Thank you.

19  BY MR. STEVENSON:

20  Q.  Let's leave Exhibit 2 aside.  I want you -- I want to

21  talk about the student progression plan that was passed in

22  the summer of 2014 that would govern the 2014-2015 school

23  year.

24  Is it fair to say that the -- a year after the

25  Florida Legislature repealed the explicit definition that

1  secondary schools are schools that primarily serve students
2  in grades six through 12, that the Lake County School
3  Board, in their student progression plan for the 2014-2015
4  year, defined the middle grades as secondary schools?
5  A.    The section of the pupil progression plan approved in
6  June for the '13-'14 school year had a section that
7  referred to secondary schools in the middle school section
8  for the redesign act.
9  Q.    I apologize.
10      I think we're maybe talking about different years.
11  I'm talking about the one that was passed just nine months
12  ago.
13  A.    Correct.
14  Q.    Okay.  You identified it as the '13-'14 school year?
15  A.    Yes, I did.
16  Q.    Did you mean the '14-'15?
17  A.    No.  I meant the '13-'14 school year.
18  Q.    Does the School Board usually pass student
19  progression plans retroactively?
20  A.    In that particular year, yes, it was.
21  Q.    So your testimony today is that it wasn't going to
22  govern the upcoming school year; it was governing the year
23  that just occurred?
24  A.    That is for the '13-'14 school year.  That received
25  final approval in June of 2014.

1   Q.    Would you agree that that's an anomaly, that

2   generally the School Board does pass a student progression

3   plan in advance of the school year instead of at the end of

4   the school year?

5   A.    It's not usually in advance of the school year

6   because we have to get technical assistance from the State

7   of Florida, and we usually do not get that until the fall.

8   Q.    Okay.  Would you agree that they usually pass it in

9   the fall of the school year that they are planning to

10   govern?

11   A.    It usually is somewhere in the January, February time

12   frame.

13   Q.    January, February?

14   A.    Uh-huh.

15   Q.    Has the School Board passed the 2014-2015 student

16   progression plan?

17   A.    No.  Not in final form yet.

18   Q.    Do you remember when I asked about this student

19   progression plan during your deposition and you told me

20   that that was a typo?

21   A.    Yes, I did.

22   Q.    How was it a typo if it's -- was correct?

23   A.    Well, it did not get removed.  It did not get -- the

24   edit did not get removed out of there that -- with the

25   reference when that statute was repealed.

Q.   So it should have been removed?

A.   It should have been, yes.

Q.   Okay.  Thank you, Dr. Moxley.

THE COURT:  Well, that brings us precisely to the lunch hour, Counsel.  Let's recess for lunch until 1:15.

(The luncheon recess was taken.)

THE COURT:  Thank you.  Be seated, everyone.  I apologize for my tardiness.

Ms. Moxley, if you will come back to the witness stand, please -- or I'm assuming you wish to examine Ms. Moxley now?

MR. JOHNSON:  No, Your Honor.  We would reserve examination of Ms. Moxley on our case in chief.

THE COURT:  I called you unnecessarily, Ms. Moxley.

Next witness from the plaintiff, please.

MR. STEVENSON:  Yeah.  Plaintiffs call Mrs. Cole.

THE CLERK:  Raise your right hand.

Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, ma'am.

THE CLERK:  Please have a seat.

Please state your full name, and spell your last name for the record.

1    THE WITNESS:  Aurelia Cole, C-O-L-E.

2                  AURELIA COLE,

3    being duly sworn, testified as follows:

4                  DIRECT EXAMINATION

5    BY MR. STEVENSON:

6    Q.    Good afternoon.

7    A.    Good afternoon.

8    Q.    My name is Benjamin Stevenson.  I represent the

9    Carver GSA.

10         I think we met during your deposition that was given

11   over the summer.

12   A.    Okay.

13   Q.    Do you remember giving a deposition in June of 2014?

14   A.    Yes, I do.

15   Q.    This case involves the Carver Middle School

16   Gay-Straight Alliance.  And if I refer to that club

17   about -- as Carver GSA or a GSA, will you understand that I

18   mean Gay-Straight Alliance for GSA?

19   A.    Yes.

20   Q.    You were the school district's chief of

21   administration, correct?

22   A.    Yes.

23   Q.    And in that position you were second in charge at the

24   district after the superintendent, right?

25   A.    Yes.

```
1    Q.    You are now retired?

2    A.    Yes.

3    Q.    When did you retire?

4    A.    July 31, '14.

5    Q.    Before the 2013-2014 -- I think that's your last year

6    that you were the chief of administration.

7    A.    Yes.

8    Q.    Before that last year --

9    A.    Okay.

10   Q.    -- did -- you did not review and decide student club

11   applications, correct?

12   A.    No, I did not.

13   Q.    That -- the decision to approve or disapprove of a

14   student club was left to the principals at the individual

15   schools, right?

16   A.    Per policy, yes.

17   Q.    But that changed in the summer of 2013, right?

18   A.    Yes.

19   Q.    With -- with the new policy of 4.502, right?

20   A.    Yes.

21   Q.    Part of your duties as the chief of administration

22   during the school year of 2013-2014 was to review and

23   approve or disapprove student club applications, right?

24   A.    Yes.

25   Q.    The superintendent had delegated that job to you,
```

1  right?

2  A.    Yes.

3  Q.    And principals no longer did it in the 2013-2014

4  school year, right?

5  A.    There was -- the signature of the principal had to be

6  on the application and -- but then they had to be sent to

7  the district office.

8  Q.    For final approval?

9  A.    Yes.

10 Q.    And you reviewed and approved or disapproved of

11 student club applications from the start of the year when

12 school began in August or September in 2013 through the end

13 of the year, correct?

14 A.    Yes.

15 Q.    You reviewed the club applications and made your

16 decision about whether to approve or disapprove of the

17 student clubs based solely on the application and the

18 charter that was submitted without doing any additional

19 research, correct?

20 A.    And the policy.

21 Q.    And the policy.  Thank you.

22       So the sole basis of your decision for any particular

23 club would have been on the basis of the application, the

24 charter and review of the policy, correct?

25 A.    Yes.

Q.     You reviewed the Carver GSA club application,
correct?

A.     Yes.

Q.     And Carver GSA submitted an application and charter.
And I'm not going to press you too much, but I'll ask you
to turn to Plaintiffs' Exhibit 5.  There's two folders in
front of you.  It should be in the one on the left at
the -- it would be tab 5.

So let me rephrase my question.  The Carver GSA
submitted an application and charter, right?

A.     Yes.

Q.     And the Carver GSA used the one and only available
application form that was provided by the school district
to submit that application, correct?

A.     Yes.

Q.     And can you verify that Exhibit 5 does -- is, in
fact, the Carver GSA's application?

A.     Yes, it is.

Q.     I want to direct your attention to what's written at
the upper right-hand corner of the application.  It reads,
quote, Club is not an extension of a school curriculum; per
policy, not approved.  Right?

A.     Yes.

Q.     And you wrote that, right?

A.     Yes.

1    Q.    So you disapproved the Carver GSA because it was not

2    an extension of the curriculum, right?

3    A.    Yes.

4    Q.    And the superintendent approved your decision, right?

5    A.    I informed her that I had -- that I had not -- that I

6    had not approved it.

7    Q.    And did she say, Oh, well, you shouldn't have done

8    that?

9    A.    There was a time when we did talk about that, yes.

10   Q.    Later, though, right?

11   A.    Uh-huh.

12   Q.    Okay.  And we'll get to that.

13          And you told the Carver Middle School principal,

14   Mrs. Cunningham, of your decision, right?

15   A.    Actually, the application was returned to the school.

16   Q.    Okay.  I know it was a little while back, but do you

17   remember the means by which you told her that the Carver

18   GSA had been denied?  Maybe email or something?

19   A.    The procedure we used at that time was any

20   application that was approved or disapproved, we returned

21   it to the school principal.

22   Q.    Okay.  So the information that Mrs. Cunningham would

23   have received is simply a copy of the application with your

24   handwritten note in the upper right-hand corner?

25   A.    Yes.

Q.    And that's all the information Mrs. Cunningham would
have received, correct?

A.    At that time, yes.

Q.    I'd like you to turn to -- I apologize.  One second.

       Staying on Exhibit 5, on the denied application
itself, you did not indicate how the Carver GSA could
improve their application; is that fair to say?

A.    Correct.

Q.    And all you wrote is that it was not an extension of
the curriculum, right?

A.    Yes.

Q.    Initially you thought all middle schools had to be an
extension of the curriculum to be approved --

A.    Yes.

Q.    -- right?

A.    All middle school clubs, yes.

Q.    Thank you.

       You decided the majority of the applications at the
beginning of the school year 2013 to 2014 with this
understanding of the policy, right?

A.    Yes.

Q.    For example, you were told that chess club was
initially approved because it directly relates to math
class?

A.    Yes.

Q.     And at the time you disapproved the Carver GSA, you had that initial understanding, and you disapproved it because it was not curricular, correct?

A.     Yes.

Q.     Later, after you disapproved the Carver GSA application, you learned that a club need not be curricular so long as it promoted or strengthened critical thinking, athletic or business skills or visual arts, right?

A.     Yes.

Q.     Who informed you of this new information about policy 4.502?

A.     I think the superintendent and I were having a discussion, and it may have been with the executive cabinet, too -- I'm not sure -- but we were discussing it and it came up.

Q.     And forgive me, but the executive cabinet -- does that include any School Board members or is --

A.     No.  No.  That's the superintendent's staff.

Q.     When did -- when did you have -- when did you learn of this new interpretation?

A.     Well, I'm -- I'm not sure.  I think it was maybe a couple of months after -- I'm thinking it was around maybe November, December.  I can't remember exactly.

Q.     Had the Carver GSA resubmitted the application and expounded on the critical thinking prong, you would have

1  approved it, right?

2  A.    Yes.

3  Q.    Because it would have satisfied all the requirements

4  to become a student club, right?

5  A.    Yes.

6  Q.    Thank you, Mrs. Cole.

7        MR. JOHNSON:  May it please the Court?

8        THE COURT:  Mr. Johnson.

9                    CROSS-EXAMINATION

10  BY MR. JOHNSON:

11  Q.    Hi, Ms. Cole.

12  A.    Hello.

13  Q.    The policy 4.502 was a brand-new policy that had just

14  been passed by the School Board in August, correct?

15  A.    Yes.

16  Q.    And before that no one had interpreted it in any way?

17  A.    Yes.

18  Q.    And you were as part of the passage of that policy,

19  through a designation by the superintendent, the first

20  administrator or employee of the School Board who got to

21  analyze and approve of applications for middle school clubs

22  based on the operation of that policy?

23  A.    Yes.

24        MR. STEVENSON:  Objection.  He's leading the

25  witness.

1    THE COURT:  Yes.  Avoid leading --

2    MR. JOHNSON:  Yes, sir.

3    THE COURT:  -- Mr. Johnson.

4  BY MR. JOHNSON:

5  Q.    When you started the process of reviewing the

6  applications, did you have any discussions with anyone

7  about what your interpretations of those applications

8  should be in relation to the requirements of the School

9  Board policy?

10  A.    Well, actually I thought I understood what the policy

11  was saying.

12  Q.    All right.  And, in effect, Mrs. Cole, is it fair to

13  say that you made a mistake?

14  A.    I made a mistake.

15  Q.    Okay.  And then at some point in time -- you believe

16  it might have been with the superintendent's cabinet or it

17  was a discussion with the superintendent -- I believe you

18  just testified you figured out what was supposed to happen?

19  A.    Exactly.

20  Q.    And in your determination did you now come to the

21  conclusion that under paragraph 2 of the School Board

22  policy where it lists "offers support for critical

23  thinking, performing arts, athletics, student government,

24  honor societies," were each and every one of those an

25  expression that you found out was how the School Board was

1  now viewing curricular thought in the middle school for the
2  purpose of the policy?
3         MR. STEVENSON:  Objection, leading.
4         THE COURT:  Sustained.  That was leading --
5         MR. JOHNSON:  Yes, sir.
6         THE COURT:  -- Mr. Johnson.
7  BY MR. JOHNSON:
8  Q.    Let me show you -- we have the --
9         MR. JOHNSON:  Does she have the policy in one of
10 those notebooks up there, Ben?
11        MR. STEVENSON:  She does.
12        MR. JOHNSON:  Okay.
13        MR. STEVENSON:  It should be Exhibit 1.
14        MR. JOHNSON:  Okay.
15 BY MR. JOHNSON:
16 Q.    Could you turn to Exhibit 1, Ms. Cole.  Look at
17 paragraph 2.
18        Under Paragraph 2, can a school which -- excuse me --
19 can a school club which promotes critical thinking and
20 nothing else be qualified as a club or organization in
21 middle school under this policy?
22 A.    Yes.
23 Q.    Okay.  Can a club that strengthens and promotes
24 performing or visual arts be approved as a club in middle
25 school under this policy?

1  A.    Yes.

2  Q.    Okay.  After you learned that you had made a mistake

3  and that there were other bases for approval of clubs or

4  organizations in middle school, did you do anything further

5  with the GSA application?

6  A.    I did.

7  Q.    Tell us what you did.

8  A.    I contacted the principal of Carver Middle School and

9  explained to her the mistake I had made, and that if the

10  club would resubmit an application and expound on the

11  critical thinking that they had started, then, you know,

12  there was a possibility that club could be approved.

13  Q.    Okay.  And, in fact, if you had determined in your

14  evaluation of the club application after it was resubmitted

15  that they now had sufficient grounds to reflect, strengthen

16  and in promoting critical thinking, would it have been your

17  intention to approve that club?

18  A.    Yes, it would have been.

19  Q.    Did you communicate your information about

20  resubmitting the application through your principal,

21  Mrs. Cunningham?

22  A.    I did.

23       MR. JOHNSON:  I don't have any further questions,

24  Your Honor.

25       THE COURT:  Any redirect, Counsel?

1    MR. STEVENSON:  Yes, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. STEVENSON:

4    Q.    Do you recall the means by which you communicated to

5    Mrs. Cunningham that the Carver GSA could resubmit its

6    application, whether that was by email, for example?

7    A.    I know I called her, and I think I also sent an

8    email.  And she responded by email.

9    Q.    She responded by email?

10   A.    Yes.

11   Q.    Okay.  So in your mind you're not sure if you sent an

12   email or not; is that fair to say?

13   A.    I'm not sure, but I think I did.

14   Q.    Okay.

15                  MR. STEVENSON:  May I approach the witness,

16   Your Honor?

17                  THE COURT:  You may.

18                  And when it's dealing with an exhibit, you needn't

19   even request permission, Mr. Stevenson.

20                  MR. STEVENSON:  Thank you.

21                  For the benefit of counsel, I'm showing Mrs. Cole

22   what is marked as Plaintiffs' Exhibit 43 -- I'm sorry --

23   Defendant's Exhibit 43.

24   BY MR. STEVENSON:

25   Q.    I'd like you to review that piece of paper I've just

1    handed you.  Does that refresh your memory --

2    A.    Yes, it does.

3    Q.    -- as to whether you sent Mrs. Cunningham an email?

4    A.    Yes.

5    Q.    So it's fair to say that you told her by email --

6    A.    Uh-huh.

7    Q.    -- that the Carver GSA could resubmit their

8    application; yes?

9    A.    Yes.

10          MR. STEVENSON:  I would move for Defendant's

11   Exhibit 43 to be entered into evidence, Your Honor.

12          THE COURT:  Any objection?

13          MR. JOHNSON:  No, sir.

14          THE COURT:  It's received.

15          And that's Defendant's 43, you say, Mr. Stevenson?

16          MR. STEVENSON:  Yes, Your Honor.

17          THE COURT:  Okay.  It's in evidence.

18   BY MR. STEVENSON:

19   Q.    Thank you.

20          MR. STEVENSON:  That's all the questions I have.

21          THE COURT:  Anything further of the witness?

22          MR. JOHNSON:  Very briefly, Your Honor.

23                    RECROSS EXAMINATION

24   BY MR. JOHNSON:

25   Q.    Mrs. Cole, you said you sent her an email.  Did you

1   also talk to Mrs. Cunningham about it?

