UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CARVER MIDDLE SCHOOL GAY-
STRAIGHT ALLIANCE, an unincorporated
association, and H. F., a minor
by and through parent Janine Faughnan,

                    Plaintiffs,

-vs-                                              Case No.  5:13-cv-623-Oc-10PRL

SCHOOL BOARD OF LAKE COUNTY,
FLORIDA,

                    Defendant.

_____/

**MEMORANDUM OPINION
INCLUDING
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case is about an effort by the Gay Straight Alliance (the "GSA") to gain

recognition as a school sponsored club at Carver Middle School in Lake County,

Florida.  When the Lake County School Board (the "School Board") denied the GSA

such recognition, this suit was filed seeking injunctive relief compelling the School

Board to grant the GSA application.[1]

The case has been tried before the Court without a jury, and is ready for a

decision.  There is no dispute that the Court has federal question jurisdiction (Doc. 55,

p. 1; 28 U.S.C. §§ 1331 and 1343(a)(3)).

_____

[1]     The complaint also sought a declaratory judgment and nominal damages.

There are three issues to be determined.  The first is whether the case is justiciable.  If it is, the second issue is whether the GSA is entitled to relief under the Equal Access Act (20 U.S.C. §§ 4071-4074); and the third is whether the GSA is entitled to relief under the First and Fourteenth Amendments.

The Court has decided that the case is, indeed, non-justiciable.  Alternatively, the Court has also decided, if the case is justiciable, that the GSA has failed to establish a right to relief under either the Equal Access Act or the First and Fourteenth Amendments.

**I**

**The Facts**

Carver Middle School is situated in Leesburg, Lake County, Florida, a part of the public school system administered by the School Board of Lake County.  It offers instruction in grades six through eight, and its student body numbers approximately 870 pupils (Doc. 69, p. 166; Doc. 70, p. 82).

The Carver Middle School Gay-Straight Alliance is a club consisting of Carver Middle School students.  According to its charter (Pltf. Exh. 5, p. 2) the stated purposes and goals of the club are:

(1)    to create a safe, supportive environment at school for students to discuss experiences, challenges, and successes of LGBT [lesbian, gay, bisexual and transgender] students and their allies;

(2)    to create and execute strategies to confront and work to end bullying, discrimination, and harassment against all students, including LGBT students; and

2

      (3)    to promote critical thinking by discussing how to address bullying and other issues confronting students at Carver Middle School.

The club's anticipated activities are stated to be (Pltf. Exh. 5, p. 2):

- hold regular meetings
- design and market student-awareness campaigns
  - create educational pamphlets, fliers, posters, and/or artistic displays related to bullying and other issues facing students – including LGBT students – at Carver Middle School
  - educate students about civil rights
- engage in after-school or weekend volunteer work in the local community

In order to become a school sponsored club at Carver Middle School, or any other school in Lake County, a club must submit an application each year (Doc. 70, p. 98) and be accepted as an approved organization.  The advantages of becoming an approved club are:  announcement of a member's club membership, along with scholastic or athletic achievements, or the like, at the time of grade promotion; the use of the school public address and/or closed circuit television systems to make club announcements at the beginning of the school day; the privilege of putting up posters on school property announcing club events or activities; the inclusion of club photographs in the school yearbook; the services of the school bookkeeper in managing the club's finances; and the use of school classrooms or other facilities outside of class time to conduct meetings or other appropriate activities (Doc. 69, pp. 145-146).  Members of an unapproved club attempting to exercise any of these privileges would be subject to discipline.  (Id.).

Prior to the 2013-2014 school year, the School Board's written policy concerning clubs (Pltf. Exh. 4) was short on specifics with respect to club purposes and was applicable to all schools in the system without differentiation between elementary schools, middle schools, or high schools.  The policy simply enumerated certain common conditions, unrelated to the specific purpose of the organization, that all clubs were required to meet in order to become school sponsored, and the decision to approve or disapprove any club's application was delegated to the principal of each school, individually.  (Id.)

Sometime during the 2011-2012 school year, a group of students at Carver Middle School submitted an application to the then principal of the school seeking recognition of a GSA club, but "he said no . . . that it was against people's religions." (Doc. 69, p. 26).  The evidence supplies no additional information about that episode.

In the Fall of the 2012-2013 school year, some Carver Middle School students again attempted to form a GSA club, and they sought recognition as a school sponsored organization.  The application was submitted to a new principal at the school and, although she had authority to act on the application under the then existing School Board policy (Pltf. Exh. 4), she referred the matter to the "district level" (Doc. 69, p. 140).

During this same period of time – the 2012-2013 school year – the School Board and, in particular, the Superintendent of Lake County Schools, Dr. Susan

Moxley,[2] had been grappling with school club issues presented by several groups seeking recognition other than the GSA, such as the Fellowship of Christian Athletes (which had threatened a lawsuit) and the Kiwanis Club which had also raised questions about the manner in which the existing policy was being applied (Doc. 70, p. 68).  Specifically, both the Superintendent and the School Board were concerned that the existing policy was being inconsistently applied  by individual principals at different schools across the school district.  (Id.; Doc.69, p. 217.)

Accordingly, commencing in late January, 2013, the School Board began planning a series of meetings or "work shops" for the purpose of drafting and then adopting a new policy governing school sponsored clubs in the Lake County schools (Doc. 72-1, p. 515, lines 26-27).  The first such workshop was scheduled for February 4, 2013.  (Id.).  Also, in late January, 2013, the ACLU sent a letter to the School Board's attorney calling attention to the fact that the GSA application for school recognition had been submitted in November, 2012, and that no response had been received (Pltf. Exh. 17).  The letter requested immediate approval of the GSA application and a reply to that effect by February 1, 2013 (Id.).[3]

On May 1, 2013, a separate lawsuit was filed in this Court by a minor plaintiff against the School Board seeking injunctive relief compelling the School Board to

---

[2]     The Superintendent is appointed by the School Board and is the chief operating officer in the school district (Doc. 69, p. 73).