2   A.     I'm almost sure I talked to her on the phone.

3   Q.     Okay.  Thank you, ma'am.

4          MR. JOHNSON:  That's all, Your Honor.

5          THE COURT:  You did say you were offering

6   Defendant's Exhibit 43, Mr. Stevenson?

7          MR. STEVENSON:  Yes, Your Honor.  I believe it's

8   an email exchange between Mrs. --

9          THE COURT:  Well, I understand that, but I'm

10  looking at the defendant's trial exhibit list.  And Exhibit

11  Number 43 appears to be a different document, but we can

12  straighten that out subsequently.

13         You may step down, Ms. Cole.

14         THE WITNESS:  Thank you.

15         THE COURT:  Next witness.  Mr. Tilley?

16         MR. TILLEY:  Your Honor, we call Mrs. Cunningham.

17         THE CLERK:  Mrs. Cunningham, please raise your

18  right hand.

19         Do you solemnly swear that the testimony you're

20  about to give will be the truth, the whole truth, and

21  nothing but the truth?

22         THE WITNESS:  Yes, ma'am.

23         THE CLERK:  Please have a seat.

24         MR. JOHNSON:  Your Honor, may I ask that Mrs. Cole

25  be released from her subpoena so she can go?

MR. STEVENSON:  Yes, Your Honor.

THE COURT:  She may.

MR. JOHNSON:  Thank you.

THE CLERK:  State your full name, and spell your last name for the record.

THE WITNESS:  My name is Mollie Cunningham, C-U-N-N-I-N-G-H-A-M.

MOLLIE CUNNINGHAM,

being duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. TILLEY:

Q.    Good afternoon, Ms. Cunningham.

A.    Good afternoon.

Q.    Good to see you again.

A.    Nice to see you as well.

Q.    As you may remember, my name is Daniel Tilley, and I represent the plaintiffs in this lawsuit.

A.    Yes, sir.  I remember.

Q.    You're the principal of Carver Middle School, right?

A.    Yes, sir.

Q.    And you've been the principal there since the 2012-2013 school year?

A.    Yes, sir.

Q.    And July 1st of this year will be your -- the start of your third year, right?

1   A.    No.  July 1st of this year will be the start of my

2   fourth year.

3   Q.    Okay.  Thank you.

4        You're a member of the Florida Association of

5   Secondary Administrators, right?

6   A.    Yes.

7   Q.    And you're a member of the National Association of

8   Secondary School Principals, right?

9   A.    Yes.

10   Q.    And so you're a middle school principal, but you're a

11   member of these organizations for secondary educators,

12   right?

13   A.    Correct, but there would also be membership in any of

14   the umbrella-type clubs or activities.

15   Q.    Algebra one is taught at Carver Middle School, right?

16   A.    Yes.

17   Q.    It's taught in -- physically in the location at

18   Carver Middle School by Carver Middle School teachers?

19   A.    Yes.

20   Q.    It's a high school course, right?

21   A.    It has a high school course number, yes.

22   Q.    And it doesn't have a middle school course code,

23   right?

24   A.    No.

25   Q.    And it's that high school course that you teach in

1   the middle school, right?

2   A.    Yes.

3   Q.    And students receive high school credit for taking

4   it, right?

5   A.    When they enter high school, yes.

6   Q.    Talking briefly about certification, a secondary

7   certification means you're certified above elementary,

8   right?

9   A.    Correct.

10  Q.    And you refer to middle and high schools as secondary

11  schools, right?

12  A.    No, sir.

13  Q.    I'd like you to refer to page 36 of your deposition.

14  It's at tab 3 in the book that you have.

15  A.    I have it.

16  Q.    If you could take a look at page 36, line 17.

17  A.    Yes, sir.

18  Q.    Question:  What is a secondary education?

19        Answer:  What is a secondary education?  That just

20  means you're certified above elementary.  Remember, middle

21  and high school, we refer to those as secondary schools.

22        MS. McCULLOCH:  Your Honor?

23  BY MR. TILLEY:

24  Q.    Is that the question I asked you?

25        MS. McCULLOCH:  Objection, Your Honor.  I'm sorry,

1    but counsel has misread the question.

2           THE COURT:  I can't hear you, Ms. McCulloch.

3           MS. McCULLOCH:  I'm sorry, but counsel has misread

4    the question that's stated in the deposition at the page

5    and line I'm looking at.

6           THE COURT:  Read it again, then, please,

7    Mr. Tilley.

8           MR. TILLEY:  Sure.

9    BY MR. TILLEY:

10   Q.    Question:  What is a secondary certification?

11         Answer:  What is a secondary certification?  That

12   just means you're certified above elementary.  Remember,

13   middle and high school, we refer to those as secondary

14   schools.

15         Is that the question I asked you?

16   A.    Yes.

17   Q.    And is that the answer that you gave?

18   A.    It is the answer I gave at that time based on my

19   understanding of the question, yes.

20   Q.    You received a request to start a GSA in the fall of

21   2012, right?

22   A.    Yes.

23   Q.    There was a different student club policy in place at

24   that time than there is now, right?

25   A.    Yes, sir.

1    Q.    At that time there weren't formal applications,

2    right?

3    A.    Not as it is now, no, sir.

4    Q.    But the current policy does require formal

5    applications?

6    A.    Yes, sir.

7    Q.    Going back to the fall 2012 request to start a GSA,

8    the student Bayli Silberstein was involved in that request,

9    right?

10    A.    She was.

11    Q.    And part of that request included letters from

12    students?

13    A.    Yes.

14    Q.    And those letters talked about wanting to address

15    alleged bullying at Carver Middle School, right?

16    A.    Yes.

17    Q.    And you had a conversation with Bayli about the club

18    in fall 2012, right?

19    A.    Correct.

20    Q.    At that time you felt that the matter should be

21    referred to the district level?

22    A.    Yes.

23    Q.    And the club was not recognized as an official

24    student club in the first half of that school year, the

25    2012-2013 school year, right?

1    A.    Yes.

2    Q.    And there was a lawsuit filed in May 2013 to obtain

3    recognition of the Carver GSA, right?

4    A.    Correct.

5    Q.    Principals receive School Board meeting agendas,

6    right?

7    A.    We receive it in an email, yes, that you can choose

8    to read.

9    Q.    Sure.

10         So you were aware that in the months that preceded

11    the filing of the May 2013 lawsuit, School Board meetings

12    were taking place to discuss a potential new student club

13    policy?

14    A.    I knew that because of the news, yes.

15    Q.    And the Carver GSA was not recognized as an official

16    student club during those first few months of 2013 while

17    some of those meetings were taking place, right?

18    A.    Right.

19    Q.    But following that lawsuit the Carver GSA was

20    permitted to meet in May and June of 2013, right?

21    A.    Correct.

22    Q.    The GSA met several times during that time period?

23    A.    Three, I believe.

24    Q.    And you attended one of those meetings, right?

25    A.    I did.

1   Q.    And in your role as principal you will randomly
2   attend any club meeting or sports practice to make sure
3   that everything is going smoothly, right?
4   A.    Correct.
5   Q.    Thinking about those meetings in May and June 2013,
6   you had an assistant principal, Kim Walker Lawrence, who
7   also attended one of those meetings, right?
8   A.    Yes.
9   Q.    And it's common for whatever administrator that
10  arrives first in the morning to check in on meetings or
11  activities that are going on?
12  A.    Correct.
13  Q.    And you thought she was going to be there that
14  morning?
15  A.    The morning that I attended or the previous meeting?
16  Q.    The meeting that she actually attended.
17  A.    Yes.
18  Q.    And you asked her to be there, right?
19  A.    Yes.
20  Q.    And the sponsor was there as well?
21  A.    I assume.  I wasn't there.  But --
22  Q.    At the --
23  A.    -- I assume she was.
24  Q.    At the meeting that you did attend, the sponsor was
25  there?

1    A.    Yes, she was.

2    Q.    And that's Heather Jablonski?

3    A.    That is correct.

4    Q.    And some -- teachers attended that meeting as well,

5    right?

6    A.    Yes.

7    Q.    And the school resource officer was there?

8    A.    Yes.

9    Q.    You, yourself, didn't stay the whole time, right?

10   A.    No.

11   Q.    The time that you were there, while you were there,

12   you didn't hear anything that you considered inappropriate,

13   right?

14   A.    No.

15   Q.    Correct?

16   A.    Correct.

17   Q.    You later spoke in passing to the assistant principal

18   who attended the other meeting, right?

19   A.    Yes.

20   Q.    And that assistant principal said that everything had

21   gone fine, right?

22   A.    She did.

23   Q.    Going back to the meeting that you attended yourself,

24   you described it as pretty uneventful, right?

25   A.    Right.

1    Q.    It was basically a standard middle school club

2    meeting in the sense there was nothing out of the ordinary

3    going on?

4    A.    The number of adults present was not ordinary for a

5    middle school club meeting.

6    Q.    But, otherwise, it seemed like a standard club

7    meeting?

8    A.    Yes.

9    Q.    And at some point some weeks later you had a

10    conversation in passing with the superintendent about the

11    GSA, right?

12    A.    Yes.

13    Q.    And she asked you if you had had any difficulty with

14    the club, right?

15    A.    Yes.

16    Q.    And you said "no"?

17    A.    Correct.

18    Q.    In fall 2013 after the lawsuit, after the summer, you

19    received another club application from the Carver GSA,

20    right?

21    A.    Yes. That's right.

22    Q.    And you did not sign the application, correct?

23    A.    I did not make a recommendation, no.

24    Q.    Your decision not to sign it didn't have anything to

25    do with the feeling that it might be controversial,

1 correct?

2 A.   Correct.

3 Q.   Let's talk about some of the benefits that approved

4 clubs get.  Approved student clubs can get an induction

5 ceremony, right?

6 A.   Correct.

7 Q.   And at eighth grade promotion when a student is

8 coming up to get their certificate of completion, you'll

9 announce -- someone will announce their scholastic

10 achievement and club memberships if that's applicable,

11 right?

12 A.   Yes.

13 Q.   And clubs can make announcements about meetings on

14 the P.A. system at the beginning of the school day?

15 A.   Yes.

16 Q.   And if the morning announcement that day is via the

17 closed-circuit television system, they can make an

18 announcement on that, too, right?

19 A.   That is correct.

20 Q.   And clubs can advertise their meetings by -- or

21 meetings or activities by putting up posters, right?

22 A.   Right.

23 Q.   For instance, they could post something on the walls

24 in the cafeteria?

25 A.   Yes.

1   Q.    And clubs can have photos from the club appear in the

2   yearbook?

3   A.    Yes.

4   Q.    And if clubs raise money, the school's bookkeeper

5   will keep track of it, right?

6   A.    Correct.

7   Q.    Clubs are allowed to use the space and facilities of

8   the school outside of normal class time?

9   A.    Correct.

10  Q.    And if a student made a poster and stuck it to the

11  wall in the cafeteria, for example, without authorization,

12  they would be in trouble, right?

13  A.    Probably.

14  Q.    And if a club sought recognition but was denied it

15  and then a group of students calling themselves the club

16  was meeting in a classroom after school, there would be

17  disciplinary action taken against those students, right?

18  A.    If they had not secured permission through the

19  facilities use policy, yes.

20  Q.    When you received notice that the Carver GSA was --

21  club application was denied in fall 2013, you received an

22  email from Ms. Cole that it was denied, correct?

23  A.    An email or a phone call?

24  Q.    Okay.  Can you take a look at I think what is

25  Defendant's 43?  I think it may be on the stand --

1  A.    Oh.

2  Q.    -- perhaps.  That sheet of paper you just picked up.

3        Can you tell me if that refreshes your recollection

4  as to whether you got an email?

5  A.    Yes, but this email -- okay.  Yes, I did receive this

6  email.

7  Q.    And that's an email indicating from Ms. Cole to you

8  that the club had been denied?

9  A.    Correct.

10 Q.    And that was the only communication you had with

11 Ms. Cole about the club denial at that time, correct?

12 A.    Correct.

13 Q.    Thank you.

14       THE COURT:  Ms. McCulloch?

15       MR. STEVENSON:  Your Honor, just as a point -- it

16 would be helpful if defendant's counsel could use the other

17 lectern just because it occludes the view for us -- view of

18 the witness.

19       THE COURT:  Well, all right.  That might be

20 helpful, Ms. McCulloch.

21       MR. STEVENSON:  Thank you.

22                      CROSS-EXAMINATION

23 BY MS. McCULLOCH:

24 Q.    Good afternoon, Ms. Cunningham.

25 A.    Good afternoon.

1    Q.    As a middle school principal do you believe that you
2    are a principal of a secondary school?
3    A.    No.
4    Q.    And you testified that you belong to a couple of
5    different organizations of -- and the -- excuse me -- the
6    organizations' names include "secondary administrator" as
7    part of that title.
8          Does that -- do those associations also include
9    elementary school administrators?
10   A.    Yes.
11   Q.    Do they also include college students?
12   A.    Yes.
13   Q.    Superintendents?
14   A.    Yes.
15   Q.    District administrators?
16   A.    Yes.
17   Q.    Anyone expressing a special interest in the field of
18   education?
19   A.    Yes.
20   Q.    Okay.  Does your membership in either of those
21   associations change your opinion that you are not a
22   secondary school administrator?
23   A.    No.
24   Q.    Okay.  You spoke with Mr. Tilley about your
25   deposition, and you talked about certifications -- teacher

1    certifications being referred to as either an elementary
2    school certification or a secondary school certification.
3         Does your description of secondary school with
4    respect to teacher certifications change your thought that
5    you are not a secondary school administrator?
6    A.    I'm not sure.  Can you rephrase the question?
7    Q.    Sure.
8         When you were discussing in your deposition about
9    secondary school certifications and elementary school
10   certifications, were you limiting your discussion in any
11   way to the context of the question related to
12   certifications for teachers?
13   A.    Absolutely, because I have teachers at the middle
14   school who have elementary certification.
15   Q.    Okay.  So the fact that there are teachers at your
16   school that may have secondary school certifications as
17   that term is used in the state of Florida does not change
18   your opinion as to whether or not a middle school would be
19   a secondary school?
20   A.    It does not.
21   Q.    Okay.  There was a small portion --
22        THE COURT:  Excuse me.  Can you explain to me --
23   I'm not sure I understand that, Ms. Cole -- what -- how
24   does certification relate to whether or not a school is a
25   secondary school or not a secondary school?

1      THE WITNESS:  Well, in line with the question that
2  I was asked, it is important because on my staff of 60
3  teachers I have quite a few that have elementary
4  certification, but they work at a middle school.
5      THE COURT:  So what does that mean?  That they
6  would not be eligible to teach in high school?
7      THE WITNESS:  They would not.
8      The ones that are working at Carver that have
9  elementary certification can only teach through sixth grade
10 with the exception of science in sixth grade.
11     THE COURT:  So most of them, then, would be
12 teaching only one of the three grades in the middle school?
13     THE WITNESS:  Correct.
14     THE COURT:  I see.  All right.
15     Go ahead, Ms. McCulloch.
16     MS. McCULLOCH:  Thank you, Your Honor.
17 BY MS. McCULLOCH:
18 Q.    Carver Middle School does offer high school-level
19 algebra one to a small portion of its middle school
20 students, correct?
21 A.    Correct.
22 Q.    Are the majority of those students in eighth grade?
23 A.    They are.
24 Q.    Is there any criteria that the students have to meet
25 to be able to take algebra one in the middle school?

1  A.    Yes.

2  Q.    What are those criteria?

3  A.    They have to have a certain grade in the previous

4  math course.  They need a teacher recommendation.  And they

5  have to have a certain score on the standardized test from

6  the previous year.

7  Q.    Okay.  So algebra one is not offered generally as a

8  matter of course throughout the middle school?

9  A.    No.

10       MR. TILLEY:  Objection, Your Honor; leading the

11  witness.

12       THE COURT:  Well, I'll overrule it as to that

13  question.  The answer may stand.

14       Put another question, Ms. McCulloch.

15       MS. McCULLOCH:  Yes, sir.

16  BY MS. McCULLOCH:

17  Q.    If an elementary school student -- say a fifth

18  grader, for example -- also had the aptitude as you

19  described to take a high school-level algebra class, would

20  they be permitted to take it?