[3]     The evidence does not disclose whether a written response was made by the School Board or, if one was made, what it said.  It is clear, however, that the GSA application was not granted and that the School Board went forward during the Spring of 2013 with a series of "workshops" and Board meetings dealing with a revision of its policy governing school sponsored clubs in all of its schools – elementary schools, middle schools, and high schools.

recognize the GSA as an approved club at Carver Middle School. (Pltf. Exh. 31; B.N.S. v. School Board of Lake County, Florida, et al., Case No. 5:13-cv-205-Oc.)[4] A consent order or decree was then entered the following day (May 2, 2013). (Pltf. Exh. 32). The order required the School Board to grant official recognition to the GSA as an approved student club at Carver Middle School subject to a proviso that the injunction would expire on June 7, 2013, the end of the school year. (Id.)[5] That order was then made final, by agreement of the parties, on May 30, 2013 (Pltf. Exh. 41); and while the case was pending throughout the month of May, 2013, the GSA had three meetings at the school (Doc. 55, p. 24). Multiple school personnel attended the meetings, and there is no evidence that there was any disruptive behavior in or around the meetings or that any inappropriate discussion occurred during the meetings (Doc. 69, pp. 143-44).

On August 12, 2013, after a number of workshops and meetings had been held during the Spring and early Summer, the five member School Board by a vote of 4 to 1 (Doc. 69, p. 241) adopted a new and revised student club policy (Doc. 55, p. 25); or, more specifically, a policy that included three separate sections governing clubs

---

[4]     At trial, the Court carried with the case the Defendant's objection to Plaintiff's Exhibits 31, 32 and 41 relating to this earlier litigation. The objection is now overruled and those exhibits are received in evidence. The 2013 case was assigned to then Chief Judge Anne Conway.

[5]     It is obvious from the temporal proximity of the filing of the complaint and the entry of the consent order the following day, that both of those events must have been the result of a negotiated resolution beforehand.

– one for elementary schools (Def. Exh. 30); one for middle schools (Pltf. Exh.1); and one for high schools (Def. Exh. 28).[6]

The policy regulating high school clubs (Def. Exh. 28) is more detailed and much more permissive than the policies applicable to elementary and middle schools, respectively.  The high school policy spells out separate provisions for recognition of curricular clubs, non-curricular clubs, and interscholastic extra-curricular activities. (Id.)

At least one, and perhaps two, GSA clubs have been approved as school sponsored clubs at the high school level in Lake County (Doc. 70, p. 83).

The policy governing elementary school clubs specifies the list of limitations applicable to all schools (see fn. 6, infra) but otherwise leaves the approval or disapproval of clubs to the discretion of the Superintendent.  The policy says that "[d]ue to the age and maturity level of the students . . . only school sponsored clubs will be allowed . . . [a]nd all student clubs and organizations must be approved by the Superintendent."  (Def. Exh. 30).

The policy governing middle schools, including Carver Middle School, states (Pltf. Exh. 1):

---

[6]     All three policies are essentially the same in specifying what approved clubs must do or refrain from doing: any club must submit a detailed application including its charter stating the club's purposes and the qualifications required for membership; any club must secure the approval of the Superintendent or her designee (not the principal of the school); parental consent for each member's participation in the club is required in the elementary and middle schools, but not the high schools; hazing and "blackballing" of new members, and secret societies, fraternities and sororities are prohibited; each club will be assigned an employee sponsor selected by the principal of the school; dues must be reasonable, not prohibitive; and the club's finances must be accounted for through the school's internal accounting system (Def. Exhs. 28 and 30, and Pltf. Exh. 1).

(2)    Middle School clubs and organizations are an extension of the school curriculum.  Middle School clubs must be sponsored by the school and are limited to organizations that strengthen and promote critical thinking, business skills, athletic skills, and performing/visual arts.  Schools may also establish organizations relating to academic honor societies and student government and clubs that are directly related to the curriculum.[7]

(3)    All student clubs and organizations must be approved by the Superintendent before they can operate at a school.

The GSA argues that the School Board's adoption of the new policy governing Middle Schools was aimed at the GSA for the purpose of excluding it; that the Board members expected that the GSA would not meet the requirements of the policy (Pltf. Exh. 1); and that the GSA application would not be approved (Doc. 72, pp. 10-11). This is an exaggeration that is not supported by the evidence or the credible testimony of the witnesses.  To be sure, it is clear that the application of the GSA submitted in November, 2012, followed by the letter from the ACLU two months later in January, 2013 (Pltf. Exh. 17), created a "sense of urgency" on the part of the Superintendent and the School Board with respect to their perceived need for overall revision of the school club policies (Doc. 70, p. 68).  But it is equally clear, and the Court finds, that the GSA application and the letter from the ACLU were not the only motivating factors in the School Board's decision to revise its policies.  As previously

---

[7]    The term "critical thinking" refers to an academic regimen of problem solving consisting of a structured four step process:  (1) identification of a problem; (2) devising and analyzing potential solutions; (3) creating an action plan utilizing one of those solutions; and (4) analyzing whether the choice of a solution was the most advantageous option.  (Doc. 41-11, pp. 6-7; Doc. 70, pp. 29, 70).  A course in critical thinking was part of the curriculum at Carver Middle School in 2013-2014.  (Doc. 41-11, p. 5).

noted, the Superintendent had been dealing with issues relating to the application of the existing policy to the Fellowship of Christian Athletes as well as Kiwanis and other service clubs, and both the Superintendent and individual members of the School Board had received complaints that the existing policy was being inconsistently applied by individual principals throughout the district.