21       MR. TILLEY:  Objection, Your Honor.  It's not

22  clear whether she's talking about virtual school or

23  physical -- you know, taking a course at an elementary

24  school.

25       THE COURT:  I think the question is clear.

1          Did you understand the question, Ms. Cole?

2          THE WITNESS:  Yes, sir, I think so.

3          THE COURT:  You may answer.

4          I'll overrule the objection.

5          THE WITNESS:  An elementary student could take a

6     middle school course with a middle school course number,

7     yes.

8     BY MS. McCULLOCH:

9     Q.    Could an elementary school student take a high

10    school-level algebra class if they had the aptitude to take

11    it?

12    A.    Yes.  If their principals recommended or signed off

13    on it, absolutely.

14    Q.    Okay.  Does Carver Middle School as a whole provide

15    high school or secondary education to its students?

16    A.    No, ma'am.

17    Q.    The high school algebra course may also be taken

18    through virtual school by students in either elementary or

19    middle school, correct?

20    A.    Correct.

21    Q.    And this can be done in their spare time?

22    A.    Correct.

23    Q.    Do either of the students in elementary school or

24    middle school who may take an algebra one class receive

25    credit at Carver Middle School for that class?

1    A.    No.

2    Q.    Do those high school-level courses that are offered

3    to the small population -- small portion of the population

4    at Carver Middle School, do those satisfy the core

5    requirements to successfully complete middle school?

6    A.    No.

7    Q.    Conceivably if you had a student in the eighth grade

8    who is taking high school algebra and they passed high

9    school algebra but they failed the eighth grade core

10   classes, like English, science, social studies, language

11   arts, that student -- would that student be able to

12   graduate and move forward to become a high school student?

13   A.    No.

14   Q.    Is a virtual school also used for remedial

15   requirements?

16   A.    Yes.

17   Q.    And does a student get any credits whatsoever for

18   attending virtual school classes?  Do they get credit at

19   Carver Middle School?  I'm sorry.

20   A.    No.

21   Q.    Okay.  Are you aware of whether or not the School

22   Board has a policy prohibiting bullying in schools?

23   A.    Yes, we do.

24   Q.    Okay.  And is there an investigative mechanism that's

25   present in Carver Middle School?

1    A.    Yes.

2    Q.    If a teacher or an instructional staff member knows

3    that a student is being bullied, is there any obligation on

4    that teacher to report it to administration?

5    A.    Yes, there is.

6    Q.    When you were an elementary school principal, did you

7    have any clubs where you -- did you oversee any student

8    clubs at the elementary school level?

9    A.    No.

10   Q.    So when you were at Carver Middle School was the

11   first time that you oversee -- oversaw student clubs?

12   A.    Yes.

13   Q.    Okay.  Towards the end of the 2012-13 school year

14   when the GSA was allowed to meet and you stated you

15   attended a meeting, you also expressed that there were as

16   many or more adults as there were children?

17   A.    Correct.

18   Q.    Okay.  Why was that concerning?

19           MR. TILLEY:  Objection, Your Honor.  I don't think

20   that accurately states the witness' testimony.

21           THE COURT:  I didn't hear you, Mr. Tilley, the

22   last part of what you said.

23           MR. TILLEY:  I don't think that accurately

24   characterizes what the witness testified to.

25           THE COURT:  Well, it's a witness identified with

1    the defense, but it is in the nature of cross-examination.

2    I'll overrule that objection.

3                Do you remember the question?

4                THE WITNESS:  No, sir.

5                THE COURT:  Restate your question, Ms. McCulloch.

6                MS. McCULLOCH:  Yes, sir.

7    BY MS. McCULLOCH:

8    Q.    When you attended the club you noted that there were

9    as many or seemingly more adults present than there were

10   children.  Why was that concerning to you?

11   A.    Well, the club was requested as a club for students.

12   And based on that, membership in the club and attendance of

13   people in the club would be students, I would think,

14   outside of the sponsor.

15   Q.    Okay.  And the club was required to have a school

16   sponsor, correct?

17   A.    It was.

18   Q.    Okay.  And at that time the sponsor was

19   Ms. Jablonski.  Were there other teachers present at the

20   meeting that you attended?

21   A.    Yes.

22   Q.    Okay.  Were they directed by you to attend the

23   meeting as part of their duties?

24   A.    No.

25   Q.    Were there other school employees -- adults --

1   present at that meeting?

2   A.      Yes.

3   Q.      And who was that?

4   A.      Our resource officer was there.

5   Q.      Okay.  Was she directed to attend that meeting by

6   you?

7   A.      No.

8   Q.      Okay.  Was she attending the meeting as part of her

9   duties as a --

10  A.      No.

11  Q.      -- school resource officer?

12  A.      No.  It was actually prior to the start of school.

13  Q.      Okay.  And was it your understanding that the adults,

14  other than Ms. Jablonski, were attending for personal

15  reasons?

16  A.      Yes.

17  Q.      Was there any other reason that led you to stop in

18  and attend the meeting briefly in 2012-2013?

19  A.      I had had a parent call me.

20  Q.      Okay.  And what was the nature of the parent call?

21  A.      She was concerned about her child being a part of the

22  club.

23  Q.      Okay.  Did she address anything specifically that she

24  was concerned about?

25  A.      She --

1        MR. TILLEY:  Objection, Your Honor.  This is

2  hearsay.

3        THE COURT:  Well, I'm inclined to overrule that

4  objection.  But what is the relevance of this examination,

5  Ms. McCulloch?

6        MS. McCULLOCH:  Your Honor, I believe the

7  relevance would be some of the activities that took place

8  in the meetings.  And the literature that may have been

9  distributed at meetings may have not been appropriate for

10  middle school students.

11        THE COURT:  Well, is it the position of the

12  defense that that had anything to do with the subsequent

13  denial of the application in December of 2013?

14        MS. McCULLOCH:  Your Honor, the position of the

15  defense is that there was --

16        THE COURT:  Give me a "yes" or "no" and then

17  explain, if you wish.

18        MS. McCULLOCH:  Okay.

19        THE COURT:  Is it the position of the defense that

20  that had anything to do with the subsequent denial?

21        MS. McCULLOCH:  No, sir, but there were some

22  disruptions that were concerning within the school as a

23  result of the meetings that were held the year before.

24        THE COURT:  Well, is it the position of the

25  defense that that had anything to do with the denial?

1    MS. McCULLOCH:  With respect to Ms. Cole and

2 Ms. -- Dr. Moxley, no.

3    THE COURT:  Well, then I fail to see the relevance

4 of it.  If it's not relied upon by the defense as a -- as a

5 basis, or one of the bases, for the denial of the

6 application, I don't think it has any relevance.

7    MS. McCULLOCH:  Your Honor, if I may?  Part of

8 what we've heard today from the plaintiffs is about what

9 this club was designed to do and what they were engaging in

10 in their activities and how that fit in the critical

11 thinking component.  And because they were allowed to

12 present testimony about what was done at the meetings and

13 what their whole purpose for the meeting is, I think it's

14 important and relevant to show that some of the other

15 things that were going on were not exactly related to what

16 they were discussing as far as bullying and those types of

17 things, that there were other issues and purposes for the

18 meeting that do not meet the critical thinking component of

19 the policy.

20    THE COURT:  Well, we're talking about a meeting,

21 as I understand it, that occurred in the spring of 2013.

22 Is that --

23    MS. McCULLOCH:  Yes, sir.

24    THE COURT:  -- right?

25    And the application that was filed was in, I

1 believe, December of 2013, and you've just told me that
2 you're not relying upon disruptive effect, for example, as
3 a basis for a denial of that application, right?
4      MS. McCULLOCH: Yes, sir.
5      THE COURT: Then I don't -- I don't see its
6 relevance. I suggest you ask a question on some other
7 subject, and we'll move it along.
8      MS. McCULLOCH: Yes, sir.
9 BY MS. McCULLOCH:
10 Q. Ms. Cunningham, you testified that you spoke with
11 Ms. Cole during the 2013-14 school year regarding the GSA's
12 application for that year?
13 A. Yes.
14 Q. And it was your understanding that there was a new
15 policy in effect for middle school clubs at that time?
16 A. Yes.
17 Q. Pursuant to the policy the club was required to have
18 a faculty sponsor, correct?
19 A. Correct.
20 Q. Were all the meetings designed to take place on the
21 school premises at Carver Middle School?
22 A. As far as I know, yes.
23 Q. Okay. And you didn't have any final authority to
24 make any recommendation one way or another about a Carver
25 Middle School application, correct?

1   A.      Correct.

2   Q.      Did Ms. Cunningham send you back the application

3   originally when she first determined that it would not be

4   approved?

5   A.      Mrs. Cole?

6   Q.      I'm sorry.  Yes, Mrs. Cole.

7   A.      Yes, she did.

8   Q.      Okay.  And was that sometime before December 5th of

9   2013?  You've looked at the emails.

10  A.      Yes, ma'am.  Actually, the email came from her --

11  well, actually it was on the 6th.

12  Q.      Okay.  But you had a separate -- you received the

13  application back sometime before December 6th of 2013

14  originally?

15          MR. TILLEY:  Your Honor, she's leading the witness

16  again.  She's leading the witness, Your Honor.

17          THE COURT:  Are you objecting to it?

18          MR. TILLEY:  I am objecting to it, Your Honor,

19  yes.

20          THE COURT:  Sustained.

21  BY MS. McCULLOCH:

22  Q.      Did you have any communications with Ms. Cole shortly

23  after the time that the club first applied?

24  A.      Yes.

25  Q.      Okay.  And what were those communications?

A.     Well, the original one was that she had received it,
and I would be getting an answer.

Q.     Okay.  And did you get an answer?

A.     Yes.

Q.     And was that answer received before December 6th of
2013?

A.     Yes.

Q.     Okay.  And what was that answer?

A.     That as it was submitted it could not be approved,
but they could reapply.

Q.     Okay.  And at some point after that did you have a
discussion with Ms. Cole about notifying the GSA or its
members that they could reapply?

A.     That was in the same conversation, yes.  That's what
the email is in response to.

Q.     Okay.  And she told you -- did she instruct you in
any way to notify anyone that the GSA could resubmit the
application?

       MR. TILLEY:  Objection, Your Honor.  She's leading
the witness.

       THE COURT:  I'll overrule it as to that question.

       THE WITNESS:  Mrs. Cole asked me to let the
sponsor know that the club could not be approved as the
application was submitted, but they could reapply.  And
that was my response -- when I said it was taken care of,

1    that meant that I had met with the sponsor, and I had given

2    her the information Mrs. Cole asked me to relay to her.

3    BY MS. McCULLOCH:

4    Q.    Okay.  And by the "sponsor" you mean Ms. Jablonski?

5    A.    Yes.

6    Q.    And you offered her an opportunity to resubmit the

7    application with more information?

8    A.    I told her that Mrs. Cole said she was allowed to do

9    that, yes.

10   Q.    Okay.  To your knowledge, did Ms. Jablonski ever do

11   that?

12   A.    I never received another application.

13   Q.    Did Ms. Jablonski ever have any conversations with

14   you about, well, what more information do we need to

15   provide, or what do we need to do to resubmit this?

16   A.    No.

17   Q.    When you were present at the GSA meetings, did you

18   speak?

19   A.    No.

20   Q.    Did you inform any student or student member of the

21   GSA that they were not allowed to speak about any

22   particular topic?

23   A.    No.

24   Q.    Since the club applied in 2013-14, have you ever had

25   an occasion to discipline any student for speaking about

1   the types of topics that the GSA provided in the charter at

2   school?

3   A.    No.

4   Q.    Did you ever instruct any administrator or teacher

5   that a student should be disciplined for speaking about any

6   topics that were covered by the GSA?

7   A.    No.

8   Q.    Had you ever had any occasion to counsel

9   Ms. Jablonski, Ms. Smith or Deputy Cameron, the adults that

10   attended the meetings, regarding any of their interactions

11   with any of the students that were members of the GSA?

12   A.    Yes.

13   Q.    Okay.  Could you describe that incident for me?

14   A.    A parent called and told me that she did not want

15   either of the three of them to speak to her son, and she

16   did not -- I'm sorry.

17         MR. TILLEY:  Your Honor, I would object on the

18   basis of hearsay.

19         THE COURT:  Well, I assume it's being offered

20   merely as evidence that the statement was made as it would

21   explain her state of mind and what she did?

22         MS. McCULLOCH:  Yes, sir, Your Honor.

23         THE COURT:  I'll overrule the objection.

24         THE WITNESS:  She told me that she did not want

25   them to speak to her son, and she did not give permission

1  for him to be a part of the club.

2  BY MS. McCULLOCH:

3  Q.    Okay.  And what was the occasion or what was the

4  concern that you had, if any, with respect to counselling

5  either Ms. Jablonski or Ms. Smith or Deputy Cameron?

6  A.    Well, some days later the student was not in the

7  class he was assigned to be in.  And, you know, anytime a

8  student is not in class, the teacher notifies the office.

9      So I, along with the other administrators, went to

10  look for the student, and we found him in a classroom that

11  was not his classroom that he was assigned to with the

12  three of them.

13  Q.    Okay.

14      THE COURT:  What was the date, or approximate

15  date, of those events that you just described in your last

16  two answers, Ms. Cunningham?

17      THE WITNESS:  It would have been in May or June

18  when they had -- when the -- it would have been during the

19  time they had permission to have the club on campus.

20  BY MS. McCULLOCH:

21  Q.    Ms. Cunningham, is there any difference in maturity

22  level between the typical sixth grade student at Carver

23  Middle School and the typical eighth grade student at

24  Carver Middle School?

25  A.    Yes.

1           MR. TILLEY:  Your Honor, I object that the

2  witness -- the question is outside of the scope of

3  Ms. Cunningham's testimony.  It requests an expert opinion.

4           THE COURT:  Well, on that ground I'm entitled to

5  overrule the objection if it will eliminate the necessity

6  of recalling the witness later.

7           MS. McCULLOCH:  Yes, sir.  That's exactly the

8  purpose.  We don't want to have her come back tomorrow.

9           THE COURT:  All right.  Overruled, then.

10          You may answer, Ms. Cunningham.

11          THE WITNESS:  Would you repeat the question,

12  please?

13  BY MS. McCULLOCH:

14  Q.    Sure.

15          Is there any difference in the maturity level between

16  the typical sixth grade student and the typical eighth

17  grade student at Carver Middle School?

18          MR. TILLEY:  Your Honor, I realize you ruled on

19  that objection.  Their expert witness on that issue is a

20  different individual than Ms. Cunningham.  They have an

21  expert witness who is going to testify on the maturity of

22  middle and high school students, and it's not

23  Ms. Cunningham.

24          MS. McCULLOCH:  Your Honor, we're not designating

25  her as an expert here.

THE COURT:  I think it's a matter of observation.
Yes, I'll overrule that objection.

You may answer, Ms. Cunningham.

THE WITNESS:  Thank you.

Yes, I believe there's a significant difference in
the maturity level of a sixth grader and an eighth grader.

BY MS. McCULLOCH:

Q.    Okay.  Is there any difference between a maturity
level of a middle school student versus a high school
student?

A.    Yes.

Q.    Is there a large range of differences of mental
acuity as well from a sixth grade student to an eighth
grade student?

A.    Yes.  And we also have students that have diminished
mental aptitude on our campus.

Q.    Okay.  And approximately how many students are in
Carver Middle School's campus?

A.    873, maybe.

Q.    Okay.

A.    If no one withdrew today.

Q.    Did you have any understanding under the new middle
school club policy of whether or not parental permission
was required?

A.    I'm sorry.  Would you repeat that?

1  Q.    Sure.

2        Did you have any understanding under the new middle

3  school club policy of whether or not parental permission

4  was required?

5  A.    I believe that it was.

6  Q.    Okay.  Do you believe it's reasonable for the School

7  Board to decide that middle school students should have

8  parental consent before joining any club?

9        MR. TILLEY:  Objection, Your Honor.  I'm not

10 certain how this testimony is relevant.

11       THE COURT:  As to that one I'm inclined to sustain

12 the objection, I think, Ms. McCulloch.

13       MS. McCULLOCH:  Yes, sir.

14 BY MS. McCULLOCH:

15 Q.    You testified earlier that Ms. Jablonski never asked

16 you any details or followed up with you to determine what

17 more information she could submit to get the application

18 approved potentially.