Moreover, it is simply too much to say that the members of the School Board specifically intended to bar the GSA from the middle schools.  They testified:

- Kyleen Fischer, who is no longer on the Board, credibly testified that the new policy was not intended as a bar of the GSA (Doc. 69, p. 190), and while she did not expect that the GSA would be able to meet the critical thinking component or the curricular extension factor applicable to middle school clubs (Id., p. 185), she had no objection to the GSA being recognized if the Superintendent determined that the club met the conditions of the new policy (Id., pp. 183, 190).

- Board member William Mathias credibly testified that he did not support recognition of any club not tied to the curriculum of the middle schools including not only the GSA but also the Fellowship of Christian Athletes and service clubs such as Kiwanis and Rotarians (Doc. 69, pp. 199-200; 205-206), and that his position opposing the GSA at Carver Middle School was influenced by the age and maturity difference between middle school and high school students (Id., p. 204).

- Board member Todd Howard also credibly testified that the maturity level of middle school students was his major concern in limiting middle school clubs to those whose purposes included strengthening critical thinking or constituted an extension of the curriculum (Doc. 69, p. 218), but he had no objection to recognition of the GSA or any other club if they could meet those requirements (Id., p. 219).

- Debra Stivender credibly testified that she was motivated to revise the school club policy, not to bar the GSA (Doc. 69, p. 232), but because of the need to clarify the policy applicable to middle school clubs in general and to place the decision making authority in the Superintendent rather than the individual school principals (Id., pp. 232-233).  She had no objection to resubmission of the GSA application and its approval by the Superintendent if the application demonstrated compliance with the

conditions of the policy concerning the purposes of the club (Id., pp. 230-231, 234).

- Roseanne Brandeburg credibly testified that she voted against the new policy regarding middle schools because she wanted the same policy for both middle schools and high schools (Doc. 69, pp. 241-242) and she was concerned that the new policy would exclude not only the GSA but other "important clubs" as well (Id., p. 240).

In sum, the Court finds that the GSA application submitted for the 2012-2113 school year was one of the motivating factors that led the school board to revise its policies regarding school approved clubs; but, with the exception of one board member (Mr. Mathias), there was no intent on the part of the remaining majority to altogether bar the GSA from middle schools if it could meet the conditions generally applicable to all clubs:  namely, that the purpose of the club must be to strengthen and promote critical thinking[8] or be related to (or an extension of) the middle school curriculum.[9]

---

[8]    The GSA application focused upon strengthening "critical thinking" as the relevant part of the new middle school policy that the GSA hoped to meet in order to gain approval as a school sponsored club.  The other club purposes mentioned in the policy – strengthening and promoting business skills, athletic skills, and performing/visual arts as well as honor societies, student government and clubs directly related to the curriculum – were not mentioned in the application or the GSA charter.

[9]    This conclusion is also supported by the credible testimony of the Superintendent (discussed *infra*) that she would have approved the GSA application for the 2013-2014 school year if it had spelled out in more detail its stated purpose of fostering critical thinking (Doc. 70, p. 71).  Additionally, the lack of a general animus toward the GSA is suggested by the fact that the Superintendent has approved, under the School Board policy (Def. Exh. 28) the recognition of a GSA club at one, and possibly two, of the high schools in the district. Also, the ability of the GSA, without school sponsorship, to use the facilities of the school for its meetings under the School Board's general policy governing "use of facilities by the public" (Doc. 69, p. 212; Pltf. Exh. 3) is similarly inconsistent with the presence of a hard core GSA animus on the part of the School Board.

10

After the School Board's adoption in August, 2013 of the new policy governing the approval of school sponsored clubs, a seventh grader at Carver Middle School applied in the name of a teacher sponsor, Heather Jablonski, for recognition of the Carver Middle School GSA during the 2013-2014 school year (Pltf. Exh. 5).  The only part of the application that might reasonably be construed as an effort to establish the club as an organization in compliance with the new policy, that is, "organizations that strengthen and promote critical thinking . . . and clubs that are directly related to the curriculum" (Pltf. Exh. 1), was a conclusory statement in the club charter that one of the purposes of the club was "to promote critical thinking by discussing how to address bullying and other issues confronting students at Carver Middle School." (Pltf. Exh. 5).

Ms. Jablonski, the GSA sponsor, had "brainstormed" with another teacher about ways in which the concept of critical thinking and the purposes of the GSA could be developed and explained in some detail, but the student organizer of the club approached her with an application that had already been drafted so Ms. Jablonski  signed it as it was (Doc. 70, p. 27).  The application was then submitted to Aurelia Cole, the District Chief of Administration and second in command under the Superintendent.  Ms. Cole had been delegated the authority by the Superintendent to review and approve or disapprove club applications seeking sponsorship by the school (Doc. 69, pp. 122-124).

Upon review of the application (Pltf. Exh. 5) Ms. Cole found it to be insufficient and, in her handwriting (Doc. 60, p. 125) she made the following notation on the face of the document (Pltf. Exh. 5):

> Club is not an extension of the school curriculum, per policy.
>
> Not Approved.
>
> [sgd] A. Cole

Ms. Cole then returned the application to Mollie Cunningham, the Principal of Carver Middle School (Doc. 69, p. 126) together with an email communication dated December 6, 2013, saying (Def. Exh. 43):

> Mrs. Cunningham:
>
> After reviewing the club application and charter submitted by Ms. Jablonski, the charter does not meet the requirements for middle school clubs/organizations as outlined in Policy 4.502. Please notify Ms. Jablonski of this fact and offer her the opportunity to resubmit an application with a charter that would qualify under current Board Policy. Thank you and continue to enjoy your day!

Ms. Cunningham responded by email the same day simply stating: "It has been taken care of." (Id.).