19       Did any student member of the GSA ever contact you

20 and ask you what they needed to do to elaborate on the

21 application?

22 A.    No.

23 Q.    Did any student clubs meet at Carver Middle School

24 during the 2013-14 school year?

25 A.    Yes, the junior honor society.

1   Q.    Did they actually have any meetings?

2   A.    No, they did not have any meetings, but they had an

3   approved application.

4   Q.    Did any student club actually meet during the 2013-14

5   school year?

6   A.    No.

7   Q.    If a club like the GSA didn't meet the criteria to be

8   an approved school-sponsored club in the middle school,

9   would they still be eligible to use Carver Middle School

10  facilities?

11  A.    If they went through the process to get approval,

12  yes.

13  Q.    Okay.  Did anyone from the GSA ever contact you about

14  potentially using Carver Middle School facilities in that

15  manner?

16        MR. TILLEY:  Objection, Your Honor.  I'm not sure

17  how this testimony is relevant.

18        THE COURT:  No, I'm inclined to overrule that

19  objection.  It has some tangential relevance, I think.

20        THE WITNESS:  No, no one asked for that.

21  BY MS. McCULLOCH:

22  Q.    Okay.  Thank you, Ms. Cunningham.

23        THE COURT:  Any redirect, Mr. Tilley?

24        MR. TILLEY:  Yes, Your Honor.

25                    REDIRECT EXAMINATION

BY MR. TILLEY:

Q.    Ms. Cunningham, there are certain certifications that are grades six through 12, right?

A.    Yes.

Q.    And if your -- there are also some that are six through eight, correct?

A.    I'm not aware of any that are six through eight, no.

Q.    Okay.  There are some that are five through nine?

A.    Correct.

Q.    Uh-huh.

      Were you a secondary school principal in the 2012-2013 school year?

A.    No, I was at -- I can't remember -- which year was it?

Q.    In 2012-2013, would you describe yourself as a secondary school principal?

A.    I will describe myself as a middle school principal.

Q.    And you wouldn't describe yourself as a secondary school principal?

A.    I call myself a middle school principal.  The same as when I was an elementary principal, I called myself an elementary principal.

Q.    And when you testified in your deposition that middle and high schools were secondary schools, at that time you didn't consider yourself a secondary school principal?

1    A.    I did not.

2    Q.    You testified previously in answering a question of

3    Ms. McCulloch that an elementary school student could take

4    algebra one, right?

5    A.    They could, yes.

6    Q.    But an elementary school student could not take

7    algebra one at an elementary school, right?

8    A.    Correct.

9    Q.    They would have to take it through a virtual school,

10   right?

11   A.    Yes.

12   Q.    How long have you been a principal?

13   A.    Eighteen years.

14   Q.    And you had never reviewed club applications in any

15   prior time as being a principal?

16   A.    No.

17   Q.    Because you had been an elementary school principal

18   before?

19   A.    Correct.

20   Q.    But in your 18 years of experience, you weren't sure

21   how to address the applications that came before you -- the

22   Carver GSA application?

23   A.    No, I think I understood how to address them.

24   Q.    And that --

25   A.    I have the Board policy.

1  Q.    I'm talking about in the fall of 2012 when --

2  A.    Correct.

3  Q.    -- you received a packet of materials from Bayli.

4  A.    When we had no policy, yes, or a different policy.

5  Q.    You had a policy that left discretion to the

6  principals to decide, right?

7  A.    Correct.

8  Q.    But you decided to send it to the district,

9  nevertheless, correct?

10  A.    I did.

11  Q.    Even though you personally felt that it should be

12  approved, right?

13  A.    I didn't say that.

14  Q.    You didn't tell Bayli that you thought it should be

15  approved?

16  A.    No.

17  Q.    You didn't tell her that it was a good idea, you

18  thought?

19  A.    I told her having a club that would perhaps diminish

20  bullying was a good idea.

21  Q.    And you understood a GSA to be a club that would

22  diminish bullying, right?

23  A.    I know very little about the GSA, so I honestly

24  couldn't say that.

25  Q.    You didn't read the letters that were submitted?

1  A.    I read the letters, yes.

2  Q.    Okay.  And you didn't understand that they were

3  trying to form a club to fight bullying?

4  A.    I understood that they wanted to form a club, yes.

5  Q.    To fight bullying specifically?

6  A.    I understood that they wanted to start a club.

7  Q.    And the letters that you got were all about bullying,

8  weren't they?

9  A.    For the most part.

10  Q.    Exclusively, really, right?

11  A.    It was based on what they determined or what they

12  thought was bullying, yes.

13  Q.    Alleged bullying, right?

14  A.    Correct.

15  Q.    They were all about alleged bullying?

16  A.    Correct.

17  Q.    And so you knew that it was a club about bullying,

18  right?

19  A.    I knew that's what they believed, and that's what

20  they were submitting, yes.

21  Q.    Okay.  And yet you still weren't sure of whether or

22  not it should be approved, and you thought it should go to

23  the district level, right?

24        MS. McCULLOCH:  Objection, Your Honor.  I'm not

25  sure that this is relevant.  This is, again, dealing with

the 2012-13 application under a completely different club
policy that's no longer in effect.

THE COURT:  Well, I'll sustain the objection at
this point.  I think it's asked and answered anyway,
Mr. Tilley.

MR. TILLEY:  Yes, Your Honor.

BY MR. TILLEY:

Q.    You expect that your school employees will enforce
school rules when they are on school property, right?

A.    Yes, sir.

Q.    Even outside of class time, right?

A.    But on campus?

Q.    Correct.

A.    Yes.

Q.    Okay.  And what do you understand the GSA to be?  I'm
talking now about the latest application, the fall 2013
application.  You don't consider the topics in that
application to be inappropriate, right?

A.    The ones that were presented to me that I know about,
no.

Q.    Right.  And so if you -- if the club were to meet and
discuss the topics that are in that application, you would
have no objection to that on appropriateness grounds,
right?

A.    As I stated in my deposition, my responsibility as

1   principal is to carry out School Board policy, so any club

2   that met the requirements, it would be my job to do it, to

3   take care of it and to enforce the policy.

4   Q.   Certainly.  And if the students met and talked about

5   the things that are in that application, you wouldn't say

6   that that was inappropriate, right?

7   A.   If they met as a club?

8   Q.   Correct.

9   A.   And it wasn't approved?

10   Q.   If it was an approved club and discussed the topics

11   that are in that application, that would not be

12   inappropriate, right?

13   A.   If it were an approved club, then I would not -- I

14   wouldn't interfere.  It would be approved.

15   Q.   And the topics that they would discuss at the

16   meetings, if they were in line with what was in the

17   application, you wouldn't consider that inappropriate,

18   right?

19   A.   As it was presented, no.

20   Q.   You mentioned the national junior honor society,

21   right?

22   A.   Yes.

23   Q.   There was also a hundred point reading club that was

24   approved, too, right?

25   A.   Correct, that never met.

Q.   You referred earlier to the email from Ms. Cole,

right?

A.   Yes.

Q.   And that was the communication in which you learned

that -- that was the way you learned that the Carver GSA

could reapply, correct?

A.   Correct.

Q.   Thank you.

          THE COURT:  Anything further?

          MS. McCULLOCH:  Nothing, Your Honor.

          THE COURT:  Thank you, Ms. Cunningham.  You may

step down.

          THE WITNESS:  Thank you.

          MR. JOHNSON:  May Ms. Cunningham be released from

the subpoena, Your Honor?

          MR. STEVENSON:  Yes, Your Honor.

          THE COURT:  She's excused.

          THE WITNESS:  Thank you.

          THE COURT:  Next witness.

          MR. TILLEY:  Your Honor, I'd like to call

Ms. Fischer.

          THE CLERK:  Ms. Fischer, come up.

          Raise your right hand.  Do you solemnly swear that

the testimony you're about to give will be the truth, the

whole truth, and nothing but the truth?

1          THE WITNESS:  I do.

2          THE CLERK:  Please have a seat.

3          Please state your full name, and spell your last

4   name for the record.

5          THE WITNESS:  I am Kyleen Jane Fischer.  The last

6   name is F-I-S-C-H-E-R.

7                      KYLEEN JANE FISCHER,

8   being duly sworn, testified as follows:

9                      DIRECT EXAMINATION

10  BY MR. TILLEY:

11  Q.    Good afternoon, Ms. Fischer.

12  A.    Nice to see you again, sir.

13  Q.    Good to see you.  Thank you.

14        As you may remember, my name is Daniel Tilley.

15  A.    Yes, sir.

16  Q.    And I represent the plaintiffs in this lawsuit.

17  A.    Yes, sir.

18  Q.    You served on the Lake County School Board for about

19  20 years, right?

20  A.    That is correct, sir.

21  Q.    And you're no longer on the School Board, right?

22  A.    As -- yes, sir.  That is correct.

23  Q.    But you were on the School Board at least from

24  November 2012 through January 2014, right?

25  A.    Yes, sir.

1   Q.    And when did you leave the School Board?

2   A.    It would have been the -- and I'm going to give you a

3  guesstimate -- the first part of June.

4   Q.    Of last year?

5   A.    Yes, sir.

6   Q.    June 2014?

7   A.    Yes, sir.

8         I had my stroke in May.

9   Q.    And you know that when I say "GSA" today, I mean

10  Gay-Straight Alliance?

11  A.    Yes, Mr. Tilley.

12  Q.    And if I say "Carver GSA," you'll know that I'm

13  referring to the Carver Middle School Gay-Straight

14  Alliance, right?

15  A.    Yes, sir.

16  Q.    And you know that through this lawsuit the Carver GSA

17  is seeking recognition as an official student club?

18  A.    Yes, sir.

19  Q.    You know that a GSA is a student club, right?

20  A.    Yes, sir.

21  Q.    And as you understand the GSA, a GSA is a support

22  system, right?

23  A.    Yes, sir.  That's what I had said earlier.  Yes, sir.

24  Q.    The School Board met on February 4, 2013, to discuss

25  student club policies, right?

1   A.    That is correct, sir.

2   Q.    And is it fair to say that you became aware of the

3 Carver GSA in January 2013, within the two weeks prior to

4 the February 4, 2013, meeting?

5   A.    I'm not for sure of that, sir.

6   Q.    Okay.  I'd like you to open -- or look in that binder

7 just to your left right there at Exhibit 17.  That will be

8 at tab 17.

9   A.    Yes, sir.

10   Q.    You've seen this letter before, right?

11   A.    I believe you showed it to me, sir, recently.

12   Q.    Okay.  But is it fair to say you, yourself, saw this

13 letter before the deposition either on January 23, 2013, or

14 in the days immediately following that date?

15   A.    Maybe, yes.

16   Q.    Likely, even?

17   A.    Likely.

18   Q.    And you read this letter at that time?

19   A.    If it was presented to me, I read it, sir.

20   Q.    And this -- going back to the February 4 meeting --

21   A.    Uh-huh.

22   Q.    -- the February 4, 2013, meeting is the first time

23 that the School Board discussed amending the school club

24 policy, right?

25   A.    To my knowledge, yes.

Q.   And at the beginning of that meeting, you said that
this is one of the most challenging and important issues to
come before the School Board in a long time, right?

A.   Yes, sir.

Q.   And that discussion was on the agenda because of that
January 23, 2013, letter, right?

A.   That discussion was on the agenda along with other
items of report that needed to be looked at as far as other
policies, sir.

Q.   So you're saying that --

A.   It is a normal rule for the Board to have policies
before it that they are going to review.

Q.   Uh-huh.

A.   But it was on there, yes, sir.

Q.   And specifically because of this letter, you don't --
because of the January 23 letter?

A.   Specifically because it had come to my attention that
we had schools that were not uniform in the clubs that they
were offering on campuses.  And if I remember correctly,
Mr. Tilley, I used the one about the stacking cups.

Q.   You didn't like the cup stacking club, right?

A.   I -- it would not have been my favorite.

          THE COURT REPORTER:  Stacking cups?

          THE WITNESS:  Yes, sir.  See how odd it is?
Stacking cups.

BY MR. TILLEY:

Q.    But when you were saying this is one of the most

challenging and important issues to come before the

School Board --

A.    It is.

Q.    -- you were talking about the GSA, right?

A.    The club issue.  The club issue and the uniformity of

clubs throughout the county, including GSA.

Q.    So you thought the cup stacking club -- that was one

of the most important and challenging issues to come before

the --

A.    The whole issue was important.

Q.    Okay.

A.    The club issue was important.

Q.    And so you think it had come up before, the issue of

disparities in different clubs at different campuses?

A.    It certainly had in conversation with the

superintendent.  And if I also recall, I had stated that

prior, too.

Whether it was in a public open meeting or with the

superintendent and our counsel -- I really believe it was

with the superintendent and counsel.

Q.    And in that February 4, 2013, meeting --

A.    Uh-huh.

Q.    -- you said at one point, "There will be ample

1 opportunity for everyone to receive the encouragement they

2 need, but to socially engineer, that's not my business,"

3 right?

4 A.    Yes, sir.

5 Q.    Now looking after that meeting, the Board had several

6 meetings in the spring of 2013 discussing club policy,

7 right?

8 A.    That is accurate.

9 Q.    And at those meetings members of the public had the

10 opportunity to speak, right?

11 A.    Yes, sir.

12 Q.    And many spoke about the GSA?

13 A.    Many spoke about their own life experiences.

14 Q.    In support of the GSA?

15 A.    Let me -- let me answer this in my way.

16 Q.    Please do.

17 A.    The individuals that came before the Board were very

18 sincere in their presentations, and it included a myriad of

19 things.  There were issues of bullying.  There were issues

20 of molestation.  And there were issues of the need to

21 express themselves.

22       I would say that 80 percent of those that came before

23 the Board were adult.

24 Q.    And many of them spoke in support of the GSA, right?

25 A.    Yes.

1   Q.    And during this time, talking about the spring 2013

2   meetings, the Carver GSA was not an officially recognized

3   club at Carver Middle School, right?

4   A.    To my knowledge, that's correct.

5   Q.    In other words, the club's application was still

6   pending during the months of February, March, April 2013

7   while the School Board was discussing potentially amending

8   the club policy, right?

9   A.    I believe so.

10  Q.    Over the summer of 2013 the School Board enacted a

11  new student club policy for middle schools, right?

12  A.    I believe that's correct.

13  Q.    And for all -- for elementary, middle and high

14  schools, right?

15  A.    Three separate, yes.

16  Q.    Will you take a look at Plaintiffs' Exhibit 1 at the

17  very beginning of that booklet, tab 1.  That's policy

18  4.502, right?

19  A.    Yes, sir.  That's what it's entitled.

20  Q.    And that's the Lake County schools' policy regarding

21  student clubs in the county's middle schools?

22  A.    Yes, sir.

23  Q.    That's the policy you voted to approve in

24  August 2013?

25  A.    The August 18 meeting I was actually absent from.

1    Prior to that I did speak to this, yes.

2    Q.    And you voted to provide initial approval for it,

3    right?

4    A.    Yes, sir.  That is correct.

5    Q.    But were not there for the final approval?

6    A.    Uh-huh.

7    Q.    You're aware that the Carver GSA reapplied in the

8    fall of 2013, right?

9    A.    To my knowledge, yes.

10    Q.    After the enactment of this policy?

11    A.    After that, uh-huh.

12    Q.    Right.

13          And its application was denied, right?

14    A.    Its application was not brought before the Board and

15    denied.  The application was brought before the

16    administration and denied.

17    Q.    And you expected that the club would be disapproved

18    under the new policy, right?

19    A.    The word "expected," absolutely not.  I expected them

20    to present their application and it to be reviewed.

21    Q.    I'd like you to take a look at your deposition.

22    A.    Yes, sir.

23    Q.    It's tab 8 in the book.

24    A.    Uh-huh.

25    Q.    In the other book.  I'm sorry.  The book to your

1   right.

2           If you could turn to page 34, starting at line 3,

3   I'll read.

4           Question:  And under your understanding of the GSA,

5   it does not meet that criteria in paragraph 2 of the

6   policy?

7           Object to the form.

8           Answer:  Sir, I really have answered that before

9   and...