At the time Ms. Cole disapproved the GSA application she believed that the new policy required that the purpose or goal of any club, in order to be approved, had to be an extension of the curriculum (Doc. 69, p. 127); she did not understand that a club, such as the chess club for example, could be approved if its purpose strengthened and promoted critical thinking (Id.). Later, in a conversation with the Superintendent and the "executive cabinet" (a group of senior staff), she learned of

12

her error (Id., pp. 128, 130; Doc. 70, p. 70).   The Superintendent, Susan Moxley,

testified, (Doc. 70, pp. 70-71):

> Q.    Okay.  Did you have a discussion with Mrs. Cole about critical thinking and what that meant in the educational field:
>
> A.    Yes, I did.
>
> Q.    Okay.  What does "critical thinking" mean from the educational field?
>
> A.    "Critical thinking" is a very multidimensional approach to looking at problem solving, analysis, synthesizing. There's research parts of that.
>
>        You actually are applying and weighing options, and you're applying that to new knowledge or to whatever the new concern is or topic that you're looking at.
>
> Q.    Okay.  And in the GSA application that was provided, did there appear to be even the basic effort at describing how critical thinking was going to be implemented in their stated goal of combating bullying in the schools?
>
>        [objection by counsel that the Court overruled]
>
> A.    No.  The application that was submitted had a basic - - a basic structure of promote critical thinking.  And when I looked at that, I saw just simply those words, those limited words.
>
>        It did not discuss how they were going to be promoting critical thinking in the application.  The charter did not include that either.
>
> Q.    Okay.  Had the GSA included even a basic effort on how to indicate or put into words how they were going to promote critical thinking, as is stated in the application, would you have been inclined to approve the application of GSA for a school-sponsored club at Carver?

> A.    Yes.  If that had been developed and I had some
> semblance that there was going to be critical thinking in that
> particular club, I would have followed suit as I have done on
> other situations.

After her conversation with the Superintendent, Ms. Cole had a conversation

with Ms. Cunningham, the principal at Carver.  She explained her mistake and asked

Ms. Cunningham to again communicate with the GSA sponsor, Ms. Jablonski, and tell

her that "if the club would resubmit an application and expound upon the critical

thinking that they had started, then, you know, there was a possibility that the club

could be approved."  (Doc. 69, p. 132).   That this conversation occurred was

confirmed by Ms. Cunningham, the principal (Id., p. 161), who also testified that she

then met with Ms. Jablonski, and passed the message to her (Id., pp. 161-162).

Significantly, Ms. Jablonski, the GSA sponsor, also confirmed:  (1) that she

understood the concept of critical thinking in the academic sense (Doc. 70, p. 29); (2)

that she knew the application she signed did not describe the components of critical

thinking or how they would be strengthened or promoted by the GSA (Id.); (3) that the

application could have been more specific and detailed in that regard (Id.); (4) that the

way the application was drafted it did not meet the letter of the middle school club

policy (Doc. 70, p. 30); (4) that if the application had been amended and resubmitted

it could have been approved (Id., p. 28); (5) that she never contacted Ms.

Cunningham, Ms. Cole or the Superintendent about reconsideration (Id., p. 31); and

(6) that she knew that resubmission of the application "was one of the options but that

after [the minor plaintiff] spoke with her attorney, it was decided not to."  (Id., p. 38).

14

Thus, no application by the GSA was resubmitted for the school year 2013-2014.  Instead, this suit was filed on December 19, 2013 (Doc. 1).  Neither was any GSA application submitted to the School Board for recognition during the school year 2014-2015.  (Doc. 55, p. 25).

## II

## Conclusions of Law

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies, and there are "three strands of the justiciability doctrine – standing, ripeness, and mootness – that go to the heart" of the constitutional requirement of a live case or controversy.  Christian Coalition of Florida, Inc. v. United States, 662 F.3d 1182, 1189 (11th Cir. 2011) (quoting Harrell v. The Florida Bar, 608 F.3d 1241, 1247 (11th Cir. 2010)) (additional citations omitted).  Here, as the Court concludes below, the GSA claim was not ripe when the suit was brought and has since become moot.  Having so decided, the Court is well aware that justiciability is jurisdictional because if a matter is not ripe for decision, or becomes moot, it ceases to be a case or controversy and the court lacks jurisdiction to proceed.  North Carolina v. Rice, 404 U.S. 244, 246, 92 S. Ct. 402, 404 (1971); National Advertising Co. v. City of Miami, 402 F.3d 1329, 1333 (11th Cir. 2005); Troiano v. Supervisor of Elections in Palm Beach County, Fla., 382 F.3d 1276, 1281-1282 (11th Cir. 2004).  On the other hand, the Court is unaware of any authority prohibiting a district court from making alternative rulings on the merits for consideration by the court of appeals in the event that court decides that the case is justiciable.  And, clearly, that approach comports

with logic and common sense in the interest of judicial economy and reduction in litigation expense for the parties, by enabling the court of appeals to render judgment without remand for further proceedings in the event it should decide that, indeed, the case is justiciable. Cf., Wright v. Farouk Systems, Inc., 701 F. 3d 907, 911 (11th Cir. 2012); Clisby v. Jones, 960 F.2d 925, 935-36 (11th Cir. 1992).  The Court will therefore proceed to dispose of the case in that way.

      A.    Justiciability – Ripeness.

Circuit precedent teaches that in order to be a justiciable case or controversy, a litigated dispute must be ripe for decision.  "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." Harrell v. The Florida Bar, 608 F.3d 1241, 1257-1258 (11th Cir. 2010) (quoting Digital Props., Inc. v. City of Plantation, 121 F.3d 586, 589 (11th Cir. 1997)).[10]  Further:

> To determine whether a claim is ripe, we assess both the fitness of the issues for judicial decision and the hardship to the parties of withholding judicial review. Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1315 (11th Cir. 2000). The fitness prong is typically concerned with questions of "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995). The hardship prong asks about

---

[10]    The doctrine also seeks to prevent the federal courts from encroaching on the powers of the other branches of government. Socialist Workers Party v. Leahy, 145 F.3d 1240, 1244 (11th Cir. 1998). Although it is not implicated in this case, the policy of the courts not to decide political questions is also within the parameters of the judiciability doctrine. E.g., Baker v. Carr, 369 U.S. 186, 82 S. Ct. 691 (1962); Carmichael v. Kellogg, Brown & Root Services, Inc., 572 F.3d 1271 (11th Cir. 2009); McMahon v. Presidential Airways, Inc., 502 F.3d 1331 (11th Cir. 2007).