10          Question:  So the answer is yes?

11          Object to the form.

12          Answer:  My answer is yes.

13          Question.  Okay.

14  A.      I'm sorry.  You're on what page?

15  Q.      I'm at page 34.

16  A.      Thirty-four.  Okay.

17  Q.      I'm sorry for not waiting for you.

18          MR. JOHNSON:  Your Honor, I object to this whole

19  line of questioning.

20          THE WITNESS:  Yeah.

21          MR. JOHNSON:  The question that was asked of

22  Mrs. Fischer was whether she expected the GSA club to be

23  denied, and what counsel is reading is not that question

24  and not that answer.

25          THE COURT:  Well, it seemed to me that that was

1 counsel's question.  Maybe you need to start again.  The

2 witness just caught up with you, in any event, Mr. Tilley.

3 　　　　MR. TILLEY:  Yes, sir.  Absolutely.

4 　　　　THE WITNESS:  You're speaking to tab 8?

5 BY MR. TILLEY:

6 Q.　　It's a deposition, right?

7 　　　　MR. TILLEY:  May I approach, Your Honor?

8 　　　　THE WITNESS:  Please do, Mr. Tilley.  I need your

9 help.  Because my 34 is that.

10 　　　　Did you find it?

11 BY MR. TILLEY:

12 Q.　　Now we're in business.

13 A.　　Okay.  Thank you.

14 Q.　　Take a look at this.

15 A.　　Okay.

16 Q.　　So we're looking at page 34.

17 　　　　MR. TILLEY:  Thank you for your patience,

18 Your Honor.

19 BY MR. TILLEY:

20 Q.　　So, Ms. Fischer, I'm looking at page 34, line 10 --

21 or excuse me -- line 3, and I'm going to read again.

22 A.　　Yes.

23 Q.　　Question:  Under your understanding of the GSA, it

24 does not meet that criteria in paragraph 2 of the policy?

25 　　　　Object to the form.

Answer:  Sir, I really have answered that before and...

Question:  So the answer is yes?

Object to the form.

Answer:  My answer is yes.

Question.  Okay.

Answer:  For the fourth or fifth time.

Those are the questions that I asked you, right?

A.     Yes, Mr. Tilley, they are.

Q.     And those are the answers that you gave --

MR. JOHNSON:  Excuse me, Your Honor.  That's not the -- objection.  That is not the question that was asked of Mrs. Fischer that started the reading of the deposition.

THE WITNESS:  Exactly.  That is correct.

THE COURT:  Wait just a minute.

You're saying that counsel did not accurately read the transcript, Mr. Johnson?

THE WITNESS:  No.

MR. JOHNSON:  The question was, Your Honor, as I recall it, did you expect the GSA not to be approved under the new policy.  What he's just read doesn't say that.

THE COURT:  Well, in any event, given the witness' testimony concerning her position, she -- I think her testimony would be admissible under Rule 32, in any event.

You've published the deposition.  I suggest you go

1  on to your next question, Mr. Tilley.

2         MR. TILLEY:  Can I confirm that the witness gave

3  those answers, Your Honor?

4         THE COURT:  I think she answered that she had.

5         MR. TILLEY:  Okay.  Thank you, Your Honor.

6         THE WITNESS:  Judge Hodges, definitely it states

7  here "yes."  I'm not going to deny that.  And you're

8  correct, sir.

9         THE COURT:  Well, then just wait for another

10  question.

11         THE WITNESS:  Okay.  Thank you.

12  BY MR. TILLEY:

13  Q.    Ms. Fischer --

14  A.    Yes, sir.

15  Q.    -- under policy 4.502 -- and if you want to refer

16  back to it, that's going to be back at the other book, tab

17  1 -- the real tab 1.

18  A.    Uh-huh.

19  Q.    Have you got it in front of you?

20  A.    Yes, sir.

21  Q.    Under policy 4.502, the superintendent, or her

22  designee, decides whether to approve a club, right?

23  A.    That is correct.

24  Q.    And her word is the final word, right?

25  A.    Yes, sir.

Q.    And there's no opportunity for review by anyone else, right?

A.    I did not review them.

Q.    Correct.  So it's correct?

A.    Or her designee.  The superintendent or her designee.

Q.    Okay.  Thank you.

A.    Thank you.

        THE COURT:  Mr. Johnson?

        MR. JOHNSON:  Yes.  May it please the Court.

                    CROSS-EXAMINATION

BY MR. JOHNSON:

Q.    Hi, Ms. Fischer.

A.    Hello, Mr. Johnson.  How are you?

Q.    Fine.

        The new policy that you were looking at earlier --

A.    Yes, sir.

Q.    -- today, that is the one that the Board ultimately passed, although you were absent for the final vote?

A.    Yes, sir.

Q.    Okay.  Did you realize when you were -- when you were reviewing this and the one that -- the policy version that was ultimately passed that it required middle school students to get consent forms from their parents before they joined a club in middle school?

A.    Yes, I did.

Q.    And was that something that you were supporting?

A.    Mr. Johnson, the background on that is that I established the Safe Climate Coalition and Safe Schools in Lake County, and I'm greatly concerned that parents know where their children are before and after school.  And yes, I did support it, and I still do.

Q.    Was the issue of the policy being -- supporting -- excuse me -- was the issue of the middle school club policy supporting academics and curriculum an important issue to you in your deliberations?

A.    Most definitely, and you can see that.

Q.    And did you state at one of the meetings that you wanted to have it related to academics, and you did not think it was the School Board's job to socially mentor students?

A.    Yes, sir.

Q.    As part of the policy, Mrs. Fischer, the Board left it up to the superintendent, did it not, to interpret the policy and to apply whether or not a specific club would be admitted?

A.    It definitely states that, yes.

Q.    In the discussions that you testified to that occurred during the Board meetings during the deliberation on the policy, was the issue of the GSA brought up by the number of people that came and spoke in public comment, or

1    was it an issue and topic that the Board was discussing,

2    how to deal with the GSA and the Board policies?

3    A.    I would say that the majority of the discussion was

4    the public and their perceptions.

5    Q.    Mrs. Fischer, have you ever considered that one of

6    the criteria for you voting for the current policy, 4.502,

7    was that it was a method to stop the GSA from being an

8    approved club in middle school in Lake County, Florida?

9    A.    Never.

10    Q.    Did you have any objection to the GSA being approved

11    as a club if it could meet the criteria that the Board

12    passed in August of 2014?

13    A.    None whatsoever.

14    Q.    '13.   Excuse me.

15      MR. JOHNSON:   That's all I have.   Thank you,

16    Ms. Fischer.

17      THE WITNESS:   Thank you.

18      THE COURT:   Anything further?

19      MR. TILLEY:   We have nothing further, Your Honor.

20      THE COURT:   Thank you, Ms. Fischer.

21      THE WITNESS:   Thank you, Your Honor.

22      THE COURT:   You may step down.

23      MR. TILLEY:   Your Honor, we'd like to call

24    Mr. Mathias.

25      THE CLERK:   Raise your right hand, sir.

1          Do you solemnly swear that the testimony you're

2   about to give will be the truth, the whole truth, and

3   nothing but the truth?

4          THE WITNESS:  Yes, ma'am.

5          THE CLERK:  Please have a seat.

6          Please state your full name, and spell your last

7   name for the record.

8          THE WITNESS:  Formal name?  William -- William

9   John Mathias.

10          THE CLERK:  Spell your last name.

11          THE WITNESS:  M-A-T-H-I-A-S.

12                  WILLIAM JOHN MATHIAS,

13   being duly sworn, testified as follows:

14                  DIRECT EXAMINATION

15   BY MR. TILLEY:

16   Q.    Good afternoon.

17   A.    How are you doing?

18   Q.    I'm great.  How are you?

19   A.    Great.  Thanks.

20   Q.    Good.

21          You might remember me.  My name is Daniel Tilley.  I

22   represent the plaintiffs in this lawsuit.

23   A.    Yes, sir.

24   Q.    And you're a member of the Lake County School Board,

25   right?

1   A.    Yes, sir.

2   Q.    And you've been serving since November 2012, right?

3   A.    That's correct.

4   Q.    And you know that today when I say "GSA," I mean

5   Gay-Straight Alliance, correct?

6   A.    Yes, sir.

7   Q.    And that if I say "Carver GSA," I'm referring to the

8   Carver Middle School Gay-Straight Alliance, right?

9   A.    Okay.  I didn't know that.  I do now.

10   Q.    Okay.  And you know that a GSA is a student club,

11   right?

12   A.    Correct.

13   Q.    And that through this lawsuit the Carver Middle

14   School GSA is seeking recognition as an official student

15   club?

16   A.    Yes, sir.

17   Q.    And under your understanding a GSA is basically a

18   support group, right?

19   A.    Do I understand that?

20   Q.    Is that your understanding, is what I'm asking you?

21   A.    Yeah.  I think you told me that when you made our

22   subpoena, yes.

23   Q.    Do you believe that?  That's your belief, your own

24   personal belief as well, that a GSA --

25   A.    I believe it's a club.  I told you before I don't

1    know all of the intricacies about that club, but yes,

2    that's what I understand they do.

3    Q.    You believe it to be a support group, basically,

4    right?

5    A.    Can be, yes.

6    Q.    It frequently is, right?

7    A.    I don't know that.

8    Q.    Okay.  And club members talk about bullying, is that

9    right, in a GSA?

10   A.    I've never been to a GSA meeting, but that's what I

11   understood they speak about as one issue.

12   Q.    Okay.  And they talk about bullying against all

13   students, not just LGBT students, right?

14   A.    I suppose.

15   Q.    Okay.  Can you take a look at your deposition which

16   is -- it's at tab 13 in the book right in front of you,

17   right there.

18             MR. JOHNSON:  May I ask what that --

19             MR. TILLEY:  I'm sorry?

20             MR. JOHNSON:  What you're asking him to look at.

21             MR. TILLEY:  His deposition.

22             MR. JOHNSON:  Oh.  Okay.

23   BY MR. TILLEY:

24   Q.    I'd like you to take a look --

25             THE COURT:  Mr. Tilley, you need to assist the

1   witness, I think, in sorting those books out.

2           THE WITNESS:  Thank you.

3           MR. TILLEY:  Okay.  Tab 13.

4           THE WITNESS:  All right.  That's me.

5   BY MR. TILLEY:

6   Q.    Yeah.

7   A.    Uh-huh.

8   Q.    I'd like you to take a look at page 7, line 17, and

9   let me know when you're there.

10  A.    I'm there.

11  Q.    Question:  What do you understand the purposes and

12  goals of a Gay-Straight Alliance to be?

13          Answer:  This is just my interpretation?

14          Question:  Yes.

15          Answer:  And it's a group brought together of guys

16  (sic) and bisexuals and transgenders in questioning in

17  Florida and straights and for them to be able to just meet

18  and have understanding of each other.

19          THE COURT:  Slow down, Mr. Tilley.

20          MR. TILLEY:  Should I start over?

21          THE COURT REPORTER:  No.

22  BY MR. TILLEY:

23  Q.    And for them to be able to just meet and have

24  understandings of each other -- of each other's -- sort of

25  a support group, I guess.

1   Question: So you understand it to be a support
2   group?
3   Answer: Yeah. Pretty much. Yeah. It's a club,
4   obviously.
5   Question: Is there anything else you think other
6   than acting as a support group?
7   MR. JOHNSON: Your Honor, excuse me. I'm
8   objecting again on the basis that the question that was
9   asked is not related to what counsel is reading.
10  THE COURT: Well, I think that's for my
11  evaluation, because under Rule 32 as a member of the School
12  Board, I think the deposition testimony of the witness
13  would be independently admissible.
14  MR. JOHNSON: Yes, sir. All right. I just --
15  THE COURT: And if you think there's some
16  confusion that needs to be addressed, you can do so on your
17  examination, Mr. Johnson.
18  MR. JOHNSON: Yes, sir.
19  MR. TILLEY: Question -- I'm starting again at
20  8 -- page 8, line 4.
21  BY MR. TILLEY:
22  Q.   Is there anything else you think other than acting as
23  a support group that -- any other roles that it serves?
24  Answer: No. I think that they are -- what I have
25  followed that they tend to be activists.

1      THE COURT REPORTER:  Say that again.  When they
2  follow -- slow down.
3      MR. TILLEY:  I'm sorry.
4      THE COURT REPORTER:  Start over.
5      MR. TILLEY:  Is there anything else you think
6  other than acting as a support group that -- any other
7  roles that it serves?
8      Answer:  No.  I think that they are -- what I have
9  followed that they tend to be activists, and one of their
10  main focuses, again, with understanding is that they speak
11  a lot about bullying of those folks.
12      Question:  When you say, Those folks, you mean
13  LGBT folks?
14      Answer:  Sort of both.  All students.
15      Those are the questions I asked you, right?
16      THE WITNESS:  Uh-huh.
17  BY MR. TILLEY:
18  Q.    And those are the answers that you gave?
19  A.    Yeah.
20  Q.    And is it your understanding that for reasons -- to
21  combat bullying, that's why students at Carver Middle
22  School wanted to form a GSA, right?
23  A.    Yes.  That's correct.
24  Q.    Could you take a look in that other notebook at
25  Plaintiffs' Exhibit 17.  It's going to be tab number 17 in

1   that other notebook.

2   A.    I have it.

3   Q.    Okay.  You've seen that letter before, right?

4   A.    Yes.  Uh-huh.

5   Q.    And you stated previously that this letter sped the

6   process for review of the school clubs policy, right?

7   A.    I believe it did, yes.

8   Q.    You said that it accelerated the review of the club

9   policy, right?

10  A.    That was my opinion.

11  Q.    I want to talk for a moment about the School Board

12  meetings in the spring of 2013.  The School Board spoke

13  about amending the clubs policy at the February 4, 2013,

14  meeting, right?

15  A.    Okay.  I'm holding you to those dates, so --

16  Q.    Okay.  Well, let's --

17  A.    I'm sure you're right.  Go ahead.

18  Q.    Let's be -- let's be certain.

19        Could you take a look at Exhibit 7.  That's going to

20  be in that same notebook, tab 7.

21  A.    This here?

22  Q.    Yes, sir.

23  A.    Yes, sir.

24  Q.    Look at page 3, line 47.  Page 3, line 47.

25  A.    Three.  Okay.

1    Q.    So at this meeting the School Board spoke about
2    amending the clubs policy, right?
3    A.    Yes.
4    Q.    And then the School Board --
5    A.    Did you say workshop?  This is the workshop.
6    Q.    Yes.
7    A.    Right.
8    Q.    Thank you.
9    A.    Uh-huh.
10   Q.    And the School Board had several meetings that spring
11   to discuss the club policy, right?
12   A.    Oh, we did.
13   Q.    And a lot of people spoke about the GSA at those
14   meetings, right?
15   A.    A lot of people showed up, yes.
16   Q.    And during the public comment period spoke about the
17   GSA?
18   A.    They did.
19   Q.    And you, yourself, wanted to understand how some of
20   the members of the local community felt about the GSA,
21   right?
22   A.    That is correct.
23   Q.    And you had an informal meeting, a sort of round
24   table with a friend of yours, I believe, who is gay and who
25   had brought some friends, right?

1    A.    He did.

2    Q.    And they, those other individuals, supported the GSA

3    being allowed in Lake County middle schools, right?

4    A.    They did, but they also -- it was more than that.  It

5    was sharing their experience of them coming out.  And so

6    yeah, we spoke about it.  But I also spoke with other

7    groups, too.

8    Q.    But you, yourself, do not support a GSA in

9    Lake County middle schools, right?

10   A.    I do not support it.

11         Can I add something?  But I also don't support any

12   clubs outside of curriculum-based clubs.

13   Q.    And if you'll take a look at Plaintiffs' Exhibit 1 in

14   that same booklet.  It's going to be the first tab.

15   A.    Okay.

16   Q.    That's the Lake County school policy regarding

17   student clubs in the county's middle schools, right?

18   A.    Yes.

19   Q.    And you provided final approval to that policy, or

20   you voted to provide final approval to that policy in

21   August 2013, right?

22   A.    Yes, sir.

23   Q.    And that's the current school clubs policy, right?

24   A.    Yes, sir.

25   Q.    You're aware that the Carver GSA reapplied to meet --

1   well, first, you're aware of the May 2013 lawsuit, correct?