> the costs to the complaining party of delaying review until
> conditions for deciding the controversy are ideal.  Id.

Harrell, 608 F.3d at 1258 (third emphasis supplied).

In this instance it is hard to imagine a case that would better illustrate a circumstance in which, at the time the suit was filed, resolution of the challenge was not "fit" for adjudication because it depended upon facts that were not sufficiently developed.   Furthermore, the lack of such development was attributable to a deliberate choice made by the GSA to proceed with litigation that might well have been avoided through the simple process of resubmitting an enhanced application. All of the witnesses agreed, including the GSA sponsor herself, that resubmission of the GSA application "was an option" (Doc. 70, p. 38); that the application could have been amended to embellish the description of the ways and means that the club would "strengthen and promote critical thinking" (Pltf. Exh. 1); that if the application had been resubmitted it "could" have been approved (Ms. Jablonski, Doc. 70, p. 28) or  that it "would" have been approved (Dr. Moxley, Doc. 70, p. 71).

Secondly, in addition to the claim's unfitness for adjudication in its present posture, application of the hardship prong of the Harrell postulation of a lack of ripeness also militates toward the conclusion that the case is not ripe.  The costs to the GSA, both in terms of money and the delay in getting a final decision, appear to be minimal.  In fact, there is no indication of any direct financial effect in putting the case off; the complaint seeks an award of nominal damages only (Doc. 1, p. 15). Neither does there appear to be any other special hardship to the GSA over and above the hardship present in any case in which a lack of ripeness delays the

plaintiff's enjoyment of the benefits of victory – assuming revival of the litigation and achievement of ultimate success on the merits of the claim.  Indeed, a finding of a lack of ripeness in this case has the effect of giving the GSA an opportunity to strengthen its right to an adjudication – that is, the presentation of a justiciable claim – as well as an opportunity to strengthen its claim on the merits, and perhaps even a favorable resolution of the case without need of additional litigation.

  B. <u>Justiciability – Mootness</u>.

  Not only was the case not ripe for adjudication when filed, it has since become moot as well.  In addition to not amending and resubmitting an application for approval of its club during the 2013-2014 school year, it is stipulated that the GSA made no application at all for the now concluded 2014-2015 school year (Doc. 55, p. 25).  The net result is that there is nothing to enjoin the School Board to do or not to do.  The last submission of an application to the School Board by the Carver Middle School GSA occurred in early December 2013, over a year and a half ago, for the 2013-2014 school year.  A curious election was made at that time to eschew an amended application in favor of an immediate lawsuit (this case), but there is no explanation at all for not filing an application for the ensuing 2014-2015 school year.[11]  And there was no procedural impediment posed by the pendency of this lawsuit.  An application for recognition could have been filed and a motion made pursuant to the familiar provisions of Federal Rule of Civil Procedure 15(d) concerning supplemental

---

[11] The School Board was left to speculate whether there was and still is a present lack of interest on the part of potential sponsors or potential club members, or both; and, in any event, no injunctive relief can now be granted with respect to years gone by.

pleadings "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The controversy, through that mechanism, could have been kept alive if, indeed, an embellished application had also been rejected by the School Board.

The mootness doctrine, within the larger doctrine of justiciability, has often been explained and applied by the Court of Appeals. One such example is Soliman v. United States, 296 F.3d 1237, 1243-1244 (11th Cir. 2002). The court there explained that the concept of mootness "derives directly from the case or controversy limitation [of the Constitution] because 'an action that is moot cannot be characterized as an active case or controversy.'" Id. at 1242 (quoting Adler v. Duval County Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997)). Further, "'[i]f events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give the plaintiff . . . meaningful relief, then the case is moot and must be dismissed.'" Id. (quoting Al Najjar v. Ashcroft, 273 F.3d 1330, 1336 (11th Cir. 2001)).

There is an exception to the mootness doctrine where the dispute, though moot, is "capable of repetition yet evading review" because the alleged wrong is likely to recur without sufficient time for the plaintiff to obtain a judicial remedy – that is, the issue will become moot again as it did in the case at hand. Precedent teaches, however, that this exception is narrow and applied only in exceptional circumstances. Soliman, 296 F.3d at 1242; Al Najjar, 273 F.3d at 1336. See also Christian Coalition of Florida, 662 F.3d at 1194-1195. The challenged behavior must be too short in duration to be fully litigated prior to cessation or expiration of the wrongful conduct,

and there must be a reasonable expectation that the same complaining party will be subject to the same injury again.  Id.

Whether the GSA will be subject to the same injury again is problematical.  If an amended application is filed for the next school year it may well be granted by the Superintendent.  For present purposes, however, the Court will assume that there is a reasonable expectation that any new application by the GSA for recognition by Carver Middle School will also be denied.  But should that occur there is no persuasive showing that the GSA will not have an opportunity for full judicial review. The Court has previously determined that the GSA as an organization has standing to maintain the action (Doc. 17, pp. 3-7); and, as previously noted, all the organization has to do to keep a new action alive, as need be, from school year to school year, is to file an application each year as required by the standing practice (Doc. 70, p. 98) together with the filing of a simultaneous Fed. R. Civ. P. 15 motion to supplement the pleadings.  Then, even if there should be some unforseen impediment to injunctive relief, the action would still be viable on the claim for a declaratory decree (Doc. 1, p. 14, ¶¶ A and B) with injunctive relief thereafter should the GSA prevail.