2   A.    Oh, yes, sir.

3   Q.    And then you're aware that in the fall of 2013 the

4   Carver GSA reapplied to -- to form again, correct?

5   A.    Was it 2013 or '14?  Must have been '13.  Yes.  Okay.

6   Q.    And the application was denied, right?

7   A.    Yes.

8   Q.    And you understood when you voted to approve this

9   policy that a lot of clubs that had the opportunity to meet

10  before were not going to be able to meet in the future,

11  right?

12  A.    Yes, sir.

13  Q.    And you understood that the GSA would be one of those

14  clubs that would not be able to meet again, right?

15  A.    Yes.

16  Q.    And under policy 4.502 the superintendent, or her

17  designee, decides whether to approve a club, right?

18  A.    That's correct.

19  Q.    And she has the final word, right?

20  A.    That's correct.

21  Q.    Thank you.

22        MR. JOHNSON:  May it please the Court?

23        THE COURT:  Mr. Johnson.

24                         CROSS-EXAMINATION

25  BY MR. JOHNSON:

1    Q.    Hello, Mr. Mathias.

2    A.    How are you, sir?

3    Q.    Could you tell the Court what you do when you're not

4    acting as a School Board member or testifying in trial?

5    A.    I started my company 33 years ago next month.  We

6    design restaurants and supply food service equipment for

7    restaurants all over the world.

8    Q.    The policy that you have in front of you, 4.502, for

9    middle schools, was there lengthy discussion of any kind

10   between the Board members about ending up with that

11   particular verbiage in that particular policy?

12   A.    Oh, yes, sir.

13   Q.    You were -- you discussed with counsel about the

14   meetings that the School Board had and the people coming in

15   to tell their story.  Did -- was the GSA the center of

16   attention of the School Board and their discussions of the

17   policy?

18   A.    The -- the GSA, from my prospectus (sic), was more

19   ground noise.  The real issue was coming up with a policy,

20   whether it was going to be open or closed, but not

21   club-specific for me.

22   Q.    Okay.  Was there any issue about consistency between

23   the different schools and the principals as to how policy

24   and student club organizations were being applied?

25   A.    Absolutely.

Q.    Is part of that policy -- and I think -- do you have
it up there with you, 4.520?

A.    I still have it, yes, sir.

Q.    Okay.  Are all clubs required to be school sponsored?

A.    Are all clubs required to be school sponsored?

Q.    Under the -- do you have it up there?

A.    Are you talking about -- we're talking about middle
school, now, right?

Q.    Yes, sir.

      4.502.

A.    The clubs --

Q.    Look at paragraph 2, the second sentence.

A.    Yeah, that's what I thought you meant.  Yes.

Q.    Okay.  Are all of them required to be based somehow
on academics?

A.    100 percent.

Q.    Okay.  And did you favor that approach?

A.    Yes, sir.

Q.    Why is that?

A.    I strongly believe that the foundation of our young
people is -- it should be academics; that the notion that
we get off on these clubs -- I was actually set back about
it.

      That 11, 12, 13-year-olds should be focused on
academics where there -- if we're going to have to make a

1  concession about clubs at all, they should be based on

2  something to do with their curriculum.

3  Q.     Okay.  And do you understand now that under this

4  paragraph 2 there are actually seven potential areas where

5  a club could qualify to be approved in Lake County?

6              MR. TILLEY:  Your Honor --

7              THE WITNESS:  I do.

8              MR. TILLEY:  -- I object to the relevance.  I'm

9  not sure the interpretation of the Board members in terms

10  of what the policy is is relevant.

11              THE COURT:  Well, given his direct examination

12  I'll overrule that objection.

13  BY MR. JOHNSON:

14  Q.     Did you understand that this created essentially

15  seven different areas where there could be potential

16  approval of a club in Lake County in middle school?

17  A.     Yes, I understood that.

18  Q.     And was your concern that there be a number of clubs

19  and you have different groups available, or was your

20  concern that there -- these clubs be related somehow to

21  academics and schoolwork?

22  A.     It is my understanding they would be related to

23  academics and schoolwork.

24  Q.     Did you also at the same time pass a high school

25  policy?

1    A.    We did.

2    Q.    And is the high school policy closed or open?

3    A.    It is open.

4    Q.    Does the high school policy have a requirement for

5    parental approval?

6    A.    No.  That actually came from the group meetings that

7    I had, that when one comes out in high school, it is

8    normally their parents or family members that have the

9    issue.  So it was important for me to advocate that that

10   not be a requirement of the policy.

11   Q.    Okay.  Did the age and maturity of the students in

12   high school make any difference in your mind in your

13   decision to have these additional requirements in middle

14   school that you weren't making as a part of the policy in

15   high school?

16   A.    It absolutely influenced that.

17   Q.    How so?

18   A.    Well, again, we have 11, 12, 13-year-olds for middle

19   school that should be focused on academics.  As one enters

20   high school, there is another level of critical thinking.

21   It -- they are more mature.  They are able to make better

22   judgments.

23   Q.    Okay.  Did you leave the final decision up to the

24   superintendent on whether any particular application met

25   the policy requirements?

A.    I actually supported that.  I think our
superintendent should be the one making the decision.

Q.    You said earlier you did not support the GSA in
middle schools.  Did that -- was that a decision based on
the information that you acquired about them after you
started discussing the policy issues, or was it because you
did not feel that they were academic based?

A.    I didn't support the GSA -- and I really hate we keep
coming back to that specific club -- I did not support any
club that was -- did not have a curriculum component to it.

Q.    When you attempted to get up to speed on the club
issue and what was needed to go forward with the club, what
kinds of things did you do, Mr. Mathias?

A.    You mean as far as meetings?

Q.    As far as obtaining information.  I mean, did you get
information off the Internet or from friends or from --

A.    I had -- I looked at the Internet.  I reached out,
and Jay Scott Barry organized a group for me to be able to
meet with when it came to the gay issues.

      I had the Kiwanis Club at my home.  I met with the
Rotarians, those stakeholders that had clubs that would be
affected.

      I met with the FCA, Fellowship of Christian Athletes,
at my office so that they all understood where ultimately I
would -- first gathered information, but I also reached

1   back out and shared what my decision was going to be.

2   Q.      And some of the people that were providing

3   information for you at the meetings, were there any

4   repetition of the same individuals at different meetings

5   that were had on the clubs coming to speak that you recall?

6   A.      You mean at the workshops when --

7   Q.      The workshops and the regular meetings that we had.

8   A.      Yes, sir.  There was -- there was a -- particularly

9   when it suddenly became this Gay-Straight Alliance issue,

10  then there was an organized approach to the Board with

11  their same color shirts and that kind of thing.

12  Q.      Do you recall during the discussions with the Board

13  that those discussions were that it was a Gay-Straight

14  Alliance thing with the passage of the new club policy?

15  A.      Did I understand they would be impacted?

16  Q.      Did you understand that that was an issue for the

17  Board whether the Gay-Straight Alliance would or would not

18  be allowed under any particular version of the policy?

19  A.      Not the Gay-Straight.  We were affecting a number of

20  clubs.

21  Q.      There were other clubs that would be directly

22  impacted by the operation of the new policy, was your --

23  A.      Absolutely.  That's correct.

24  Q.      Did at any point you take the position that you were

25  going to approve or revise any School Board policy in order

1  to be able to keep any group from being an approved club at

2  the middle school as long as they were related to one of

3  the seven criteria listed in paragraph 2 of the policy?

4  A.    If they met the criteria, they would be allowed.

5  Q.    Did you participate in the initiation of any change

6  in the language in the statutes prior to April 2013 that

7  secondary schools include grades six through 12?

8  A.    Yes, I did.

9  Q.    What did you do?

10  A.    Ultimately -- and you were the one that shared with

11  us the reason for this whole threatened lawsuit at that

12  time -- was that sixth through twelfth graders were

13  considered secondary school.

14        For a new School Board member that was just moronic

15  to me and that it was in the statute.  So I did reach out

16  to our legislators that -- they apparently agreed because

17  very quickly the designation of that six through 12 was

18  taken out and that that which is understood, which is high

19  school as secondary, was left in.  The -- that change took

20  effect July 2014, I think.

21  Q.    Could it have been July 2013?

22  A.    Could have been, yes, sir.

23  Q.    Thank you, Mr. Mathias.

24        MR. JOHNSON:  No more questions, Your Honor.

25        THE COURT:  Any redirect, Counsel?

1    MR. TILLEY:  Yes, Your Honor.
2                    REDIRECT EXAMINATION
3    BY MR. TILLEY:
4    Q.    Mr. Mathias, if a discussion of amending the school
5    club policy or the need to amend it took place, you would
6    expect that that would be reflected in Board minutes,
7    correct?
8    A.    Yes, sir.
9    Q.    And that if it didn't appear in Board minutes, then a
10   substantial discussion about amending club policy did not
11   take place, correct?
12   A.    I would say that's accurate.
13   Q.    Thank you.
14             MR. JOHNSON:  No further questions, Your Honor.
15             THE COURT:  Thank you, Mr. Mathias.  You may step
16   down, sir.
17             THE WITNESS:  Thank you.
18             THE COURT:  Let's take an afternoon break of
19   15 minutes, Counsel.
20             (A recess was taken.)
21             THE COURT:  Thank you.  Be seated, everyone.
22             Next witness, Counsel.
23             MR. TILLEY:  Your Honor, we'd like to call
24   Mr. Howard.
25             THE CLERK:  Raise your right hand.

1          Do you solemnly swear that the testimony you're

2     about to give will be the truth, the whole truth, and

3     nothing but the truth?

4          THE WITNESS:  I do.

5          THE CLERK:  Please have a seat.

6          Please state your full name, and spell your last

7     name for the record.

8          THE WITNESS:  Todd Andre Howard, H-O-W-A-R-D.

9                    TODD ANDRE HOWARD,

10    being duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12    BY MR. TILLEY:

13    Q.    Good afternoon, Dr. Howard.

14    A.    Good afternoon.

15    Q.    My name is Daniel Tilley.  I represent the plaintiffs

16    in this lawsuit.

17          You're a former member of the Lake County School

18    Board, right?

19    A.    I am.

20    Q.    And how long were you a member of the Board?

21    A.    Four years.

22    Q.    What were the dates, approximately, that you were on

23    the Board?

24    A.    From November of 2010 to November of 2014.

25    Q.    You know that when I say "GSA" today, I mean

1   Gay-Straight Alliance, right?

2   A.   Yes, sir.

3   Q.   And when I say "Carver GSA," I'm referring to the

4   Carver Middle School Gay-Straight Alliance, right?

5   A.   Yes, sir.

6   Q.   You know that a GSA is a student club?

7   A.   Yes, sir.

8   Q.   And you know that through this lawsuit the Carver GSA

9   is seeking recognition as an official student club?

10  A.   Yes, sir.

11  Q.   And as you understand it, a GSA is a club for

12  students to combat bullying, right?

13  A.   Yes, sir.

14  Q.   And that's your understanding of why students wanted

15  to form a GSA at Carver Middle School, right?

16  A.   Yes, sir.

17  Q.   The School Board had a workshop on February 4, 2013,

18  to discuss the potential need to amend the school club

19  policy, right?

20  A.   Yes, sir.

21  Q.   And is it fair to say that you became aware of the

22  Carver GSA in January 2013 within the first two weeks prior

23  to the February 4 workshop?

24  A.   I believe the week before that February workshop, but

25  yes.

Q.    And that was the first time that you recall that amending the school club policy was discussed at a School Board meeting or workshop, right?

A.    Yes, sir.

Q.    And if there was a -- the School Board had several meetings in the spring of 2013 discussing GSAs, right?

A.    Yes, sir.

Q.    And at those meetings numerous members of the public spoke about the GSA?

A.    Yes, sir.

Q.    And you, yourself, did online research about what a GSA is, right?

A.    Yes, sir.

Q.    Do you think a GSA would be a controversial club?

A.    That would be speculation, so I cannot answer that.

Q.    You can't say.

      Could you turn to Exhibit 1, which should be tab 1 of that book.  It may be right in front of you.  And that's policy 4.502, right?

A.    Yes, sir.

Q.    That's the policy you voted to approve in August 2013?

A.    Yes, sir.

Q.    And that's the current middle school student clubs policy, right?

1  A.    It is.

2  Q.    You're aware that the Carver GSA submitted an

3  application in the fall of 2013 to become a student club,

4  right?

5  A.    Yes, sir.

6  Q.    This was in the year after the May 2013 lawsuit,

7  right?

8  A.    Yes, sir.

9  Q.    And that application was denied, right?

10  A.    Yes, sir.

11  Q.    And Lake County schools has a facilities use

12  agreement, right?

13  A.    They do.

14  Q.    Can you turn to the third tab in that book.  That's

15  Plaintiffs' Exhibit 3.

16        And that is the facilities use agreement, right,

17  policy 9.30?

18  A.    Yes.

19  Q.    And it's your understanding that the GSA -- the

20  Carver GSA could meet under the facilities use agreement,

21  right?

22  A.    Yes, sir.

23  Q.    But your understanding is that it could not meet

24  under policy 4.502, right?

25  A.    With their application that they turned in, correct.

1   Q.    I'd like you to go to the other book and look at tab

2   9.  It should be your deposition.

3   A.    Okay.

4   Q.    The page I direct you to is page 36, starting at line

5   number 2.  Are you at that page?

6   A.    Not yet.

7   Q.    Okay.  I'll read, question:  So it's your

8   understanding that the --

9          MR. JOHNSON:  Your Honor, excuse me.  I'm sorry,

10  Mr. Tilley.  Objection.  I know I raised the objection

11  before about this is not impeachment.

12          One additional thing has come to mind.  We were

13  required to, if we were going to introduce any of the

14  parties' depositions, to provide underlining so that we

15  could prepare appropriate objections to the portions that

16  were underlined.

17          We provided that for the plaintiffs.  None were

18  provided to us for direct -- for direct evidence for the

19  plaintiffs.  And, therefore, I think it would only be

20  limited to use of the deposition for impeachment purposes,

21  and that's not what's being done here.

22          THE COURT:  What do you say to that, Mr. Tilley?

23          MR. TILLEY:  Your Honor, I am using it for that

24  purpose.

25          THE COURT:  Well, I won't know that until I hear

1  the question.  I think it's easier just to proceed.

2            Go ahead, and I will evaluate whether it's

3  impeachment or not.

4  BY MR. TILLEY:

5  Q.    I'm looking at page 36 of your deposition.  I'm going

6  to start reading from line 2.

7            Question:  So it's your understanding that they could

8  meet under the facilities use agreement but that they could

9  not meet under 4.502, correct?

10            Object to the form.

11            Answer:  Correct.

12            That was the question I posed to you, right?

13  A.    That is correct.

14  Q.    And that's the answer that you gave?

15  A.    That is correct.

16  Q.    And under policy 4.502, the superintendent, or her

17  designee, decides whether to approve a club, right?

18  A.    They do.

19  Q.    And the superintendent has the final word, right?

20  A.    Based on the application, yes.

21  Q.    And there's no opportunity for review by anyone else,

22  right?

23  A.    That is correct.

24  Q.    Thank you.

25            THE COURT:  Mr. Johnson, do you wish to inquire?

1    MR. JOHNSON:  Yes, Your Honor.  May it please the

2  Court.

3                       CROSS-EXAMINATION

4  BY MR. JOHNSON:

5  Q.    Good afternoon, Dr. Howard.

6  A.    Good afternoon, Mr. Johnson.

7  Q.    The comment that was just read from your deposition

8  about that the GSA could not meet under 4.502, what did you

9  mean by that?

10  A.    They were not able to meet based on their

11  application, that their application didn't meet the

12  requirements.

13  Q.    Didn't meet the requirements of --

14  A.    Of 4. --

15  Q.    -- using critical thinking?

16  A.    Correct, of -- of 4.502.

17  Q.    Okay.  So it wasn't that you didn't make a

18  determination before the superintendent looked at the

19  application for the policy that -- that you would be

20  creating a policy that they wouldn't be able to meet the

21  conditions?

22  A.    No, sir.  The policy stated that it was at the

23  discretion of Dr. Moxley.

24  Q.    What kind of research did you conduct about the GSA

25  when they -- after they first showed up and started

1 speaking at the School Board meetings regarding policy

2 changes?