In summary, the Court concludes that the case is not justiciable both because the issues presented were not ripe at the time the suit was filed and also because, if it was ripe, it has since become moot.  Dismissal is required.

Alternatively, for the reasons previously explained, if it should be determined that the case was ripe and has not become moot, the Court will decide the two issues

presented by the merits of the controversy – the claim under the Equal Access Act

and the Constitutional claim under the First and Fourteenth Amendments.

C.     The Equal Access Act.

The Equal Access Act, 20 U.S.C. § 4071-4072, provides in pertinent part that:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.
>
> (b) "Limited open forum" defined
>
> A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time.

20 U.S.C. § 4071(a), (b).

> As used in this subchapter–
>
> (1) The term "secondary school" means a public school which provides secondary education as determined by State law.

20 U.S.C. § 4072(1).

The Act was passed by Congress in 1984 as an obvious reaction to several

Court of Appeals and Supreme Court decisions during the previous three years. See

Board of Educ. of Westside Cmty. Sch. v. Mergens, 496 U.S. 226, 110 S. Ct. 2356

(1990).  Two courts of appeals had held that student religious groups could not,

consistent with the Establishment Clause, meet on public school premises during

noninstructional time. Id. at 239, 110 S. Ct. at 2366.  See Lubbock Civil Liberties

Union v. Lubbock Indep. Sch. Dist., 669 F.2d 1038, 1042-1048 (5th Cir. 1982), and

Brandon v. Guilderland Bd. of Educ., 635 F.2d 971 (2d Cir. 1980).  At about the same

time, however, the Supreme Court decided Widmar v. Vincent, 454 U. S. 263, 102 S.

Ct. 269 (1981) holding that, at the university level, when a school creates a "limited

public forum"[12] by making its facilities available to registered student groups, it may

not deny the same privilege to religious groups; and, further, the recognition of such

religious groups under the Free Exercise Clause would not violate the Establishment

Clause.[13]

Finding encouragement in Widmar, Congress enacted the Equal Access Act in

an  obvious  effort  to  create  a  statutory  right  in  secondary  schools  akin  to  the

constitutional principles established by Widmar at the university level.  It did this by

formulating  and  specifically  defining  what  it  called  a  "limited  open  forum"  as

distinguished from the concept of a "limited public forum," a term of art used by the

---

[12]      The term "limited public forum" in the Supreme Court's jurisprudence under the First
Amendment refers to the use of public facilities for expressive activity during a limited time
or for a limited purpose as distinguished from "streets and parks which 'have immemorially
been held in trust for the use of the public, and, time out of mind, have been used for
purposes of assembly . . . .'"  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S.
37, 45, 103 S. Ct. 948, 954-55 (1983) (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S. Ct.
954, 963 (1939)).  See also, Widmar, 454 U.S. at 267 n. 5, 102 S. Ct. at 273 n.5 (concerning
university limited public forums).

[13]      The Court noted that opening university facilities for secular, educational reasons to
a student religious group would not be perceived as conferring an imprimatur of state
approval of any particular religious group and would not violate the Establishment Clause
because:

> University students are, of course, young adults.  They are less
> impressionable than younger students and should be able to
> appreciate that the University's policy is one of neutrality toward
> religion.

454 U.S. at 274 n. 14, 102 S. Ct. at 276 n. 14 (citations omitted).

Supreme Court in its free speech cases.  See Mergens, 496 U.S. at 242, 110 S. Ct. at 2367-68.  Congress also took care to limit the scope of the Act to public "secondary schools" as determined by "State law."

Prior to July 1, 2013, the Florida Secondary School Redesign Act contained a provision stating that "[s]econdary schools are schools that primarily serve students in grades 6 through 12."  Fla. Stat. § 1003.413(1) (repealed effective July 1, 2013, Ch. 2013-27, § 12, 2013 Fla. Laws).  The parties agree that there is no remaining statutory provision in Florida specifically defining "secondary school" or "secondary education;" but there are numerous references in the statutes mentioning secondary schools in a variety of contexts supplying inconsistent inferences concerning the precise meaning of the term.  For example, Fla. Stat. § 386.212(1) prohibits smoking during certain hours within 1,000 feet of an "elementary, middle, or secondary school."  On the other hand, the Florida Partnership for Minority and Underrepresented Student Achievement Act states in Fla. Stat. § 1007.35(2)(b) that it is the "intent of the Legislature to provide assistance to all public secondary schools, with primary focus on low-performing middle and high schools."

There is, nonetheless, one statute that – by its very nature as a definitional provision – carries more weight in the debate on this issue, and that statute, Fla. Stat. § 1003.01, favors the position of the School Board:

> 1003.01 Definitions.
>
> As used in this chapter [entitled Public K-12 Education] the term

(1)   "District school board" means the members who are elected by the voters of a school district created and existing pursuant to s.4, Art. IX of the State Constitution to operate and control public K-12 education within the school district.

(2)   "School" means an organization of students for instructional purposes on an elementary, middle or junior high school, secondary or high school, or other public school level authorized under rules of the State Board of Education.

The structure of subsection (2) of the statute clearly creates three tiers of schools.   Elementary schools constitute one tier. Middle or junior high schools, synonymously, constitute a second tier.   And "secondary" or high schools, synonymously, constitute a third tier.  Furthermore, this structure, and the use of these terms to describe that structure, is consistent with the general (but by no means universal) definition given to secondary schools as meaning high schools.  Secondary education is most often described as that level of schooling coming after those grades in which a general education is provided – reading, writing and arithmetic – with a "secondary" education being preparatory to the college or university level thereafter. For example, Webster's Third New International Dictionary (2002 ed.) defines "secondary school" this way:

[A] school more advanced than an elementary school and offering general, technical, vocational or college-preparatory courses.