3 A.    I looked at the GLSEN website, which had some of the

4 curriculum and other information on there.

5       We also did some research on Common Sense Media,

6 which is a research-based organization to help understand

7 what is proper for different age groups from a media

8 standpoint.

9       A lot of other research online just to understand

10 about the GSA, so -- a lot of it was in California.

11 Q.    And did any of the research that you did personally

12 reflect that there was any distinction between children of

13 different ages regarding these issues?

14 A.    On the Common Sense Media side, yes.  It explicitly

15 talked about different age groups and different types of

16 relationships and what was appropriate.

17       And the big change was for the 11, 12 and

18 13-year-olds, and it progressive -- it progressively got

19 more lenient as the student aged.

20 Q.    Okay.  And what was your focus during the discussions

21 of the Board that led to the creation of the policy 4.502?

22 A.    My focus was meeting the letter of the law and

23 ensuring the safety of our students.

24 Q.    Okay.  Did you consider a need for a forward-looking

25 policy as opposed to one that was looking back at whatever

1  issues that existed in the past?

2  A.    And I did make that statement, that the policy needs

3  to be forward-looking, that we can't -- that we need to be

4  able to deal with many of the issues that are going to come

5  before us, and we may not see those in front of us.

6        For many of us the decision had very little to do, if

7  nothing, with the GSA.  You know, my concern was more along

8  the lines of the 55 hate groups that were in Florida and

9  the protections that would come along with the separation

10 of church and state creating problems for our district.

11 Q.    Had there been any issues prior to the threat of a

12 lawsuit in January of 2013 with the clubs or club policy

13 that existed at the time?

14 A.    We know that -- through the community that the club

15 policy was being applied different ways at different

16 schools, and I did have complaints from community members

17 that clubs were being allowed in one school but not being

18 allowed in -- in my district.  And so it became a problem

19 that I was aware of.

20 Q.    Okay.  And when you were deliberating the changes to

21 the School Board policy regarding clubs and organizations,

22 did you end up creating a policy for high schools as well?

23 A.    We created a separate policy for high schools.

24 Q.    Okay.  And was there a distinction between the middle

25 school and the high school policy regarding parental

1  consent?

2  A.      There was a difference regarding parental consent.

3  The high school did not require parental consent whereas

4  the middle school does.

5  Q.      Okay.  Did the high school allow nonschool-sponsored

6  clubs as well as school-sponsored clubs?

7  A.      Yes.  The high school allowed the nonschool-sponsored

8  clubs, and it was much more lenient, you know, to have that

9  broad, open acceptance.

10  Q.      Did the middle -- the middle school only allow

11  school-sponsored clubs?

12  A.      That is correct.

13  Q.      Okay.  Were the issues of school sponsored or not

14  school sponsored and parent permission or not parent

15  permission at the different levels of school an issue of

16  age appropriateness for your decision-making?

17  A.      For my decision-making that was the major

18  consequence, was what children were able to process at a

19  particular age.  And so I did feel that that was the

20  transition time, and that although it didn't need to be as

21  rigorous as the elementary school, it also should not be as

22  open as the high school.

23  Q.      Did the GSA or the statements made by individuals

24  recommending GSA clubs in middle school have any impact on

25  your decision of what type of policy to issue?

A.    Not at all.  The GSA made very little decision-making

beyond listening to the folks who wanted it.

Q.    If -- if the GSA at Carver had resubmitted its

application and provided sufficient information to -- to

indicate that it strengthened and promoted critical

thinking, would you have had any objection to their being

approved as a student club at Carver Middle School?

A.    No, sir.

        MR. TILLEY:  Your Honor, I'd object.  The witness'

interpretation of what the superintendent should do is

irrelevant.

        THE COURT:  Well, again, given his direct

examination, I'm inclined to overrule that objection.  The

answer may stand.

BY MR. JOHNSON:

Q.    And to Mr. Tilley's point, you did delegate final

decision-making authority after the policy was passed as to

whether a particular application met the criteria to the

superintendent?

A.    That is correct.

Q.    You were asked to look at the use of facilities

policy.  Was there any prohibition among a student

organization that wasn't approved as a club being able to

meet at a school?

A.    No.  And I actually worked very hard to relax this so

1    that there was no charge to the students among other more

2    lenient measures to make sure that the clubs could meet

3    there.

4    Q.    Okay.  Were you aware that the particular one that's

5    been admitted is the version that was the -- the revision

6    that would have been right before you left office that

7    actually eliminated any charges to student organizations

8    who were meeting at a club?

9    A.    Yes, and that's what I worked for.

10          MR. JOHNSON:  Nothing further, Your Honor.

11          THE COURT:  Any redirect, Mr. Tilley?

12          MR. TILLEY:  Yes, Your Honor.

13                    REDIRECT EXAMINATION

14   BY MR. TILLEY:

15   Q.    Dr. Howard, you mentioned GLSEN, right?

16   A.    Yes, sir.

17   Q.    That's G-L-S-E-N?

18   A.    Yes, sir.

19   Q.    That's the Gay, Lesbian, Straight Education Network?

20   A.    Yes.

21   Q.    That website that you looked at, it didn't suggest

22   that middle school GSAs were inappropriate, right?

23   A.    No, and it actually had some curriculum that I

24   reviewed and other things.  So I thought it was a very

25   reasonable website.

1    Q.    Right.  So you learned that there are a lot of middle

2    schools around the country that have GSAs, right?

3    A.    I don't know how many there are.

4    Q.    Uh-huh.

5          You mentioned hate groups.  It's your understanding

6    that under the prior policy the principals had to -- the

7    principals had discretion to approve hate groups if they

8    applied?

9    A.    If the group is covered under the separation of

10   church and state along with the Equal Access Act, it would

11   open us into some problems.

12   Q.    I'm talking about what you called "hate groups."

13   A.    And that's what I'm saying, is that if they're

14   cloaked in religious freedom, then it could create a

15   problem for us.  We see that happening in Orange County

16   right now.

17   Q.    I see.  So you're talking about a group that's

18   claiming to be about religious freedom but that's maybe

19   about something else?

20   A.    That is correct.

21   Q.    Okay.  But you never heard of that happening in Lake

22   County schools, right?

23   A.    No, but we were looking for a forward-looking policy.

24   Q.    Sure.

25         If there was a discussion at School Board meetings

1    about amending the school club policy, you'd expect that to

2    be reflected in the School Board minutes, right?

3    A.    Yes.

4    Q.    And so if the minutes didn't state that a discussion

5    took place about school club policies, it's fair to say

6    that a discussion was not had on that school club policy?

7    A.    That is correct.

8    Q.    Do you think that a club trying to combat bullying of

9    LGBT students is age inappropriate?

10   A.    Until you see the material, you don't know what

11   material is going to be presented.

12   Q.    So standing here -- sitting here now, you're not --

13   you would say you don't --

14   A.    I would say that I don't have enough information, I

15   think, that we would have to see the information.

16   Q.    Thank you.

17   A.    Thank you.

18           MR. JOHNSON:  May I briefly, Your Honor?

19           THE COURT:  Very well.

20           MR. JOHNSON:  Your Honor -- and I recognize this

21   second question is going to be outside the scope of the

22   direct, but it's just to avoid bringing Dr. Howard back, if

23   I might.

24           THE COURT:  Go ahead, then, Mr. Johnson.

25                   RECROSS EXAMINATION

1  BY MR. JOHNSON:

2  Q.   Let me go ahead and ask it:  Dr. Howard, were you

3  involved at all with soliciting a change in the

4  Legislature -- from the Legislature for the statute in

5  the -- the Redesign Act which had language in it suggesting

6  that a secondary school were grades six to 12?

7  A.   Yes, I did.

8  Q.   Could you tell us what you did?

9  A.   I made some calls to our legislators following --

10  well, to back up, I did some research and found out that

11  our state laws and the federal designation of secondary

12  schools did not match.

13      And so at that point I went to our legislators and

14  explained to them that this was a problem, that we should

15  mirror -- or try to closely mirror what the federal

16  government has from the census and Department of Education.

17  And so I did lobby some congressmen for that.

18  Q.   Okay.  And this was related to what Mr. Tilley asked

19  you about.  The discussion at meetings about the policy --

20  the only time the Board can meet together and talk about

21  any issues related to the Board with each other are at

22  public meetings in Florida, obviously, correct?

23  A.   That is correct.

24  Q.   Okay.  Are there usually, to your knowledge, during

25  the four years that you were a Board member discussions

1 with staff and Board members or between staff about policy

2 issues that aren't necessarily brought before the Board?

3 A.    Yes.

4          MR. JOHNSON:  Nothing further, Your Honor.

5          THE COURT:  All right.  Thank you, sir.  You may

6 step down.

7          MR. JOHNSON:  Your Honor, may Dr. Howard be

8 excused from the subpoena?

9          MR. STEVENSON:  Yes.

10          MR. JOHNSON:  Thank you.

11          THE COURT:  He's excused.

12          MR. TILLEY:  Your Honor, we'd like to call

13 Ms. Stivender.

14          THE CLERK:  Please raise your right hand.

15          Do you solemnly swear that the testimony you are

16 about to give will be the truth, the whole truth, and

17 nothing but the truth?

18          THE WITNESS:  Yes, ma'am.

19          THE CLERK:  Please have a seat.

20          Please state your full name, and spell your last

21 name for the record.

22          THE WITNESS:  Debra C. Stivender,

23 S-T-I-V-E-N-D-E-R.

24          THE COURT REPORTER:  Debra, D-E-B-R-A?

25          THE WITNESS:  D-E-B-R-A.

1      DEBRA STIVENDER,

2   being duly sworn, testified as follows:

3      DIRECT EXAMINATION

4   BY MR. TILLEY:

5   Q.   Good morning -- or good afternoon.

6   A.   Good afternoon.

7   Q.   Good to see you again.

8   A.   You, too.

9   Q.   My name is Daniel Tilley.

10  A.   Uh-huh.

11  Q.   And I represent the plaintiffs in this lawsuit.

12       You're a member of the Lake County School Board?

13  A.   Yes, sir.

14  Q.   About how long have you been a member of the

15  Lake County School Board?

16  A.   I was elected to the School Board in 2008.

17  Q.   And you know that when I say "GSA," I mean

18  Gay-Straight Alliance, right?

19  A.   Yes, sir.

20  Q.   And then when I say "Carver GSA," I mean the Carver

21  Middle School Gay-Straight Alliance?

22  A.   Yes, sir.

23  Q.   And you know that through this lawsuit the Carver

24  Middle School GSA is seeking recognition as an official

25  student club?

1    A.    Yes, sir.

2    Q.    And you know that a GSA is a student club, right?

3    A.    Yes, sir.

4    Q.    It's a club for students to talk about bullying,

5    right?

6    A.    Bullying and probably other items.  It's a club.

7    Q.    I'd like you to look in that book to your left.

8    A.    I have to take my glasses off.

9    Q.    Okay.  At tab 16.

10   A.    Yes, sir.

11   Q.    If you could look at page 9, reading from line 6.

12         Question:  Okay.  So your understanding at the time

13   was that GSAs were about discussing bullying?

14         Answer:  Witness nodding head.

15   A.    "Nodding head."  I did that a lot.  You got on to me,

16   I remember.

17   Q.    That was the --

18   A.    Yes.

19   Q.    -- question I asked you, right?

20   A.    Yes, sir.

21   Q.    And you nodded your head at that moment, right?

22   A.    Yes, sir.

23   Q.    And the first meeting or workshop where you discussed

24   amending the school club policy was in February 2013,

25   right?

A.     Yes, sir.

Q.     Could you look at Plaintiffs' Exhibit 17, which is in the other book at tab 17.

You've seen this January 23, 2013, letter, right?

A.     Yes, sir.

Q.     And in the normal course you would have received something like this on the day it was sent or in the following days, right?

A.     Not necessarily.  The chairman -- it probably would have gone to the superintendent as is addressed and to Mr. Johnson.  And the chairman at the time would have seen this before any of the rest of us would have.

Q.     But you eventually would have seen it, right?

A.     I don't recall seeing the letter, no, sir.

Q.     Okay.  But in the normal course you would expect that you would receive it, right?

A.     If it's a case they're working on, we don't necessarily see all the documentation while they're working on it.

Q.     Okay.  Could you --

A.     Unless you're the chairman.

Q.     Could you turn to page 15 of your deposition, please, back in the other book.

A.     What page?

Q.     Page 15.

1    I'm going to read from line 5.

2    Question:  Would you expect that upon receiving a

3 letter like that -- and just so we're clear for the record,

4 we're talking about a January 23, 2013, letter.

5    Answer:  Right.

6    Question:  Would you expect that in the normal course

7 you would receive such a letter distributed to the Board

8 members?

9    Object to the form.

10    You can answer.

11    The answer:  Yes.

12 A.    Do you want me to respond to that?  Because the rest

13 of it says the normal procedure is it goes to the chairman.

14 Q.    The normal procedure is whomever the chairman is gets

15 a copy.

16         THE COURT REPORTER:  Wait.  Start over.

17         MR. TILLEY:  I'll continue reading.

18         THE WITNESS:  Okay.

19 BY MR. TILLEY:

20 Q.    After you say yes, you say, The normal procedure is

21 whomever the chairman is gets a copy of this first with the

22 school superintendent.  They decide and put it in our

23 baskets if there's stuff that we need to review.

24         So I wasn't the chairman at the time, so I'm not

25 sure, you know -- I'm sure at some point we may have seen

1   it, but I'm not positive.

2   A.      Yes, sir.  That is correct.

3   Q.      That's the answer you gave, right?

4   A.      Yes, sir.

5   Q.      Okay.  And you suggested in your deposition that it

6   would appear that the January 23 letter is why the school

7   clubs issue was discussed at the February 4, 2013, meeting,

8   right?

9   A.      Yes, sir.

10  Q.      And you had several meetings in the spring of 2013

11  discussing the club policy, right?

12  A.      Yes, sir.

13  Q.      And at those meetings members of the public had the

14  opportunity to speak?

15  A.      Yes, sir.

16  Q.      And many spoke about the GSA, right?

17  A.      About the GSA and other clubs, because we were

18  looking at it to make it consistent for all clubs.

19  Q.      If you could look at tab 1 of the other book.

20          That's policy 4.502, right?

21  A.      Yes, sir.

22  Q.      That's the policy you voted to approve in

23  August 2013?

24  A.      Yes, sir.

25  Q.      And that's the current school clubs policy for middle

1 schools, right?

2 A. Yes, sir.

3 Q. You're aware that the Carver GSA applied in the fall

4 of 2013 to become a student club, right?

5 A. The fall of 2013, yes, sir.

6 Q. So there was a May 2013 lawsuit.

7 A. Right.

8 Q. And then in the fall --

9 A. Yes, sir.

10 Q. -- the club applied again, right?

11 A. Yes, sir.

12 Q. And its application was denied, right?

13 A. Yes, sir.

14 Q. And your understanding is that as a consequence of

15 policy 4.502 being in place, GSAs cannot form in Lake

16 County middle schools, right?

17 A. It had to meet the requirements that were put in for

18 it to have met as a curricular club.

19 Q. So your understanding is that as a consequence of the

20 policy being in place, the GSA can't meet -- can't form in

21 Lake County middle schools, right?

22 A. If they -- I'm not so sure about that because I think

23 if -- if they can show -- any club can show that they are

24 promoting critical thinking, business skills, athletic

25 skills or performing and visual arts, that is something

1  that the superintendent would have the ability to approve.

2  Q.    I'd like you to look at page 22 of your deposition

3  back in the other book.  And just let me know when you're

4  there.

5  A.    I'm there.

6  Q.    Okay.  I'm going to read from line 7 of page 22.

7        Question:  And as a consequence of this policy being

8  in place, the GSA cannot meet in middle schools in Lake

9  County, correct?

10       Object to the form.

11       Answer:  Yes.

12       That was the question I submitted to you, right?

13  A.    Yes, sir.

14  Q.    And that's the answer you gave?

15  A.    Yes, sir.

16  Q.    And under policy 4.502 the superintendent, or her

17  designee, decides whether to approve a club, right?

18  A.    Yes, sir.

19  Q.    And the superintendent has the final word, right?

20  A.    Yes.

21  Q.    And there's no opportunity for review by anyone else,

22  right?