Random House Unabridged Dictionary (2d ed. 1997) defines "secondary school" as:

[A] high school or a school of corresponding grade, ranking between a primary school and a college or university.

24

And Princeton University's WordNet online dictionary defines "secondary school" as:

> [A] school for students intermediate between elementary school and college, usually grades 9 to 12.[14]

The GSA argues that "it would be impossible for a state to opt its schools out of the requirements of federal law simply by not defining a term, and this Court should find that Carver Middle School is a secondary school covered by the Equal Access Act." (Doc. 4, p. 9, n. 10). No authority is cited in support of this proposition, and while the stated premise has some initial appeal, it does not withstand closer scrutiny. Although Congress may not have contemplated that there could be instances in which a given state would be placed entirely outside of the operation of the Act because of the lack of state law defining secondary education, it must be conceded that Congress <u>at the least</u> conferred upon the several states the power to "opt out" with respect to a given school grade or grades. A state could, for example, define secondary schools as consisting of grades 10 through 12, while another state might define its secondary schools as consisting of grades 9 through 12. Or, of course, as the GSA would have it here, Florida could treat grades 6 through 12 as secondary schools; but there could well be any number of variations among the states in the way the Equal Access Act applies, or does not apply. In fact, it is conceivable that the Act could have a different application even within a given state from district to district if state law should provide, for example, that "middle schools shall be regarded as secondary schools," but each

---

[14]     Princeton University "About WordNet." WordNet. Princeton University. 2010. <http://wordnet.princeton.edu>.

district had the autonomy to configure its middle schools as consisting of either grades 6 through 8 or grades 7 through 9. In such a case there could be contiguous school districts within the same state in which all of the sixth graders in one district would be covered by the Act while those in the other district would not.

The GSA is thus left in the unenviable position of inviting the Court to fill a legislative void and supply a judicial definition for the term "secondary school" in Florida. No authority is cited for that course of action either, and the Court will decline to do so. Moreover, if the Court thought it had the authority to proceed in that manner, then, relying upon Fla. Stat. § 1003.01, quoted supra, and the generally accepted definitions of "secondary school," the Court would define the term "secondary school" to mean high schools, grades 9 - 12.

Most sixth graders are 12 years of age. All of the educators who testified in this case, including Ms. Jablonski (Doc. 70, pp. 24-25) gave the opinion, consistent with common knowledge and experience, that there is a significant difference between the level of maturity of sixth graders and eighth graders, and between middle schoolers and high schoolers. The Supreme Court has long and consistently recognized that the constitutional rights of minors and adults are not coextensive, Ginsberg v. State of New York, 390 U.S. 629, 637-639, 88 S. Ct. 1274, 1279-80 (1968) and, more particularly, that school authorities may disassociate a school from speech that is "unsuitable for immature audiences." Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 271, 108 S. Ct. 562, 570 (1988). In creating by statute a "limited open forum" in secondary schools below the "limited public forum" existing at the university level

26

under <u>Widmar</u>, it was not the intent of Congress to obliterate age distinctions relative to the exercise of First Amendment rights. Rather, the creation of a limited public forum was restricted to secondary schools as determined by state law; and that clearly evinces a Congressional intent to permit state regulation of expressive activities by school students based upon differences in their levels of maturity.

The Court concludes, therefore, that in repealing former Fla. Stat. § 1003.413(1) in 2013, it was the intent of the Florida legislature – and is the present law of Florida at least for purposes of the federal Equal Access Act – that a "secondary school" means a high school and does not include a middle school. It follows that the GSA claim under the Equal Access Act fails because the Act simply does not apply and the claim will be Dismissed.

> D.   <u>The First and Fourteenth Amendments</u>.

The rejection of the GSA application was necessarily predicated upon the content of the expressive activity or associational rights intended to be exercised by the GSA as stated in its charter. And the same would be true whether the denial of school sponsorship occurred solely because of a perceived disconnect from the school's curriculum or because the School Board held the opinion that the GSA's expressive activity – or the club's association for the purposes of conducting such expressive activity – was not age appropriate for middle school sponsorship.

Nevertheless, a governmental infringement of First Amendment rights is not necessarily a violation of those rights in every setting including, in particular, the management of a limited open forum in public schools.

In Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 89 S. Ct. 733 (1969) the Supreme Court gave voice to the oft quoted pronouncement that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U.S. at 506, 89 S. Ct. at 736. The Court went on to say, however, that "[o]n the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." 393 U. S. at 507, 89 S. Ct. at 737.[15]

As the court of appeals has noted:

> Since Tinker, the Supreme Court has refined the framework for analyzing First Amendment claims in the public school context. As we have explained, "[w]ithin scholastic nonpublic fora, there are four clear categories of expression: vulgar expression, pure student expression, government expression, and school-sponsored expression." Bannon v. Sch. Dist. of Palm Beach County, 387 F.3d 1208, 1213 (11th Cir. 2004).

Heinkel v. School Bd. of Lee County, Florida, 194 F. App'x 604, 609 n. 7 (11th Cir. 2006).[16]

---

[15]   Tinker involved enforcement by school officials of a regulation prohibiting students from wearing black arm bands on school premises in protest of the Viet Nam war. This has come to be known as the pure speech case in which the Court held that the prohibitive regulation was unconstitutional in the absence of evidence of "interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone." 393 U.S. at 508, 89 S. Ct. 737.