23  A.    No, sir.

24  Q.    Thank you.

25       MR. JOHNSON:  May it please the Court.

1    THE COURT:  Mr. Johnson?

2                    CROSS-EXAMINATION

3    BY MR. JOHNSON:

4    Q.    Hi, Ms. Stivender.

5    A.    Good afternoon, Mr. Johnson.

6    Q.    That part of your deposition that you were just

7    reading about that, as a result of the policy passing, the

8    GSA was not allowed to meet, was that as a result of the

9    policy passing and the superintendent applying the policy

10   to the application?

11   A.    Yes, sir.

12   Q.    You didn't intend that to be -- you weren't looking

13   to pass a policy to keep the GSA from meeting?

14   A.    No, sir.

15           MR. TILLEY:  Your Honor, objection.

16   BY MR. JOHNSON:

17   Q.    Were you passing a policy to keep the GSA from

18   meeting?

19   A.    No, sir.

20   Q.    Was that ever your intent?

21   A.    No, sir.  If you have -- and everybody has probably

22   read them all.  I brought up the fact that when I first

23   came on the Board we had other clubs that we had some

24   situations with and that Florida Christian -- Fellowship of

25   Christian Athletes, and I had -- I had people that had

1  called me when I first was elected to find out why they

2  weren't allowed, and so I had gone through that.

3      I went to staff, Ms. Cole, who was the one who did

4  our policies at the time, met with her and with Dr. Moxley

5  about my concerns so those -- they were already looking at

6  that.

7      My other concern was, nothing was consistent from one

8  school to the other.  It was left up to the principal, and

9  I thought we needed to have a policy that was consistent

10  county-wide.

11  Q.    Did you have high school and middle school principals

12  applying some fairly complicated federal law at different

13  schools in applying the Equal Access Act?

14  A.    Did we have them --

15  Q.    Did you have different principals applying the Equal

16  Access Act?

17  A.    I didn't review it in that --

18  Q.    Okay.

19  A.    -- manner, so I don't know.

20  Q.    Did you see the application for Carver Middle School

21  GSA before the superintendent or Mrs. Cole reviewed it and

22  denied it?

23  A.    No, sir.

24  Q.    To your knowledge, did any Board member see the

25  Carver school middle -- GSA application before the

1  superintendent or Mrs. Cole reviewed it and denied it?

2  A.    Not to my knowledge.

3  Q.    So you weren't aware until after the fact that there

4  was an issue about the application, of the sufficiency of

5  it?

6  A.    Yes, sir.

7  Q.    If the Carver Middle School GSA had submitted a --

8  resubmitted an application which had sufficient information

9  to be able to qualify for one of the seven areas under the

10  new middle school club policy, would you have had any

11  objection to that club being approved?

12  A.    No, sir.

13  Q.    You passed at the same time as the middle school

14  policy a high school policy that encompassed all the high

15  schools in Lake County?

16  A.    Yes, sir.

17  Q.    And was that policy different from the middle school

18  policy?

19  A.    Okay.  Which -- which one are we --

20  Q.    Was the high school policy different from the middle

21  school policy?

22  A.    Yes, sir.

23  Q.    Did the high school policy allow a great number of

24  school-sponsored and nonschool-sponsored clubs to

25  participate?

1  A.    Yes, sir.  But they had to meet -- they had to be
2  curricular in nature.
3  Q.    All right.  Did there have to be parental permission
4  for high school?
5  A.    Yes, sir.  What -- when the original one came
6  through, that was one of the things that I wanted in there,
7  whether it was middle school or high school, that the
8  parent had to sign if their child was going to be in the
9  club.  I wanted parental approval.
10  Q.    That's what you wanted --
11  A.    Yes.
12  Q.    -- but is that what was voted on?
13  A.    No, sir.
14  Q.    Okay.  What was voted on was that high schools do not
15  have to have parental --
16  A.    Correct.
17  Q.    -- permission, right?
18  A.    Correct.
19  Q.    What was your focus in passing the policies,
20  Ms. Stivender?
21  A.    To make it consistent throughout the county in how we
22  addressed clubs at all levels.
23  Q.    Did you ever indicate to anyone that your attempt was
24  to try to stop the Gay-Straight Alliance club from meeting
25  or espousing whatever information they wanted to about

1  dealing with school violence or bullying?

2  A.    No, sir.

3  Q.    To your knowledge, did any other Board member?

4  A.    Not to my knowledge.

5  Q.    Okay.

6         MR. JOHNSON:  I don't have anything further,

7  Your Honor.

8         THE COURT:  Redirect?

9         MR. TILLEY:  Yes, Your Honor.

10                   REDIRECT EXAMINATION

11  BY MR. TILLEY:

12  Q.    If there was a discussion at Board meetings about a

13  need to amend the school club policy, you would expect that

14  to be reflected in the School Board minutes, right?

15  A.    If there had been a prior discussion about it, yes,

16  sir.  But if it had been individual Board members

17  discussing it with staff, it would not have been in.

18  Q.    So it's fair to say that if a discussion was not had

19  on school club policy or a need to amend the school club

20  policy at a School Board meeting, that the discussion did

21  not take place; is that right?

22  A.    If it's not in the minutes, that's correct.

23  Q.    Thanks.

24         MR. JOHNSON:  Nothing further, Your Honor.

25         THE COURT:  All right.  Thank you, Ms. Stivender.

1    You may step down.

2              THE WITNESS:  Thank you, Judge.

3              THE CLERK:  Please raise your right hand.

4              Do you solemnly swear that the testimony you are

5    about to give will be the truth, the whole truth, and

6    nothing but the truth?

7              THE WITNESS:  Yes.

8              THE CLERK:  Please have a seat.

9              Please state your full name, and spell your last

10   name for the record.

11             THE WITNESS:  Rosanne Brandeburg,

12   B-R-A-N-D-E-B-U-R-G.

13                       ROSANNE BRANDEBURG,

14   being duly sworn, testified as follows:

15                       DIRECT EXAMINATION

16   BY MR. TILLEY:

17   Q.    Good afternoon.

18   A.    Good afternoon.

19   Q.    My name is Daniel Tilley, and I represent the

20   plaintiffs in this lawsuit.

21         You're a Lake County School Board member, aren't you?

22   A.    Yes.

23   Q.    And about how long have you been a Lake County School

24   Board member?

25   A.    I was elected in November of 2008.

1    Q.    And you've been a Board member since that time?

2    A.    Yes, I have.

3    Q.    Can you take a look at -- well, let me just say, if I

4    say "GSA," you know that I'm referring to Gay-Straight

5    Alliance, right?

6    A.    Yes.

7    Q.    And if I say "Carver GSA," you know that I'm

8    referring to the Carver Middle School Gay-Straight

9    Alliance, right?

10    A.    Okay.  I do now.

11    Q.    Okay.  And you're aware of an attempt by the Carver

12    GSA to form at Carver Middle School, correct?

13    A.    Correct.

14    Q.    And you're aware that -- of the spring 2013 Board

15    meetings at which the School Board discussed the potential

16    need to amend the student club policy, correct?

17    A.    Correct.  Yes.

18    Q.    I'd like you to turn in your notebook, the one on the

19    bottom, to tab 21, please.

20            MR. JOHNSON:  Did you say 21?

21            MR. TILLEY:  Yes.

22    BY MR. TILLEY:

23    Q.    Can you tell me what this is after you have had a

24    chance to look at it?

25    A.    I had requested a list of all of the clubs that we

1   had at Carver Middle School and in our other schools as

2   well.

3   Q.    This is an email dated March 8 from you to a person

4   named Patty Painter; is that right?

5   A.    Yes.  She is the superintendent's assistant.

6   Q.    And in the email you say, Can you please send me a

7   list of clubs that will be affected if we do not allow the

8   club; is that right?

9   A.    That is correct.  I would like -- I wanted to have a

10  list of all the clubs that were offered at Carver Middle

11  School.

12  Q.    And when you said "the club," you were talking about

13  the GSA?

14  A.    Yes.

15        MR. TILLEY:  Your Honor, I'd like to move this

16  exhibit into evidence, and my recollection from the

17  pretrial statement is that there was no objection to it

18  being admitted.

19        MR. JOHNSON:  No objection, Your Honor.

20        THE COURT:  All right.  It's received.

21        And that's exhibit what, Mr. Tilley?

22        MR. TILLEY:  That's -- I'm sorry.  It's

23  Exhibit 21.

24        THE COURT:  Plaintiffs' 21 is received.

25  BY MR. TILLEY:

Q.    And if you could refer to the next page, that's
Exhibit 22.  Plaintiffs' Exhibit 22.

      And is it accurate to say that's an email from you on
March 13, 2013, to an individual named Joyce?  At least
that's the heading that appears in the T-O line.

A.    I'm sorry.  Can you repeat what you asked me?  I was
reading this.

Q.    Sure.  Absolutely.

      Is it accurate to say that this is an email that you
sent to an individual and that it's dated March 13, 2013?

A.    Yes, I did send that email.

Q.    And at the end of the first full line that you write,
you say, "I do not want to eliminate the important clubs
because of one and the opportunities they provide"; is that
right?

A.    That is correct.

Q.    And when you say the "of one," you're talking about
the GSA, right?

A.    Correct.

      MR. TILLEY:  Your Honor, I'd like to move that
exhibit, Plaintiffs' Exhibit 22, into evidence.  And the
pretrial statement indicates that there was no objection
there.

      MR. JOHNSON:  No objection, Your Honor.

      THE COURT:  It's received.

1          MR. TILLEY:  Thank you.

2          THE COURT:  Any questions, Mr. Johnson?

3          MR. JOHNSON:  Yes, Your Honor.  May it please the

4   Court.

5                    CROSS-EXAMINATION

6   BY MR. JOHNSON:

7   Q.     Good afternoon, Ms. Brandeburg.

8   A.     Good afternoon.

9   Q.     You were on the losing side of the vote, were you

10  not?

11  A.     I was.

12  Q.     So the institution of the club policies in August of

13  2013 was a four-to-one vote with your dissension?

14  A.     Yes.

15  Q.     And at that time there was passed not only the middle

16  school and the elementary school but also a high school

17  club?

18  A.     Yes.

19  Q.     What did you voice as your preference for what you

20  wanted to do with clubs in middle schools and high schools

21  at the time that that vote was taken?

22  A.     At the time that that vote was taken, I wanted to

23  make sure that we were affording the students every

24  opportunity to have clubs in our middle and high schools.

25  Q.     So your vote was for an open forum in both high

**Dennis Miracle, Court Reporter**
Affiliated with Joy Hayes Court Reporting
(352) 726-4451 * Inverness, Florida

1  schools and middle schools?

2  A.    Yes, it was.

3  Q.    So your vote would have allowed the GSA and all other

4  clubs, be it noncurricular or curricular at middle school,

5  to be approved clubs at the middle school level?

6  A.    Yes.

7        MR. JOHNSON:  No further questions, Your Honor.

8        THE COURT:  Anything further of the witness?

9        MR. TILLEY:  No, Your Honor.

10       THE COURT:  Thank you, Ms. Brandeburg.  You may

11  step down.

12       THE WITNESS:  Thank you, sir.

13       MR. JOHNSON:  Once again, Your Honor, may

14  Ms. Brandeburg be excused from subpoena?

15       MR. STEVENSON:  Yes, Your Honor.

16       THE COURT:  She's excused.

17       MR. TILLEY:  Your Honor, we have no further

18  witnesses.

19       Your Honor, we have no further witnesses.

20       THE COURT:  Plaintiff rests?

21       MR. STEVENSON:  Plaintiffs rest.

22       THE COURT:  The plaintiffs have rested.

23       Who speaks for the defense?  Mr. Johnson?

24       MR. JOHNSON:  I do, Your Honor.

25       Your Honor, we'd like to move for a Rule 56

1    motion.

2          52(c). Excuse me.

3          THE CLERK: Come to the podium, please.

4          MR. JOHNSON: Oh. I'm sorry.

5          Yes, Your Honor. Defendants would like to move

6    for a Rule 52(c) motion. If it's acceptable to the Court,

7    I would present the argument for the Equal Access Act, and

8    Ms. McCulloch would present the argument for the

9    application of the rule to the constitutional violation.

10         THE COURT: Well, let me suggest, Mr. Johnson, at

11    this point, particularly in a non-jury configuration, that

12    we proceed and get in all the evidence that either side

13    wishes to offer.

14         The record will reflect that you have made your

15    motion.

16         MR. JOHNSON: Yes, sir.

17         THE COURT: And at the moment I will overrule it

18    subject to being reasserted at the conclusion of all the

19    evidence.

20         MR. JOHNSON: Yes, Your Honor.

21         Your Honor, then we have -- in addition to our

22    calling Dr. Moxley as a witness, we have three witnesses in

23    addition to her to call and then -- and none of them, I

24    believe, are going to be lengthy witnesses.

25         MS. McCULLOCH: No, sir, but they have been

1    subpoenaed for tomorrow.

2          MR. JOHNSON:  We would ask to have an opportunity

3    to come back tomorrow morning and present our case in

4    chief.

5          THE COURT:  Well, can we get started with

6    Dr. Moxley this afternoon?  She's here.

7          MR. JOHNSON:  My preference would be not to,

8    Your Honor, but we'll do what you want us to do.

9          THE COURT:  Well, all right.  You're confident

10    that we can finish before noon tomorrow?

11          MR. JOHNSON:  Yes, sir.

12          THE COURT:  All right.  Well, I think we've made

13    good progress.  It's after four o'clock, so we'll recess

14    until nine o'clock tomorrow morning and finish up then.

15          MR. JOHNSON:  Thank you, Your Honor.

16          (Thereupon, the proceedings in this case for this

17    date were concluded at this time.)

18                C E R T I F I C A T E

19    I hereby certify that the foregoing is an accurate

20    transcription of the proceedings in the above-entitled

21    matter.

22

23    S/Dennis Miracle             March 8, 2015

24    _____      _____

25      Dennis Miracle               Date

1                       I N D E X

2   Witness:                                    Page No.

3   BAYLI SILBERSTEIN

4       Direct by Mr. Tilley                       24
        Cross by Ms. McCulloch                     35
5       Redirect by Mr. Tilley                     41

6   HANNAH FAUGHNAN

7       Direct by Mr. Stevenson                    43
        Cross by Ms. McCulloch                     55
8       Redirect by Mr. Stevenson                  68

9   SUSAN MOXLEY

10      Direct by Mr. Stevenson                    73

11  AURELIA COLE

12      Direct by Mr. Stevenson                    122
        Cross by Mr. Johnson                       129
13      Redirect by Mr. Stevenson                  133
        Recross by Mr. Johnson                     134
14

15  MOLLIE CUNNINGHAM

16      Direct by Mr. Tilley                       136
        Cross by Ms. McCulloch                     147
17      Redirect by Mr. Tilley                     168

18  KYLEEN JANE FISCHER

19      Direct by Mr. Tilley                       176
        Cross by Mr. Johnson                       188
20

    WILLIAM JOHN MATHIAS
21
        Direct by Mr. Tilley                       191
22      Cross by Mr. Johnson                       200
        Redirect by Mr. Tilley                     208
23

24

25

**Dennis Miracle, Court Reporter**
Affiliated with Joy Hayes Court Reporting
(352) 726-4451 * Inverness, Florida

TODD ANDRE HOWARD

    Direct by Mr. Tilley    209
    Cross by Mr. Johnson    215
    Redirect by Mr. Tilley    220
    Recross by Mr. Johnson    222

DEBRA STIVENDER

    Direct by Mr. Tilley    225
    Cross by Mr. Johnson    232
    Redirect by Mr. Tilley    236

ROSANNE BRANDEBURG

    Direct by Mr. Tilley    237
    Cross by Mr. Johnson    241

Exhibit:    Page No.

Plaintiffs' Exhibits 1 through 5, 7 through 14, 24 to 25, and
30    20
Plaintiffs' Exhibit 28    21
Plaintiffs' Exhibit 17    30
Plaintiffs' Exhibit 43    107
Plaintiffs' Exhibit 44    108
Defendant's Exhibit 43    134
Plaintiffs' Exhibit 21    239
Plaintiffs' Exhibit 22    240

* * * * * * *