[16]   Heinkel involved a prohibition against a middle school student's distribution of pro-life literature to her classmates on school premises. The court applied the pure speech precedent of Tinker, but upheld the prohibition because the record supported the findings of the district court that the school authorities reasonably forecasted substantial disruption of, or material interference with, school activities if the distribution of the pro-life literature was permitted. 194 F. App'x at 609-10. Unpublished opinions are not binding precedent but

In <u>Bannon v. School Dist. of Palm Beach County</u>, 387 F.3d 1208, 1213-1214 (11th Cir. 2004), as noted in <u>Heinkel</u>, <u>supra</u>, the court of appeals further synthesized the Supreme Court's student speech cases this way:

> Vulgar expression is student expression that is lewd, offensive, or indecent and schools may freely curtail it. <u>Bethel Sch. Dist. No. 403 v. Fraser</u>, 478 U.S. 675, 685, 106 S. Ct. 3159, 92 L.Ed.2d 549 (1986). Pure student expression is student expression that merely happens to occur on the school premises, and schools must tolerate such expression unless they can reasonably forecast that the expression will lead to "substantial disruption of or material interference with school activities." <u>Tinker</u>, 393 U.S. at 514, 89 S. Ct. 733. Government expression is expression delivered directly through the government or indirectly through private intermediaries, and the government is free to make subject-matter-based choices. <u>See</u> <u>Rosenberger v. Rector & Visitors of the Univ. of Va.</u>, 515 U.S. 819, 833, 115 S. Ct. 2510, 132 L.Ed.2d 700 (1995). Finally, between the spectrum of pure student expression and government expression is the intermediate category of school-sponsored expression: when "students, parents, and members of the public might reasonably perceive [students' expressive activities] to bear the imprimatur of the school," schools may censor student expression so long as their actions are reasonably related to legitimate pedagogical concerns. [<u>Hazelwood School District v. Kuhlmeier</u>, 484 U. S. 260, 271-273, 108 S. Ct. 562, 570 (1988)].

<u>Hazelwood Sch. Dist. v. Kuhlmeier</u>, 484 U.S. 260, 108 S. Ct. 562 (1988) involved a high school sponsored, student run newspaper. In one of the issues of the paper, there were two articles written by student reporters. One of the articles described student experiences with pregnancy. The other discussed the impact of parental divorce on students at the school. Believing these articles to be inappropriate

---

may be cited as persuasive authority. Fed. R. App. P. 32.1; Eleventh Circuit Rule 36-2.

for publication in the school sponsored newspaper, the principal directed that the articles be removed.[17]   484 U.S. at 262-64, 108 S. Ct. at 565-66.   The student reporters sued, claiming a violation of their First Amendment rights. The Eighth Circuit concluded that Tinker supplied the governing standard with respect to student speech, and that the principal's removal of the articles was not justified by any showing that he could have reasonably anticipated material disruption or disorder in the school resulting from their publication. Id. at 264-66, 108 S. Ct. at 566-67.   The Supreme Court reversed, holding that the Tinker standard involving "pure speech" in the public areas of a school did not apply.   Rather, the newspaper was not a public forum and was sponsored by the school.   As such, its publications were subject to reasonable controls, and the action taken by the principal was reasonable.   Id. at 268-70; 108 S. Ct. at 568-69.

Not surprisingly, the GSA urges in this case that Tinker supplies the rule of decision; and that strict scrutiny is required.   Thus, in the absence of any basis for reasonably forecasting disruption of, or interference with, the educational mission of Carver Middle School by the recognition of the GSA as an approved club, the rejection

---

[17]     The principal was concerned about personal characteristics disclosed in the article that would permit individual identification of the pregnant students resulting in invasion of their privacy; and, with respect to the divorcing parents, the principal was concerned that they had not been given an opportunity to respond consistent with good journalistic practice. With greater relevance to this case, the principal also acted, and the district court held such action to be justified – "to avoid the impression that [the school] endorses the sexual norms of the subjects and to shield younger students from exposure to unsuitable material."   484 U. S. at 264-265, 108 S. Ct. at 566 (quotations omitted).   This is not to suggest that the GSA endorses or does not endorse any sexual "norms," or that it would produce or disseminate "unsuitable" material.   The emphasis here should be upon the concept of shielding younger students from material that may be unsuitable for them because of their immaturity.

of the club because of the content of its speech is a violation of the First and Fourteenth Amendments.

The School Board, by contrast, persuasively argues that <u>Hazelwood School District</u> should govern this case. It points out that there has been no limitation of any kind upon pure speech activity by the GSA or any of its members, and no discipline or penalty of any kind has been imposed upon the GSA or any of its members because of speech or speech related activities. Rather, the only action taken by the School Board has been the withholding of sponsorship by the school because the stated purpose of the GSA was not sufficiently related to the curriculum or, more specifically, to the strengthening and promotion of critical thinking, a pedagogical concern.

The School Board was well within its rights to undertake a complete overhaul of its policies concerning approved or school sponsored clubs, and to draw distinctions based on differences in maturity levels between elementary schools, middle schools, and high schools – distinctions not previously spelled out in its written policies. Moreover, the fact that the GSA application for recognition as an approved club was one of the precipitating factors bringing about the new policies is of no moment where the new middle school policy was one of general application and was "reasonably related to legitimate pedagogical concerns." <u>Hazelwood Sch. Dist.</u>, 484 U.S. 273, 108 S. Ct. 570. Applying the new middle school policy to the GSA therefore, did not, per <u>Hazelwood School District</u>, violate the constitutional rights of the GSA members.

## III.

## <u>Conclusion</u>

The Court has determined that this case is non-justiciable because it was not ripe for decision when it was filed and, in any event, has since become moot.  Further, and alternatively, if the case is justiciable, the GSA claim under the Equal Access Act is without merit because that Act does not apply, and there has been no infringement of the Constitutional rights of the GSA or its members.

The case is DISMISSED WITH PREJUDICE and the Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiffs with costs to be assessed according to law.  The Clerk is further directed to terminate all other pending motions and to close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 19th day of August, 2015.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Mari Jo Taylor